```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,                  :

        -against-                          :          MEMORANDUM OF LAW
                                           :
                                                      19 Cr. 676 (PGG)
ALEXEI SAAB,                               :
                Defendant,                 :
-----------------------------------------------------------x
```

### PRELIMINARY STATEMENT

Defendant Alexei Saab respectfully submits this memorandum of law in support of his motion to suppress all statements obtained or derived because of the unlawful interrogation of Mr. Saab by the Federal Bureau of Investigation (FBI) and New York City Police Department Task Force ("NYPD") on March 14, 2019, March 16, 2019, March 19, 2019, March 21, 2019, March 22, 2019, April 6, 2019, April 19, 2019, April 30, 2019, May 6, 2019, May 31, 2019, June 20, 2019, and July 9, 2020.

Specifically, Mr. Saab moves for the suppression and exclusion of the following:

1. Any and all statements made by Mr. Saab to law enforcement officers/agents on or about the above-mentioned dates, whether oral, written, or illustrated and whether signed or unsigned, as the fruits of the illegal interrogation of Mr. Saab by the FBI and NYPD in violation of his rights under the Fifth Amendment;

2. Any other property, physical items or information – to wit, internet passwords, encryption keys, social media, and email identifications - obtained or seized from Mr. Saab on or about the above-mentioned dates, as the fruit of the illegal interrogation of Mr. Saab in violation of his rights under the Fourth Amendment; and

1

3. All other information or testimony pertaining to or referencing the illegal interrogation of Mr. Saab by the FBI and/or NYPD on or about the above-mentioned dates.

4. For a change of venue based on the prejudice raised by the press coverage of his case.

## FACTUAL BACKGROUND

Mr. Saab is charged in nine Counts of his indictment with the following:

1. Conspiracy to Provide Material Support to Hizballah
2. Provision of Material Support to Hizballah
3. Conspiracy to Receive Military-Type Training from Hizballah
4. Receipt of Military-Type Training from Hizballah
5. Unlawful Procurement of Citizenship or Naturalization to Facilitate an Act of International Terrorism
6. Marriage Fraud Conspiracy
7. Citizenship Application Fraud
8. Naturalization Fraud
9. False Statements

On March 14, 2019, Mr. Saab was in the rear parking lot of his residential address when he was approached by FBI Special Agent Anthony J. Cipriano ("Agent") and NYPD Task Force Officer Frank Miceli ("Officer"). [1] Agent and Officer immediately identified themselves upon stopping Mr. Saab. [2] Mr. Saab was given directions to take his belongings to his apartment and then to come back out.[3] Agent and Officer accompanied Mr. Saab to the entranceway of his

---

[1] *See* Saab Declaration ¶ 6.
[2] *Id.* ¶ 7.
[3] *Id.*

2

apartment building and waited there as Mr. Saab dropped his things off and came back out. Mr. Saab asked if he needed an attorney, to which Agent and Officer responded that he could call whomever he wanted and that he was not under arrest.[4] They then instructed him to follow them across the street to an office building at 62 Elm Street, 3rd Floor, Morristown, NJ 07960, where they proceeded to question him for a couple of hours.[5] Agent and Officer asked Mr. Saab detailed questions about Hizballah, military training, his life in Lebanon, life in the United States, and his international travels.[6] Mr. Saab had no attorney present, and no one read him his Miranda rights on March 14, 2019.[7] On March 14, 2019, Agent and Officer told Mr. Saab that he was not allowed to travel by plane.[8] Agent and Officer gave Mr. Saab a list of restrictions on his movement and monitored actions.[9]

    Mr. Saab met with Agent and Officer eleven more times without counsel and without Miranda warnings to continue to answer questions about his involvement with Hizballah, Lebanon, military training, people he was connected to, and his international travels.[10] For the duration of the twelve interviews with Agent and Officer, Mr. Saab drew diagrams, identified coordinates on google maps, identified photos of other people, and provided his various email addresses, passwords, and social media accounts.[11] By Mr. Saab's twelfth interrogation session without counsel, Agent and Officer finally read Mr. Saab his Miranda warnings, and Mr. Saab signed the FD-395 Advice of Rights form, indicating that he would speak with Agent and Officer

---

[4] *Id.*
[5] *Id.*
[6] *Id.* at ¶ 8.
[7] *Id.*
[8] *See* Saab Declaration at ¶24.
[9] *Id.* at ¶¶25, 26.
[10] *Id.* at ¶¶ 8-25, ¶28.
[11] *Id.* at ¶¶9-10.

3

without an attorney present on July 9, 2019.[12]  After speaking with Agent and Officer for the twelfth time without counsel, Mr. Saab was arrested on July 9, 2019, at 26 Federal Plaza, New York, New York.[13]  The arrest of Mr. Saab has generated 82 press accounts regarding his case.[14]  The focus of the press accounts has been that prominent New York City landmarks were targeted for destruction by a foreign terrorist organization.

## ARGUMENT

### I. THE PRE-MIRANDA STATEMENTS SHOULD BE SUPPRESSED BECAUSE MR. SAAB WAS CUSTODIALLY INTERROGATED BY LAW ENFORCEMENT

The Fifth Amendment of the United States Constitution guarantees that "[n]o person… shall be compelled in any criminal case to be a witness against himself."  To protect this right, the Supreme Court has held that police may not interrogate a suspect who has been taken into custody without first warning the person "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."[15]  Without Miranda warnings, statements obtained during a custodial interrogation are rendered inadmissible against a defendant.[16]

---

[12] *Id* at ¶27.
[13] *Id* at ¶30.
[14] Exhibit A.
[15] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[16] *Id.* at 476.

4

A. <u>Mr. Saab was in custody for the purposes of Miranda because a reasonable person in Mr. Saab's position would not have understood that he or she was free to leave.</u>

After identifying themselves to Mr. Saab, Agent and Officer told Mr. Saab that they wanted to talk to him about Hizballah.[17]  After instructing Mr. Saab to take his belongings into his apartment, they instructed him to follow them across the street to an office building at 62 Elm Street, 3rd Floor, Morristown, NJ 07960.  That office building was across the street from Mr. Saab's home.[18]  At the time that Mr. Saab was instructed to follow Agent and Officer into the office building, a reasonable person in Mr. Saab's position would not have felt free to disobey the instruction or walk away from Agent and Officer.

"The Second Circuit uses a two-step objective test to determine whether a person is in custody: The first step requires consideration of whether a reasonable person in the defendant's position would have understood that he or she was free to leave."[19]  A reasonable person would not feel free to walk away from an FBI agent and an NYPD officer if they were approached steps away from their home with the understanding that the agent and officer are looking to discuss a terrorist group.  The very presence of an FBI agent in combination with the mention of a terrorist organization suggests a level of seriousness in the encounter that a reasonable person would be too intimidated and afraid to walk away from such agent and officer.

"Whether a reasonable person would have believed that he was free to leave is to be determined from the circumstances *as they unfold* before [the suspect]."[20]  "The question of whether someone believes that he is free to leave requires the court to examine the interaction

---

[17] *See* Saab Declaration ¶ 7.
[18] *Id*.
[19] *United States v. McDow*, 206 F. Supp. 3d 829, 845 (S.D.N.Y. 2016), citing *United States v. Newton*, 369 F.3d 659, 670 (2d Cir.2004)
[20] *United States v. Camacho*, 674 F. Supp. 118, 122 (S.D.N.Y. 1987).

5

between the citizen and the police officer as it evolves."[21] Agent and Officer first arrived in the parking lot of Mr. Saab's home, but the interrogation did not happen in Mr. Saab's home. The interrogation took place in an unfamiliar setting for Mr. Saab - an office building across the street from Mr. Saab's home. Mr. Saab went from standing in the familiar parking lot of his building to being isolated with an FBI agent and NYPD officer in an unfamiliar office building within minutes. Agent and Officer took Mr. Saab away from the comfort of his home. The evolution of the interrogation beginning in the parking lot of Mr. Saab's building and continuing in an isolated, unfamiliar office space suggests the seriousness of the encounter and that the atmosphere was not casual or lax. A reasonable person experiencing such evolution of the interrogation would not have felt free to walk out of that office building.

"Additional restraints, directions, questions, or commands can at any time during an interrogation change a suspect's perception of whether he is free to go."[22] In *United States v. Camacho*, "…when the Postal Inspectors first entered the apartment, the circumstances surrounding the initiation of the search did not create the kind of atmosphere in which a reasonable person would believe that he was required to remain."[23] "Camacho had been given no directions, no warnings, and no restrictions had yet been placed on his movements."[24] Then, the interrogation changed. "McDermott directed Camacho into another room, and told him to sit down, remain seated, and make no sudden movements."[25] In our instant case, Agent and Officer started their interrogation in an open parking lot with Mr. Saab. Similarly, to what happened to Mr. Camacho, the interrogation with Mr. Saab changed. Agent and Officer gave Mr. Saab

---

[21] *Id.*
[22] *Id.*
[23] *United States v. Camacho*, 674 F. Supp. 118, 122 (S.D.N.Y. 1987)
[24] *Id.*
[25] *Id.* at 123

6

additional directions to take his belongings to his apartment and then to come back out. Once outside, Mr. Saab was given further, stricter, instructions to follow Agent and Officer into an unfamiliar office building to continue the interrogation. By the time Mr. Saab sat down with Agent and Officer in that office building, the atmosphere and the tone of the interrogation had drastically changed. Agent and Officer began to ask Mr. Saab detailed and serious questions about his involvement with Hizballah.[26] Some of the specific questions asked were about Mr. Saab receiving military training from Hizballah.[27] As the atmosphere and the tone of the interrogation became heavier and more serious, Mr. Saab did not feel free to leave that office building. No reasonable person in Mr. Saab's position would have felt free to leave that office building on May 14, 2019.

"Factors such as strong "requests" given by police officers, ..." scrupulously watching" a suspect as he is doing things he is perfectly entitled to do,…and otherwise conveying a sense of urgency and obligation all contribute to a suspect's reasonable perception that he is not free to leave, even if he is simultaneously informed that, officially, he is not under arrest."[28] Agent and Officer requested that Mr. Saab deposit his belongings in his apartment and return to Agent and Officer. That was a strong request. While Mr. Saab went to drop his belongings in his apartment, Agent and Officer waited by the entrance of the apartment building for Mr. Saab to return.[29] It is our position that they waited at the entrance of the apartment building to scrupulously watch as Mr. Saab entered and exited the building – which he is perfectly entitled to do. They told Mr. Saab that he was not under arrest as he exited the apartment building.[30]

---

[26] *See* Saab Declaration ¶ 8
[27] *Id.* at ¶ 9
[28] *United States v. Camacho*, 674 F. Supp. 118, 122 (S.D.N.Y. 1987), citing *United States v. Ceballos*, 812 F.2d 42, 48 (2d Cir. 1987).
[29] *See* Saab Declaration ¶ 7.
[30] *Id.*

7

However, not only did they wait at the entrance of the building for Mr. Saab to come back out, as soon as he exited the apartment building, they further instructed him to go across the street and into the office building. The fact that Agent and Officer approached Mr. Saab in an open parking lot instructed him to take his belongings into his home and promptly return conveys a sense of urgency and obligation that would contribute to a person's reasonable perception that they are not free to leave. The fact that Agent and Officer took Mr. Saab into an unfamiliar office building, where no one else was present for the interrogation, conveys a sense of urgency and obligation that no reasonable person in Mr. Saab's position would have felt free to leave.

      The remaining ten instances in which Agent and Officer unlawfully interrogated mr. Saab did not start with a meeting in the parking lot, but they did begin with strict instructions, scrupulous accountings of Mr. Saab's whereabouts as he did things that he was perfectly entitled to do, and extensive questioning regarding Mr. Saab's involvement in Hizballah.

    B. <u>Mr. Saab was in custody for the purposes of Miranda because he was also deprived of his freedom of action.</u>

"Actions taken by police officers to restrict a suspect's freedom of movement weigh in favor of finding <u>Miranda</u> custody."[31] "…[D]epriving a person of "freedom of action" is relevant to triggering *Miranda* warnings."[32] Mr. Saab's restricted freedom of movement began on March 14, 2019, when Agent and Officer instructed him to take his belongings into his apartment and come back downstairs. That restricted where he could go and what he could do that day. Mr. Saab's freedom of action became further restricted as Agent and Officer took him into an

---

[31] *United States v. McDow*, 206 F. Supp. 3d 829, 846 (S.D.N.Y. 2016), citing *J.D.B. v. N. Carolina*, 564 U.S. 261, 297, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011).
[32] *Cruz v. Miller*, 255 F.3d 77, 82 (2d Cir. 2001).

8

unfamiliar office building where the only three people in the room during the interrogation were Agent, Officer, and Mr. Saab.  During the interrogation on March 14, 2019, Agent and Officer instructed Mr. Saab with respect to how his movement from that day forth would continue to be restricted.[33]  Consistent with the March 14, 2019 interrogation, for the duration of all the other ten interrogation sessions, Mr. Saab was given the following restrictions on his movement:

a. Mr. Saab was not allowed to travel by plane.[34]

b. Mr. Saab was not allowed to go anywhere or do anything within the United States without telling Agent and Officer.[35]

c. Mr. Saab was required to provide a detailed itinerary of his schedule during his work trips.[36]

d. On fourteen different occasions during the unlawful interrogation sessions, Mr. Saab was required to notify Agent and Officer of everywhere he was going – with full itineraries and updates.[37]

e. On May 14, 2019, Agent and Officer provided Mr. Saab with a black Verizon Motorola Moto E5 Go mobile phone with telephone number was 917-923-8849.[38] The mobile phone was for Agent and Officer to communicate with Mr. Saab and manage his movements.   All communication regarding Mr. Saab's restricted movements were done either on the mobile phone provided to Mr. Saab by Agent and Officer or in person.[39]

---

[33] *See* Saab Declaration ¶24.
[34] *Id.* at ¶24
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *See* Saab Declaration ¶24.
[39] *Id.*

9

For the duration of all eleven unlawful interrogation sessions, Mr. Saab was surveilled and followed by the FBI in Sports Utility Vehicles bearing New York State License Plates, and he could not travel domestically without getting permission from Agent and Officer.[40] The Court in United States v. McDow specifically found that the officers "…exercised control over his [defendant's] movements by blocking his ability to walk away, by searching his person, and by instructing him to unlock the front door to a nearby building and walk inside."[41] As a result, the *McDow* Court ruled that "…McDow was subjected to a "restraint of freedom of movement akin to that associated with a formal arrest.""[42] The finding of restricted movement was befitting and conducive to the circumstantial scale of McDow's alleged crimes. McDow was charged with "…conspiracy to distribute and possess with intent to distribute heroin and cocaine base."[43] The factual allegations underlying McDow's charges appear to be contained within the State of New York with no reference made to illegal international activity. The circumstantial scale of Mr. Saab's alleged crimes is much larger, and his alleged conduct is much broader. The factual allegations underlying Mr. Saab's present charges include illegal activity in multiple countries in the world and more than ten international trips. While Mr. Saab might not have been in handcuffs over the course of the eleven unlawful interrogations, he was in the constructive custody of the United States Government. Mr. Saab was essentially under house arrest by the federal government. Agent and Officer took actions to restrict Mr. Saab's freedom of movement consistent with the circumstantial scale of Mr. Saab's alleged crimes.

---

[40] *Id.* at ¶25.
[41] *United States v. McDow*, 206 F. Supp. 3d 829, 847 (S.D.N.Y. 2016).
[42] *United States v. McDow*, 206 F. Supp. 3d 829, 847 (S.D.N.Y. 2016), citing *United States v. Guzman*, 724 F.Supp.2d at 445 (S.D.N.Y. 2010).
[43] *United States v. McDow*, 206 F. Supp. 3d 829 (S.D.N.Y. 2016)

C.  <u>While Mr. Saab was in the custody of FBI Agent Cipriano and NYPD Officer Miceli, he was unlawfully interrogated.</u>

"An interrogation occurs when a suspect "is subjected to either express questioning or its functional equivalent" and his statements are "the product of words or actions on the part of the police" that "were reasonably likely to elicit an incriminating response.""[44] During each of the eleven interrogation sessions between Mr. Saab and Agent and Officer, Agent and Officer expressly asked Mr. Saab questions about the terrorist organization, Hizballah.[45] Agent and Officer continued to ask detailed questions about Mr. Saab's specific involvement with Hizballah as it related to the allegation of receiving military training from Hizballah.[46] Law enforcement expressly asking a suspect about his involvement with a designated terrorist organization are reasonably likely to elicit an incriminating response.

"Under *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), officers are not required to give *Miranda* warnings for "routine booking question[s] ... reasonably related to the police's administrative concerns" and used "to secure the biographical data necessary to complete booking or pretrial services," so long as the questions are not "designed to elicit incriminating admissions."[47] The questions that Agent and Officer asked Mr. Saab, as described above, were not routine booking questions because they were specific to Mr. Saab's alleged receipt of military training from Hizballah. The questions were so specific at times that Mr. Saab was instructed to draw diagrams of specific devices alleged to have been used in military training with Hizballah.[48] The questions that required Mr. Saab to draw multiple

---

[44] *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017), citing *Rhode Island v. Innis*, 446 U.S. 291, 299, 100 S. Ct. 1682, 1689, 64 L. Ed. 2d 297 (1980).
[45] *See* Saab Declaration ¶¶ 8-25, ¶28.
[46] *Id.*
[47] *United States v. Durand*, 767 F. App'x 83, 87 (2d Cir. 2019), *as amended* (Apr. 16, 2019)
[48] *See* Saab Declaration ¶10.

11

diagrams of alleged explosive devices employed in the alleged military training received from Hizballah were specifically designed to elicit an incriminating admission from Mr. Saab.

## II. THE POST-MIRANDA STATEMENTS SHOULD BE SUPPRESSED BECAUSE THEY WERE TAINTED BY A DELIBERATE TWO-STEP INTERROGATION PROCESS

A. <u>The Government has the burden of disproving deliberateness in a two-step interrogation process.</u>

Two-step interrogation is a strategy employed by law enforcement used to elicit a post-Miranda waiver and confession after the suspect had already confessed before he was given Miranda warnings.[49]  "…[T]he burden rests on the prosecution to disprove deliberateness."[50]

B. <u>The FBI and NYPD deliberately used a two-step interrogation process to interrogate Mr. Saab</u>

"Law enforcement may not circumvent Miranda by engaging in a two-step interrogation process whereby a person is questioned without the proper warnings, made to confess, Mirandized, and then questioned again."[51]  Agent and Officer questioned Mr. Saab eleven times without Miranda warnings, obtained what could be deemed as confessions, Mirandized him, and then questioned him again for the twelfth time.

In order for the Court to conclude that Agent and Officer did not deliberately employ a two-step interrogation process, the Court needs to consider whether "… (1) there was no overlap

---

[49] *United States v. Capers*, 627 F.3d 470, 475 (2d Cir. 2010)
[50] *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010), (quoting *United States v. Ollie*, 442 F.3d 1135, 1142 (8th Cir.2006)).
[51] *United States v. Pritchette*, 219 F. Supp. 3d 379, 383–84 (S.D.N.Y. 2016), citing *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

12

between the suspect's first and second statements; (2) different officers questioned the suspect at different locations, and the second officer was not aware of the suspect's previous inculpatory statement; and (3) 'the post warning questioning was not a continuation of the prewarning question[ing]."[52] As to the first prong of the *Capers'* Court assessment, there was an overlap in Mr. Saab's prewarning and post warning questioning because all prewarning questionings consisted of the same questioning as the post warning questioning.[53] As to the second prong of the *Capers'* Court assessment, all eleven prewarning interrogation sessions and the twelfth post warning interrogation session was conducted by the same two law enforcement officers – Agent Anthony Cipriano and Officer Frank Miceli.[54] Over the course of the twelve interrogation sessions, Mr. Saab was questioned by Agent and Officer either in Morristown, New Jersey, or New York, New York.[55] The interrogations took place in the same locations and by the same two law enforcement officers each time. Although the locations of Mr. Saab's interrogation sessions occasionally differed, "…the inquisitorial environment of the questioning was consistent[56] The Court in *Capers* explains that "[t]he circumstances surrounding the two sessions of the interrogation, including the nature of the respective environs in which the interrogation took place and the continuity of the cast of interrogating officers, was indicative of a deliberate two-step interrogation. While the location of the interrogation sessions changed, the first taking place in a room at the post office and the second in the Domicile, the inquisitorial environment of the questioning was consistent."[57] Finally, the post warning interrogation on

---

[52] *United States v. Capers*, 627 F.3d 470, 478 (2d Cir. 2010) (quoting *United States v. Carter,* 489 F.3d at 536.)
[53] *See* Saab Declaration ¶28.
[54] *Id.* at ¶¶ 8-25, ¶28
[55] *Id.*
[56]." *United States v. Capers*, 627 F.3d 470, 483 (2d Cir. 2010).
[57] Id.

13

July 9, 2019, was not only a continuation of the cumulative prewarning interrogations, but it duplicated all the information previously gathered from Mr. Saab's prewarning interrogations.[58]

Based on the test applied in United States v. Capers, Agent, and Officer employed a deliberate two-step interrogation process when interrogating Mr. Saab. As a result of this deliberate two-step interrogation employed by the FBI and NYPD, Mr. Saab's post-*Miranda* statements are tainted by the pre-*Miranda* statements previously obtained by Agent and Officer. "The use of coercive and improper tactics in obtaining an initial confession may warrant a presumption of compulsion as to a second one, even if the latter was obtained after properly administered Miranda warnings."[59] In each successive interrogation, Agent and Officer would review Mr. Saab's previous statements, and the same was true for the post warning statement given on July 9, 2019.[60] "Reminders of earlier statements, such as explicit reference to such statements, the presence of an earlier written statement within the defendant's view, or the presence of interrogators who conducted the earlier interviews demonstrate to a defendant that she had previously answered in a certain way to certain questions."[61]

The actions of FBI Agent Anthony Cipriano and NYPD Officer Frank Miceli are in direct violation of the rule against a deliberate two-step interrogation technique. Thus, any statements made by Mr. Saab post-Miranda must be suppressed as they were tainted by the pre-Miranda statements.

### III. EVIDENCE OBTAINED AS A RESULT OF THE ILLEGAL INTERROGATION MUST BE SUPPRESSED AS FRUIT OF THE POISONOUS TREE

---

[58] Id.
[59] *United States v. Pritchette*, 219 F. Supp. 3d 379, 386–87 (S.D.N.Y. 2016) (quoting *United States v. Taylor*, 745 F.3d 15, 25 (2d Cir. 2014))
[60] *See* Saab Declaration ¶28.
[61] *United States v. Cohen*, 372 F. Supp. 2d 340, 358 (E.D.N.Y. 2005)

The evidence obtained during and statements made following the illegal interrogation of Mr. Saab should be suppressed as the fruit of the poisonous tree. "As the dissent in ***Patane*** explained, the issue is not whether the nontestimonial nature of the evidence is directly tied to the Self–Incrimination Clause, but whether by admitting the Miranda-offending evidence an incentive is created for police misconduct."[62] Deliberately using the two-step interrogation process is police misconduct. Over the course of the deliberate two-step illegal interrogations of Mr. Saab, Agent and Officer obtained encrypted passwords to Mr. Saab's electronic devices, email addresses, and social media accounts from Mr. Saab. With the illegally obtained passwords, email addresses, and social media accounts, Agent and Officer recovered photographs and internet activity that the Government could introduce against Mr. Saab in its case in chief. United States v. Patane has held that "…failure to give suspect Miranda warnings does not require suppression of physical fruits of suspect's unwarned but voluntary statements[63] In its decision, the *Patane* Court explains that *Miranda's* protection does not extend to the physical fruits of unwarned statements.[64] However, … "the Court has only extended *Miranda's* protection in *Seibert* where the police had deliberately sought to contravene its purposes."[65] "The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them after the suspect has already confessed."[66] Agent and Officer waited until July 9, 2019, to give Mr. Saab his *Miranda* warnings after eleven previous interrogations in which Mr. Saab had made unwarned statements. The Court in United

---

[62] *United States v. Gilkeson*, 431 F. Supp. 2d 270, 294 (N.D.N.Y. 2006), (quoting *United States v. Patane*, 542 U.S. 630, 645, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004)
[63] ."*United States v. Patane*, 542 U.S. 630, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004).
[64] *Id*.
[65] *United States v. Gilkeson*, 431 F. Supp. 2d 270, 293 (N.D.N.Y. 2006) (citing *Missouri v. Seibert*, 542 U.S. 600, 611, 124 S. Ct. 2601, 2610, 159 L. Ed. 2d 643 (2004)
[66] *Missouri v. Seibert*, 542 U.S. 600, 611, 124 S. Ct. 2601, 2610, 159 L. Ed. 2d 643 (2004)

States v. Gilkeson found that "[i]n a deliberate attempt to avoid the requirements of *Miranda,* the police officers engaged in a specific technique. The officers intentionally ignored defendant's requests for counsel, immediately left the room only to return a short time later to resume the interrogation as if the requests had not been made."[67] The defendant in *Gilkeson* subsequently made a statement about a computer in his barn.[68] Consequently, the *Gilkeson* court ruled that "…the derivative evidence seized from the defendant at the address of his barn is subject to the fruit doctrine and is inadmissible for the prosecution's case in chief."[69] In our instant case, the two-step interrogation process was a specific technique employed deliberately by Agent and Officer to contravene the purposes of *Miranda*. And because of this police misconduct, Mr. Saab made statements that produced the physical fruit of the illegal interrogation. Thus, *Miranda's* protection should be extended in this instant case, and the fruits of Mr. Saab's illegal interrogation should be suppressed.

### IV  MEDIA COVERAGE OF THIS CASE PREVENTS HIM FROM RECEIVING A FAIR TRIAL IN THE SOUTHERN DISTRICT OF NEW YORK

The Sixth Amendment affords criminal defendants the right to trial by an impartial jury in the states where the crimes have been committed.[70] However, district courts may transfer proceedings to a different district if extraordinary local prejudice will prevent a fair trial.[71]

---

[67] *United States v. Gilkeson*, 431 F. Supp. 2d 270, 294 (N.D.N.Y. 2006)
[68] *Id.*
[69] *Id.*
[70] *Skilling v. United States,* 561 U.S. 358 (2010).
[71] *Id. In re Murchinson,* 349 U.S. 133, 136 (1955). *Rideau v. Louisiana*, 373 U.S. 723 (1963). *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

16

"Conclusions reached in a case will be induced only by evidence and argument in open court, and not by outside influence, whether of private talk or public print." [72]

In *Skilling*, the named defendant was the former CEO of Houston based Enron Corporation. Enron was an oil services company that, at one point, was the seventh-largest corporation in the United States. Skilling resigned in august of 2002. Four months later, Enron filed for bankruptcy protection. An investigation ensued. The investigation uncovered widespread fraud among dozens of senior executives. They were accused of committing fraud by artificially inflating the value of the company shares. After the bankruptcy filing, the stock crashed. Thousands of Houston area employees were laid off. Scores of investors lost money, and thousands of former Enron employees lost their retirement savings. Skilling objected to the trial being held in Houston for those reasons and the avalanche of publicity generated by the case. The U.S. Supreme Court held that there was no presumption of prejudice generated by the pretrial publicity and no actual prejudice of the Houston based jurors. The Court said that "news stories about Enron did not present the kind of vivid, unforgettable information we have recognized as particularly likely to produce prejudice." [73]

In *Rideau*, the defendant robbed a bank in a small Louisiana parish. During the robbery, a bank employee was shot, and two others were injured. Rideau was interrogated without counsel and made a full videotaped confession. Excerpts of the confession were broadcast on local television. The US Supreme Court reversed his conviction holding that he was denied a fair trial. The Court presumed prejudice from the press coverage of the case and did not examine the voir dire transcript.

---

[72] *Skilling* at 378, quoting, *Patterson v. Colorado ex rel Attorney General of Colorado* 205 U.S. 454 462 (1907).
[73] I*d* at 384.

17

In the case at bar, there were 82 news accounts of the charges against Mr. Saab. These stories focused almost exclusively that there were major NYC landmarks that were the potential targets of Mr. Saab's conspiracy. The articles focused on specific NYC Landmarks such as the Brooklyn Bridge, Empire State Building, and Grand Central Terminal.[74]  These landmarks are visited and used by millions of New Yorkers each year. No potential juror in the SDNY can forget or put aside the landmarks that were targeted in this case. This case presents evidence of "the kind of vivid, unforgettable information we have recognized as particularly likely to produce prejudice." Skilling 384. There is a presumption of prejudice that arises in the SDNY that is tied directly to the Landmarks referenced in the media stores about this case. The potential jurors either have visited or used these landmarks regularly. Prejudice, in this narrow instance, is presumed.

## Conclusion

For the foregoing reasons, the defendant respectfully requests this Court to enter an Order granting the relief sought herein.  Specifically, it is respectfully requested that a pre-trial hearing be ordered on this issue and granting such other and further relief as this Court may deem to be just and reasonable.

Dated:     New York, New York
           May 4, 2020

Respectfully submitted,

| s/Esere J. Onaodowan | s/Marlon G. Kirton |
| --- | --- |
| Esere J. Onaodowan, Esq. | Marlon G. Kirton, Esq. |

---

[74] Exhibit A.