UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ALEXEI SAAB,
    a/k/a "Ali Hassan Saab,"
    a/k/a "Alex Saab,"
    a/k/a "Rachid,"

                        Defendant.

19 Cr. 676 (PGG)


# THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S PRETRIAL MOTIONS


GEOFFREY S. BERMAN
United States Attorney Southern
District of New York
*Attorney for the United States*
*of America*


Michael K. Krouse
Jason A. Richman
    Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

BACKGROUND ..................................................................................................................... 7

I. Hizballah and the Islamic Jihad Organization ................................................................... 7

II. The Defendant's Role in Hizballah and the IJO ............................................................... 9

III. The Defendant's Marriage to CC-1 ................................................................................ 12

IV. The Interviews, Investigation, and Procedural History .................................................. 12

DISCUSSION ....................................................................................................................... 20

I. The Pre-Arrest Interviews Were Non-Custodial and No Hearing is Required .................... 20

    A. Applicable Law ......................................................................................................... 21

    B. Discussion ................................................................................................................ 23

        1. The March 14 Interview ......................................................................................... 23

        2. The Other Pre-Arrest Interviews ............................................................................ 34

II. The Defendant's Post-Arrest Statement was not the Product of a Deliberate Two-Step Interrogation ...................................................................................................................... 37

    A. Applicable Law ......................................................................................................... 38

    B. Discussion ................................................................................................................ 40

III. The Court Should Deny the Defendant's Motion to Suppress the Fruits of his Statements to Law Enforcement ................................................................................................................ 43

    A. Applicable Law ......................................................................................................... 44

    B. Discussion ................................................................................................................ 45

IV. The Court Should Deny the Defendant's Motion to Change Venue .................................. 48

    A. Applicable Law ......................................................................................................... 48

        1. A Change of Venue Is Not Warranted Unless the Legal Process Is Displaced ........ 49

        2. Pretrial Publicity and Juror Familiarity Are Not Dispositive .................................... 50

        3. Publicity Long Before Trial Does Not Give Rise to Presumptive Prejudice ............. 51

        4. Voir Dire and Jury Instructions Produce Unbiased Juries, and Any Presumption of Prejudice Is Rebuttable ............................................................................................ 52

    B. Discussion ................................................................................................................ 52

        1. Given the Size and Diversity of this District, Voir Dire and Jury Instructions Are Sufficient to Ensure an Impartial Jury ........................................................................ 52

        2. The Defendant's Media Analysis Fails to Establish a Presumption of Prejudice ...... 55

CONCLUSION ...................................................................................................................... 57

## TABLE OF AUTHORITIES

**Cases**

*Beckwith v. United States*, 425 U.S. 341 (1976) .................................................................. 23, 30

*Berkemer v. McCarty*, 468 U.S. 420 (1984) ................................................................................ 21

*Bobby v. Dixon*, 565 U.S. 23 (2011) ........................................................................................... 42

*California v. Beheler*, 463 U.S. 1121 (1983) ............................................................................. 21

*Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985) ............................................................. 52, 53

*Colorado v. Connelly*, 479 U.S. 157 (1986) ............................................................................... 39

*Dickerson v. United States*, 530 U.S. 428 (2000) ............................................................. 39, 40, 43

*Duckworth v. Eagan*, 492 U.S. 195 (1989) ................................................................................ 39

*Estes v. Texas*, 381 U.S. 532 (1965) ........................................................................................... 50

*Garrett v. United States*, 471 U.S. 773 (1985) .................................................................... 52, 53

*Illinois v. Perkins*, 496 U.S. 292 (1990) .................................................................................... 21

*J.D.B. v. North Carolina*, 564 U.S. 261 (2011) ......................................................................... 31

*McMillon v. Culley*, 380 F. App'x 63 (2d Cir. 2010) ................................................................ 39

*Miranda v. Arizona*, 384 U.S. 436 (1966) ................................................................................. 21

*Missouri v. Seibert*, 542 U.S. 600 (2004) ...................................................................... 38, 40, 41, 42

*Murphy v. Florida*, 421 U.S. 794 (1975) .................................................................................... 50

*Oregon v. Elstad*, 470 U.S. 298 (1985) ...................................................................................... 38

*Oregon v. Mathiason*, 429 U.S. 492 (1977) ............................................................................... 30

*Parsad v. Greiner*, 337 F.3d 175 (2d Cir. 2003) ...................................................................... 39

*Patton v. Yount*, 467 U.S. 1025 (1984) ...................................................................................... 50

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ........................................................................... 36, 42

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ..................................................................... 39

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ............................................................................... 50

*Skilling v. United States*, 561 U.S. 358 (2010) ................................................................... passim

*Stansbury v. California*, 511 U.S. 318 (1994) ...................................................................... 21, 31

*United States v. al Fawwaz*, No. 98 Cr. 1023 (LAK), 2015 WL 400621 (S.D.N.Y. Jan. 23, 2015) ........................................................................................................................................ 49, 54

*United States v. Alexander*, No. 16 Cr. 141 (CR), 2018 WL 1891307 (D. Vt. Apr. 19, 2018) .... 29

*United States v. Awadallah*, 457 F. Supp. 2d 246 (S.D.N.Y. 2006) .................................. passim

*United States v. Ayala*, 64 F. Supp. 3d 446 (E.D.N.Y. 2014) ......................................... 49, 52, 53

*United States v. Badmus*, 325 F.3d 133 (2d Cir. 2003) ..................................................... passim

*United States v. Beal*, 730 F. App'x 30 (2d Cir. 2018) ......................................................... 24, 25

*United States v. Belcher*, No. 96 Cr. 789 (BSJ), 1997 WL 35495 (S.D.N.Y. Jan. 29, 1997) ....... 29

*United States v. Camacho*, 674 F. Supp. 118 (S.D.N.Y. 1987) ...................................... 32, 33, 34

*United States v. Capers*, 627 F.3d 470 (2d Cir. 2010) ............................................................. 38

*United States v. Carter*, 489 F.3d 528 (2d Cir. 2007) ............................................................. 38

*United States v. Casellas-Toro*, 807 F.3d 380 (1st Cir. 2015) ................................................ 52, 53

*United States v. Chagra*, 669 F.2d 241 (5th Cir. 1982) .......................................................... 52, 53

*United States v. Cota*, 953 F.2d 753 (2d Cir. 1992) ................................................................ 22, 25

*United States v. Deas*, No. 17 Cr. 719 (JGK), 2018 WL 3023282 (S.D.N.Y. June 15, 2018) 26, 39

*United States v. Familetti*, 878 F.3d 53 (2d Cir. 2018) ........................................................... 22, 24

*United States v. Gilkeson*, 431 F. Supp. 2d 270 (N.D.N.Y. 2006) ......................................... 46, 47

*United States v. Gotti*, 399 F. Supp. 2d 214 (S.D.N.Y. 2005) ........................................ 51, 53, 54

*United States v. Grandi*, 424 F.2d 399 (2d Cir. 1970) ................................................................. 37

*United States v. Groezinger*, 625 F. Supp. 2d 145 (S.D.N.Y. 2009) ........................................... 27

*United States v. Guarno*, 819 F.2d 28 (2d Cir. 1987) .................................................................. 32

*United States v. Haygood*, 157 F. App'x. 448 (2d Cir. 2005) ...................................................... 44

*United States v. Kirsteins*, 906 F.2d 919 (2d Cir. 1990) ........................................................ 26, 30

*United States v. Konn*, 634 F. App'x 818 (2d Cir. 2015) ............................................................. 39

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) .......................................... 49, 51

*United States v. McDow*, 206 F. Supp. 3d 829 (S.D.N.Y. 2016) ...................................... 32, 33, 44

*United States v. Mitchell*, 966 F.2d 92 (2d Cir. 1992) ................................................................. 27

*United States v. Moore*, 670 F.3d 222 (2d Cir. 2012) ............................................................ 39, 43

*United States v. Newton*, 369 F.3d 659 (2d Cir. 2004) ........................................................ passim

*United States v. Paccione*, 738 F. Supp. 691 (S.D.N.Y. Apr. 30, 1990) ...................................... 24

*United States v. Palase*, No. 11 Cr. 413 (SLT), 2014 WL 6802560 (E.D.N.Y. Dec. 2, 2014) 23, 31

*United States v. Parker*, 116 F. Supp. 3d 159 (W.D.N.Y. July 8, 2015) ...................................... 24

*United States v. Patane*, 542 U.S. 630 (2004) ....................................................................... 44, 45

*United States v. Rahimi*, No. 16 Cr. 760 (RMB) ......................................................................... 53

*United States v. Rakowski*, 714 F. Supp. 1324 (D. Vt. Nov. 27, 1987) ........................................ 27

*United States v. Redrick*, 48 F. Supp. 3d 91 (D.D.C. July 3, 2014) ............................................. 42

*United States v. Rhoades*, No. 15 Cr. 206 (JAM), 2016 WL 7197358 (D. Conn. Dec. 9, 2016) . 24

*United States v. Rico*, No 18 Cr. 661 (PGG), 2019 WL 4014826 (S.D.N.Y. Aug. 26, 2019) ...... 44

*United States v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010) ...................................................... passim

*United States v. Salim*, 151 F. Supp. 2d 281 (S.D.N.Y. 2001) ......................................... 48, 52, 54

*United States v. Salim*, 189 F. Supp. 2d 93 (S.D.N.Y. 2002) ...................................................... 54

*United States v. Santillan*, 902 F.3d 49 (2d Cir. 2018) ..................................................... 25, 26, 28, 30

*United States v. Sawinski*, No. 00 Cr. 49 (RPP), 2000 WL 1357491 (S.D.N.Y. Sept. 20, 2000). 26

*United States v. Schaffer*, 851 F.3d 166 (2d Cir. 2017) .............................................................. 23

*United States v. Schaffer*, No. 12 Cr. 440 (ARR), 2014 WL 1414799 (E.D.N.Y. April 18, 2014) ................................................................................................................................................ 27

*United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019) 45

*United States v. Simmonds*, 641 F. App'x 99 (2d Cir. 2016) .................................................. 39, 40

*United States v. Skelos*, No. 15 Cr. 317 (KMW), 2018 WL 2849712 (S.D.N.Y. June 8, 2018) .. 54

*United States v. Smith*, No. 12 Cr. 52 (CR), 2012 WL 5187922 (D. Vt. Oct. 18, 2012) ............. 29

iii

*United States v. Soteriou*, No. 12 Cr. 39 (CR), 2012 WL 5426440 (D. Vt. Nov. 7, 2012) .......... 31

*United States v. Stevens*, 83 F.3d 60 (2d Cir. 1996) .................................................................... 49

*United States v. Stone*, No. 12 Cr. 133 (JGM), 2013 WL 5274850 (D. Vt. Sept. 18, 2013)........ 27

*United States v. Taylor*, 752 F.3d 254 (2d Cir. 2014)................................................................. 40

*United States v. Tirado*, No. 17 Cr. 668 (GHW), 2018 WL 3432040 (S.D.N.Y. July 16, 2018). 41

*United States v. Titemore*, 437 F.3d 251 (2d Cir. 2006).................................................. 22, 25, 26

*United States v. Vado*, 87 F. Supp. 3d 472 (S.D.N.Y. 2015)....................................................... 27

*United States v. Valerio*, 765 F. App'x 562 (2d Cir. 2018) ................................................... 26, 30

*United States v. Williams*, 681 F.3d 35 (2d Cir. 2012) ......................................................... 39, 41

*United States v. Wilson*, 901 F. Supp. 2d 172 (S.D.N.Y. 1995) ................................. 23, 27, 30, 32

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003)................................................. 50, 51, 52, 56

*United States v. Yousef*, No. 93 Cr. 180 (KTD), 1997 WL 411596 (S.D.N.Y. July 18, 1997) .... 55

*United States v. Zuber*, No. 12 Cr. 45 (WKS), 2013 WL 3873178 (D. Vt. July 25, 2013).......... 22

**Other Authorities**

U.S. Const. amend. VI. ................................................................................................................. 48

U.S. Const. art. III, § 2, cl. 3......................................................................................................... 48

**Rules**

Fed. R. Crim. P. 21 ....................................................................................................................... 49

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-                                                    19 Cr. 676 (PGG)

ALEXEI SAAB,
    a/k/a "Ali Hassan Saab,"
    a/k/a "Alex Saab,"
    a/k/a "Rachid,"

                                    Defendant.

The Government respectfully submits this memorandum of law in opposition to the pretrial

motions (the "Def. Mot.") filed by the defendant: (i) a motion to suppress statements made by the

defendant to the Federal Bureau of Investigation (the "FBI") during eleven meetings with the FBI

between March 14 and June 20, 2019; (ii) a motion to suppress statements made by the defendant

to the FBI after he was arrested on July 9, 2019; (iii) a motion to suppress the fruits of the

defendant's statements to the FBI; and (iv) a motion seeking a change of venue.

The defendant is a highly trained terrorist who has performed missions for Hizballah in the

United States and around the world. Hizballah first recruited the defendant in 1996 while he was

attending college in Lebanon. The defendant then spent three years reporting to Hizballah on

Israeli troop movements in Southern Lebanon, before he began training for placement in

Hizballah's Islamic Jihad Organization (the "IJO"). The IJO trained the defendant on surveillance,

the use of firearms, and military tactics, including explosives. The IJO focused the defendant's

explosives training on triggering mechanisms, explosive substances, and circuit assembly.

The defendant did not merely train like a terrorist—he became one. The defendant moved

to the United States in 2000, and fraudulently obtained citizenship in 2008 by falsely claiming

under penalty of perjury that he had never been a member of any terrorist organization. While nominally a New Jersey resident, working by day as an internet developer and engineer, the defendant was living a double life as an IJO spy, as he surveilled and photographed landmarks throughout the United States for potential future IJO attacks. The defendant was clear-eyed and focused during his intelligence gathering—he located the structural weaknesses of tourist attractions and critical infrastructure to best prepare the IJO to attack his targets in the future.

While the defendant was engaged in training and operational activity in the United States, he frequently traveled back to Lebanon to report on his findings to the IJO, advance his hands-on training, and engage in Hizballah missions in Lebanon and elsewhere. On certain of these trips, the defendant provided the IJO with detailed surveillance notes and photographs that he had taken in the United States. The defendant also continued to undertake missions for Hizballah abroad. For example, in approximately 2004, the defendant attempted to shoot and kill, at close-range, an individual he later understood to be a suspected Israeli spy. A twice-jammed firearm was all that thwarted his effort. In 2005, the defendant traveled to Istanbul, Turkey, where he engaged in pre-attack surveillance similar to his activity in the United States. The defendant visited landmarks, including mosques, palaces, and street markets, took photographs, and reported on his trip to the IJO. The defendant returned to the United States shortly after this trip, and then traveled back and forth between the United States and Lebanon over the course of the next 12 years.

While living in the United States, the defendant also entered a fraudulent marriage with a woman living in New York City ("CC-1"). CC-1 married the defendant in an effort to obtain citizenship status in the United States, and, in exchange, CC-1 paid the defendant $20,000. In

connection with this fraudulent marriage, the defendant falsely affirmed, again under penalty of perjury, that the purpose of the marriage was not to obtain an immigration benefit for CC-1.

In March 2019, the defendant began a series of meetings with the FBI, during which he admitted this conduct and more. The defendant participated in 11 pre-arrest interviews. The first interview was on March 14, 2019 (the "March 14 Interview") in an office building across the street from the defendant's apartment. After the March 14 Interview, the defendant then participated in ten more pre-arrest interviews with the FBI (the "Other Pre-Arrest Interviews" and, collectively with the March 14 Interview, the "Pre-Arrest Interviews"). During the Pre-Arrest Interviews, the defendant identified the individuals responsible for his training and tasking (collectively, his "Handlers") and other members and supporters of Hizballah and the IJO. The defendant drew sketches of explosive devices he learned to create and detonate during his training, and gave precise details of his focus in surveilling landmarks for potential future attacks. In short, the defendant admitted to being a trained terrorist who operated undetected for years.

After the Pre-Arrest Interviews, and after the FBI analyzed evidence recovered from judicially-authorized searches of the defendant's home, electronics, and social media and email accounts, the FBI arrested the defendant on July 9, 2019—19 days after the last Pre-Arrest Interview. The FBI read the defendant *Miranda* warnings and, after the defendant waived his *Miranda* rights orally and in writing, conducted a post-arrest interview of the defendant (the "Post-Arrest Interview"). During the Post-Arrest Interview, which was video recorded, the defendant discussed further operations he conducted for Hizballah. For example, the defendant detailed a mission with his brother, during which they placed an improvised explosive device designed to explode and kill Israeli soldiers in Lebanon, including a high-ranking Israeli commander. The

defendant also explained that his Handlers had once tasked him with preparing a place to store small firearms and hand grenades, and admitted that he had created a small storage space in the basement of his family's home in Lebanon for this purpose. Finally, the defendant identified other individuals, including family members, who belonged to Hizballah.

The defendant's first motion seeks to suppress the statements he made to the FBI in the Pre-Arrest Interviews. However, even accepting the facts alleged by the defendant as true, he was not in custody during these interviews.[1] Far from it, the defendant's declaration describes a series of consensual encounters with law enforcement. As the defendant admits in his Declaration, before the March 14 Interview, the two FBI agents (the "Questioning Agents") who met with the defendant explicitly told the defendant he was not under arrest and was free to call whomever he wanted. Further, the defendant acknowledges that after they first approached him, the Questioning Agents allowed the defendant to leave by himself and return to his own apartment before the interview began. The defendant also admits that he then returned on his own volition to meet with the Questioning Agents in the parking lot outside his building. In addition, the defendant does not allege that the Questioning Agents nor any other law enforcement officers ever handcuffed or otherwise physically restrained the defendant, and law enforcement never showed any force—via the presence of firearms, let alone the brandishing of them—before or during the March 14

---

[1] The Government adopts the factual account set forth in the defendant's motion papers, including the supporting Declarations, for purposes of opposing his pretrial motions because, even based on the defendant's account of the interviews, he does not meet the threshold for an evidentiary hearing, much less suppression of his statements or the other relief he seeks. Notwithstanding that, the Government does not concede the accuracy of the defendant's account for purposes of future proceedings, including any hearing on the motions, should the Court hold one, or at trial. This is particularly true because the defendant has repeatedly lied under penalty of perjury in connection with his own citizenship application and his fraudulent marriage to CC-1.

Interview. The FBI did not arrest the defendant after the March 14 Interview, but, instead, allowed the defendant to return to his job and life in New Jersey, under FBI surveillance, as the Pre-Arrest Interviews continued.

The Other Pre-Arrest Interviews were even more clearly noncustodial. As the defendant admits, the defendant freely traveled to them, and the defendant confirmed at each interview that he was there voluntarily. The defendant further communicated with the Questioning Agents between interviews to schedule the times, notify them if he was running late, and discuss and confirm with them the locations of the meetings. In certain of these communications, the defendant was the one dictating the times and "informing" the agents of his other travel plans. The defendant clearly felt free to leave each interview—as he admits he did, after each one—and any objectively reasonable person would have felt the same. As such, all of the Pre-Arrest Interviews were non-custodial, and the Court should deny this motion.

Next, the defendant seeks to suppress the statements he made after his arrest, arguing that his Post-Arrest Interview constituted the second step of an unlawful "two-step" interrogation. This motion fails on three fronts. First, because the Pre-Arrest Interviews were non-custodial, the "two-step" interrogation inquiry is irrelevant. Second, the circumstances of the Post-Arrest Interview demonstrate that the Questioning Agents did not deliberately seek to circumvent *Miranda*; instead, the Questioning Agents, consistent with the law, only advised the defendant of his *Miranda* rights after arresting him and taking him into custody. Finally, even if the Questioning Agents deliberately used a "two-step" interrogation, and even if the Pre-Arrest Interviews were custodial, there was a break of 19 days between the last Pre-Arrest Interview and the defendant's arrest, and the defendant gave the Post-Arrest Statement at 26 Federal Plaza—the only time he was

interviewed in a custodial setting, and a location far different from the Pre-Arrest Interviews. The long break in time and changed circumstances such as the new location for the Post-Arrest Interview sufficed as curative measures even if there was a "two-step" interrogation.

Relatedly, the defendant next argues that the Court should suppress the fruits of his statements to the FBI because they were the result of unconstitutional police misconduct. Again, this motion should fail. First, there was no police misconduct in connection with the defendant's statements to the FBI, either before or after his arrest. Second, the defendant argues that the "police misconduct" arose from the failure of the Questioning Agents to *Mirandize* him and through their use of an illegal "two-step" interrogation. The defendant points to no authority in support of this argument, Supreme Court precedent forecloses it, and the Court should reject it.

Finally, the defendant seeks a change of venue. In support of his argument, the defendant cites to 82 news articles, 70 of which were published within two days of the charges against him being unsealed in September 2019, and argues that they have forever tainted the jury pool in the Southern District of New York against him. However, a defendant seeking a change of venue prior to jury selection bears the heavy burden of establishing that pretrial publicity is so pervasive and prejudicial that it corrupts the criminal process and renders a fair trial virtually impossible. In trials with far more pretrial publicity, courts within this district—one of the largest and most diverse in the country—have rejected similar motions. Here, too, the defendant has not come close to meeting his burden, and the Court should deny this motion.

**BACKGROUND**

**I.  Hizballah and the Islamic Jihad Organization**

Hizballah is a Lebanon-based Shia Islamic organization with political, social, and terrorist components. (May 26, 2020 Decl. of Jason A. Richman (the "Richman Decl.") Ex. A, Complaint ¶ 18(a)).  Hizballah was founded in the early 1980s with support from Iran after the 1982 Israeli invasion of Lebanon, and its mission includes establishing a fundamentalist Islamic state in Lebanon.  (*Id.*).  In 1997, the U.S. Department of State designated Hizballah a Foreign Terrorist Organization, pursuant to Section 219 of the INA, and it remains so designated today.  In 2001, pursuant to Executive Order 13,224, the U.S. Department of the Treasury designated Hizballah a Specially Designated Global Terrorist entity.  (*Id.*).  In 2010, State Department officials described Hizballah as the most technically capable terrorist group in the world, and a continued security threat to the United States.  (*Id.*).

The defendant was a member of the IJO—also known as the External Security Organization ("ESO") or "910"—which is a highly compartmentalized component of Hizballah responsible for the planning, preparation, and execution of intelligence, counterintelligence, and terrorist activities outside of Lebanon.  (*Id.* ¶ 18(b)).  Hizballah and the IJO are responsible for numerous terrorist attacks that have killed hundreds, including the 1983 bombing of the United States Marine barracks in Lebanon, which killed 241 Marines; the 1983 bombing of the United States Embassy in Beirut, which killed 24 people; the 1985 hijacking of TWA Flight 847, which killed one U.S. citizen; the 1992 bombing of the Israeli Embassy in Argentina, which killed 29 people; and the 1994 bombing of a Jewish cultural center in Buenos Aires, which killed 95 people. (*Id.* ¶ 18(c)).  In July 2012, an IJO operative conducted a bombing in Burgas, Bulgaria that killed six people and injured 32.  (*Id.* ¶ 18(f)).  Additional IJO attacks in Thailand and Cyprus were

thwarted in 2012, and an attack was thwarted in Cyprus in 2015, which involved the seizure of approximately 8.2 tons of the bomb-making component ammonium nitrate. (*Id.* ¶¶ 18(e)-(h)).

More recently, in or about June 2017, a now-cooperating witness ("CW-1") was arrested in the United States, and has since pleaded guilty to a number of terrorism-related offenses pursuant to a cooperation agreement with the Government. (*Id.* ¶ 19(a)). Hizballah recruited CW-1 into the IJO in or about 2007, and he remained an IJO operative until 2016. (*Id.* ¶ 19(b)). Like the defendant, CW-1 received extensive training from the IJO in surveillance, bomb-making, and military tactics. (*Id.* ¶ 19(c)). CW-1 conducted operations overseas, including in Panama and Thailand, and surveilled potential targets for future IJO attacks. (*Id.* ¶¶ 19(d), 19(e)).

Finally, in May 2019, Ali Kourani, another former IJO operative, was convicted after trial of terrorism, sanctions, and immigration offenses. *See United States v. Kourani*, 17 Cr. 417 (AKH), Dkt. 141 (Judgment). Like the defendant, Kourani conducted pre-operational surveillance of landmarks in New York City for potential future attacks. *See United States v. Kourani*, 17 Cr. 417, Dkt. 1 (Complaint) ¶ 26(a). For example, Kourani surveilled 26 Federal Plaza and U.S. Army facilities in New York City. (*Id.*). Also like the defendant, Kourani surveilled and collected information on airports and airport security protocols. (*Id.* ¶ 26(c)). In December 2019, Judge Hellerstein sentenced Kourani to a 40-year term of imprisonment and signed an order revoking his naturalization and citizenship in the United States. *United States v. Kourani*, 17 Cr. 417, Dkts. 138 (Denaturalization Order), 141 (Judgment).

## II. The Defendant's Role in Hizballah and the IJO

Hizballah first recruited the defendant in 1996. (Ex. A ¶ 21(b)). For the next three to four years, the defendant observed and reported on the actions and movements of Israeli and Southern Lebanese Army soldiers in Yaroun, Lebanon. (*Id.* ¶ 21(c)). In approximately 1999, the defendant's training intensified, and he attended his first training focused on the use of firearms. (*Id.* ¶ 21(d)). During the course of this training, the defendant handled and fired an AK-47, an M16 rifle, and a pistol, and he learned how to use and throw grenades. (*Id.*).

Shortly after his IJO training began, the defendant moved to the United States. (*Id.* ¶ 20(b)). Before Saab moved, one of his Handlers provided him with a means of covert communication to use while he was in the United States. (*Id.* ¶ 21(g)). The defendant's Handler told him that if the IJO ever needed the defendant to return to Lebanon, he would receive an email that appeared to be spam but that would contain a coded signal in either the subject line or body, indicating to the defendant that he needed to return. (*Id.*). Saab traveled back and forth to Lebanon over the ensuing 17 years, and the IJO continued to train him for operations on Hizballah's behalf. For example, in 2004 and 2005, the defendant attended explosives training in Lebanon. (*Id.* ¶ 21(k)). The training included detailed instruction in, among other things, triggering mechanisms, explosive substances, detonators, and the assembly of circuits. (*Id.*). Portions of the training took place in an underground workshop, and the training included instruction on the various shapes of explosive charges and their most effective uses, including the types most effective against certain Israeli targets. (*Id.*). For example, the IJO taught the defendant to construct the following, as he later admitted to the FBI:



(*Id.* ¶¶ 20(m), 23).

Saab put his training to good use, conducting two missions overseas. In approximately January 2005, Saab traveled to Istanbul, Turkey, with instructions from his Handler to learn enough detail about the city to report on it to someone who had never been there. (*Id.*). Hizballah paid for the trip, during which the defendant surveilled and took photographs of tourist locations, including the Blue Mosque, palaces, and street markets. (*Id.* ¶ 28(b)). On his way back to Lebanon, the defendant met one of his Handlers in Syria. (*Id.* ¶ 28(c)). From there, the defendant and his Handler drove across the border between Syria and Lebanon, where his Handler showed Syrian intelligence officers identification so that they could pass. (*Id.*). The defendant also purchased a map of Istanbul, which the FBI later recovered in a search of his New Jersey residence. (*Id.* ¶¶ 28(b), 30).

The defendant also attempted to murder a suspected Israeli spy. (*Id.* ¶ 32). During the course of his training in Lebanon, one of the defendant's Handlers had him locate a car, which they then drove together to the intended victim's location. (*Id.* ¶¶ 32(b), (c)). Once there, the Handler told Saab to reach under his seat, where the defendant found a silver firearm with an attached silencer. (*Id.*). Saab's Handler then told him to go to a second car and shoot the person

inside "twice in the belly" and "once in the head." (*Id.* ¶ 32(c)). The defendant walked to the vehicle and pointed his firearm at the individual inside. (*Id.* ¶ 32(d)). The intended victim cried out that it "wasn't him" as the defendant raised his gun. (*Id.*). The defendant pulled the trigger twice, but the firearm jammed and he was unable to complete the killing. (*Id.*).

Saab continued pre-attack surveillance and intelligence gathering for the IJO in the United States. (*Id.* ¶¶ 24-27). The IJO instructed the defendant to have an intelligence collection mindset, such that he was constantly surveilling potential attack locations while traveling in New York and elsewhere. (*Id.* ¶ 24(b)). At one point, one of Saab's Handlers explicitly tasked him to map out certain "hot spots" in New York, and to report intelligence on these locations back to the IJO. (*Id.* ¶ 24(a)). In carrying out this mission, the defendant focused on the structural weaknesses of the targets he surveilled, so that any future attack would cause the maximum possible destruction. (*Id.* ¶ 24(c)). To that end, the defendant gathered details such as the materials used to construct particular targets, how close in proximity one could get to a potential target, and site weaknesses or "soft spots" that the IJO could exploit. (*Id.*). The defendant understood that the IJO would use the information he provided to calculate the size of a bomb needed to target a particular structure and to determine the ideal location to place a bomb to maximize damage. (*Id.* ¶ 24(d)). The defendant provided his findings to his Handlers in a detailed, hand-written report (the "Report"), complete with photographs of various locations. (*Id.* ¶ 24(e)). The Report contained a hand-drawn map with particular location, and a detailed summary of potential targets in New York City and elsewhere, including 26 Federal Plaza, the United Nations, the Statute of Liberty and Ellis Island, the Empire State Building, and local tunnels and bridges. (*Id.*). The defendant also provided details on local airports. (*Id.* ¶ 24(f)).

### III. The Defendant's Marriage to CC-1

In addition to his training and terrorist activity, the defendant committed another series of federal crimes in connection with his fraudulent marriage to CC-1. On or about July 13, 2012, the defendant married CC-1, and CC-1 applied for conditional residency based on that marriage approximately three months later. (*Id.* ¶ 35). Then, on or about March 13, 2015, the defendant and CC-1 filed a petition (the "Petition") seeking to obtain United States citizenship for CC-1. (*Id.*). In the Petition, both Saab and CC-1 affirmed under penalty of perjury that their marriage "was not for the purpose of procuring an illegal immigration benefit." (*Id.*).

However, as he later admitted to the FBI, Saab entered the marriage with CC-1 in exchange for $20,000 and for the exact reason he swore was not the case—so that she could obtain her citizenship. Throughout 2012, the defendant had a series of communications with another individual ("Individual-1") in which Saab explained that the marriage to CC-1 was for money and that had only met CC-1 two times. (*See id.* ¶ 36). In addition, in the Pre-Arrest Interviews, Saab admitted that he had proposed to CC-1 that they should stage a marriage so that CC-1 could obtain her citizenship, and that CC-1 had paid the defendant $20,000 in return. (*Id.* ¶¶ 40(a), (b)).

### IV. The Interviews, Investigation, and Procedural History

On or about April 10, 2018, a Magistrate Judge in the Southern District of New York authorized the search of three email accounts—two belonging to the defendant, and one belonging to CC-1—for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1015(a) and 1546(a) (the "Marriage Fraud Offenses"). Next, on or about March 11, 2019, a Magistrate Judge in the District of New Jersey authorized two search warrants (the "DNJ Warrants"), one for the defendant's premises and one for electronics on the defendant's person,

for evidence, fruits, and instrumentalities of the Marriage Fraud Offenses and violations of Title 18, United States Code, Section 1001.

On March 14, 2019, the FBI approached the defendant and conducted the first voluntary interview. During the course of the March 14 Interview, the defendant admitted, among other things, that (a) he was first recruited into Hizballah in 1996 and spent his first several years observing troop movements in Southern Lebanon; (b) he attended his first training in approximately 1999, and was trained on firearms and the use of grenades; (c) he transitioned to a second Handler in approximately 2000, and this Handler then began to instruct Saab and provided him with a means of covert communication for use in the United States; (d) Saab began training in surveillance, counter-surveillance, and other techniques in approximately 2002; and (e) Saab attended explosives training in 2004 or 2005. In addition, Saab admitted that, in approximately 2003, his Handler tasked him with mapping out certain "hot spots" in New York City, with a focus on the security features and construction of these potential targets. Saab told the Questioning Agents that he knew that his brother had been associated with Hizballah in the same manner as Saab, and he had learned this before Saab himself moved to the United States. Saab also admitted that his marriage to CC-1 had been fraudulent, and explained to the FBI how the marriage originated. Finally, Saab provided the FBI with a number of his email and social media accounts, and provided the FBI with the passwords to certain of his electronic devices. After the FBI concluded the March 14 Interview, the FBI executed the DNJ Warrants. The FBI recovered, among other things, electronic devices from both the defendant's residence and his person.

The next interview took place on March 16, 2019. During the course of this interview, Saab provided further detail on his Handlers and the specific assignments that they had given Saab.

13

In addition, Saab provided particulars of his explosives training. For example, Saab explained that each explosives training session began in a classroom in an underground workshop, where he and other trainees would change into military uniforms and masks. This training focused, in part, on particular explosives that would be useful against Israeli targets, and on the construction of various component parts of explosives. Saab also detailed a trip he took in April 2005, when he flew back to the United States via Istanbul. En route, in Istanbul, explosives detection equipment hit on Saab's backpack, which he had previously used during his training. Saab also admitted details of a trip he took to Istanbul, during which his Handler tasked him with locating and reporting back on certain landmarks and tourist locations. Finally, Saab explained that he had tried to contact one of his Handlers in 2008, but was unable to reach him.

The next interview took place on March 19, 2019, and Saab provided more information on his intelligence gathering in the United States. Saab admitted, among other things, that his surveillance in New York was intended to locate structural weaknesses of his potential targets, and that he would look at access points, and the characteristics and compositions of buildings. Saab explained that the purpose of his surveillance was to determine how Hizballah could cause the "most destruction" in an attack. During the fourth interview, on March 21, 2019, Saab again detailed his explosives expertise. Saab drew for the Questioning Agents explosives that he had learned to create, and explained how each functioned. In addition, Saab explained that during training, he was taught that each "cell" of operatives had to learn to be self-sufficient, so that they could carry out an attack on their own. Further, Saab explained that he obtained significant detail about the Port Authority bus terminal, and recalled that he had detailed, among other things, the height and span of each floor, what was housed in each area, and the entrances and exit points.

Finally, Saab admitted that he frequently volunteered to drive people to airports and, as a result, had many opportunities to surveil these locations.

During the next interview, on March 28, 2019, Saab provided a consent to search one of his laptops, a silver Lenovo. Saab also located on Google maps certain of the safehouses where he underwent training in Lebanon, and detailed specifically what training occurred in which location. In addition, the defendant detailed a particular operation in Lebanon during which he attempted to shoot and kill, at close range, a man he later learned was a suspected Israeli spy. The defendant tried to shoot the man twice, but his gun jammed and he was unable to kill him. Saab also provided the Questioning Agents with other email addresses and social media accounts that he had utilized.

On or about April 3, 2019, a Magistrate Judge in the Southern District of New York signed a warrant authorizing the search of 29 electronic devices recovered during the execution of the DNJ Warrants, for evidence, fruits, and instrumentalities of various terrorism-related offenses, including providing material support to Hizballah, and conspiracy to do the same, and receiving military-type training from Hizballah, and conspiracy to do the same, in violation of Title 18, Untied States Code, Sections 2339B and 2339D. In connection with the execution of these warrants, the FBI discovered that the defendant had saved in his electronic devices the following photographs of local bridges in and around New York City, mirroring the surveillance that the defendant admitted he had conducted on Hizballah's behalf :



(*Id.* ¶ 25(b)).  The defendant had similar photographs of other landmarks and Government

buildings in New York City, Washington, D.C., and Boston.  (*Id.* ¶¶ 25(b), 27).  In addition, the

FBI located Hizballah propaganda videos and photographs on the defendant's electronics, including speeches from Hizballah's current Secretary General, Hassan Nasrallah. (*Id.* ¶ 33).

The next interview took place on April 6, 2019. During the course of this interview, among other things, the defendant admitted that his Handlers had provided him with a means of covert communication while he was in the United States, and he detailed for the Questioning Agents how it would work. Saab also provided more information on his Handlers, including details of their own families and their cover jobs in Lebanon. Saab also admitted that, in 2010, he was in Lebanon and again attempted to contact his Handler, but claimed that he was unable to do so. Finally, Saab admitted attending rallies led by Hassan Nasrallah.

The seventh interview was on April 19, 2019. Among other things, Saab claimed he could not recall if he was ever summoned back to Lebanon through the use of covert communications but that, if he had, it would have been for training and not a mission. Saab did admit that he would frequently check his spam folder to make sure he did not miss a signal to return to Lebanon, and further detailed how the system would work. Further, Saab explained how his meetings with his Handlers were arranged, and the security precautions they would take when traveling to various safehouses for training. Saab also admitted taking photographs at various airports around the world, including at the airport in Prague, and detailed that he would focus on security features and the gate areas. Finally, Saab identified many of the locations he focused on in New York, and how his photograph strategy would change depending on the location. For example, Saab explained that at Grand Central Station, he used a computer program to create a panoramic photograph so that he could capture the entire structure.

On April 30, 2019, Saab identified certain trips he had taken when he took photographs for Hizballah. For example, Saab explained that he traveled to France and took photographs of major landmarks for potential future use in targeting. Further, Saab admitted that, at some point between 2003 and 2005, one of his Handlers explained to him that a United States passport would be a valuable tool for him to travel. During the next interview, on May 6, 2019, Saab admitted that he had seen an article on Kourani, and that he was not surprised to learn of another operative in New York. Further, Saab provided even more detail on his explosives training, and said that, at one point, he went through an exercise during which he had to try to identify the type of explosive used based on the damage. Saab also explained some of his travel protocols and the excuses he would use when going back to Lebanon for training.

Next, on or about May 6, 2019, a Magistrate Judge in the Southern District of New York authorized the search of seven of the defendant's email accounts and 10 of his social media accounts. The following interview took place on May 31, 2019. During this interview, the defendant discussed a multi-page report he prepared for Hizballah, detailing the locations he surveilled and including photographs of potential targets. The defendant explained that the report contained construction details of the locations and that he discussed it with his Handler after he completed writing it. The report included, in particular, details of security at these locations.

Finally, the last Pre-Arrest Interview was on June 20, 2019. During this interview, the defendant told the Questioning Agents that he had "made" certain surveillance vehicles that were following him. The defendant also detailed even more training, including an explosives training during which another trainee carried RDX into the training site, which Saab and the other trainee then used to pack into an improvised explosive device. The defendant admitted that his explosives

training took approximately three to four weeks, and detailed, with specificity, the various aspects of the training. Finally, the defendant admitted that Hizballah always wanted him to remain operationally ready. Ultimately, the FBI then arrested the defendant on or about July 9, 2019—19 days after the last Pre-Arrest Interview—based on charges contained in a nine-count Complaint filed under seal on July 8, 2019. (Dkt. 1). In connection with the defendant's arrest, the FBI obtained another warrant to search his residence, which agents executed on the day of his arrest.

On or about September 19, 2019, a Grand Jury sitting in this district returned Indictment 19 Cr. 676 (PGG), charging the defendant in nine counts. (Dkt. 6). Count One charges the defendant with conspiring to provide material support to Hizballah, in violation of 18 U.S.C. § 2339B. Count Two charges the defendant with providing material support to Hizballah, in violation of 18 U.S.C. § 2339B. Count Three charges the defendant with participating in a conspiracy to receive military-type training from Hizballah, in violation of 18 U.S.C. § 2339D. Count Four charges the defendant with receiving that military-type training from Hizballah, again in violation of 18 U.S.C. § 2339D.

Counts Five through Nine relate to immigration and marriage fraud. Count Five charges the defendant with unlawfully procuring citizenship or naturalization to facilitate an act of terrorism, in violation of 18 U.S.C. § 1425(a). Count Six charges the defendant with participating in a conspiracy to commit marriage fraud, in violation of 8 U.S.C. § 1325(c). Count Seven charges the defendant with citizenship application fraud, in violation of 18 U.S.C. § 1546(a). Count Eight charges the defendant with naturalization fraud, in violation of 18 U.S.C. § 1015(a), and Count Nine charges the defendant with making false statements, in violation of 18 U.S.C. § 1001.

## DISCUSSION

### I.  The Pre-Arrest Interviews Were Non-Custodial and No Hearing is Required

The defendant argues that he was in custody during the Pre-Arrest Interviews despite admitting several facts demonstrating that any reasonable person in his position would have felt free to "leave the police encounters at issue," and certainly would not have felt restrained "to a degree associated with formal arrest." *United States v. Newton,* 369 F.3d 659, 672 (2d Cir. 2004) (citations omitted).  In making his argument, the defendant emphasizes his own purported feelings during the Pre-Arrest Interviews, which are entirely irrelevant to the custody inquiry and, in any event are belied by the record.[2]  To the contrary, in his Declaration (the "Def. Decl.," Dkt. 28), the defendant admits, among other things, that (a) the Questioning Agents explicitly told him that he was not under arrest; (b) at his request, the Questioning Agents allowed him to walk away from them, alone, and into his own apartment, before they began the interview; (c) the Questioning Agents told the defendant that he could call anyone before the March 14 Interview began; (d) the Questioning Agents informed the defendant of the purpose of the March 14 Interview before it started; and (e) the Questioning Agents did not arrest the defendant at the conclusion of the March 14 Interview.  Notably absent are any allegations regarding a use or show of force, or the use of restraints at any time.  Regarding the Other Pre-Arrest Interviews, the defendant makes two additional arguments—that the Questioning Agents told the defendant he had to inform them about any travel plans he had in advance, and that he could not fly in connection with his travel, and, second, that he noticed that he was under FBI surveillance.  Again, inherent in the defendant's own

---

[2] The defendant does not argue that his statements to law enforcement were involuntary.  *See* Richman Decl. Ex. A ¶ 21(a) (noting that defendant confirmed before each interview that he was there voluntarily).

factual assertions are certain dispositive facts: (a) he was allowed to resume his job and life after the March 14 Interview; (b) he traveled, alone and on his own volition, to meet with the Questioning Agents ten more times; and (c) he was allowed to continue to travel for work. All of these facts stand in stark contrast to the relevant legal standard—whether the Questioning Agents curtailed the defendant's freedom such that a reasonable person would have felt he was under formal arrest. Put simply, even accepting the defendant's recitation of facts as true, the Pre-Arrest Interviews were non-custodial, and the Court should deny this motion without a hearing.

## A. Applicable Law

Individuals who are subjected to custodial interrogation by law enforcement must be advised of their right against self-incrimination under the Fifth Amendment, and then knowingly and voluntarily waive that right, before interrogation begins. *Miranda v. Arizona*, 384 U.S. 436, 448-50 (1966). However, the protections afforded by *Miranda* only attach in situations involving "questioning initiated by law enforcement officers after a person has been taken into custody." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990) (quoting *Miranda*, 384 U.S. at 444). In turn, the determination of whether someone is "in custody" is an objective inquiry based on the totality of the circumstances, not based on "the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). The relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Thus, there is a two-step test for determining whether an individual is in custody for purposes of *Miranda*: first, a court must ask "whether a reasonable person would have thought he was free to leave the police encounter at issue." *Newton*, 369 F.3d at 672 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Stansbury*, 511 U.S. at 322). "If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not

require advice of rights." *Newton*, 369 F.3d at 672. However, even if the answer is no, because "not every seizure constitutes custody for the purposes of *Miranda*," the court must then evaluate whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* (citations omitted). "Only if the answer to this second question is yes was the person in custody for practical purposes, and entitled to the full panoply of protections prescribed by *Miranda*." *Id.* (citations and internal quotations omitted).

Among the factors that courts consider in trying to determine whether an individual was in custody are: whether questioning officers had their guns visible or drawn during an interview, *e.g.*, *United States v. Badmus*, 325 F.3d 133, 138-39 (2d Cir. 2003) (affirming district court, which noted in part that guns may have been present during interview but were not drawn at any point); whether questioning officers verbally indicate to an individual that he is not under arrest, *e.g.*, *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2018) (noting that, while not dispositive, the fact that officers told suspect that he was "not under arrest and was free to leave" was highly probative in evaluation of whether interview was custodial); *United States v. Zuber*, No. 12 Cr. 45 (WKS), 2013 WL 3873178, at *6 (D. Vt. July 25, 2013) ("[C]ourts tend to not find custody when officers specifically tell an individual that he or she is not under arrest.") (citations omitted); whether officers physically restrain an individual, including by the use of handcuffs, *e.g.*, *United States v. Titemore*, 437 F.3d 251, 260 (2d Cir. 2006) ("[The defendant], however, was never placed under arrest, nor restrained in anyway."); whether a defendant travels freely to the interview, *e.g. United States v. Cota*, 953 F.2d 753, 758-59 (2d Cir. 1992) (finding that *Miranda* warnings were not needed when defendant voluntarily accompanied police to the station); *Titemore*, 437 F.3d at 260 (noting that fact that the defendant was "asked . . . to step outside to talk with" police officer

was indicia of non-custodial interview); the location of the interview, *e.g.*, *Beckwith v. United States*, 425 U.S. 341, 345-47 (1976) (finding that *Miranda* warnings were not required because the interview was conducted in a private home where the defendant occasionally stayed); *United States v. Wilson*, 901 F. Supp. 2d 172, 174-75 (S.D.N.Y. 1995) (noting, in finding interview non-custodial, that a factor of particular weight was fact that "the interview was conducted during ordinary business hours in a commercial, as opposed to government, premises"); and whether the defendant was arrested at the conclusion of the interview, *e.g.*, *United States v. Palase*, No. 11 Cr. 413 (SLT), 2014 WL 6802560, at *7 (E.D.N.Y. Dec. 2, 2014) ("Finally, the fact that the defendants were not arrested until one month later weighs heavily in favor of finding the interviews non-custodial.") (citations omitted).

## B. Discussion

### 1. The March 14 Interview

Based solely on the defendant's Declaration, it is clear that the March 14 Interview was non-custodial. First, the defendant admits that the Questioning Agents approached him in the parking lot outside of his home, identified themselves as law enforcement, and informed him they wanted to talk to him about Hizballah. (Def. Decl. ¶¶ 6, 7). Thus, the Questioning Agents "identified themselves to [the defendant] in a public place," an early fact supporting the finding that the subsequent interview was non-custodial. *See Wilson*, 901 F. Supp. 2d at 174-75. Further, while the defendant repeatedly claims in his declaration that he was "not told" that the FBI was "looking to charge me with any crimes involving terrorism," this is a subjective belief about his own status, which is irrelevant, *United States v. Schaffer*, 851 F.3d 166, 173-74 (2d Cir. 2017) ("[a]n individual's subjective views about his or her status generally does not bear on the custody analysis.") (citation omitted), and belied by his own admission that the Questioning Agents told

23

him, in their very first encounter, that they wanted to discuss Hizballah (Def. Decl. ¶ 7). *See, e.g.*, *United States v. Paccione*, 738 F. Supp. 691, 709 (S.D.N.Y. Apr. 30, 1990) (denying motion to suppress as "frivolous" because questioning agents "identified themselves and explained the nature and purpose of interview" before interviewing defendant in his own home, and noting that the commencement of a criminal investigation does not mandate *Miranda* warnings in a non-custodial setting); *see also United States v. Rhoades*, No. 15 Cr. 206 (JAM), 2016 WL 7197358, at *6 (D. Conn. Dec. 9, 2016) (in finding interview non-custodial, noting that the defendant had gone to a conference room "with knowledge that the police wanted to talk to him"); *United States v. Parker*, 116 F. Supp. 3d 159, 171 (W.D.N.Y. July 8, 2015) (noted as relevant in finding interview non-custodial that officer identified himself and the purpose of the interview).

Second, the defendant admits that the Questioning Agents allowed him to walk away from them and enter his apartment before the March 14 Interview began, and that he then walked back outside his apartment, again on his own, to meet with them. (Def. Decl. ¶ 8; *see also id.* ¶ 7("I asked for and was permitted by the [Questioning Agents] to take my belongings into my apartment before going to the office building with them.")). The defendant was therefore "free to leave" the encounter before the interview began, he did so, and then walked to meet with the agents, on his own, to begin the interview. *Cf. Familetti*, 878 F.3d at 60 (outlining the standard for determining custody) (citations omitted). This admission alone is dispositive of the inquiry into whether an objectively reasonable person in his place would have felt free to leave. *See, e.g.*, *United States v. Beal*, 730 F. App'x 30, 33 (2d Cir. 2018) (affirming district court finding that interaction was non-custodial in part because officers did not affirmatively convey that defendant was not free to leave interrogation). For example, in *Beal*, interrogating officers met with the defendant in an open

24

showroom at his place of business. *Id.* at 33-34. During the course of the interview, the officers did *not* "affirmatively tell [the defendant] that he could leave," but the Second Circuit still found that the Beal was not in custody because the officers also "did not tell [the defendant] that he could not leave or physically block or prevent him from leaving the room." *Id.* The Second Circuit thus found it sufficient (coupled with other facts) merely that the officers in *Beal* had not taken the affirmative step of asserting their control over the defendant, even though they never confirmed for him that he was free to go or not under arrest. Here, by contrast, the Questioning Agents explicitly told the defendant he was not under arrest (as discussed below) and affirmatively allowed him to walk away, alone, into the comfort and safety of his own residence. The defendant was clearly free to leave, as any objectively reasonable person would have felt in the same situation, and demonstrated this through his admitted conduct.

Third, the defendant admits that the Questioning Agents "instructed" him to walk with them to the office building across the street from his apartment, and does not allege that they forced him to do so or that they physically restrained him. (Def. Decl. ¶ 9). *See Cota*, 953 F.2d at 758-59 (affirming district court finding that interview was non-custodial and noting, in part, that subjects had chosen to go to the police station themselves before questioning began); *Titemore*, 437 F.3d at 260 ("easily" dispensing with *Miranda* claim after officer "asked [the defendant] to step outside with him" because defendant was never placed under arrest or restrained in any way). Indeed, the defendant does not allege that law enforcement restrained or handcuffed him at any point prior to or during the course of the March 14 Interview. This is another fact strongly counseling in favor of finding that the interview was non-custodial. *See, e.g.*, *United States v. Santillan*, 902 F.3d 49, 61 (2d Cir. 2018) (affirming district court finding that interview was non-

custodial based, in part, on fact that defendant was "never handcuffed"); *United States v. Valerio*, 765 F. App'x 562, 566 (2d Cir. 2018) (affirming district court finding that interaction non-custodial based on several factors, including that defendant "was never handcuffed or restrained at any time"); *Titemore*, 437 F.3d at 260 (holding that "[the defendant], however, was never placed under arrest, nor restrained in anyway" in finding interaction non-custodial); *United States v. Deas*, No. 17 Cr. 719 (JGK), 2018 WL 3023282, at *7-8 (S.D.N.Y. June 15, 2018) (holding that interrogation which took place in a precinct's "muster room" was not custodial based, in part, on fact that handcuffs were never applied to the defendant); *United States v. Kirsteins*, 906 F.2d 919, 924 (2d Cir. 1990) (finding interaction non-custodial because, while government attorney accompanied defendant to street and back during break in questioning, "[t]he attorney never touched or impeded [the defendant] in any way"); *United States v. Sawinski*, No. 00 Cr. 49 (RPP), 2000 WL 1357491, at *4 (S.D.N.Y. Sept. 20, 2000) (in finding interview non-custodial, noting that defendant was allowed to walk "alongside" law enforcement to location of interview).

Fourth, the defendant admits that, before the interview began, he asked the Questioning Agents if he needed an attorney, and the Questioning Agents responded that the defendant was "free to call anyone that I wanted and that I was not under arrest." (Def. Decl. ¶ 10). Again, this weighs heavily in favor of finding that the subsequent interview was non-custodial. *See Newton*, 369 F.3d at 677 ("[A reasonable person told . . . that he was not under arrest would likely have understood that he was not about to be removed from his house to the police station—a significant factor in determining the degree to which one is at 'the mercy' of the authorities.") (citation omitted); *United States v. Santillan*, 902 F.3d 49, 61 (2d Cir. 2018) (holding that fact that defendant was told "that he was not under arrest" was factor in finding interaction non-custodial); *Badmus*,

325 F.3d at 139 (finding particularly important that agents had told subjects that they "were not under arrest and could ask the agents to leave at any time" in finding interview non-custodial); *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("Decisions in this circuit have emphasized that in the absence of an actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave."); *United States v. Vado*, 87 F. Supp. 3d 472, 479 (S.D.N.Y. 2015) (noting that agents had told suspect that he was "not under arrest and was free to leave" in finding interaction non-custodial, despite officers having moved defendant between rooms in his house, away from his girlfriend, and, at one point, officer physically placing himself between defendant and exit door); *United States v. Groezinger*, 625 F. Supp. 2d 145, 158-59 (S.D.N.Y. 2009) (finding interview non-custodial based, in part, on fact that "at the very beginning of the encounter, [the defendant] was explicitly told that he was not under arrest" and emphasizing that "notably, [the officers] explicitly told him that he was *not* under arrest") (emphasis in original); *Wilson*, 901 F. Supp. at 175 (noting that the defendant "was not told that he was under arrest or that he was not free to leave" in finding interview non-custodial); *United States v. Schaffer*, No. 12 Cr. 440 (ARR), 2014 WL 1414799, at *8 (E.D.N.Y. April 18, 2014) (finding that fact that defendant "was informed that he was not under arrest" and then "voluntarily agreed to speak" with officers was relevant in finding interview non-custodial, despite fact that agents told him he could not leave at one point because of boxes stacked in the hallway and potential security issues); *United States v. Stone*, No. 12 Cr. 133 (JGM), 2013 WL 5274850, at *4 (D. Vt. Sept. 18, 2013) ("The agents also informed the defendant that he was not under arrest—another factor which weighs against a custody finding."); *United States v. Rakowski*, 714 F. Supp. 1324, 1334 (D. Vt. Nov. 27, 1987) ("In addition, courts often find that questioning

following law enforcement officers' statements that the individual is not under arrest is noncustodial, especially where there is insufficient evidence to show that the defendant did not believe the officer's statement.") (citations omitted).

For example, in *Santillan*, the Second Circuit considered a situation in which an individual was "questioned, frisked, and asked to sit in the back of a police car" before being interviewed. 902 F.3d at 61. In determining the "ultimate inquiry" and finding that this interaction was not akin to a formal arrest, the court emphasized three factors—the defendant was able to observe the police officers dealing with other interviews, on the side of the highway, while he sat in the police car (putting him on notice that he was placed in the car for safety purposes), the officers did not handcuff the defendant, and the officers explicitly told the defendant that he was not under arrest. *Id.* Similarly, in *Badmus*, the Second Circuit affirmed a district court's reliance on the use of similar language by interrogating officers in finding an interview non-custodial. 325 F.3d at 139. There, the district court had held that an interview was non-custodial despite the fact that officers asked the defendant and his wife to remain seated in their living room after they provided consent to search their apartment, there were a "half dozen" officers in a small space during the interview, and the officers had holstered firearms, which may have been visible to the defendant. *Id.* However, the Second Circuit still affirmed the district court finding that the subsequent interview was non-custodial, based "in particular" on the district court's determination that the officers had told the defendant and his wife that they "were not under arrest" and could ask the officers conducting the consent search to "leave at any time." *Id.* Here, in circumstances otherwise far less restrictive, the officers used explicit language to convey to the defendant that he was not under

arrest, and this strongly supports a finding that the defendant was not in custody during the first interview.

Similarly, the fact that the Questioning Agents informed the defendant that he was allowed to make a telephone call before the March 14 Interview began further demonstrates that the interview was non-custodial. *See, e.g.*, *United States v. Belcher*, No. 96 Cr. 789 (BSJ), 1997 WL 35495, at *2 (S.D.N.Y. Jan. 29, 1997) (noting that officers allowed a defendant "to make numerous phone calls" as relevant in finding interrogation non-custodial); *United States v. Alexander*, No. 16 Cr. 141 (CR), 2018 WL 1891307, at *6 (D. Vt. Apr. 19, 2018) (noting in part that defendant was allowed to make phone calls during interview in finding it non-custodial); *United States v. Smith*, No. 12 Cr. 52 (CR), 2012 WL 5187922, at *5 (D. Vt. Oct. 18, 2012) (noting that officers offered defendant opportunity to call lawyer as a factor that weighed in favor of finding the interview non-custodial). This fact carries particular weight in context. As the defendant admits, he asked the Questioning Agents if he needed an attorney as he walked out of his apartment building. The agents responded by telling him he was not under arrest, and that he was free to call anyone he wanted. (Def. Decl. ¶ 7).[3] The impact that this statement would have on an objectively reasonable person is clear, because the language used is unequivocal—the defendant was not under arrest, and thus free to contact anyone he desired and to leave. These facts, even if they were standing alone, strongly support a finding that the interview was far from akin to an arrest, and thus non-custodial.

---

[3] While the Government does not believe a hearing is necessary and the Court should deny this motion based on the defendant's own admissions, if the Court does hold a hearing, the Government anticipates that it would adduce the additional fact that the defendant was actually on his phone as he walked out of his apartment building to the parking lot to meet with the Questioning Agents.

Fifth, the defendant admits that the March 14 Interview took place in a commercial office building, across the street from his own residence, and not in a police station. (Def. Decl. ¶ 7). The location of an interrogation is another important factor in determining whether it is custodial. *See Beckwith*, 425 U.S. at 345-47 (finding that *Miranda* warnings were not required because the interview was conducted in a private home where the defendant occasionally stayed); *Wilson*, 901 F. Supp. at 175 (noting, in finding interview non-custodial, that a factor of particular weight was fact that "the interview was conducted during ordinary business hours in a commercial, as opposed to government, premises"). Indeed, even if an interrogation takes place at a police station or other government building, this does not suffice, without more, to establish that the interview was custodial. *See United States v. Kirsteins*, 906 F.2d 919, 924 (2d Cir. 1990) (noting that the "Supreme Court has held that a police station is not so coercive an environment as to establish, without more, custodial restriction of freedom," and extending that logic to the U.S. Attorney's Office) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The March 14 Interview took place in a location far from that—it was in a familiar neighborhood, in a non-coercive environment.

Sixth, the defendant does not allege that he ever saw the Questioning Agents holding or brandishing firearms. *See, e.g.*, *Santillan*, 902 F.3d at 61 (noting that officer "never . . . displayed a weapon" in affirming district court finding that interaction was non-custodial); *Valerio*, 765 F. App'x at 566 (affirming district court finding of non-custodial interview based, in part, on fact that "agents did not brandish or draw their weapons at any time while executing the search warrant or interviewing Valerio"); *Badmus*, 325 F.3d at 138-39 (affirming district court, which noted in part that guns may have been present during interview but were not drawn at any point). In *Badmus*, the district court found that the questioning officers had holstered weapons, and that the subjects

may have seen the weapons during the course of their interrogation. 325 F.3d at 139. However, the Second Circuit noted that the district court also found that the weapons were "not drawn at any time" as a mitigating factor in evaluating whether the subjects were in custody. *Id.* Again, here, the defendant does not even allege that he saw firearms at any time, another factor demonstrating that the March 14 Interview was non-custodial.

Finally, the defendant admits that he was not arrested after the March 14 Interview but was, instead, allowed to return to work, and was allowed to travel in connection with his job. *See Palase*, 2014 WL 6802560, at *7 ("Finally, the fact that the defendants were not arrested until one month [after the interview] weighs heavily in favor of finding the interviews non-custodial.") (citations omitted); *United States v. Soteriou*, No. 12 Cr. 39 (CR), 2012 WL 5426440, at*6 (D. Vt. Nov. 7, 2012) ("Finally, following the interview, the defendant was neither arrested nor threatened with arrest. This weighs heavily in favor of finding that the interrogation was not custodial."). This fact, too, weighs heavily towards a finding that the March 14 Interview was not custodial.

In the face of this series of facts supporting the denial of his motion, the defendant relies almost exclusively on the subjective claim that he did not feel free to decline to speak with the Questioning Agents. However, "the subjective views harbored by either the interrogating officers or the person being questioned" are entirely irrelevant to this inquiry. *J.D.B. v. North Carolina*, 564 U.S. 261, 270-71 (2011) (quoting *Stansbury*, 511 U.S. at 323). Further, the defendant makes much of the fact that the Questioning Agents were waiting for him outside his building when he exited his apartment after they had permitted him to walk away from them and go back inside. (Def. Mot. at 5-6). This, too, is a misplaced argument, as it entirely ignores the fact that the

Questioning Agents did not accompany him into his building or apartment and, instead, allowed him to walk freely away from their encounter—a fact that, standing alone, demonstrates the non-coercive nature of this interaction.

In addition, the defendant argues that "a reasonable person would not feel free to walk away from an FBI agent and NYPD officer if they were approached steps away from their own home," an argument directly contrary to Second Circuit precedent which holds that much more than a mere approach by law enforcement is required to find an interaction custodial. (Def. Mot. at 6). *See, e.g.*, *United States v. Guarno*, 819 F.2d 28, 31-32 (2d Cir. 1987) (noting that, in absence of actual arrest, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.") (citations omitted). As Judge Kaplan explained:

> It would be naive to suggest that there is not a hint, however slight, of threat in almost any circumstance in which law enforcement personnel seek to question a citizen. But the cases make crystal clear that far more than this is required in order to transform a perfectly appropriate request for information into a custodial interrogation.

*Wilson*, 901 F. Supp. at 174. The defendant's allegations do not supply the "far more" that is required under the law and, instead, he has admitted sufficient facts for the Court to find without a hearing that the March 14 Interview was non-custodial.

The defendant also cites two cases in support of his argument—this Court's decision in *United States v. McDow*, 206 F. Supp. 3d 829 (S.D.N.Y. 2016) and *United States v. Camacho*, 674 F. Supp. 118 (S.D.N.Y. 1987). But neither case helps him. In *McDow*, a defendant sought to suppress statements he made to law enforcement about his possession of narcotics. *McDow*, 206

F. Supp. 3d at 844-48. The court relied on a number of factual findings far different from the situation here in holding that the defendant was in custody at the time of his questioning. First, the officers in *McDow* "directed [the defendant] to return" after he began walking away from their initial approach. *Id.* at 846. The officers then started to question the defendant, with one officer standing behind him "blocking him from leaving" while the other questioned him. *Id.* The officer blocking the defendant admitted in testimony that his purpose was just that—to secure him so that he was not free to leave. *Id.* In addition, the officers conducted a "thorough search" of the defendant's pockets before interrogating him. *Id.* Finally, the officers testified at the suppression hearing that *they believed* the defendant was not free to leave from the inception of their interaction with him, and the Court found that the officers had conveyed their belief to the defendant through the aggregate of the above-cited objective factors. *Id.*

None of the factors the Court relied on in *McDow* are present here, even as alleged by the defendant. The officers did not conduct a search of the defendant before they began the interview (despite having a judicially authorized search warrant for any electronics on his person, which they waited to execute until they completed the interview). The officers did not "request" that the defendant unlock his building or enter the lobby; instead, they told him he was not under arrest, and allowed him to return alone to his apartment and come back outside to meet with them. The officers never physically "blocked" the defendant from leaving or going anywhere. After the defendant came back outside, he walked unrestrained with the Questioning Agents to another location, across the street, where the March 14 Interview took place.

The defendant's reliance on *Camacho* fares no better. In *Camacho*, the defendant refused to sign a *Miranda* waiver, but the officers proceeded to question him anyway. *Id.* The court held

33

that the interaction turned from non-custodial to custodial due to a number of factors, each of which was not present in this case:

> After Camacho showed [Postal Inspector] McDermott his wallet, however, the tone of the interaction changed. McDermott directed Camacho into another room, and told him to sit down, remain seated, and make no sudden movements. McDermott testified that he said to Camacho words to the effect that this instruction was "for your safety and our safety[.]" McDermott also told Camacho that he would follow him anywhere he went in the apartment, and when Camacho had to go to the bathroom, he was followed, and told that he had to leave the door open to do so. Camacho was never told that he was free to leave. Finally, Camacho was read his rights, an act which the public at large knows generally attends an arrest.

*Id.* Unlike in *Camacho*, the agents in this case allowed the defendant to enter his own apartment alone, and they told the defendant he was free to leave. Thus, as with *McDow*, a comparison of this case to *Camacho* reveals the noncustodial nature of the March 14 Interview, and further supports a denial of this motion.

### 2. The Other Pre-Arrest Interviews

The defendant also alleges that the Other Pre-Arrest Interviews were custodial. First, the defendant undermines his own argument by implicitly admitting that he left every one of the meetings, and traveled, on his own, to and from each one. Additionally, many of the factors discussed above also show that the Other Pre-Arrest Interviews were also non-custodial—among them, that the Questioning Agents did not arrest the defendant after the interviews, that the Questioning Agents never handcuffed or restrained the defendant, and that the defendant does not claim that he ever saw a firearm. The defendant does not make any new allegations regarding the circumstances of these interviews, other than reasserting his subjective belief that he was not free to leave them. The defendant, instead, argues that the Questioning Agents placed "restrictions on his movement" akin to arrest because he had to tell the Questioning Agents before he was traveling and because the Questioning Agents told the defendant that he was not allowed to fly. (Def. Mot.

at 10-11). This, the defendant contends, amounted to him being in the "constructive custody" of law enforcement, and thus rendered the Other Pre-Arrest Interviews custodial. (*Id.*). As the defendant admits, however, he was allowed to travel, and, the defendant alleges that the Questioning Agents told him could not fly starting on March 22, 2019—thus this fact is only relevant, if at all, to the Other Pre-Arrest Interviews (and not the March 14 Interview). (Def. Decl. ¶ 26(b)). Second, the defendant argues that he noticed he was under FBI surveillance after the March 14 Interview (possibly because of his counter-surveillance training from the IJO) and this, too, was a restriction on his movement akin to an arrest. (*Id.*).

First and foremost, once again, the defendant's contention that an objectively reasonable person would not have felt "free to leave" the interviews is belied by the fact that he did just that, nine times, before returning to subsequent interviews in a variety of locations. The defendant admits as much, and in his Declaration notes that the Pre-Arrest Interviews took place at a variety of locations in New York and New Jersey. Further, between the Other Pre-Arrest Interviews, the defendant traveled throughout the United States for his job and pleasure. Thus, not only was the defendant free to leave the various police encounters at issue, but he voluntarily chose to travel *to* them, each time, and meet with the Questioning Agents.

The defendant cites to no cases in support of this novel theory, other than an attempt to analogize the actions of the agents in *McDow* to law enforcement who surveilled the defendant after the March 14 Interview. This strains credulity. After the March 14 Interview, the defendant was allowed to return to his job and life. While he was under FBI surveillance after the March 14 Interview (which was a reasonable law enforcement measure, given the admissions the defendant made during the course of that interview), this is in no way similar to two officers blocking the

defendant on a sidewalk. Indeed, the defendant undermines his own argument by noting that law enforcement allowed him to travel. In short, the defendant offers no support for his contention that merely being under law enforcement surveillance establishes that an individual is in custody akin to an arrest, and would cause an objectively reasonable person to believe he was not free to terminate subsequent law enforcement interviews. *See United States v. Grandi*, 424 F.2d 399, 401 (2d Cir. 1970) (finding, in context of a *Miranda* analysis, that "[b]y taking a seat across the aisle from appellant so that he might maintain surveillance, Inspector Graveline did not restrain appellant's liberty of movement nor did he assert custody over appellant's person or luggage").

Similarly, the defendant cites no authority for his argument that having to inform the Questioning Agents of his travel plans was akin to "restraints comparable to those associated with formal arrest." *Newton*, 369 F.3d at 671. Again, the defendant admits that he traveled several times around the United States during the time when the FBI was arranging to voluntarily interview him. (Def. Decl. ¶ 26 (listing trips the defendant took after March 14 and before his arrest)). The defendant was not just free to leave, he was free to travel, and he did. The text messages the defendant exchanged with the Questioning Agents demonstrates the true nature of their interactions. *See* Richman Decl. Ex. B (phone report containing text messages and call log). Between March 14 and July 9, 2019, the defendant exchanged approximately 58 text messages and 72 calls with the Questioning Agents, all of which establish that he was voluntarily agreeing to continue speaking and meeting with them.[4] For example, on March 25, 2019, the defendant missed a call from the Questioning Agents, and then sent a text message, "I was in a meeting. I'm

---

[4] Exhibit B lists 60 text messages, including two text messages setting up the phone, and 82 calls, including nine missed calls.

free now. You can call at your convenience." (Richman Decl. Ex. B at p.1, line 10). On April 4, 2019, the Questioning Agents messaged the defendant to coordinate their meeting plans, and wrote "Both Friday or Saturday are fine on our end. *Whichever is more convenient for you*." (*Id.* at p. 2, line 1) (emphasis supplied). Similarly, on April 19, 2019, in setting up another meeting, the Questioning Agents asked the defendant to let them know what time was convenient, and the defendant responded, "I'll be done by 4." (*Id.* at p. 2, line 21). On April 29, 2019, one of the Questioning Agents asked the defendant to "give me a call when you're free," and the defendant responded that he would call in "20 min[utes]." (*Id.* at p. 2, lines 27-28). Further, as an example of the supposed "restraints" placed on the defendant, on June 26, 2019, he sent a text message *informing* the Questioning Agents that he would be traveling, "Just wanted to tell you that I am traveling tomorrow for work to PA, will stay there for the night and come back on Fri." (*Id.* at page 4, line 57). This comports with the defendant's declaration, in which he affirms that he "notified" the officers of no fewer than five work trips, and nowhere even alleges that he was told he was not able to take any of his planned trips. (Def. Decl. ¶ 26).

The defendant has fallen far short of demonstrating that the interviews with law enforcement were custodial, and the Court should deny this motion without a hearing.

## II. The Defendant's Post-Arrest Statement was not the Product of a Deliberate Two-Step Interrogation

The FBI arrested the defendant on July 9, 2019. After his arrest, the defendant waived—orally and in writing—his *Miranda* rights, and proceeded to participate in a post-arrest interview with the FBI. During the course of his post-arrest interview, the defendant provided the FBI with additional information about his activities on behalf of the IJO. Because the Pre-Arrest Interviews were non-custodial, because the FBI did not engage in a deliberate two-step process to undermine

the defendant's *Miranda* rights, and because there was a 19-day break between the last Pre-Arrest Interview and the defendant's arrest, the Court should deny the defendant's motion.

## A. Applicable Law

When an initial confession is improperly obtained without the required *Miranda* warnings, the Government is not precluded from introducing a subsequent confession obtained after the warnings have been properly administered. *See Oregon v. Elstad*, 470 U.S. 298, 318 (1985). However, officers are not permitted to employ a "question first" strategy in which they deliberately withhold *Miranda* warnings until a suspect has confessed and then give the warnings in the midst of a continuing interrogation. *See Missouri v. Seibert*, 542 U.S. 600, 617 (2004) (plurality opinion); *United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007) (holding that *Seibert* creates an exception to the *Elstad* rule but does not overrule it). The Second Circuit has adopted a "totality of the circumstances" test, under which the Government has the burden of proof by a preponderance of the evidence, to determine whether a two-step interrogation by the police is deliberate. *United States v. Capers*, 627 F.3d 470, 480 (2d Cir. 2010). Factors relevant to determining whether the taint of a coerced confession has dissipated include "the time that passes between confessions, the change in place of interrogations, and the change in identity of interrogators." *Elstad*, 470 U.S. at 310; *see also Brown*, 422 U.S. at 603-04. Thus, courts must address first whether officers employed a "deliberate, two-step strategy, predicated upon violating *Miranda* during an interview," and, if so, whether they took any "specific, curative steps" before the subsequent, *Miranda*-compliant, interview. *Capers*, 627 F.3d at 477-78 (quoting *Seibert*, 452 U.S. at 621).

Importantly, the "two-step interrogation" inquiry is only relevant if pre-*Miranda* statements were the product of custodial interrogation. *See United States v. Simmonds*, 641 F.

App'x 99, 101 (2d Cir. 2016) (holding that court did not need to reach two-step inquiry because defendant was not in custody before *Miranda* warnings were given); *United States v. Deas*, No. 17 Cr. 719 (JGK), 2018 WL 3023282, at *9 (S.D.N.Y. June 15, 2018) ("The defendant's argument is unavailing because, as explained above, the defendant's first statement was not the product of a custodial interrogation and therefore there was nothing to 'circumvent.'") (citing *United States v. Moore*, 670 F.3d 222, 228-29 (2d Cir. 2012)). Thus, if a defendant was not in custody during the first statement given before *Miranda* warnings, the two-step interrogation inquiry does not apply.

Finally, while the defendant does not argue that his statements—before or after his arrest— were involuntary, the pertinent question in considering voluntariness is "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973)). In order to address that question, courts consider the "totality of the circumstances, including '1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police.'" *United States v. Konn*, 634 F. App'x 818, 822 (2d Cir. 2015) (summary order) (quoting *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003)). "[A] violation of the constitutional guarantee occurs when one is 'compelled' by *governmental* coercion to bear witness against oneself in the criminal process." *Duckworth v. Eagan*, 492 U.S. 195, 209 (1989) (emphasis added). Thus, "'[c]oercive police activity is a necessary predicate to the finding that a confession is not voluntary.'" *McMillon v. Culley*, 380 F. App'x 63, 67 n.3 (2d Cir. 2010) (summary order) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)); *accord United States v. Romero*, 897 F.2d 47, 52 (2d Cir. 1990). Further, a knowing and intelligent waiver of *Miranda* rights is "'highly probative' of voluntariness." *United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012). "[C]ases

in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson*, 530 U.S. at 444 (internal quotation marks omitted). "Implicit in *Dickerson*'s rarity admonition is the recognition that, among the totality of circumstances that determine voluntariness, *Miranda* waivers bear considerable weight." *United States v. Taylor*, 752 F.3d 254, 260 (2d Cir. 2014) (Raggi, J., dissenting from denial of rehearing *en banc*).

## B. Discussion

For three reasons, the Court should not suppress the defendant's post-arrest statement. First, for all the reasons detailed above, the defendant was not in custody during the course of the Pre-Arrest Interviews. As such, the "two-step interrogation" inquiry is irrelevant, and the Court should deny the motion on this basis alone. *Simmons*, 641 F. App'x at 101.

Second, the totality of the circumstances before the Court demonstrate that the Questioning Agents did not engage in a "deliberate" two-step process. The Pre-Arrest Interviews took place over the course of three months, in a variety of locations, and covered a number of topics. The Questioning Agents did not provide *Miranda* warnings because the interviews were not custodial, and the defendant confirmed at each interview that he was there voluntarily. (*See* Richman Decl. Ex. A ¶ 21(a)). Nineteen days after the last Pre-Arrest Interview, after a Complaint had been sworn out and a Magistrate Judge authorized a warrant for the defendant's arrest, the Questioning Agents arrested the defendant, transported him to 26 Federal Plaza, and read him his *Miranda* warnings, which he waived before giving the Post-Arrest Statement. Thus, the Questioning Agents did not seek to "undermine the *Miranda* warnings" by referring to the defendant's prior statements to law enforcement. *Seibert*, 542 U.S. at 616 (plurality opinion). They provided the warnings promptly once they arrested the defendant and took him into custody, and before

engaging in his post-arrest, custodial, interrogation. This is a situation far afield from *Seibert*, where the Court took issue with a series of factors, including, most pointedly, that there was only a 15 to 20 minute break between the two statements, and the defendant gave both statements at the same police station. *Id.*; *see also Williams*, 681 F.3d at 45 (noting that the "quintessential two-step technique involves a suspect's 'hearing warnings only in the aftermath of interrogation and *just after making a confession*,' with the police 'lead[ing] him over the same ground again'") (emphasis supplied) (quoting *Seibert*, 542 U.S. at 613); *United States v. Tirado*, No. 17 Cr. 668 (GHW), 2018 WL 3432040, at *18-21 (S.D.N.Y. July 16, 2018) (noting that 2.5 to three hour break between interviews counseled in favor of finding that there was no deliberate two-step interrogation). Here, 19 days elapsed between the last Pre-Arrest Interview and the arrest. As such, based on the totality of the circumstances as provided by the defendant, it is clear that the agents did not deliberately seek to evade *Miranda* by conducting a two-step interrogation.

Third, even if the Pre-Arrest Interviews were custodial, and the two-step interrogation was deliberate, the 19-day break between the last Pre-Arrest Interview and the Post-Arrest Interview, plus the fact that the Post-Arrest Interview took place at a new location (26 Federal Plaza), were sufficient "curative" steps to render the post-arrest statement admissible. Justice Kennedy in *Seibert* explicitly recognized that, even if law enforcement does engage in a two-step interrogation, curative measures, including a break in time and circumstances, suffice to eliminate any taint. *Seibert*, 542 U.S. at 621 ("For example, a substantial break in time and circumstances between the prewarning statement and the Miranda warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn.") (citation omitted). Thus, for example, in *United States v. Redrick*, the court

considered, in relevant part, two statements made by a defendant over the course of a single day. *United States v. Redrick*, 48 F. Supp. 3d 91, 109 n.13 (D.D.C. July 3, 2014). The defendant made the first statement before receiving *Miranda* warnings, at 6 a.m., in his apartment, during the course of a search. *Id.* He then made the second statement, at approximately 4 p.m., at the police station, after receiving and waiving his *Miranda* rights. *Id.* While the court also noted that the agent who questioned the defendant at the police station was not present during the search, it still found that these factors, including a break of only 10 hours between the two statements, sufficed to establish that they were not "part of a continuum." *Id.* (quoting *Seibert*, 542 U.S. at 617); *see also Bobby v. Dixon*, 565 U.S. 23, 31-32 (2011) (noting, in part, that "[f]our hours had passed between Dixon's unwarned interrogation and his receipt of *Miranda* rights" in finding that no illegal two-step interrogation had occurred). Here, there was a break of 19 days, and a similar change in location to the confines of 26 Federal Plaza from a variety of other locations in New York and New Jersey, including hotel rooms and commercial buildings. Thus, even if there was a two-step interrogation, there was sufficient attenuation in time and place between the Post-Arrest Interview and the Pre-Arrest Interviews to cure any arguable violation of the rule laid out in the plurality opinion in *Seibert* and *Capers*.

Finally, while the defendant does not contend to the contrary, his own Declaration undermines any contention that his post-arrest statement was the product of an involuntary confession. The defendant has not alleged any "coercive police activity" during the course of the Post-Arrest Interview, and, instead, admits that he was "read my *Miranda* rights" and then "read and signed my *Miranda* waiver . . . indicating that I wanted to speak with [the Questioning Agents] without an attorney present." (Def. Decl. ¶ 27). This is, standing alone, almost dispositive. *See*

*Dickerson*, 530 U.S. at 444 ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."). Further, the defendant then admits that the Questioning Agents asked him the "same detailed questions" that he had previously answered, and "reviewed the previous statements" that he had made to the Questioning Agents. (*Id.* ¶ 28). The defendant does not allege that the Questioning Agents coerced, tricked, or otherwise compelled him to make an involuntary statement. Instead, the defendant's own admissions demonstrate that this situation starkly contrasts to situations in which courts have found that statements were involuntary, and the defendant does not argue otherwise. *See, e.g.*, *United States v. Moore*, 670 F.3d 222, 233 (2d Cir. 2012) (holding that a post-arrest statement "contain[ed] no traces of the brutality, psychological duress, threats, or unduly prolonged interrogation that courts have previously found when they have concluded that statements were involuntarily made.") (internal quotation marks omitted).

For all of these reasons, the Court should reject the defendant's motion to suppress his post-arrest statement as the product of a two-step interrogation.

## III. The Court Should Deny the Defendant's Motion to Suppress the Fruits of his Statements to Law Enforcement

The defendant next seeks to suppress the fruits of his statements to law enforcement. (Def. Mot. at 15-16). The defendant does not identify specifically what evidence he seeks to suppress. The defendant's preliminary statement indicates that he is seeking suppression of the fruits of statements made by Saab during all of his interviews, Def. Mot. at 1, and the defendant's actual argument focuses on the alleged two-step interrogation process, Def. Mot. at 15-16. In any event, the Court should deny this motion. The defendant cites to one district court case, which deals

with an entirely different doctrine—the invocation of counsel, and its impact on a subsequent consent to search—and expressly disclaims any application to a situation like the one arguably at issue here. Further, Supreme Court precedent expressly forecloses any argument that the Court should suppress the fruits of his otherwise voluntary statements. Accordingly, the Court should deny this motion.

## A. Applicable Law

The failure to give *Miranda* warnings does not require suppression of physical evidence that law enforcement discovers based on unwarned statements that are voluntary. *United States v. Patane*, 542 U.S. 630, 637-44 (2004). The Court in *Patane* reasoned that "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause," which in the Court's view "is not implicated by the admission into evidence of the physical fruit of a voluntary statement." *Id.* at 636; *see also United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010) (summary order) (appellant's argument that physical evidence obtained as the result of a *Miranda* violation must be suppressed "is foreclosed . . . by the Supreme Court's decision in" *Patane*); *United States v. Haygood*, 157 F. App'x. 448, 449 (2d Cir. 2005) ("[T]he Self–Incrimination Clause of the Fifth Amendment 'cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements.'" (quoting *Patane*, 542 U.S. at 637)); *McDow*, 206 F. Supp. 3d at 848 n.13 (granting motion to suppress statements, but noting that "physical evidence obtained as the result of a *Miranda* violation is not subject to suppression because of the *Miranda* violation.") (citations omitted); *United States v. Rico*, No 18 Cr. 661 (PGG), 2019 WL 4014826, at *21 (S.D.N.Y. Aug. 26, 2019) ("While it is the general rule that a failure to advise a defendant of his *Miranda* rights results in suppression of his statements, [a]n interrogating officer's failure to advise a suspect of his *Miranda* rights does not require suppression

of the physical fruits of the suspect's unwarned statements.") (internal quotations and citations omitted); *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *8 (S.D.N.Y. Aug. 13, 2019) (denying motion to suppress firearm and noting that "[f]ailure to give *Miranda* warnings does not require suppression of physical evidence discovered as a consequence of unwarned statements that are voluntary and uncoerced") (citations omitted).

### B. Discussion

First, to the extent the defendant is arguing that the Court should suppress the fruits of the Pre-Arrest Interviews because he did not receive his *Miranda* warnings—even assuming they were warranted—*Patane* squarely forecloses this argument. 542 U.S. at 644. Even if the agents had improperly declined to Mirandize Saab (which, as discussed above, they did not), the Government is not precluded from offering the fruits of his un-Mirandized statements at trial. For example, in *Sharma*, Judge Schofield applied *Patane* in considering a motion to suppress a firearm that law enforcement located after a defendant alerted officers that the firearm was located in his house, upstairs, on a nightstand. *Sharma*, 2019 WL 3802223, at *7. Judge Schofield first suppressed the statement itself, finding that it was custodial interrogation, that the officers had not properly administered the *Miranda* warnings, and that the public safety exception did not justify the questioning pre-*Miranda*. *Id.* However, Judge Schofield then denied the motion to suppress the firearm, which the officers located as a direct result of the suppressed statement. *Id.* The court instead found that, because the defendant's statements were voluntary, *Patane* precluded suppressing the fruits of the suppressed statement—the firearm. *Id.* The same analysis controls here, and *Patane* compels denial of this motion.

The defendant's argument fares no better to the extent it rests upon a claim that the agents engaged in a two-step interrogation and therefore *Patane* does not apply. For the reasons discussed

above, there was no two-step interrogation; to the contrary, the defendant knowingly and voluntarily agreed to speak with the FBI agents on multiple occasions, often during meetings dictated by his own schedule. Beyond that, however, the defendant does not cite to a single case—and the Government is not aware of one—in which a court suppressed the fruits of a post-arrest statement that was taken in violation of the two-step interrogation rule. Instead, the defendant cites to one district court case from the Northern District of New York, United States v. Gilkeson, in support of this argument. *United States v. Gilkeson*, 431 F. Supp. 2d 270 (N.D.N.Y. 2006). But *Gilkeson* is inapplicable, as it concerned a situation in which law enforcement did not just fail to warn an in-custody defendant of his Miranda rights, but ignored his repeated requests to end the interrogation and provide him access to a lawyer. In *Gilkeson*, first, the court made factual findings crediting the defendant's testimony over that of law enforcement witnesses concerning a series of interactions related to the defendant's arrest and consent to search. *Id.* at 277-79. More specifically, in relevant part, the court found that the defendant had requested an attorney three times before providing consent to search a barn. *Id.* In considering whether this contravention of *Miranda* mandated suppression of the evidence that the questioning officers found based on the consent to search, the court determined that the officers had attempted to "bypass the *Miranda* requirement in this case" and had done so intentionally:

> Furthermore, the apparent attempt to bypass the *Miranda* requirement in this case is akin [to] the question-first conduct in *Seibert,* in which the plurality decision focused on the deterrence rationale. Of course, the need for deterrence is not implicated by good-faith police conduct. . . . The police in this case sought to contravene *Miranda*'s purposes. The police officers ignored Gilkeson's repeated requests in a calculated manner in an attempt to confuse the defendant and/or undermine his understanding of the effect of his assertion of his right to counsel.

*Id.* at 293-94 (internal citations omitted). In considering whether this conduct should lead to the suppression of the evidence found after the subsequent search, the court explicitly noted that "*Patane* is not controlling here because the instant case involves a *Miranda-Edwards* violation, *not a mere failure to warn*. The difference is dispositive." *Id.* at 292. (emphasis added). The defendant does not acknowledge this language of the opinion, which squarely takes it outside the argument he is now trying to make. Instead, the court in *Gilkeson* went on to explain that "*Miranda* and its progeny have treated the right to counsel during interrogation with a specific prescription— actually a prohibition. Once the right to counsel is invoked, officers must cease questioning . . ." *Id.* Thus, even the one case cited by the defendant does not help his cause.

Third, in addition, *Gilkeson* presents a set of circumstances far different from the conduct of the Questioning Agents. Here, in fact, the defendant admits that he was told he could call anyone from the very onset of the interactions he had with the Questioning Agents, and, as discussed above, each of the Pre-Arrest Interviews took place in a non-custodial setting, thus obviating the need for *Miranda* warnings in the first place. As opposed to *Gilkeson*, a case in which the court also found law enforcement to lack credibility on the key points of this analysis, there is no evidence that the Questioning Agents intentionally sought to contravene *Miranda*, and the defendant does not even allege that they did. Instead, the evidence shows that when the officers did take the defendant into custody, thus requiring *Miranda* warnings, they administered the warnings, verbally and in writing. For all of these reasons, *Gilkeson* is inapposite, a comparison to *Gilkeson* only demonstrates the failings of the defendant's motion, and the defendant otherwise cites to no support for his argument. The Court should therefore deny this motion.

## IV.  The Court Should Deny the Defendant's Motion to Change Venue

A defendant seeking a change of venue prior to jury selection bears the heavy burden of establishing that pretrial publicity is so pervasive and prejudicial that it corrupts the criminal process and renders a fair trial virtually impossible.  The defendant here asserts that because of "82 news accounts" of the charges against him, almost all of which came out in the fall of 2019, "[n]o potential juror in the SDNY can forget or put aside the landmarks that were the targets in this case." (Def. Mot. at 18).  The Southern District of New York is one of the largest and most diverse Districts in the country, one which has served as a fair venue for high-profile trials relating to criminal conduct in and around New York City, including cases involving terrorism, organized crime, corruption, and cases involving far more media attention than that at issue in this case. Further, even before the recent pause in Court activities due to the Covid-19 pandemic, the defendant had asked the Court for a trial date in April 2021—approximately 18 months after his arrest and vast majority of the media coverage of his conduct, diminishing greatly the impact, if any, that this coverage had on the jury pool.  Finally, any theoretical risk of prejudice can be mitigated using thorough *voir dire* and jury instructions.  For all of these reasons, the Court should deny the defendant's motion for a change of venue.

### A.  Applicable Law

The U.S. Constitution provides that criminal trials shall be held in the state and district where the crimes were committed.  *See* U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI. "Many high profile cases have been tried in the Southern and Eastern Districts of New York, and courts have relied on thorough voir dire examinations . . . to produce unbiased juries."  *United States v. Awadallah*, 457 F. Supp. 2d 246, 254 (S.D.N.Y. 2006) (internal quotation marks omitted). Nevertheless, the Constitution's place-of-trial requirements may yield in the "extreme case,"

*Skilling v. United States*, 561 U.S. 358, 381 (2010), in which "publicity in essence displace[s] the judicial process," *United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir. 2010) (internal quotation marks omitted). Rule 21(a) also provides that "the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a); *see also Sabhnani*, 599 F.3d at 232 (describing non-exhaustive list of relevant considerations).

In order to warrant a change of venue based on this authority, a defendant must meet the "difficult burden," *United States v. Salim*, 151 F. Supp. 2d 281, 282 (S.D.N.Y. 2001), of demonstrating "a reasonable likelihood," *United States v. Maldonado-Rivera*, 922 F.2d 934, 966-67 (2d Cir. 1990) (internal quotation marks omitted), that "extraordinary local prejudice will prevent a fair trial," *Skilling*, 561 U.S. at 378; *see also United States v. al Fawwaz*, No. 98 Cr. 1023 (LAK), 2015 WL 400621, at *2-3 (S.D.N.Y. Jan. 23, 2015); *United States v. Ayala*, 64 F. Supp. 3d 446, 449-50 (E.D.N.Y. 2014). "[D]istrict-court calls on the necessity of transfer are granted a healthy measure of appellate-court respect." *Skilling*, 561 U.S. at 378 n.11.

### 1. A Change of Venue Is Not Warranted Unless the Legal Process Is Displaced

The Supreme Court has rejected the proposition that "juror exposure to . . . news accounts of the crime alone presumptively deprives the defendant of due process." *Skilling*, 561 U.S. at 381 (internal quotation marks omitted). "[E]ven pervasive, adverse publicity . . . does not inevitably" require a change of venue. *Id.* at 384 (internal quotation marks omitted); *see also United States v. Stevens*, 83 F.3d 60, 66 (2d Cir. 1996) (per curiam) ("Substantial publicity alone is not enough to require a change of venue."). Rather, for prejudicial pretrial publicity to warrant a change of venue, that publicity must "in essence displace[] the judicial process," *Sabhnani*, 599 F.3d at 233 (internal

quotation marks omitted), rising to the level at which it effectively supplants the trial as the ultimate arbiter of the defendant's guilt. *See Skilling*, 561 U.S. at 380-81; *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963) (observing that the pretrial publicity "in a very real sense was Rideau's trial"). In short, a change of venue is warranted only where pretrial publicity causes "such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984).

Such circumstances arise in only the rarest of cases. *See, e.g.*, *Skilling*, 561 U.S. at 381 ("A presumption of prejudice, our decisions indicate, attends only the extreme case."); *Sabhnani*, 599 F.3d at 233. Prior cases in which the Supreme Court overturned convictions for failure to grant a change-of-venue motion involved convictions "obtained in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy v. Florida*, 421 U.S. 794, 798 (1975). For example, in *Estes v. Texas*, 381 U.S. 532, 538 (1965), the Court was confronted with a trial conducted in a "circus atmosphere" where the media was "allowed to sit within the bar of the court and to overrun it with television equipment." *Murphy*, 421 U.S. at 799; *see also Skilling*, 561 U.S. at 382 n.14 (noting that *Estes* and *Sheppard v. Maxwell*, 384 U.S. 333 (1966) "involved media interference with courtroom proceedings *during* trial" (emphasis in original)).

### 2. Pretrial Publicity and Juror Familiarity Are Not Dispositive

Long-standing, black-letter law makes clear that the critical question is not exposure to pretrial publicity, but rather "actual prejudgment by the venire of the issues to be decided in the case." *Sabhnani*, 599 F.3d at 233. "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381 (emphases in original). Thus, where ongoing press coverage principally tracks court proceedings, such publicity does not require a change of venue. *See Sabhnani*, 599 F.3d at 233 (observing that "most of the press

coverage tracked the frequent court proceedings" and that "[c]overage of actual developments in a criminal case generally will not rise to the level of prejudicial publicity that will warrant a venue change").

### 3. Publicity Long Before Trial Does Not Give Rise to Presumptive Prejudice

Even significant, continuing, and prejudicial pretrial publicity can dissipate to acceptable levels by the time of the trial. *See, e.g.*, *Skilling*, 561 U.S. at 383; *Sabhnani*, 599 F.3d at 233; *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003). In *Sabhnani*, the pretrial press coverage included descriptions of "incomprehensible brutality and violence and inhumanity" by the defendants, and "continual[]" references by the media to the "Slave Case." 599 F.3d at 232 (internal quotation marks omitted). Nevertheless, the Second Circuit affirmed the district court's denial of the defendants' pretrial change-of-venue motion, though only five months had passed from the bail hearing to voir dire. *Id.* at 233. Recognizing that five months was "a shorter amount of time than has been present in some cases in which we have noted that the effects of publicity had dissipated by the time the trial began," *Sabhnani* nonetheless relied on *Maldonado-Rivera*, which had "affirmed the denial of a motion to transfer venue even though the district judge there found that the press coverage was 'continuing and prominent.'" *Id.* (quoting *United States v. Maldonado-Rivera*, 922 F.2d at 967). The Supreme Court in *Skilling* held likewise—observing that, in cases where the Court had determined that a change of venue was required, "trial swiftly followed a widely reported crime," pointing specifically to *Rideau*, where the trial occurred within two months of a murder and kidnappings. *Skilling*, 561 U.S. at 383.

### 4. Voir Dire and Jury Instructions Produce Unbiased Juries, and Any Presumption of Prejudice Is Rebuttable

Where, as here, a defendant fails to demonstrate that pretrial publicity has displaced the judicial process, courts in this District and elsewhere rely on jury selection and instructions to ensure an appropriately impartial jury. *See Yousef*, 327 F.3d at 155 ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *Ayala*, 64 F. Supp. 3d at 452; *Awadallah*, 457 F. Supp. 2d at 254; *United States v. Gotti*, 399 F. Supp. 2d 214, 222 (S.D.N.Y. 2005). Indeed, even if a defendant establishes a *presumption* of prejudice, the presumption is rebuttable and may be overcome through searching voir dire and jury instructions. *See United States v. Chagra*, 669 F.2d 241, 250 (5th Cir. 1982) ("This presumption is rebuttable, however, and the government may demonstrate from the voir dire that an impartial jury was actually impaneled in appellant's case."), *overruled on other grounds by Garrett v. United States*, 471 U.S. 773 (1985); *see also United States v. Casellas-Toro*, 807 F.3d 380, 389 (1st Cir. 2015) (assuming presumption is rebuttable); *Coleman v. Kemp*, 778 F.2d 1487, 1541 n.25 (11th Cir. 1985) (same).

### B. Discussion

### 1. Given the Size and Diversity of this District, Voir Dire and Jury Instructions Are Sufficient to Ensure an Impartial Jury

The Southern District of New York is "one of the largest and most diverse districts in the country." *Salim*, 151 F. Supp. 2d at 284; *see also Awadallah*, 457 F. Supp. 2d at 253 ("[T]he Southern District of New York serves one of the country's most diverse cross-section of ethnicities, backgrounds, and experiences.") (internal quotation marks omitted).[5] According to the

---

[5] In *United States v. Salameh*, which related to the 1993 bombing of the World Trade Center, the

U.S. Census Bureau, approximately 5.2 million people live in the District, and there is substantial diversity in terms of race, socioeconomic status, and national origin.[6]

Accordingly, and especially because the defendant cannot show that pretrial publicity has displaced the judicial process (as discussed below), this Court can rely on jury selection and instructions to ensure an appropriately impartial jury. *See United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *Ayala*, 64 F. Supp. 3d at 452; *Awadallah*, 457 F. Supp. 2d at 254; *Gotti*, 399 F. Supp. 2d at 222. Indeed, even if a defendant establishes a presumption of prejudice—and the defendant here has not—the presumption is rebuttable and may be overcome through searching voir dire and jury instructions. *See United States v. Chagra*, 669 F.2d 241, 250 (5th Cir. 1982) ("This presumption is rebuttable, however, and the government may demonstrate from the voir dire that an impartial jury was actually impaneled in appellant's case."), *overruled on other grounds by Garrett v. United States*, 471 U.S. 773 (1985); *see also United States v. Casellas-Toro*, 807 F.3d 380, 389 (1st Cir. 2015) (assuming presumption is rebuttable); *Coleman v. Kemp*, 778 F.2d 1487, 1541 n.25 (11th Cir. 1985) (same).

_____

court observed: "I must seek, therefore, jurors willing to try this case with an open mind, and who will render a decision based solely upon the evidence, or lack thereof, against the individual defendants. It is just as likely, if not more so, that jurors from this district, one of the largest and most diverse districts in the country, will fit this description as well as jurors from other parts of the country." No. 93 Cr. 180 (KTD), 1993 WL 364486, at *1 (S.D.N.Y. Sept. 15, 1993); *accord United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir. 1987) ("It is not an uncommon occurrence for a notorious trial held in Metropolitan New York to engender extensive publicity.").

[6] U.S. Census Bureau, Quick Facts (population estimate as of July 1, 2019), *available at* https://www.census.gov/quickfacts/table/PST045216/00 (last accessed May 26, 2020).

Based in part on these considerations, courts in this District have routinely denied motions for a change of venue, including in cases involving arguably more sensational conduct and greater publicity than that at issue here, such as:

- *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2018 WL 2849712, at *9-10 (S.D.N.Y. June 8, 2018): denying change-of-venue motion by Dean and Adam Skelos, brought in advance of re-trial after previous conviction was overturned on appeal, holding that despite over 100 articles about the case, "it is likely that the Courts and the parties will be able to select a jury that has not been prejudiced by the pretrial publicity in this case[.]"

- *United States v. Rahimi*, No. 16 Cr. 760 (RMB), Transcript of conference on May 8, 2017 (Dkt. #82) at 31: denying pretrial change-of-venue motion by Ahmad Khan Rahimi in connection with trial relating to the 2016 bombing in the Chelsea neighborhood of Manhattan, and finding that "there is in fact a long line of compelling precedents that demonstrate overwhelmingly that the Southern District of New York is regularly able to impanel fair juries and to conduct fair trials in complex, high-profile, and highly publicized cases."

- *United States v. al Fawwaz*, No. 98 Cr. 1023 (LAK), 2015 WL 400621, at *5 (S.D.N.Y. Jan. 23, 2015): denying pretrial change-of-venue motion by Khalid Al Fawwaz, al Qaeda member and associate of Usama bin Laden, in connection with trial on charges relating to the 1998 Embassy bombings in Africa.

- *United States v. Awadallah*, 457 F. Supp. 2d at 252-54 (S.D.N.Y. 2006): denying pretrial change-of-venue motion by Osama Awadallah in connection with retrial on perjury charges relating to Awadallah's relationship with a participant in the September 11, 2001 attacks of the World Trade Center.

- *United States v. Gotti*, 399 F. Supp. 2d at 222 (S.D.N.Y. 2005): denying pretrial change-of-venue motion by Joseph D'Angelo in connection with trial of Gambino crime family boss and other organized crime figures on racketeering charges. Motion was based in part on alleged "incredible media scrutiny and publicity" in advance of trial.

- *United States v. Salim*, 151 F. Supp. 2d at 282-85 (S.D.N.Y. 2001), 189 F. Supp. 2d 93, 95-97 (S.D.N.Y. 2002): denying pretrial change-of-venue motions—including a ruling just six months after September 11, 2001—by Mamdouh Mahmud Salim, a senior al Qaeda member and associate of Usama bin Laden, in connection with trial relating to stabbing of correctional officer that Salim committed while facing charges in the District related to the 1998 Embassy bombings in Africa, which killed 224 people and injured thousands.

- *United States v. Yousef*, No. 93 Cr. 180 (KTD), 1997 WL 411596, at *3 (S.D.N.Y. July 18, 1997), *aff'd* 327 F.3d at 155: denying (and affirming denial of) pretrial change-of-venue motion by Ramzi Yousef in connection with trial relating to terrorist attacks, including the 1993 bombing of the World Trade Center.

Thus, as with several cases in this District, "[g]iven this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Skilling*, 561 U.S. at 382. The defendant has not done so here.

### 2. The Defendant's Media Analysis Fails to Establish a Presumption of Prejudice

The defendant argues that because of the "82 news accounts of the charges against" the defendant, he cannot obtain a fair trial in this District. (Def. Mot. at 18). More specifically, he argues that because of the description of his conduct contained in these articles—that he had surveilled certain landmarks in New York City and elsewhere for a potential attack by the IJO—he will be prejudiced, since "[n]o potential juror in the SDNY can forget or put aside the landmarks that were targets in this case." (*Id.*).

However, the defendant's own exhibit undermines his argument. Of the 82 news accounts attached by the defendant, 70 came out on September 19 or September 20, 2019—the day of or the day after the Department of Justice announced the unsealing of charges against him. *See* Dep't of Justice, "Manhattan U.S. Attorney Announces Indictment of New Jersey Man for Terrorist Activities on Behalf of Hizballah's Islamic Jihad Organization," Sept. 19, 2019, *available at* justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-indictment-new-jersey-man-terrorist-activities-behalf. 74 of the 82 articles came out within one week of the charges being announced. The two most recent articles were from January 2020, and each contained a discussion of the defendant in larger articles about the threat that Iran may pose against the United States in the wake of the death of Qasem Soleimani. *See* John Miller, *How Iran can Endanger New York: What*

*the NYPD is guarding against now*, N.Y. Daily News, Jan. 3, 2020, http://www.nydailynews.com/opinion/ny-oped-how-iran-can-endanger-new-york-20200103-7u3jzcc3qjhknnysix65w3ffs4-story.html; Atlantic Council (Jan. 10, 2020), *Reverberations from Soleimani death require vigilance in NYC*, https://www.atlanticcouncil.org/blogs/menasource/reverberations-from-soleimani-death-requires-vigilance-in-nyc/.  Radical dissipation of news reporting like what has occurred here is highly relevant to the defendant's ability to meet his burden.  *See, e.g.*, *Skilling*, 561 U.S. at 383; *Sabhnani*, 599 F.3d at 233; *Yousef*, 327 F.3d at 155.  Prejudicial reporting must be far more significant and proximate to trial to require a change of venue.  *See Rideau*, 373 U.S. at 726 (less than two months prior to trial).  The defendant does not cite to a single article within the last four months, and trial is not likely to happen for several more months.  As such, the defendant's motion fails on this basis, as well.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's pretrial motions without

a hearing.

Dated: New York, New York
      May 26, 2020

                                          Respectfully submitted,

                                          GEOFFREY S. BERMAN
                                          United States Attorney
                                          Southern District of New York


By:       /s/
                                          Michael K. Krouse
                                          Jason A. Richman
                                          Assistant United States Attorneys

Cc:     Defense Counsel
        (Via ECF)