UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

              -against-                               **DECLARATION**

                                                                 19 Cr. 676 (PGG)

ALEXEI SAAB,

                 Defendant.
-------------------------------------------------------------X

STATE OF NEW YORK                    )
COUNTY OF NEW YORK:  ss .:
SOUTHERN DISTRICT OF NEW YORK   )

        ATHANASIOS CAMBANIS, Esq., pursuant to Title 28, United States Code, section 1746, hereby declares under the penalties of perjury:

1. My name is Athanasios Cambanis, known professionally as Thanassis Cambanis, the shorter version of my name.

2. I graduated from the University of North Carolina at Chapel Hill in 1996 with a bachelor's degree in history and from the Princeton University School of Public and International Affairs in 2000 with a master's degree in public affairs.

3. Since 2011, I have worked a senior fellow at The Century Foundation, where I run research programs on Arab politics and American foreign and security policy. Since 2009, I have taught part-time as an adjunct professor at Columbia University's School of International and Public Affairs.

4. Prior to these posts, from 2003 to 2010, I worked a journalist in the Middle East for The Boston Globe and The New York Times.

5. In my capacity as a researcher and journalist, I have extensively researched Hezbollah since 2003. I have written numerous articles and reports. I have written a book on the organization published in

2010 by the Free Press imprint at Simon & Schuster, entitled "A Privilege to Die: Inside Hezbollah's Legions and Their Endless War Against Israel."

6. In 2019, The Century Foundation published a monograph entitled "Hybrid Actors: Armed Groups and State Fragmentation in the Middle East," of which I was the lead author and contributed the section on Hezbollah.

7. In 2018, The Century Foundation's edited volume "Order From Ashes," included my study of Hezbollah's indirect negotiations with Israel, entitled "The Israel-Hezbollah Channel."

8. I have spent more than five years full-time in Lebanon as a researcher and reporter, including the period from January 2013 to June 2018.

9. I am extensively familiar with the environs of Beirut and specifically of southern Beirut, where Hezbollah has its headquarters and where the suspect allegedly underwent training. I am extensively familiar with Hezbollah's role in Lebanon, its public profile, and its public-facing military, political, and social practices.

10. I have examined the complaint, the indictment, and the public filings in this case. I have met with the defendant. I have examined a copy of the data seized from the defendant's hard drive.

11. This declaration addresses the issues of the training exercise that the government misleadingly describes as an "attempted murder" of an unidentified male. (Indictment Paragraph 3 ( c )).

THE TRAINING EXERCISE

12. According to the complaint, FBI Special Agent Anthony J. Cipriano alleges that the suspect attempted to shoot a man "he later came to believe was an Israeli spy." The complaint includes further details about this allegation, all of them sourced to Special Agent Cipriano's reports of his interviews with the suspect (recorded on forms known by their FBI code, 302).

13. The description of the alleged incident misstates and willfully distorts the defendant's own description of the training exercise, creating an alarmist fantasy that has no connection to the facts described by the defendant.

14. The government's claims are easily debunked, and appear intended to create an aura of intrigue and drama around a routine training exercise.

15. The defendant, Alexei Saab, described to the FBI a trust exercise that occurred during his Hezbollah training in 2005 — the very training that led him to break away from the organization and permanently cease contact.

16. The training exercise described by Saab required him to show that he trusted his trainers and would follow orders. Saab had been on call for an extended Hezbollah training that was supposed to last six months. (October 2004 to April 2005). At the time of the alleged incident, he had been following instructions from his trainers, attending courses, and undergoing field training for a period of between two and five months.

17. Neither the government nor the defendant can place the alleged incident in time. There is no corroborating evidence: no witness, no surveillance record, no testimony from another person who heard about the alleged incident from the defendant or anyone else. The entire story comes from the defendant.

18. According to the defendant's story, sometime between January and April 2005, during the final stretch of his extended training, he was ordered to perform a series of tasks as part of his training. He was ordered to steal a specific car, although he was given a key and told which car to take, consistent with a training exercise in which the trainee is participating in a simulation that is meant to approximate real-life circumstances. Saab was ordered to wait in an apartment. His trainer came to the apartment and drove Saab in the car to an unbuilt lot in the urban area of southern Beirut. According to Saab, the incident took place in the area of Hadath, a commercial neighborhood between the neighborhood of Haret Hreik, where Hezbollah has many of its headquarters' facilities, and the Beirut-Damascus highway.

19. According to the complaint, the trainer parked behind a van, and ordered Saab to shoot the man in the van "twice in the belly" and "once in the head." Saab approached the van and pulled the trigger twice.

The gun did not fire. He returned to the car and was driven back to an apartment. The complaint states without any substantiation that "Saab later came to believe the driver was a suspected Israeli spy."

20. Saab disputes that he ever characterized the man in the van in any way at all. In fact, he had no idea who the man in the van was, if this story even took place as described at all.

21. The details as presented by Saab are consistent with a training exercise and not with an attempted assassination. This type of exercise is similar to training exercises in military and paramilitary organizations around the world, including SERE training in the U.S. military, which strives to prepare trainees to withstand psychological pressure and torture if captured by enemy forces. In this exercise, at each step Saab was given orders, without time to prepare, in order to assess his willingness to trust his instructor, and to assess how he responded to stress.

22. After the gun failed to fire, Saab did not engage in any violence. He did not attempt to harm or capture or otherwise engage with the man in the van. Saab returned to the car, and his trainer drove them away from the van. The man in the van did not pursue Saab, or lodge a complaint with Hezbollah, his extended family or tribe, law enforcement, or any other authority. In Lebanon the state has limited authority, and Hezbollah and other factions hold sway in their respective zones of control; but the country is not an ungoverned black hole. There are authorities. If a man draws a gun and attempts to shoot another man in the face in public, the community learns of the outrage and formal or informal arbitration processes follow. Communities are small and people recognize one another. The fact that no such repercussions followed is consistent with the only plausible explanation for the events described by Saab: that it was a choreographed training exercise. The trainer tested whether Saab would shoot a gun at a person if ordered. The gun was disabled or otherwise configured not to shoot, and the target was playing a role as part of the training exercise.

23. Afterward, Saab was upset and angry at his trainer, and complained that the exercise violated Saab's trust. He told his trainer to never again involve him in an exercise without warning him ahead of time about the nature of the training exercise. After completing the training in March 2005, the defendant never participated in any training with Hezbollah, or received any instructions from the organization.

24. The description of the man in the van as an Israeli spy is nonsensical at best or intentionally inflammatory at worst. Saab in any case neither knew nor claimed to know the identity of the man in the van. Few if any "Israeli spies," meaning agents or operatives originating in Israel or working as part of an Israeli agency, have ever been apprehended inside Lebanon. On the other hand, a great many Lebanese have admitted to, been convicted of, or suspected of, providing intelligence or information to Israeli authorities; such people are referred to as "collaborators," "informants," or in colloquial Lebanese Arabic as "spies." Since 2000, when Israel ended its military occupation of southern Lebanon, Hezbollah has arrested thousands of Lebanese suspected of collaborating with Israel and has turned them over to the Lebanese state for trial. Thousands of known former collaborators have been welcomed back to their homes in southern Lebanon where they live and work in areas tightly under Hezbollah's control. There are many allegations of Hezbollah harassing, interrogating, and on occasion kidnapping suspected collaborators with Israel. There are no documented cases of the group publicly assassinating suspected collaborators.

25. If the training exercise were not a training exercise but a bungled hit, it would not be consistent with known Hezbollah practice. Hezbollah would not risk, in a simple operation on Hezbollah's home turf that could be conducted by any trained shooter, the capture of a trainer, nor the compromise of a trainee whose value was as a legal U.S. resident who could operate abroad and who was on a path to U.S. citizenship.

26. Hezbollah has been tied to numerous attacks and killings in Lebanon and abroad. Inside Lebanon, where the group is exceedingly well resourced and powerful, Hezbollah operatives who are linked to acts of violence always evade capture. For example, four of the publicly identified suspects in the assassination of former Lebanese prime minister Rafik Hariri have never been captured or interrogated. The group is careful to keep its members out of the hands of rival factions or state law enforcement. When Hezbollah commits assassinations or is suspected of conducting killings, kidnappings, bombings, or other acts of violence, its operatives are rarely publicly identified and never apprehended. Operatives are active in rural areas, on country roads, in dark alleys; Hezbollah

conducts its clandestine operations as would be expected from an underground guerilla organization whose founding purpose was to wage war. Hezbollah is a military-political organization that as of 2005 (the year of the alleged incident) had nearly a quarter century of unbroken experience in combat, warfare, and clandestine operations; it was linked at that point to a great number of violent acts and earned its high ranking on America's list of threats because of its effectiveness, not its bungling.

27. There is no evidence that Saab attempted to murder an Israeli spy, or anybody at all. The complaint details nothing more than uncorroborated story from Saab himself about a training exercise, in which he pointed an object that he believed to be a gun at an unidentified man and pulled the trigger. The gun, if it was a real gun, did not fire. No one was harmed; there were no follow-on consequences, other than Saab's angry complaint to his trainers, and subsequent decision to part ways with Hezbollah before completing his training.

28. The complaint's inflammatory language describing the alleged incident portrays the defendant as a cold-blooded killer engaged in a murder attempt with loaded political overtones. The government, with vast resources at its disposal, has furnished no corroborating evidence for this allegation, relying entirely on the defendant's own storytelling. The defendant's account, however, tells the story of a nervous recruit who performed poorly in a Hezbollah training course. He did not trust his instructors and complained about the training exercises. He severed contact with the group after the training exercise that included the simulated shooting, and never again received instruction from Hezbollah.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 24, 2021.

*[signature]*

Athanasios (Thanassis) Cambanis