UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

ALEXEI SAAB,
      a/k/a "Ali Hassan Saab,"
      a/k/a "Alex Saab,"
      a/k/a "Rachid,"

                Defendant.

**MEMORANDUM
OPINION & ORDER**

19 Cr. 676 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Alexei Saab is charged with (1) conspiracy to provide material support to Hizballah, in violation of 18 U.S.C. § 2339B (Count One); (2) provision of material support to Hizballah, in violation of 18 U.S.C. § 2339B (Count Two); (3) conspiracy to receive military-type training from Hizballah, in violation of 18 U.S.C. §§ 371, 2339D, and 3238 (Count Three); (4) receipt of military-type training from Hizballah, in violation of 18 U.S.C. §§ 2339D and 3238 (Count Four); (5) unlawful procurement of citizenship or naturalization to facilitate an act of international terrorism, in violation of 18 U.S.C. § 1425(a) (Count Five); (6) marriage fraud conspiracy, in violation of 18 U.S.C. § 371 (Count Six); (7) citizenship application fraud, in violation of 18 U.S.C. § 1546(a) (Count Seven); (8) naturalization fraud, in violation of  18 U.S.C. § 1015(a) (Count Eight); and (9) making false statements to a Federal officer, in violation of 18 U.S.C. § 1001 (Count Nine).  (See Indictment (Dkt. No. 6) ¶¶ 1-21)

Saab has moved for an order

(1)      suppressing statements he made to law enforcement officers, and the fruits of his statements;

(2)      granting a change of venue;

  (3)  dismissing Count Seven or Count Nine as multiplicitous;

  (4)  dismissing Count Eight for failing to allege a crime;

  (5)  granting pre-trial release;

  (6)  remedying alleged <u>Brady</u> violations; and

  (7)  granting a <u>Franks</u> hearing as to a search warrant the Government obtained for Saab's electronic devices.

(<u>See</u> May 4, 2020 Mot. (Dkt. No. 26); Feb. 22, 2021 Mot. (Dkt. No. 67); May 24, 2021 Mot. (Dkt. No. 87); Aug. 7, 2021 Mot. (Dkt. No. 117))

  For the reasons stated below, Saab's motions will be denied.[1]

## BACKGROUND

## I.  FACTUAL ALLEGATIONS

  The Government contends that Saab is a terrorist who was trained by and performed missions for Hizballah, a foreign terrorist organization.[2]  (<u>See</u> <u>generally</u> Cmplt. (Dkt. No. 1); Indictment (Dkt. No. 6))

  According to the Government, Saab was recruited by Hizballah in 1996 and primarily conducted missions in Lebanon.  (Cmplt. (Dkt. No. 1) ¶ 17)  In 2000, Saab transitioned to the Islamic Jihad Organization ("IJO"), "a sophisticated, highly compartmentalized component of Hizballah responsible for the planning, preparation, and execution of intelligence, counterintelligence, and terrorist activities for Hizballah around the world."  (<u>Id.</u>)  After joining

---

[1]  Citations to page numbers of docketed material correspond to the pagination generated by this District's Electronic Case Files ("ECF") system.  Citations to transcripts correspond to the pagination generated by the court reporter.
[2]  Hizballah is often referred to as "Hezbollah."  This opinion uses the "Hizballah" spelling, because that spelling is employed in "the list of designated foreign terrorist organizations maintained by the United States Department of State."  <u>United States v. Kourani</u>, 6 F.4th 345, 348 n.2 (2d Cir. 2021).

the IJO, Saab  "participated in extensive training in IJO tradecraft, weapons, and military tactics,

including in the construction of explosive devices."  (Id.)

> A.    **Hizballah and the Islamic Jihad Organization**

The Government alleges that "Hizballah is a Lebanon-based Shia Islamic

Organization with political, social, and terrorist components" that "was founded in the early

1980s . . . ."  (Id. ¶ 18(a))  "[I]ts mission includes establishing a fundamentalist Islamic state in

Lebanon."  (Id.)

On October 8, 1997, the U.S. Department of State "designated Hizballah a

Foreign Terrorist Organization pursuant to Section 219 of the [Immigration and Nationality Act],

and it remains so designated today."  (Id.); see Designation of Foreign Terrorist Organizations,

62 Fed. Reg. 52,650 (Oct. 8, 1997); U.S. Dept. of State, Bureau of Counterterrorism, Foreign

Terrorist Organizations, https://www.state.gov/foreign-terorrist-organizations/.  On October 31,

2001, pursuant to Executive Order 13,224, the U.S. Department of State designated Hizballah a

Specially Designated Global Terrorist entity.  See Designations of Terrorists and Terrorist

Organizations Pursuant to Executive Order 13224 of September 23, 2001, 67 Fed. Reg. 12,634

(Mar. 19, 2002).  And, "[i]n 2010, State Department officials described Hizballah as the most

technically capable terrorist group in the world and a continued security threat to the United

States."  (Cmplt. (Dkt. No. 1) ¶ 18(a))

The IJO, also known as "910" and the "External Security Organization," plans

and coordinates Hizballah intelligence, counterintelligence, and terrorist activities outside of

Lebanon.  (Id. ¶18(b))  "IJO operatives are typically assigned a Lebanon-based 'handler,'" and

"IJO often conducts targeted operations in stages, sending waves of one or more operatives with

separate taskings such as surveillance, obtaining and storing necessary components and equipment, and attack execution."  (Id.)

Hizballah is responsible for "the 1983 bombing of the United States Marine barracks in Lebanon, which killed 241 Marines; the 1983 bombing of the United States Embassy in Beirut, which killed 24 people; the 1985 hijacking of TWA Flight 847, which killed one U.S. citizen; the 1992 bombing of the Israeli Embassy in Argentina, which killed 29 people; and the 1994 bombing of a Jewish cultural center in Buenos Aires, which killed 85 people."  (Id. ¶ 18(c))

**B.    Recruitment and Training by Hizballah
and Arrival in the United States**

Hizballah recruited Saab in 1996 while he was a student at the University of Lebanon.  (Id. ¶ 21(b))  "Handler-1" was responsible for Saab's initial Hizballah training, which "focused on the use of firearms."  (Id. ¶ 21(b), (d))  Saab received instruction in the use of AK-47 and M16 rifles, pistols, and grenades.  (Id. ¶ 21(d))  "Between approximately 1996 and 2000, Saab met with Handler-1 at least 15 times" and was tasked "with observing and reporting on the actions and movements of Israeli and Southern Lebanese Army soldiers in Yaroun, Lebanon," including observing "patrol schedules and formations, procedures at security checkpoints, and the description of vehicles used by soldiers, including whether the vehicles appeared to be armored."  (Id. ¶ 21(c))

In November 2000, Saab entered the United States lawfully, using a Lebanese passport.  (Id. ¶ 20(b))  Before Saab left for the United States, Handler-1 introduced Saab to another handler who would serve as one of Saab's primary Hizballah handlers over the ensuing years.  (Id. ¶ 21(e))  Saab was also eventually introduced to two other Hizballah handlers, and Saab interacted with all three handlers after arriving in the United States.  (Id.)

One of Saab's handlers provided him with a method by which the IJO would signal to Saab that it was necessary for him to return to Lebanon.  (Id. ¶ 21(g))  "Saab would receive an email to his personal email account that would appear to be spam," but the email would in fact contain "a coded signal concealed in either the subject or the body of the message that would alert Saab of the need to return to Lebanon."  (Id.)  One of Saab's handlers also provided Saab with a phone number and numeric code that Saab could use to alert the handler that Saab had re-entered Lebanon.  (Id. ¶ 21(h))

Saab returned to Lebanon a number of times while living in the United States, and he continued to receive training from the IJO between 2000 and 2005, including in surveillance and counter-surveillance.  (Id. ¶¶ 21(e) n.3, 21(j))  In 2004 and 2005, while in Lebanon, Saab was trained in the use of explosives.  (Id. ¶ 21(k))  He prepared a "'sticky bomb'" that he "tested in the mountains outside of Beirut."  (Id. ¶ 21(l))  Saab was also trained to analyze "photographs to determine where the center of [a] blast occurred and the size, type, and triggering mechanism of the explosive that was used."  (Id. ¶ 21(n))

In April 2005, Saab left Lebanon and returned to the United States by way of Turkey.  (Id. ¶ 21(o))  Saab "was stopped and interviewed at the airport in Istanbul, Turkey, due to the detection of an explosive substance on his luggage or clothing."  (Id.)  Saab "had just completed his explosives training."  (Id.)  "On or about April 14, 2005," Saab arrived at John F. Kennedy International Airport, where he was interviewed by law enforcement officers, and acknowledged that Turkish authorities had questioned him about the explosives residue found in his luggage.  (Id. ¶ 22(a))  Saab denied any knowledge as to why his luggage had tested positive for the presence of explosives.  (Id. ¶ 22(a)-(b))

In December 2005, Saab applied to the Immigration and Naturalization Service for naturalization.  (Id. ¶ 20(c))  In his application, Saab affirmed – under penalty of perjury – that he had never been a member of, or associated with, a terrorist organization.  (Id.)  In August 2008, Saab became a naturalized citizen of the United States.  (Id. ¶ 20(d))

### C.     Saab's Activities on Behalf of Hizballah

In 2003, one of Saab's Hizballah handlers directed him "to surveil certain 'hot spots' in New York City and to report intelligence about them to the IJO."  (Id. ¶ 24(a))  Saab also conducted surveillance operations for the IJO in Boston and Washington, D.C.  (Id. ¶ 26(a))  Saab took "'dual purpose'" photographs, collecting images of landmarks that he was interested in as a tourist and that would be useful to the IJO.  (Id. ¶ 24(b))  Saab "focused on structural weaknesses of the locations he surveilled to determine how a future attack could cause the most destruction – i.e., he sought to learn how to maximize damage if the IJO later bombed a location."  (Id. ¶ 24(c))  Saab analyzed the materials used to construct a target, how close one could get to a target, and weaknesses in the target that could be exploited.  (Id.)  "Saab understood that the information he provided to the IJO would be used to calculate the size of a bomb needed to target a particular structure and the ideal location in which to place explosive devices to maximize damage."  (Id. ¶ 24(d))

Later in 2003, Saab met with one of his Hizballah handlers in Lebanon.  (Id. ¶ 24(e))  The handler instructed Saab "to prepare a detailed guide to New York City."  (Id.)  Saab prepared a seven to ten page report with a hand-drawn map that included certain locations annotated by number, with summaries of information concerning these locations.  (Id.)  Saab's report addressed (1) federal, state, and local government buildings; (2) the United Nations headquarters; (3) the Statute of Liberty and Ellis Island; (4) Rockefeller Center; (5) Wall Street

and the New York Stock Exchange; (6) Times Square; (7) the Empire State Building; (8) Herald Square and Macy's in Midtown; (9) local airports; and (10) local tunnels and bridges.  (<u>Id.</u>)  The report also contained "directions to the local airports, the number of terminals at the local airports, and which terminals were for international or domestic travel."  (<u>Id.</u> ¶ 24(f))  During this visit, Saab provided his handler with photographs he had taken of the New York City landmarks discussed in his report.  (<u>Id.</u> ¶ 24(g))

In 2005, at the direction of one of his handlers, Saab undertook similar surveillance activities in Istanbul, Turkey.  (<u>Id.</u> ¶ 28(a)-(b))  After his trip to Istanbul, Saab flew to Damascus, where he met one of his handlers.  (<u>Id.</u> ¶ 28(c))  The two "then traveled at night from Damascus back to Beirut in a black BMW with heavily tinted windows.  They were stopped at the border between Syria and Lebanon, and [the handler] provided an identification document to the Syrian intelligence officers there," after which they "were waved through."  (<u>Id.</u>; <u>see also id.</u> ¶ 29 (discussing Saab's Lebanese passport, which shows entry into Turkey on or about January 15, 2005); <u>id.</u> ¶ 30 (discussing an "Istanbul City Guide" found in Saab's residence; several landmarks discussed in the guide were highlighted, and a reference to the "Blue Mosque" was circled))

At some point between 2003 and 2005, Saab "attempted to murder a man he later understood to be an Israeli spy."  (<u>Id.</u> ¶ 32(a))  A Hizballah surveillance instructor directed Saab to steal a Mercedes-Benz vehicle from a certain location.  (<u>Id.</u> ¶ 32(b); <u>see id.</u> ¶ 4(d))  Saab was given a universal key that could be used to access various cars, stole the Mercedes-Benz vehicle, and delivered the vehicle to his surveillance instructor.  (<u>Id.</u> ¶ 32(b))  A few days later, the surveillance instructor – driving the Mercedes-Benz – picked up Saab from a safehouse.  (<u>Id.</u>)

The instructor told Saab to reach under the passenger's seat.  (Id.)  Saab found a plastic bag containing a handgun with a silencer attached.  (Id.)

The two drove to a location about ten minutes outside Beirut, where they observed a "small white van parked in [a] field."  (Id. ¶ 32(c))  The surveillance instructor parked the Mercedes-Benz behind the van and directed Saab to "walk up to the passenger's side of the van and shoot the person inside 'twice in the belly' and 'once in the head.'"  (Id.)  Saab approached the van and pointed the firearm at the driver, who cried out.  (Id. ¶ 32(d))  Saab twice pulled the trigger of the firearm, but it did not fire.  (Id.)  Saab and the instructor then fled the scene.  (Id. ¶ 32(e))  Saab later "came to believe that" the man in the white van "was a suspected Israeli spy."  (Id.)

### D.      Saab's Marriage Fraud and Related Offenses

In 2012, Saab married a woman ("CC-1") in what was a fraudulent marriage.  (Id. ¶¶ 12, 34; see also id. ¶ 36(c) (discussing marriage certificate showing that Saab and CC-1 were married on July 13, 2012 in New York City))

CC-1 is a French citizen who entered the United States in 2005 under the Visa Waiver Program.  (Id. ¶ 35(a))  In 2009, CC-1 obtained an F1 student visa to attend college in New York City.  (Id. ¶ 35(b))

Saab – who as of 2012 was a dual U.S.-Lebanese citizen – "told others [that] he was paid to marry CC-1 so that CC-1 could apply for naturalized citizenship in the United States based on their marriage."  (Id. ¶¶ 34; 35(c); see also id. ¶ 40(b) (stating that "CC-1 agreed to pay Saab $20,000 in exchange for Saab agreeing to marry her," and that CC-1 paid Saab that amount in several increments))

In July 2012, shortly before the July 13, 2012 marriage, Saab wrote in a WhatsApp message that he had "only met her twice – one time we spoke and one time with the attorney for me to ask questions. . . . I may not even see her once a week.  I told you, she has a guy – and he has money."[3]  (Id. ¶ 36(b))

After the July 13, 2012 marriage, CC-1 applied for conditional residency in the United States based on her marriage to Saab.  (Id. ¶ 35(c)-(d))  And in March 2015, Saab and CC-1 jointly filed a "[p]etition seeking to obtain naturalized citizenship for CC-1," the basis for which was their marriage.  (Id. ¶ 37(a)-(b))  Attached to the petition were "affidavits from individuals purporting to know both Saab and CC-1, in which the affiants attested that their marriage was genuine."  (Id. ¶ 37(c))  One such affiant, CC-2, stated in his affidavit that he had known Saab for more than five years.  (Id. ¶ 37(c)-(d))  CC-2 later told law enforcement agents that "he had met [Saab] on only approximately two occasions, both in 2015," and that he was "unable to recall Saab's first or last name[]."  (Id. ¶ 39(a))

Saab and CC-1 signed the March 2015 petition under penalty of perjury and affirmed the following:

> I certify, under penalty of perjury under the laws of the United States of America, that this petition and the evidence submitted with it is all true and correct.  If conditional residence was based on a marriage, I further certify that the marriage was entered in accordance with the laws of the place where the marriage took place and was not for the purpose of procuring an immigration benefit.

(Id. ¶ 37(e))

---

[3]  The original WhatsApp communication is in Arabic, and was translated by an FBI interpreter. (Id. ¶ 36(b) n.12)

E.   **Saab Is Interviewed by Law Enforcement Officers**

Between March 14, 2019 and July 8, 2019, Saab was interviewed on eleven separate occasions by law enforcement officers.  (Saab Decl. (Dkt. No. 32) ¶¶ 8, 11, 13-15, 17-21, 23; Cmplt. (Dkt. No. 1) ¶ 21)  Saab was not represented by counsel at these interviews, and Miranda warnings were not administered, but he told agents on each occasion "that he was participating in the interview voluntarily."  (Cmplt. (Dkt. No. 1) ¶ 21(a); Saab Decl. (Dkt. No. 32) ¶¶ 8, 11, 13-15, 17-21, 23)

During the first interview on March 14, 2019, Saab was asked questions about "Hizballah, military training, and [his] international travels," and provided "[his] various email addresses, passwords, and social media accounts" to the agents.  (Saab Decl. (Dkt. No. 32) ¶¶ 8-9)  Between March 16, 2019 and March 22, 2019, Saab was interviewed on four additional occasions.  (Id. ¶¶ 11, 13-15)  During these first five interviews, Saab "admitted, among other things, that he was a member of Hizballah, . . . that he joined Hizballah in approximately 1996," and that "he was paid to marry [CC-1] so that [CC-1] could apply for naturalized citizenship on the basis of their marriage."  (Def. Br., Ex. A (Dkt. No. 118-1) ¶ 9)  Based in part on information Saab had supplied, the FBI obtained search warrants for Saab's electronic devices.  (See Apr. 3, 2019 Search Warrant (Dkt. No. 134) at 4-7 (listing the seized devices, including cellphones, laptop computers, and storage devices))

Saab was interviewed by law enforcement officers on six additional occasions between April 6, 2019 and June 20, 2019.  (Saab Decl. (Dkt. No. 32) ¶¶ 17-23)  During these interviews, Saab provided additional information concerning his involvement with Hizballah, "the content on [his] electronic devices and social media," his "life in Lebanon," and "various people that were on [his] mobile phone's contact list."  (Id. ¶¶ 17-21, 23)  Saab was not

represented by counsel during these interviews, and Miranda warnings were not administered.
(Id. ¶¶ 17-21, 23)

On July 9, 2019, Saab was interviewed again by law enforcement officers. (Id. ¶ 27) Miranda warnings were administered at the outset of the interview, and Saab signed an Advice of Rights form confirming that he had agreed to speak with the agents without an attorney. (Id.) Saab answered "the same detailed questions" he had answered in his previous interviews "about Hizballah, military training, [Saab's] travels, people with whom [he had] interacted, the contents of [his] electronic devices, the contents of [his] social media and email accounts, [his] life in Lebanon, and [his] life in the United States." (Id. ¶ 28) At the conclusion of the July 9, 2019 interview, Saab was arrested. (Id. ¶ 30)

## II.  INDICTMENT

On September 19, 2019, the Government obtained a nine-count indictment against Saab. (Dkt. No. 6) Counts One, Two, Three, and Four charge Saab with providing and conspiring to provide material support to Hizballah, and receiving and conspiring to receive military-type training from Hizballah. (Id. ¶¶ 1-10) The Indictment alleges that Saab (1) received extensive training from Hizballah between 1996 and 2005; (2) conducted surveillance in New York City for Hizballah in 2003; (3) conducted surveillance in Istanbul, Turkey for Hizballah in 2005; and (4) on behalf of Hizballah, attempted to murder a suspected Israeli spy in 2005. (Id. ¶ 3)

Count Five charges Saab with procuring U.S. citizenship and naturalization to facilitate an act of international terrorism. (Id. ¶¶ 11-12) According to the Government, between 2005 and 2008, Saab "submitted a naturalization application for himself containing false

statements relating to, among other things, his membership in and provision of material support and resources to Hizballah."  (Id. ¶ 12)

Counts Six, Seven, Eight, and Nine charge Saab with marriage fraud conspiracy, citizenship application fraud, naturalization fraud, and the making of false statements.  (Id. ¶¶ 13-21)  The Government alleges that, between July 2012 and July 2019, Saab and CC-1 entered into a marriage for purposes of evading the immigrations laws, and that in March 2015, Saab and CC-1 filed a fraudulent petition seeking to remove conditions on CC-1's residency in the United States.  (Id. ¶¶ 13-15)  In that petition, Saab and CC-1 "falsely affirmed under penalty of perjury that their marriage 'was not for the purpose of procuring an immigration benefit.'" (Id. ¶ 15(c))

## III.   PROCEDURAL HISTORY

At the September 25, 2019 initial pre-trial conference, the Government described the discovery materials as "quite voluminous."  (Sept. 25, 2019 Tr. (Dkt. No. 11) at 2)  The Government stated that it would produce "all of the legal process that was authorized in this case," including the "search warrants for Mr. Saab's residence[] [and] for all of his electronic devices, . . . Communications Act warrants that were directed towards e-mail service providers[,] . . . several search warrants . . . executed on social media accounts controlled by Mr. Saab, and . . . warrants that were directed to co-conspirators, primarily for the marriage fraud charges."  (Id. at 2-3)  The Government also stated that there would "be some CIPA [Classified Information Procedures Act] litigation in this case," and that the Government intended "to file a motion under CIPA Section 4."  (Id. at 4)

At a December 19, 2019 status conference, defense counsel asserted that the Government had produced discovery material showing that Saab had had "no involvement or

connection with Hizballah . . . [after] he was stopped at the [JFK] airport in 2005." (Dec. 19, 2019 Tr. (Dkt. No. 18) at 5)  Defense counsel asked the Government to identify in the discovery materials anything showing that Saab "was communicating with and/or involved with Hizballah after the 2005 airport incident."  (Id. at 5-6)  The Government responded that there were "items in the discovery that, from the government's perspective, would indicate [Saab's] involvement . . . in continued activities for Hizballah after [2005]," and that the Government would assist defense counsel in reviewing the relevant discovery materials on this point.  (Id. at 6)  The Government noted, however, that even "if everything was pre-2005," the terrorism-related charges against Saab "would still stand as is."  (Id.)

The parties pursued plea negotiations in the spring of 2020, but those discussions were not successful.  (See Mar. 30, 2020 Def. Ltr. (Dkt. No. 20); Apr. 6, 2020 Govt. Ltr. (Dkt. No. 22))  On May 4, 2020, Saab moved to suppress statements he had made to law enforcement officers during his twelve interviews, along with the fruits of those statements.  He also moved for a change of venue.  (See May 4, 2020 Mot. (Dkt. No. 26); Def. Br. (Dkt. No. 30) at 1-2)

At a September 18, 2020 conference, defense counsel stated that Saab wished to file additional pre-trial motions.  (Sept. 18, 2020 Tr. (Dkt. No. 57) at 4-5)  On February 22, 2021, Saab moved to dismiss (1) Count Seven or Count Nine of the Indictment as multiplicitous; and (2) Count Eight for failure to allege a crime.  (See Feb. 22, 2021 Mot. (Dkt. No. 67); Def. Br. (Dkt. No. 69) at 1)

In a February 25, 2021 letter, defense counsel requested permission to file additional pre-trial motions premised on a February 8, 2021 letter counsel had received from the Government.  In its February 8, 2021 letter, the Government states that it "'does not dispute that Hizballah terminated its relationship with the defendant after Spring 2005 and no longer

provided the defendant with any assignments, tasking, or training after Spring 2005.'" (Feb. 25, 2021 Ltr. (Dkt. No. 71) at 1)  Defense counsel complained that the Government had refused to confirm whether this information was known to law enforcement before agents conducted their first interview of Saab on March 14, 2019.  Counsel also asserted that the Government's February 8, 2021 disclosure contradicted statements that the Government had made at the December 19, 2019 status conference.  (Id. at 1-2)

In a March 5, 2021 letter, the Government asserted that there was no contradiction between its February 8, 2021 disclosure and its prior representations regarding Saab's involvement with Hizballah after 2005.  (Mar. 5, 2021 Govt. Ltr. (Dkt. No. 74) at 1)  That same day, defense counsel submitted a letter again complaining that the Government refused to disclose when the Government knew that Hizballah had terminated its relationship with Saab in the spring of 2005.  (Mar. 5, 2021 Def. Ltr. (Dkt. No. 75) at 2)

On April 7, 2021, the Court entered a briefing schedule for Saab's third set of pre-trial motions, and set a hearing date for all of Saab's pre-trial motions.  (Apr. 7, 2021 Order (Dkt. No. 78))

On May 24, 2021, Saab moved for pre-trial release, and for an order addressing alleged Brady violations related to the Government's disclosure that Hizballah had terminated its relationship with Saab in the spring of 2005.  (May 24, 2021 Mot. (Dkt. No. 87); Def. Br. (Dkt. No. 90) at 20)

The Court heard oral argument concerning Saab's pre-trial motions on July 15, 2021.  (See July 15, 2021 Tr. (Dkt. No. 113))

On July 22, 2021, defense counsel requested permission to file a new "motion to controvert the [April 2019] search warrant" to search Saab's electronic devices.  (See July 22,

14

2021 Def. Ltr. (Dkt. No. 110))  The Court granted Saab's request to file that motion, and on

August 7, 2021, Saab filed a motion seeking a <u>Franks</u> hearing regarding the April 2019 search

warrant.  (<u>See</u> Aug. 7, 2021 Mot. (Dkt. No. 117); Def. Br. (Dkt. No. 118) at 2, 5)

    In response to Saab's motion concerning the search warrant, the Government filed

an unclassified opposition brief, along with a classified <u>ex parte</u> supplement that raises additional

arguments.  (<u>See</u> Govt. Br. (Dkt. No. 120) at 13-14)  On September 13, 2021, pursuant to the

Criminal Justice Act, the Court appointed Deborah Colson to be available to assist the defense in

reviewing classified information in this case.  (<u>See</u> Sept. 13, 2021 Memo Endorsement (Dkt. No.

123))  On October 12, 2021, Saab filed a letter motion seeking an order directing the

Government to disclose its classified <u>ex parte</u> supplement to Colson.  (<u>See</u> Oct. 12, 2021 Ltr.

Mot. (Dkt. No. 126))

<b><u>DISCUSSION</u></b>

## I.  <u>SAAB'S MOTION TO SUPPRESS</u>

    Saab has moved to suppress all statements he made to law enforcement officers

during the twelve interviews that preceded his arrest, as well as the fruits of those interviews.

(Def. Br. (Dkt. No. 30) at 1-2)

### A.  <u>Legal Standard</u>

    "A suspect is entitled to <u>Miranda</u> warnings only if he or she is interrogated while

'in custody.'"  <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 242-43 (2d Cir.1998) (quoting <u>Thompson</u>

<u>v. Keohane</u>, 516 U.S. 99, 100-01 (1995)); <u>see also</u> <u>United States v. Newton</u>, 369 F.3d 659, 669

(2d Cir. 2004) ("<u>Miranda</u>'s warning requirements apply only to 'custodial interrogation.'"

(quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966))).  For purposes of <u>Miranda</u>, "an accused

is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak

15

in a manner that conveys the message that they would not permit the accused to leave."

Tankleff, 135 F.3d at 244 (quoting United States v. Kirsch, 54 F.3d 1062, 1067 (2d Cir. 1995)).

Where a suspect is in custody, and Miranda warnings are not provided, the suspect's statements

are inadmissible. Miranda, 384 U.S. at 476.

       Courts in the Second Circuit use a "two-step, objective test" to determine whether

a suspect is in custody for purposes of Miranda. United States v. Santillan, 902 F.3d 49, 60 (2d

Cir. 2018). First, a court must ask whether "a reasonable person in the defendant's position

would have understood that he or she was free to leave." Id. Whether a reasonable person

would have felt free to leave is an objective inquiry based on the totality of the circumstances,

and "[a]n individual's subjective belief about his or her status generally does not bear on the

custody analysis." United States v. Faux, 828 F.3d 130, 135 (2d Cir. 2016).

       If a reasonable person in the defendant's position would have understood that they

were free to leave, "the Miranda inquiry is at an end; the challenged interrogation did not require

advice of rights." Newton, 369 F.3d at 672. If a reasonable person in the defendant's position

would not have understood that they were free to leave, the court must then consider whether the

interview involved "a restraint of freedom of movement akin to that associated with a formal

arrest." Santillan, 902 F.3d at 60. "For the second step, relevant factors are whether the suspect

is told that he or she is free to leave, the location and atmosphere of the interrogation, the

language and tone used by the law enforcement officers, whether the subject is searched or

frisked, and the length of the interrogation." Id. Only if a court finds that both the first and

second steps are satisfied is "the person '"in custody" for practical purposes,' and 'entitled to the

full panoply of protections prescribed by Miranda.'" Newton, 369 F.3d at 672 (quoting

Berkemer v. McCarty, 468 U.S. 420, 421 (1984)).

B.     **Analysis**

1.     **Interviews Between March 14, 2019 and June 20, 2019**

As discussed above, law enforcement officers interviewed Saab on eleven

occasions prior to administering <u>Miranda</u> warnings to him on July 9, 2019.  (Saab Decl. (Dkt.

No. 32) ¶¶ 6-23, 27)

The first such interview took place on March 14, 2019.  (<u>Id.</u> ¶ 8)  According to

Saab, FBI Special Agent Anthony J. Cipriano and New York City Police Department Task Force

Officer Frank Miceli (together, the "Agents") approached Saab in the parking lot of his

apartment building in Morristown, New Jersey.  (<u>Id.</u> ¶ 6)  Cipriano and Miceli identified

themselves and told Saab that "they were not there to talk about [Saab's] marriage[;] they wanted

to talk to [him] about Hizballah."  (<u>Id.</u> ¶ 7)  Saab asked the Agents whether he could "take [his]

belongings into [his] apartment before going . . . with them," and the Agents permitted him to do

so.  (<u>Id.</u>)  Saab went inside his apartment, and the Agents waited outside.  (<u>Id.</u>)

When Saab came back downstairs to speak with the Agents, he asked whether he

needed an attorney.  (<u>Id.</u>)  The Agents told Saab that he "was free to call anyone that [he] wanted

and that [he] was not under arrest."  (<u>Id.</u>)  The Agents asked Saab to accompany them to an

office building across the street, where they questioned him for approximately eight and a half

hours about "Hizballah, military training, and [Saab's] international travels."  (<u>Id.</u> ¶¶ 7-8, 10)

The Agents did not administer <u>Miranda</u> warnings to Saab, and he was not represented by an

attorney at the March 14, 2019 interview.  (<u>Id.</u> ¶ 8)  During the interview, at the Agents' request,

Saab provided his "various email addresses, passwords, and social media accounts."  (<u>Id.</u> ¶ 9)  At

the end of the interview, the Agents provided Saab with a cellphone for the Agents "to get in

touch with [Saab]."  (<u>Id.</u> ¶ 10)  Saab does not contend that the Agents prevented him from

leaving the March 14, 2019 interview at any point, and at the conclusion of the interview, Saab was not arrested.

Based on Saab's account, a reasonable person would have believed that he was "free to leave" the March 14, 2019 interview.  Santillan, 902 F.3d at 60.  While Saab contends that he "did not feel as though [he] could walk away" from the Agents before accompanying them to the office building, and that "he did not feel free to leave the interview . . . or to disobey the instruction to enter the office building" (Saab Decl. (Dkt. No. 32) ¶¶ 7, 10), Saab's alleged subjective understanding does not control the custody analysis.  See Faux, 828 F.3d at 135.  And the circumstances surrounding the March 14, 2019 interview are such that a reasonable person would have understood that they were free to leave the interview or to refuse to participate in it.

The Agents first encountered Saab in a public area – the parking lot of his apartment building.  (Saab Decl. (Dkt. No. 32) ¶ 6)  They explained to Saab that they wanted to interview him "about Hizballah."  (Id. ¶ 7)  They allowed Saab to go upstairs to his apartment unaccompanied and drop off his belongings, and they told Saab that he was "free to call anyone that [he] wanted" before the interview began, and that he was not under arrest.  (Id.)  Saab does not contend that the Agents threatened him in any way, or that any force was used.  A reasonable person in these circumstances would have understood that he was free to leave the March 14, 2019 encounter with the Agents.  See, e.g., United States v. Rhoades, No. 15 Cr. 206 (JAM), 2016 WL 7197358, at *6 (D. Conn. Dec. 9, 2016) (in finding interview non-custodial, noting that the defendant had gone to a conference room "with knowledge that the police wanted to talk to him"); United States v. Parker, 116 F. Supp. 3d 159, 171 (W.D.N.Y. 2015) (noting that the interviewing officer "clearly identified himself, disclosed the purpose for the interview, and informed [the defendant] that the interview was voluntary and that he did not have to participate

18

in it and could leave at any time"); United States v. Belcher, No. 96 Cr. 789 (BSJ), 1997 WL

35495, at *2 (S.D.N.Y. Jan. 29, 1997) (in concluding that interrogation was non-custodial, noting

that officers "allowed the defendant to make numerous phone calls").

           Even if this Court were to conclude that a reasonable person would not have felt

free to leave the March 14, 2019 interview, however, Saab's first encounter with the Agents did

not involve "a restraint of freedom of movement akin to that associated with a formal arrest."

Santillan, 902 F.3d at 60. As an initial matter, the Agents assured Saab that he was not under

arrest. He was also permitted to return unaccompanied to his apartment before speaking with the

Agents. (See Saab Decl. (Dkt. No. 32) ¶ 7) The interview took place in a commercial office

building across the street from Saab's apartment building, rather than in a law enforcement

building. (Id.) Saab does not contend that he was physically restrained or prohibited from

leaving the interview, and he does not claim that he was handcuffed, searched, frisked, or patted

down. And after the March 14, 2019 interview, Saab was permitted to go on his way. These

facts are not consistent with "a restraint of freedom of movement akin to that associated with a

formal arrest." See, e.g. United States v. Titemore, 437 F.3d 251, 260 (2d Cir. 2006) ("easily

dispens[ing]" with the defendant's claim that an interrogation was custodial where a police

officer "asked [the defendant] to step outside to talk with him," given that the defendant "was

never placed under arrest, nor restrained in any way"); Tankleff, 135 F.3d at 244 (explaining that

"whether the suspect is searched, frisked, or patted down" is relevant to the custody analysis);

United States v. Kirsteins, 906 F.2d 919, 924 (2d Cir. 1990) (finding that an interview was non-

custodial where prosecutor "accompan[ied] [the defendant] to the street and back during the

break in the questioning . . . [but] never touched [the defendant] or physically impeded his

movements in any way"); United States v. Palase, No. 11 Cr. 413 (SLT), 2014 WL 6802560, at

*7 (E.D.N.Y. Dec. 2, 2014) ("[T]he fact that the defendants were not arrested until one month later weighs heavily in favor of finding the interviews non-custodial.").

        The Court acknowledges that – at eight and a half hours – Saab's initial interview was lengthy.  (Saab Decl. (Dkt. No. 32) ¶ 10)  But Saab does not claim that he asked the Agents if he could leave the interview or that the Agents conveyed to him that he was prohibited from doing so.  And, as noted above, the Agents told Saab before the interview began that he "was not under arrest."  (Id. ¶ 7)  While not dispositive, this fact weighs in favor of finding that the interview was not custodial.  See Santillan, 902 F.3d at 61 (the fact that the defendant "was told that he was not under arrest" weighed against a finding that encounter was custodial); United States v. Familetti, 878 F.3d 53, 60 (2d Cir. 2017) (noting that the officers' statements that the defendant "was not under arrest and was free to leave" – "while not dispositive [–] is probative in 'assessing the extent to which a reasonable person would understand any restraints on his freedom'" (quoting Newton, 369 F.3d at 676)); Newton, 369 F.3d at 677 ("[A] reasonable person told . . . that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station – a significant factor in assessing the degree to which one is at 'the mercy' of the authorities (quoting Berkemer, 468 U.S. at 438)).[4]

---

[4]  In arguing that he was in custody, Saab cites United States v. McDow, 206 F. Supp. 3d 829 (S.D.N.Y. 2016), and United States v. Camacho, 674 F. Supp. 118 (S.D.N.Y. 1987).  (See July 15, 2021 Tr. (Dkt. No. 113) at 35-37; Def. Br. (Dkt. No. 30) at 5, 10)  Neither case supports Saab's argument, however, because their facts are not comparable.  In McDow, officers approached the defendant, who "began walking away."  McDow, 206 F. Supp. 3d at 845.  The officers "directed McDow to return" and began interrogating him, during which one of the officers "assumed a position immediately behind McDow, blocking him from leaving."  Id. at 845-46.  The officers then "conducted a thorough search of [the defendant's] pockets," and directed him to enter a building.  The officers also "testified that – from the time they first approached McDow on the sidewalk – he was not free to leave."  Id. at 846-47.  Saab experienced none of the physical restraints on his freedom seen in McDow.

In sum, Saab's March 14, 2019 interview was not a "custodial interrogation" that triggered an obligation to administer Miranda warnings.

As to the remaining ten interviews before July 9, 2019, the record is similar. Although Saab was not represented by counsel, and Miranda warnings were not administered, he voluntarily appeared for these interviews – seven of which occurred in Morristown, New Jersey, and three of which occurred in New York City.  Saab was not arrested before, during, or after the interviews.[5]  (See Saab Decl. (Dkt. No. 32) ¶¶ 11-23)  There is likewise no evidence that the Agents searched, frisked, or handcuffed Saab at the interviews that followed March 14, 2019; that they threatened him; or that the interviews the Agents conducted were of an inordinate length.  There is also no evidence – in connection with any of these other interviews – that Saab was subjected to conditions that would have led "a reasonable person [to understand that] his freedom of action [was] curtailed to a degree associated with formal arrest."  Newton, 369 F.3d at 672.

Saab argues, however, that he was in "constructive custody" after his first interview, because of restrictions the Agents placed on his ability to travel.  (See Def. Br. (Dkt. No. 30) at 10 (arguing that Saab was in "constructive custody . . . [and] essentially under house

---

In Camacho, postal inspectors had obtained a warrant to search the defendant's apartment; they performed the search in the defendant's presence.  Camacho, 674 F. Supp. at 120.  Although one of the postal inspectors told the defendant that he was not under arrest, that postal inspector continuously followed the defendant as he moved around the apartment.  Id. at 121.  The postal inspector then instructed the defendant to sit down and to stay seated, and warned him not to make any sudden movements "'for [the defendant's] safety and [the postal inspectors'] safety.'"  Id.  These facts indicate a greater degree of restraint on freedom of action than is present in the instant case.  Moreover, unlike here, the postal inspectors in Camacho arrested the defendant after conducting their search and interrogated the defendant in his home.  Id. at 122.

[5]  Saab has not disputed the Government's contention that he "confirmed at each of the [interviews before July 9, 2019] that he was participating in the interview voluntarily."  (Cmplt. (Dkt. No. 1) ¶ 21(a))

arrest by the federal government")) Saab contends that he "was required to tell Agent Cipriano anytime [he] wanted to go anywhere or do anything within the United States," and that he "was not allowed to travel internationally." (Saab Decl. (Dkt. No. 32) ¶ 24) "It was expected for [Saab] to tell the [Agents] with whom [he] was traveling, where [he] was staying, and when [he] would return." (Id.) Saab "was asked to provide a detailed itinerary of [his] schedule during [his] trips," and "was required to inform the [Agents] if [he] traveled outside the New York Metro area." (Id.) The Agents also told Saab "that [he] was restricted from air travel." (Id.) Saab has submitted "a list of dates on which [he] was required to notify the [Agents] of any trips that [he] took or anticipated taking." (Id. ¶ 26 (listing fourteen instances between March and July 2019))

　　　　　In response to Saab's motion to suppress, the Government has submitted a cellphone extraction report showing text messages and calls between Saab and one of the Agents. (See Richman Decl. (Dkt. No. 34) ¶ 3; Richman Decl., Ex. B (Dkt. No. 34-2)) The extraction report lists 57 text messages and 82 calls between Saab and one of the Agents during the March 16, 2019 to July 9, 2019 period. (Richman Decl., Ex. B (Dkt. No. 34-2)) Most of the text messages are about arranging interview times; these text messages do not support Saab's claim that the Agents placed substantial restrictions on his freedom of movement. For example, in one text message, an agent tells Saab – in connection with arranging an interview – "Both Friday and Saturday are fine on our end. Whichever is more convenient for you." (Id. at 2) In another text message, the agent writes to Saab, "5:15 ok? Traffic" – to which Saab responds, "Take your time." (Id.) These text messages suggest that Saab was permitted to schedule interviews at times that were convenient to him, a fact that weighs against a finding that he was in custody during those interviews.

As to Saab's travel, in a June 26, 2019 text message to an agent, Saab writes, "Just wanted to tell you that I am traveling tomorrow for work to PA, will stay there for the night and come back Fri." (Id. at 4)  The fact that Saab was permitted to travel on less than a day's notice suggests that the Agents placed little meaningful restrictions on his ability to travel, at least in the tri-state area.

As to Saab's claim that the Agents told him that he could not travel by air or outside the United States, Saab has not cited case law suggesting that such a restriction on his movements in between his interviews suggests that he was in custody for those interviews.

Finally, Saab's belief that he was under FBI surveillance after his first interview (see Saab Decl. (Dkt. No. 32) ¶ 25) does not demonstrate that he was in custody during his interviews.  See United States v. Grandi, 424 F.2d 399, 401 (2d Cir. 1970) ("By taking a seat across the aisle from [the defendant] so that he might maintain surveillance, [the customs inspector] did not restrain [the defendant's] liberty of movement nor did he assert custody over appellant's person or luggage.")).

Having conducted the Second Circuit's two-part inquiry, the Court concludes that Saab was not in custody for purposes of any law enforcement interview prior to July 9, 2019. Saab's motion to suppress the statements he made at those interviews – and the fruits of those statements – will therefore be denied.

## 2.    July 9, 2019 Interview

Saab's final interview took place on July 9, 2019, at FBI headquarters at 26 Federal Plaza in Manhattan.  (Saab Decl. (Dkt. No. 32) ¶ 27)  Saab has not alleged any facts that materially distinguish the background for this interview from those that took place prior to July 9, 2019.  Saab has not alleged that he was searched, frisked, or handcuffed when he arrived at 26

Federal Plaza, nor has he asserted that he was threatened by the Agents that day.  Nor has he alleged that the interview was of inordinate length.  Prior to Saab's arrest on July 9, 2019, there is no evidence that he was subjected to "a restraint of freedom of movement akin to that associated with a formal arrest."  Santillan, 902 F.3d at 60.

        The only distinction Saab has identified is that – at the outset of the July 9, 2019 interview – the Agents administered Miranda warnings to Saab, and he "reviewed and signed the FD-395 Advice of Rights form, indicating that [he] wanted to speak with the [Agents] without an attorney present."  (Saab Decl. (Dkt. No. 32) ¶ 27)  There is no evidence, however, that the Agents said or did something prior to or during the interview that signaled to Saab that he was in custody, or that he would be taken into custody.  To the contrary, Saab states in his declaration that he "was shocked when [the Agents] arrested [him]."  (Id. ¶ 30)

        Saab states that he "signed the FD-395 [waiver form] because [he] had already told [the Agents] everything in the previous interviews," and "did not think that it would make a difference."  (Id. ¶ 27)  After the Agents administered Miranda warnings to Saab and he signed the waiver form, the Agents asked Saab

> the same detailed questions about Hizballah, military training, [Saab's] travels, people with whom [he had] interacted, the contents of [his] electronic devices, the contents of [his] social media and email accounts, [his] life in Lebanon, and [his] life in the United States.  They reviewed the previous statements that [Saab] made before [he] had [his] Miranda warnings read to [him].  [Saab and the Agents] did not discuss anything different or new after [Saab] signed the FD-395 Advice of Rights form.  [They] talked about all the same things that [they] had been discussing in the previous eleven interviews. . . .

(Id. ¶ 28)  The Agents arrested Saab at the conclusion of the July 9, 2019 interview.  (Id. ¶ 30)

        Saab argues that his July 9, 2019 post-Miranda statements should be suppressed because the Agents had engaged in an improper two-step interrogation strategy, in which they conducted eleven interviews without administering Miranda warnings to Saab, and then – at the

twelfth interview – repeated their questions and elicited the same answers after administering Miranda warnings.  (Def. Br. (Dkt. No. 30) at 12-14)

The Supreme Court addressed two-stage interrogation in Oregon v. Elstad, 470 U.S. 298 (1985), and Missouri v. Seibert, 542 U.S. 600 (2004) (plurality opinion).  Elstad involves a robbery suspect who made an incriminating statement to police officers at his home. Elstad, 470 U.S. at 300-01.  The officers then transported the suspect to police headquarters, where they gave him Miranda warnings before obtaining his oral and written confession.  Id. at 301-02.  The suspect was charged with first-degree robbery, and he moved to suppress both his pre-Miranda statement and his post-Miranda confession.  Id. at 302.  The Supreme Court granted certiorari to consider whether "the Fifth Amendment requires the suppression of a confession, made after proper Miranda warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant."  Id. at 303.  The Court held that it did not, explaining that when a suspect's statement is elicited in violation of Miranda, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."  Id. at 309.

In Seibert, the Supreme Court considered whether the general rule announced in Elstad extended to "a police protocol for custodial interrogation that call[ed] for giving no warnings of the rights to silence and counsel until interrogation ha[d] produced a confession." Seibert, 542 U.S. at 604 (plurality opinion).  In a split opinion, the Court concluded that such a technique was unconstitutional under Miranda.  Id.  Unlike the "good-faith Miranda mistake" at issue in Elstad, id. at 615 (plurality opinion), the "two-step interrogation technique" in Seibert "was used in a calculated way to undermine the Miranda warning."  Id. at 622 (Kennedy, J., concurring).

Although none of the Justices' opinions garnered a majority vote in Seibert, the Second Circuit has treated "Justice Kennedy's concurrence in Seibert as controlling." United States v. Williams, 681 F.3d 35, 41 (2d Cir. 2012). Seibert thus "lays out an exception to Elstad for cases in which a deliberate, two-step strategy was used to obtain [a] postwarning confession." Id. (citing United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007)). "[A] court should review 'the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness.'" Id. (quoting United States v. Capers, 627 F.3d 470, 479 (2d Cir. 2010)). Because "'the intent of the officer will rarely be . . . candidly admitted . . . ,'" "in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." Capers, 627 F.3d at 479 (quoting Seibert, 542 U.S. at 616 n.6 (plurality opinion)). "[T]he Government bears the burden of disproving by a preponderance of the evidence that it employed a deliberate two-step strategy." Williams, 681 F.3d at 41 (citing Capers, 627 F.3d at 480).

Seibert has no application here because – as discussed above – Saab was not in custody during any of the eleven interviews that preceded the July 9, 2019 administration of Miranda warnings and the subsequent interview. See United States v. Simmonds, 641 F. App'x 99, 101 (2d Cir. 2016) (rejecting two-step interrogation claim where the defendant "was not in custody before [law enforcement] provided him a Miranda warning"); United States v. Deas, No. 17-CR-719 (JGK), 2018 WL 3023282, at *9 (S.D.N.Y. June 15, 2018) (finding defendant's two-step interrogation argument "unavailing because . . . the defendant's first statement was not the product of a custodial interrogation and therefore there was nothing to 'circumvent'" (quoting United States v. Moore, 670 F.3d 222, 228-29 (2d Cir. 2012))); United States v. Barro, No. 12 Cr. 160 (NGG), 2013 WL 3992405, at *6 (E.D.N.Y. Aug. 2, 2013) (holding that the fact that

26

defendant did not make "a pre-<u>Miranda</u> statement that was obtained in violation of his <u>Miranda</u> rights, . . . render[ed] <u>Seibert</u> inapplicable"); <u>see also</u> <u>United States v. Thompson</u>, 496 F.3d 807, 811 (7th Cir. 2007) ("In this case, <u>Miranda</u> warnings before the first confession were not required because [the defendant's] first interview was not custodial; <u>Seibert</u> therefore does not apply."); <u>United States v. Kiam</u>, 432 F.3d 524, 531 (3d Cir. 2006) (holding that <u>Miranda</u> warnings were not required before routine questions by border patrol, making <u>Seibert</u> inapplicable to the post-<u>Miranda</u> confession).

The Court concludes that there is no basis for suppressing Saab's statements at the July 9, 2019 interview.  It is undisputed that the Agents administered <u>Miranda</u> warnings to Saab, and that he waived his rights in writing.  There is no evidence of the two-step interrogation technique found improper by the plurality in <u>Seibert</u>.  Accordingly, Saab's motion to suppress his pre-arrest statements – and the fruits of those statements – will be denied.

## II.   <u>MOTION TO CHANGE VENUE</u>

Saab seeks a change of venue, because his July 9, 2019 arrest "generated 82 press accounts regarding his case," and this media coverage prevents him from receiving a fair trial. (Def. Br. (Dkt. No. 30) at 4, 16, 18)

According to Saab, the "82 news accounts of the charges against [him] . . . focused on specific NYC [l]andmarks that were the potential targets of [his] conspiracy[, and, are] . . . landmarks . . . visited and used by millions of New Yorkers each year."  (<u>Id.</u> at 18)  "No potential juror in the SDNY can forget or put aside the landmarks that were targeted in this case."  (<u>Id.</u>; <u>see also</u> <u>id.</u> (arguing that "[t]here is a presumption of prejudice that arises in [this district] that is tied directly to the [l]andmarks referenced in the media stor[i]es about this case"))

"By constitutional design," trials generally occur "'in the State where the . . . Crimes . . . have been committed.'"  <u>Skilling v. United States</u>, 561 U.S. 358, 377-78 (2010)

(quoting U.S. Const. Art. III, § 2, cl. 3 and citing U.S. Const. amend. VI).  However, a defendant may request a transfer to a difference district "if extraordinary local prejudice will prevent a fair trial," id. at 378, and the Supreme Court has overturned convictions where the "trial atmosphere [was] utterly corrupted by press coverage," id. at 380 (quoting Murphy v. Florida, 421 U.S. 794, 798 (1975)).

"'[P]retrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial.'"  Id. at 384 (quoting Nebraska Press Assn. v. Stuart, 427 U.S. 539, 554 (1976)).  "A presumption of prejudice . . . attends only the extreme case." Id. at 381.

In Skilling, the Supreme Court considered "the size and characteristics of the community in which the crime occurred," suggesting that a larger jury pool reduced the likelihood of prejudice.  Id. at 382.  The Court also considered whether the news stories contained confessions or other blatantly prejudicial information of the "smoking-gun variety," as well as the time that had passed between the news reports and the trial.  Id. at 382-84.

A defendant seeking a change of venue because of media reports "must show 'a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial.'"  United States v. Sabhnani, 599 F.3d 215, 232 (2d Cir. 2010) (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 967 (2d Cir. 1990))); see id. at 232-33 (listing factors to consider, including the time between the press coverage and trial); see also United States v. Volpe, 42 F. Supp. 2d 204, 218 (E.D.N.Y. 1999) (collecting high profile cases in which voir dire examination was found adequate to address extensive pre-trial publicity).

In support of his motion for a change of venue, Saab cites Rideau v. Louisiana, 373 U.S. 723 (1963), where the Supreme Court reversed a conviction on the basis of prejudicial pre-trial publicity.  (See Def. Br. (Dkt. No. 30) at 17)  In that case, a 20-minute film of a police

interrogation – during which the defendant had confessed to various crimes – was broadcast on three occasions in the small community where the crimes had taken place.  See Rideau, 373 U.S. at 724.  The trial took place about two months after the film had been broadcast, and members of the venire stated during voir dire they had seen the broadcast.  Id. at 725; id. at 729 (Clark, J., dissenting).

The facts here are not comparable to those in Rideau.  Acknowledging Saab's claim that (1) there were 82 news reports about his July 9, 2019 arrest; (2) those reports focused on the fact that "major NYC landmarks . . . were the potential target of [the charged] conspiracy"; and (3) certain of the articles cite inculpatory statements Saab made in his pre-arrest interviews (Def. Br. (Dkt. No. 30) at 18; July 15, 2021 Tr. (Dkt. No. 113) at 24-26, 29), any venire member who saw and who recalls this news coverage from two-and-a-half years ago will be identified during voir dire, and excused where appropriate.  New York is a huge metropolis with a very large jury pool, and voir dire can ensure that an unbiased jury is selected.  See Skilling, 561 U.S. at 384; Volpe, 42 F. Supp. 2d at 218.

Saab's motion for a change of venue will be denied.

## III.    MOTION TO DISMISS COUNT SEVEN OR COUNT NINE AS MULTIPLICITOUS

Count Seven of the Indictment charges Saab with citizenship application fraud, in violation of 18 U.S.C. §§ 1546(a) and 2, while Count Nine charges Saab with false statements in violation of 18 U.S.C. §§ 1001 and 2.  (Indictment (Dkt. No. 6) ¶¶ 16-17, 20-21)  Count Seven is premised on the March 2015 petition to remove conditions on CC-1's residence, in which Saab and CC-1 "falsely affirmed under penalty of perjury that their marriage 'was not for the purpose of procuring an immigration benefit.'"  (Id. ¶ 17)  Count Nine is likewise premised on Saab's false statements in the March 2015 petition concerning his marriage.  (Id. ¶ 21)

Saab argues that these two counts are multiplicitous, and that one of the counts must be dismissed prior to trial.  (Def. Br. (Dkt. No. 69) at 2-7; see also id. at 2 ("To avoid waiving his right to challenge the multiplicitous charges in this indictment, . . . Saab rightfully raises the issue of multiplicity in his pre-trial motions."))

"Where there has been no prior conviction or acquittal, [however,] the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed."  United States v. Josephberg, 459 F.3d 350, 355 (2d Cir. 2006) (per curiam); see also United States v. Polouizzi, 564 F.3d 142, 157 (2d Cir. 2009) (where "[n]o convictions have been entered . . . the Double Jeopardy Clause's guarantee against multiple punishments for the same offense has not yet been triggered"). Accordingly, courts in this Circuit routinely deny as premature pre-trial motions to dismiss potentially multiplicitous counts.  See, e.g., United States v. Maxwell, 534 F. Supp. 3d 299, 322-23 (S.D.N.Y. 2021) (denying as premature motion to dismiss allegedly multiplicitous counts); United States v. Ahmed, 94 F. Supp. 3d 394, 434 (E.D.N.Y. 2015) (same, and collecting cases); see also Josephberg, 459 F.3d at 355 ("If the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts.")[6]

---

[6] See also United States v. Cobb, 1:19-CR-00155 (EAW), 2021 WL 3700512, at *2 (W.D.N.Y. Aug. 19, 2021) ("If the jury convicts on two multiplicitous counts, the court can enter judgment on only one of the two counts."); United States v. Sakoc, 2:13-cr-106, 2014 WL 7336426, at *2 (D. Vt. Dec. 22, 2014) ("[I]n light of the holding in Josephberg, [the defendant's] motion . . . is denied without prejudice as premature, and this issue may be raised again by the defendant at the close of the evidence."); United States v. Mostafa, 965 F. Supp. 2d 451, 464 (S.D.N.Y. 2013) ("It is well established that the Double Jeopardy clause does not prohibit simultaneous prosecutions for the same offense; it prohibits duplicative punishment. . . . Accordingly, multiplicity is properly addressed by the trial court at the sentencing stage."); United States v. Ghavami, No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *11 (S.D.N.Y. July 13, 2012) ("To the extent that the Indictment alleges more than one conspiracy in violation of different statutory provisions . . . ,

Saab's motion to dismiss either Count Seven or Count Nine as multiplicitous will be denied as premature.

## IV.    MOTION TO DISMISS COUNT EIGHT AS INSUFFICIENT

Count Eight of the Indictment charges Saab with naturalization fraud, in violation of 18 U.S.C. §§ 1015(a) and 2, and alleges that Saab "knowingly made, and aided and abetted the making of, a false statement under oath, in a case, proceeding, and matter relating to, under, and by virtue of a law of the United States relating to naturalization, citizenship, and registry of aliens, to wit, [he] affirmed, and aided and abetted CC-1's affirmance, in the [March 2015 petition], under penalty of perjury, that their marriage 'was not for the purpose of procuring an immigration benefit.'"  (Indictment (Dkt. No. 6) ¶ 19; see also id. ¶ 15(b) ("In or about March

---

Defendants' multiplicity challenge is premature. . . . Should the jury convict Defendants on what the Court ultimately determines to be multiplicitous counts, the Court will enter judgment on only one of the multiplicitous convictions."); United States v. Rivera, No. 09-CR-619 (SJF), 2011 WL 1429125, at *4 (E.D.N.Y. Apr. 13, 2011) ("Since it is possible that the jury will convict defendants on only one . . . of the respective counts that they allege are multiplicitous, and acquit defendants on all of the counts with which they allege that count is multiplicitous, the issue of whether the counts are multiplicitous in violation of the Double Jeopardy Clause is premature at the pretrial stage."); United States v. Jahedi, 681 F. Supp. 2d 430, 436 (S.D.N.Y. 2009) ("[A] defendant's Double Jeopardy rights are only at risk upon conviction on more than one multiplicitous count.  If this occurs, the proper remedy is for the district court to enter judgment on only one of the multiplicitous convictions." (footnote omitted)); United States v. Deas, No. 3:07-cr-73 (CFD), 2008 WL 5063903, at *2 n.1 (D. Conn. Nov. 24, 2008) ("Where, as is the case here, a single prosecution contains counts that are potentially multiplicitous, the Double Jeopardy Clause protects against multiple punishments.  As described . . . in Josephberg, this protection is best achieved by vacating any multiplicitous conviction at trial, rather than by premature dismissal of the counts." (emphasis in original)); United States v. Ferguson, 478 F. Supp. 2d 220, 233 (D. Conn. 2007) ("The defendants' motion [to dismiss allegedly multiplicitous counts] is denied. . . . [I]t is premature under Josephberg.  Josephberg made clear that the defendants' Double Jeopardy rights are only at risk of violation after they are convicted of multiplicitous charges, not pre-trial.  Because of this, district courts should dismiss multiplicitous counts only if a defendant is convicted on multiplicitous counts." (citations omitted)).

15, 2015, Saab and CC-1 filed a joint petition . . . seeking to remove conditions on CC-1's residence.'"))

Saab argues that Count Eight should be dismissed as insufficient to allege a crime. (Def. Br. (Dkt. No. 69) at 7-13)  According to Saab, the alleged false statements were made in a "Form I-751 Petition to Remove Conditions on Lawful Residency," and such a petition is "not a case, proceeding, and matter relating to naturalization, citizenship, and registry of aliens" within the meaning of 18 U.S.C. § 1015(a).  (Id. at 8)  Saab contends that a Form I-751 petition is merely "an adjustment of status process, which is a separate and distinct legal process, and not one relating to naturalization, citizenship, or to the registry of aliens within the meaning of" Section 1015(a).  (Id. at 8-9; see id. at 10 (contending that a Form I-751 petition is "not a process related to naturalization but one related to lawful permanent residency"); id. at 12 (contending that a Form I-751 petition "is not an application related to registry"))

The Government counters that the alleged false statements Saab made in the Form I-751 petition "relate[] to CC-1's pursuit of her naturalized citizenship"; that Count Eight properly tracks the language of Section 1015(a); and that Saab's objection to Count Eight "is a factual sufficiency claim for the jury – not an appropriate basis to dismiss the charge at this time."  (Govt. Br. (Dkt. No. 99) at 18)

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  Hamling v. United States, 418 U.S. 87, 117 (1974); see also

United States v. Frias, 521 F.3d 229, 235 (2d Cir. 2008) ("Typically, to state an offense, an indictment 'need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, state time and place in approximate terms.'" (quoting United States v. Flaharty, 295 F.3d 182, 198 (2d Cir. 2002))).

"The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001) (citation and quotation marks omitted). Such a dismissal is an "extreme sanction," United States v. Fields, 592 F.2d 638, 647 (2d Cir. 1978), which has been upheld "only in very limited and extreme circumstances," and should be "reserved for the truly extreme cases," "especially where serious criminal conduct is involved," United States v. Broward, 594 F.2d 345, 351 (2d Cir. 1979). In reviewing a motion to dismiss an indictment, the Court must accept the allegations of the indictment as true. See Boyce Motor Lines v. United States, 342 U.S. 337, 343 n.16 (1952); New York v. Tanella, 374 F.3d 141, 148 (2d Cir. 2004).

18 U.S.C. §1015(a) provides that, "[w]hoever knowingly makes any false statement under oath, in any case, proceeding, or matter relating to, or under, or by virtue of any law of the United States relating to naturalization, citizenship, or registry of aliens [is guilty of a crime]." Here, Count Eight tracks the language of 18 U.S.C. 1015(a), stating in relevant part, the following: "Saab . . . knowingly made, and aided and abetted the making of, a false statement under oath, in a case, proceeding, and matter relating to, under, and by virtue of a law of the United States relating to naturalization, citizenship, and registry of aliens . . . ." (Indictment (Dkt. No. 6) ¶ 19)

As a result of the alleged fraudulent marriage between Saab – a dual U.S.-Lebanese citizen – and CC-1 – a French national – CC-1 obtained conditional permanent

33

residency status in the United States.  (Cmplt. (Dkt. No. 1) ¶ 35)  Where an individual obtains

conditional permanent residency status as the result of a marriage to a U.S. citizen, that

conditional status is only valid for two years and cannot be renewed.  See Alrefae v. Chertoff,

471 F.3d 353, 355 (2d Cir. 2006) (citing 8 U.S.C. § 1186a(a)(1)).  Within the two-year period,

that individual must file a petition to remove the conditions on her permanent resident status or

risk losing lawful status.  See Alom v. Whitaker, 910 F.3d 708, 710 (2d Cir. 2018) (citing, inter

alia, 8 U.S.C. § 1186a(d)(2)(A)); see also 8 C.F.R. § 216.4(a)(1).  Here, CC-1 obtained

conditional permanent residency status as the result of her marriage to Saab, and on March 13,

2015, Saab and CC-1 filed a Form I-751 petition seeking to remove the conditions on CC-1's

permanent residency status, thus rendering her a lawful permanent resident.  (Cmplt. (Dkt. No. 1)

¶ 35(e)); see also Atsilov v. Gonzales, 468 F.3d 112, 113 (2d Cir. 2006) ("Under the Immigration

and Nationality Act . . . , the marriage of an alien to a United States citizen entitles the alien to

petition for permanent-residence status . . . .")).

   The Government alleges that Saab made a false statement in a petition to remove

the conditions on CC-1's permanent residency status.  (See Indictment (Dkt. No. 6) ¶ 21)  Saab's

alleged conduct falls within the conduct proscribed by Section 1015(a), which makes it unlawful

to "knowingly make[] any false statement under oath, in any case, proceeding, or matter relating

to, or under, or by virtue of any law of the United States relating to naturalization, citizenship, or

registry of aliens."  18 U.S.C. § 1015(a).  While it is true that Count Eight is not premised on a

false statement Saab made in an application for naturalization – i.e., a "Form N-400," see Poole

v. Mukasey, 522 F.3d 259, 265 (2d Cir. 2008) – as defense counsel recognizes, "[i]n the

overwhelming number of cases, prior admission as a lawful permanent resident is a prerequisite

for naturalization" (Def. Br. (Dkt. No. 69) at 11 (citing 8 U.S.C. §§ 1429, 1427(a))); see also 8

U.S.C. § 1430(a) (providing that "[a]ny person whose spouse is a citizen of the United States . . . , may become naturalized . . . if such person . . . has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least three years"). Accordingly, removing the conditions on CC-1's residency was a prerequisite for her naturalization at any point in the future.  And given the broad language utilized in Section 1015(a), the Court concludes that the Indictment sufficiently alleges that Saab's false statement in the March 2015 petition was made in a "matter relating to . . . any law of the United States relating to naturalization."  18 U.S.C. § 1015(a).  Cf. United States v. Chahla, 752 F.3d 939, 944, 948 (11th Cir. 2014) (upholding conviction under 18 U.S.C. § 1425(a), which criminalizes false statements made to "procure[] or attempt to procure[] . . . naturalization," based on statements made on lawful permanent resident application materials, including a Form I-751)

Because (1) Saab's alleged conduct violates Section 1015(a); and (2) Count Eight properly tracks the language of Section 1015(a), apprises Saab of the nature of the accusation against him, and provides notice generally of how the crime occurred, Count Eight is legally sufficient.  Accordingly, Saab's motion to dismiss Count Eight will be denied.

## V.     MOTION FOR PRE-TRIAL RELEASE

On July 10, 2019, Saab was presented before Magistrate Judge Henry B. Pitman on a criminal complaint charging him with providing, and conspiring to provide, material support to a foreign terrorist organization; receiving and conspiring to receive military-type training from a foreign terrorist organization; unlawfully obtaining citizenship or naturalization to facilitate an act of international terrorism; and marriage fraud, citizenship application fraud, naturalization fraud, and false statements.  (Cmplt. (Dkt. No. 1) ¶¶ 1-15; July 10, 2019 Presentment Tr. at 7-8)  Saab was detained on consent.  (July 10, 2019 Presentment Tr. at 9)

Saab now contends that he should be granted pre-trial release on the following

conditions:

> 1. [A] $50,000 [personal recognizance bond], 2. Co-signed by one (1)
> [f]inancially responsible person, 3. Surrender of all passports and no new
> applications, 4. Travel restricted to the Southern District of New York, Eastern
> District of New York, and the District of New Jersey, 5. Pretrial Supervision, 6.
> Home detention with GPS monitoring, 7. Defendant will not contact anyone
> outside of the United States except for his parents.

(Def. Br. (Dkt. No. 90) at 8)  Trial in this matter is scheduled for January 10, 2022.  (July

15, 2021 Order (Dkt. No. 109))

Pre-trial release is governed by the Bail Reform Act, 18 U.S.C. § 3142.  The

statute directs courts to consider the following factors in determining whether pre-trial release is

appropriate:

> (1) the nature and circumstances of the offense charged, including whether the
> offense is a crime of violence, a violation of section 1591, a Federal crime of
> terrorism, or involves a minor victim or a controlled substance, firearm,
> explosive, or destructive device;
>
> (2) the weight of the evidence against the [defendant];
>
> (3) the history and characteristics of the [defendant], including . . . the
> [defendant's] character, physical and mental condition, family ties, employment,
> financial resources, length of residence in the community, community ties, past
> conduct, history relating to drug or alcohol abuse, criminal history, and record
> concerning appearance at court proceedings; . . . and
>
> (4) the nature and seriousness of the danger to any person or the community that
> would be posed by the defendant's release. . . .

18 U.S.C. § 3142(g).

Section 3142(e)(3)(c) of the Bail Reform Act creates a presumption – "[s]ubject

to rebuttal by the [defendant]" – "that no condition or combination of conditions will reasonably

assure the appearance of the [defendant] as required and the safety of the community if the

judicial officers finds that there is probable cause to believe that the [defendant] committed . . .

36

an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum

term of imprisonment of 10 years or more is prescribed."  18 U.S.C. § 3142(e)(3)(C).

   The offenses listed in Section 2332b(g)(5)(B) include violations of 18 U.S.C.

§ 2339B – providing material support or resources to a foreign terrorist organization – and 18

U.S.C. § 2339D – receiving military-type training from a foreign terrorist organization.  18

U.S.C. § 2332b(g)(5)(B).  Here, as discussed above, Saab is charged with providing and

conspiring to provide material support to a foreign terrorist organization – Hizballah – and with

receiving and conspiring to receive military-type training from Hizballah, a foreign terrorist

organization.  (See Indictment (Dkt. No. 6) ¶¶ 1-10)  Accordingly, there is a rebuttable

presumption here that no condition or combination of conditions can ensure Saab's return to

court and the safety of the community.  18 U.S.C. § 3142(e)(3)(C); see also United States v.

Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) ("Where, as here, a defendant has been indicted

for violating 18 U.S.C. § 2339B(a)(1), a rebuttable presumption arises that no conditions can

provide the requisite assurances.").

    Where, as here, the rebuttable presumption is applicable, the defendant must

"com[e] forward with evidence that he does not pose a danger to the community or a risk of

flight."  United States v. English, 629 F.3d 311, 319 (2d Cir. 2011) (citation and quotation marks

omitted).  And "[s]atisfying the burden of production does not eliminate the presumption

favoring detention; it remains a factor to be considered among those weighed by the district

court."  Id. (citation and quotation marks omitted); see id. (noting that the Government ultimately

retains the "burden of persuasion by clear and convincing evidence that the defendant presents a

danger to the community," and a burden of persuasion by "a preponderance of the evidence that

the defendant presents a risk of flight" (citation and quotation marks omitted)); see also United

States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000) (noting that the Government can meet its

burden of persuasion "by proffer alone" (citation and quotation marks omitted)).

Here, consideration of the factors listed in the Bail Reform Act makes clear that

Saab must be detained pending trial, both on grounds of risk of flight and danger to the

community.

As to the nature and circumstances of the alleged offenses, Saab is charged with

extremely serious terrorism offenses.  Indeed, he allegedly assisted an extremely dangerous

foreign terrorist organization – Hizballah – with identifying landmarks in the New York City

area that would make suitable targets for a terrorist attack.  (Cmplt. (Dkt. No. 1) ¶ 24; Indictment

(Dkt. No. 6) ¶ 3)  The Government also alleges that Saab received training in firearms and

explosives from Hizballah, and that he participated in the attempted murder of an individual

suspected of being an Israeli spy.  (Cmplt. (Dkt. No. 1) ¶¶ 21, 32; Indictment (Dkt. No. 6) ¶ 3)

In sum, Saab presents an obvious, serious danger to the community.  The fact that Saab's alleged

conduct on behalf of Hizballah took place more than ten years ago does not alter this Court's

conclusion that he presents a danger to the community.

The weight of the evidence against Saab appears to be quite strong, given that it

consists primarily of statements he provided to law enforcement officers over the span of several

months, in a dozen interviews.  (Cmplt. (Dkt. No. 1) ¶ 21)

As to risk of flight, Saab is a dual U.S.-Lebanese citizen who has traveled

frequently to the Middle East.  (Id. ¶¶ 21(e) n.3, 35(c))  His parents reside in Lebanon.  (See Def.

Br. (Dkt. No. 90) at 17)  Moreover, Saab faces a maximum sentence of 105 years' imprisonment

if convicted on all counts, and a minimum mandatory sentence of ten years' imprisonment.

(Indictment (Dkt. No. 6) ¶¶ 1-21); 18 U.S.C. §§ 371, 1001(a), 1015(f), 1425(b), 1546(a),

2339B(a)(1), 2339D(a).  These potential penalties provide Saab with a compelling motive to flee. See, e.g., United States v. Boustani, 356 F. Supp. 3d 246, 252 (E.D.N.Y. 2019), aff'd, No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019) ("When faced with the possibility of a significant prison term, defendants have a strong incentive to flee.").  The fraud and false statement charges against Saab – which include citizenship, naturalization, and marriage fraud as well a Section 1001 violation – demonstrate that any promise on Saab's part to return to court if granted pre-trial release would be of dubious reliability.  Acknowledging Saab's assertion that he "has friendships, family, and acquaintances all over the New York metropolitan area" (Def. Br. (Dkt. No. 90) at 17), this Court is not persuaded that these relationships are sufficient – given the serious charges against Saab – to ensure his return to court.  Given Saab's ties to Lebanon, his training as a Hizballah operative, the fact that he holds a master's degree in computer information systems, and his work as "an experienced IT professional" (id.), Saab has both a compelling motive to flee and the capacity to do so if granted pre-trial release.

In support of his application for pre-trial release, Saab points to the poor conditions of confinement at the now-closed Metropolitan Correctional Center ("MCC"), including frequent lockdowns; lack of showers, hot meals, religious services, and social visits; and poor COVID-19 protocols.[7]  (Def. Br. (Dkt. No. 90) at 10-12)[8]  While the conditions in which Saab was held at the MCC are regrettable, they do not alter this Court's conclusion that he has not rebutted the presumption that there is no condition or combination of conditions that can ensure his return to court and the safety of the community if he is released.  Accordingly, Saab's

---

[7]  The Johnson & Johnson vaccine was administered to Saab on June 3, 2021.  (Govt. Br. (Dkt. No. 99) at 37; id., Ex. A (Dkt. No. 99-1))
[8]  Saab also complains about inadequate access to the law library.  (Def. Br. (Dkt. No. 90) at 12)  On June 4, 2021, however, this Court issued an order directing that Saab be permitted  at least fifteen hours per week in the law library.  (See June 4, 2021 Order (Dkt. No. 96) ¶ 4)

motion for pre-trial release will be denied, and he will be detained pending trial, which will go forward as scheduled on January 10, 2022.

## VI.   ALLEGED *BRADY* VIOLATION

Counts One and Two of the Indictment charge Saab with providing, and conspiring to provide, "material support or resources" to Hizballah, a foreign terrorist organization.  (Indictment (Dkt. No. 6) ¶¶ 1-5)  Both counts assert that Saab's criminal conduct took place between 1996 and March 2019, when Saab was first interviewed by law enforcement officers.  (Id. ¶¶ 1, 5)

As discussed above, at a December 19, 2019 conference, defense counsel asserted that Saab had had "no involvement or connection with Hizballah . . . [after] he was stopped at the airport in 2005. . . ."  (Dec. 19, 2019 Tr. (Dkt. No. 18) at 5)  Defense counsel asked the Government to identify anything in the discovery materials suggesting that Saab "was communicating with and/or involved with Hizballah after the 2005 airport incident."  (Id.)  The Government responded that there were "items in the discovery that, from the government's perspective, would indicate [Saab's] involvement . . . in continued activities for Hizballah after [2005]," and that the Government would assist defense counsel in reviewing the relevant discovery materials on this point.  (Id. at 6)  The Government noted, however, that even "if everything was pre-2005, [the] charge[s] would still stand as is."  (Id.)

In a February 8, 2021 letter, the Government informed defense counsel "that the Government does not dispute that Hizballah terminated its relationship with the defendant after Spring 2005 and no longer provided the defendant with any assignments, tasking, or training after Spring 2005."  (Feb. 25, 2021 Def. Ltr. (Dkt. No. 71) at 1)

Saab argues that the Government committed a Brady violation in not making its February 2021 disclosure earlier, and asks this Court either to declassify documents that relate to

40

the Government's February 2021 disclosure, or direct that defense counsel receive a security

clearance so that he can review the relevant classified documents.  (Def. Br. (Dkt. No. 90) at 8,

18-20)

        Saab's counsel represent that they "relied on the Government's representations at

the December [2019] conference" that the Government had evidence showing Saab's post-2005

involvement with Hizballah.  (Id. at 18-19)  Defense counsel "was convinced [that] the

Government had evidence that would be turned over before trial that would show . . . Saab's

involvement with [Hizballah] after the spring of 2005.  This was based on the time frame

referenced in the indictment as ending in 2019 and the Government's 12/19/19 representations."

(Id. at 19)  Based on the February 2021 disclosure, however, "[i]t turns out there was no such

evidence . . . [and] [t]here can be no conspiracy between [Hizballah] and Mr. Saab after the

Spring of 2005."  (Id.)

        Saab contends that he has a right to know when the Government became aware

that Saab's contact with Hizballah ended in 2005.  (Id. at 20)  In particular, Saab contends that

the Government must disclose whether it was aware of this fact before law enforcement officers

conducted their first interview of Saab in March 2019.  (Id.)

        At an April 7, 2021 conference, the Government suggested that the timing of

when the Government became aware that Hizballah had terminated its relationship with Saab in

2005 would implicate "classified issues."  (Apr. 7, 2021 Tr. (Dkt. No. 81) at 13)  In response,

Saab contends that – to remedy the alleged Brady violation – defense counsel should receive a

"security clearance to review the classified information regarding the timing of the

Government's knowledge of the disclosure.  In the alternative, the Court should order the

41

Government to declassify this information and turn it over to the defense." (Def. Br. (Dkt. No. 90) at 20)

In opposing Saab's motion, the Government draws a distinction between Hizballah's termination of its relationship with Saab, and Saab's alleged desire to maintain a relationship with Hizballah. In this regard, the Government notes that its February 2021 disclosure "focuses entirely on <u>Hizballah</u>'s decision to terminate its relationship with the defendant in the spring of 2005." (Govt. Br. (Dkt. No. 99) at 25 (emphasis in original)) The February 2021 disclosure "says nothing about whether <u>the defendant</u> believed" that the relationship had been terminated, "or whether <u>the defendant</u> undertook additional tasks on behalf of Hizballah without Hizballah's knowledge." (<u>Id.</u> (emphasis in original)) "The Government did not, and does not, stipulate that [Saab] no longer performed tasks for Hizballah after the spring of 2005." (<u>Id.</u>) "To the contrary, [Saab's] activities in support of Hizballah continued after that date." (<u>Id.</u>) While the Complaint makes clear that most of the evidence against Saab regarding Hizballah arises from conduct that took place between 1996 and 2005, the Government expects to offer evidence that post-dates 2005, including (1) Saab's "admissions that he tried to contact his Hizballah 'handler' on trips to Lebanon in at least 2008 and 2010"; and (2) "certain photographs and videos found on [Saab's] electronic devices, some of which post-date spring 2005." (<u>Id.</u> at 25-26)

Pursuant to <u>Brady v. Maryland</u>, "[t]he government has a duty to disclose evidence favorable to the accused when it is material to guilt or punishment." <u>United States v. Madori</u>, 419 F.3d 159, 169 (2d Cir. 2005) (citing <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)). The Government's obligations extend "not only [to] evidence that tends to exculpate the accused, but also [to] evidence that is useful to impeach the credibility of a government witness," that is,

Giglio material.  United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (citing Giglio v. United States, 405 U.S. 150, 154 (1972)).  Brady and Giglio material "must be disclosed in time for its effective use at trial . . . or at a plea proceeding."  Coppa, 267 F.3d at 146; see also id. at 144 ("[A]s long as a defendant possesses Brady evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner.")

There is no evidence of a Brady violation here.  Assuming arguendo that the Government's February 2021 disclosure constitutes Brady material, the disclosure was made nearly a year before trial, giving defense counsel ample time to make use of the disclosure at trial.  Indeed, the disclosure was made before any trial date had been set.  (See July 15, 2021 Order (Dkt. No. 109) (setting trial for January 10, 2022))

Because there is no evidence of a Brady violation, Saab is not entitled to the remedy he seeks, whether declassification or a security clearance for defense counsel.[9]

## VII.   MOTION FOR A *FRANKS* HEARING

On April 3, 2019, Magistrate Judge Robert W. Lehrburger signed a search warrant for certain of Saab's electronic devices.  (See Apr. 3, 2019 Search Warrant (Dkt. No. 134))  The search warrant was issued on the basis of an affidavit submitted by FBI Special Agent Anthony J. Cipriano.  (See Def. Br., Ex. A (Dkt. No. 118-1) (Cipriano Aff.))  Saab complains that Agent Cipriano did not disclose in his affidavit that Hizballah had "terminated its relationship [with Saab in the Spring of 2005] and provided [Saab] with no tasks after the Spring

---

[9]  The Court notes that, at oral argument, defense counsel could not explain why it was relevant when the Government became aware of the information that is the subject of its February 2021 disclosure.  (See July 15, 2021 Tr. (Dkt. No. 113) at 7-13)

of 2005."  (Def. Br. (Dkt. No. 118) at 2 n.5)  Saab argues that the failure to disclose these facts

constitutes a material omission that "should be the subject of a <u>Franks</u> hearing."  (<u>Id.</u> at 5)

> ### A.   <u>Agent Cipriano's Affidavit</u>

        In his affidavit, Agent Cipriano sought authorization to search twenty-nine

electronic devices that had been seized from Saab or from his Morristown, New Jersey residence

on March 14, 2019, the day of his first FBI interview.  (Cipriano Aff. (Dkt. No. 118-1) ¶¶ 3-4)

These electronic devices had been seized pursuant to two search warrants issued by Magistrate

Judge James B. Clark III of the District of New Jersey.  (<u>Id.</u> ¶ 7; <u>see also</u> Cipriano Aff., Ex. A

(Dkt. No. 133) at 31-46 (New Jersey Search Warrants))  The New Jersey search warrants

authorize the FBI to search Saab's electronic devices and seize

> evidence, fruits, and instrumentalities of violations of Title 18, United States
> Code, Section 1015(a) (making false statements in connection with any
> proceeding or matter relating to naturalization, citizenship, or registry of aliens),
> Title 18, United States Code, Section 1546(a) (fraud and misuse of visas, permits,
> and other immigration-related documents), and Title 18 United States Code,
> Section 1001 (false statements).

(New Jersey Search Warrants (Dkt. No. 133) at 35, 44; <u>see also</u> <u>id.</u> at 37, 46 (requiring that law

enforcement personnel "make reasonable efforts to search only for files, documents, and other

electronically stored information" that constitute evidence, fruits, and instrumentalities of the

marriage fraud-related offenses))

        In his April 2019 affidavit, Agent Cipriano seeks authorization to search these

same twenty-nine electronic devices and seize

> evidence, fruits, and instrumentalities of violations of:  (i) Title 18, United States
> Code, Section 2339B (providing and conspiracy to provide material support or
> resources to designated foreign terrorist organizations); (ii) Title 18, United States
> Code, Sections 2339D and 371 (receipt of, and conspiracy to receive, military-
> type training from designated foreign terrorist organizations); . . . (iii) Title 18,
> United States Code, Section 924 (firearms offenses related to crimes of violence)
> (collectively, the "Material Support [Subject] Offenses"), as well as (iv) Title 18,

United States Code, Section 1001 (making false statements or omissions in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States); (v) Title 18, United States Code, Section 1425 (procurement of citizenship or naturalization unlawfully); (vi) Title 18, United States Code, Section 1015(a) (making false statements in connection with any proceeding or matter relating to naturalization, citizenship, or registry of aliens); and (vii) Title 18, United States Code, Section 1546(a) (fraud and misuse of visas, permits, and other immigration-related documents) ( collectively, the "Marriage Fraud Subject Offenses," and, together with the Material Support Subject Offenses, the "Subject Offenses").

(Cipriano Aff. (Dkt. No. 118-1) ¶ 5)

In his affidavit, Agent Cipriano states that between March 14, 2019, and March 28, 2019, he and other law enforcement officers had interviewed Saab on five occasions. In these interviews, Saab disclosed

that he was a member of Hizballah, particularly affiliated with a component of Hizballah known to Saab as "External Operations," and that he joined Hizballah in approximately 1996. Saab has described his training and certain operations he conducted on behalf of Hizballah, including his surveillance of landmarks in New York City, which included an assessment of how vulnerable they may be to explosive attacks, and operational travel he took to Istanbul, Turkey. Finally, Saab admitted that he was paid to marry [CC-1] so that [she] could apply for naturalized citizenship on the basis of their marriage.

(Id. ¶ 9 (footnote omitted))

Agent Cipriano also provides a general overview of Hizballah, including the terrorist attacks it has perpetrated and the fact that it has been designated by the State Department as a foreign terrorist organization. (Id. ¶ 10) Agent Cipriano also summarizes information obtained from a cooperating witness concerning (1) training the witness had received from Hizballah regarding bomb-making and the handling of explosives; and (2) operational activity the witness undertook in Panama, including evaluating the Panama Canal and the Israeli embassy "as potential targets of a Hizballah bombing or other attack." (Id. ¶ 12)

Agent Cipriano then turns to Saab's disclosures regarding his recruitment by Hizballah and membership in that organization, and his activities on Hizballah's behalf, including (1) training Saab received from Hizballah in 1999 in which he "handled and fired a number of firearms, including an AK-47, M16, and pistol, and also learned to throw grenades" (id. ¶ 13(c)); (2) being tasked, in 2003, to "map out certain 'hot spots' in New York City . . . and . . . to identify if there were particular places on the targets that would be most susceptible to an explosive attack" (id. ¶ 13(g)); (3) in late 2004 or 2005, receiving explosives training from Hizballah in Lebanon; (4) traveling to Istanbul at the direction of his Hizballah handler, and visiting certain landmarks; (5) returning from Lebanon to the United States in April 2005, via Turkey, where explosive residue was detected on Saab's luggage or clothing at the Istanbul airport; and (6) being questioned at JFK Airport about the positive test for explosive residue in Istanbul.  (Id. ¶¶ 13(a)-(k))

Agent Cipriano disclosed that, during Saab's law enforcement interviews, he "claimed to have told [his Hizballah handler, after the positive April 2005 explosive residue test,] that he was done with Hizballah, i.e., that he was quitting."  (Id. ¶ 13.k)  Agent Cipriano likewise disclosed that Saab had stated that, in an April 2006 meeting with his Hizballah handler, he "reiterated . . . that he was not doing anything else for Hizballah – i.e., confirming that he quit [Hizballah's External Operations unit]."  (Id. ¶ 13(l))  Agent Cipriano noted, however, that Saab "retracted this statement in subsequent . . . [i]nterviews," and had admitted that "[i]n 2008, [he] attempted to contact [his Hizballah handler] but his telephone number was out of order."  (Id. and n.12)  Saab told the agents that he had contacted the handler out of curiosity, to find out "what had happened to him during and after the 2006 conflict between Israel and Hizballah."  (Id.)

As to Saab's marriage fraud, the Cipriano affidavit reports that, during interviews of Saab, he had "admitted that he entered into a fraudulent marriage with [CC-1] so that [CC-1] could apply for naturalized citizenship on the basis of their marriage."  (Id. ¶ 15)

Agent Cipriano asserts that "probable cause exists to search the Subject Devices for evidence, fruits, and instrumentalities of the [material support and marriage fraud offenses]," noting that

> Saab has admitted that he used electronic communications and electronic devices in furtherance of the Material Support Subject Offenses. . . . [D]uring [FBI interviews, Saab admitted] that he had a method of coded electronic communications to contact his handlers if necessary, . . . [that he] was told that he would be contacted by Hizballah by email if he needed to return to Lebanon, . . . that he took operational travel for Hizballah[,] and . . . that he took photographs while in Istanbul.  If Saab took photographs or videos, it is likely they were maintained on a cellular telephone or storage device, like one of the Subject Devices, particularly if he did so while conducting surveillance in New York. Further, Saab has admitted that he was trained on how to create certain explosive devices.  To the extent Saab has conducted any research on the same, it is possible that evidence of this research (such as Internet searching or purchasing records) is maintained on the Subject Devices.  Finally, Saab has admitted traveling back and forth to the United States during the course of his Hizballah training.  As such, evidence corroborating these statements – such as travel records, Internet search history, purchase records, photographs, or communications – may be present on the Subject Devices and be further evidence of the Material Support Subject Offenses.

(Id. ¶¶ 16-17(a))  Agent Cipriano also notes that "to the extent Saab is still in contact with his handlers . . . or other individuals about his involvement with . . . Hizballah, the content of such communications may be maintained on the Subject Devices and would be evidence of Saab's commission of the Material Support Subject Offenses."  (Id.)

Agent Cipriano also notes that Saab is

> an international actor[] who needs to communicate with people quickly, cheaply, and across borders, and thus is more likely to use electronic communications which may be maintained on devices like the Subject Devices (as Saab was himself at one point located abroad, and certain of his co-conspirators and/or individuals he communicated with about the Subject Offenses continue to be

located there) and . . . [Saab] has already made use of online accounts in
furtherance of criminal activity, such as Saab's admission that he was told that he
may be contacted by Hizballah by email, and the use by Saab and [CC-1] of email
and other electronic communications.

(Id. ¶ 19(d))[10]

### B.    Legal Standard

The Fourth Amendment provides that "no Warrants shall issue, but upon probable

cause, supported by Oath or affirmation, and particularly describing the place to be searched, and

the persons or things to be seized."  U.S. Const. amend. IV.  "'There is . . . a presumption of

validity with respect to the affidavit supporting [a] search warrant.'"  United States v. Martin,

426 F.3d 68, 73 (2d Cir. 2005) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)).  In

certain limited circumstances, however, a defendant "may challenge the validity of a search

warrant alleged to contain deliberately or recklessly false or misleading information."  Id. (citing

Franks, 438 U.S. at 164-72).

In order to obtain a Franks hearing,

a defendant must make a substantial preliminary showing that (1) there were
intentional misrepresentations or omissions in the warrant affidavit, or, in other
words "the claimed inaccuracies or omissions are the result of the affiant's
deliberate falsehood or reckless disregard for the truth"; and (2) those
misrepresentations or omissions were material, or "necessary to the issuing
judge's probable cause finding."

---

[10]  From Saab's devices agents recovered photographs and videos depicting "images matching
those that Saab [had] described as the kind he provided to [Hizballah]."  (Cmplt. (Dkt. No. 1)
¶¶ 25(b), 27(b))  These images include photographs or video clips of:  (a) the Brooklyn Bridge;
(b) the Verrazano-Narrows Bridge; (c) 26 Federal Plaza; (d) the George Washington Bridge;
(e) the Prudential Center in Boston; (f) Fenway Park in Boston; (g) the Lincoln Memorial in
Washington, D.C.; and (h) the United States Capitol in Washington, D.C.  (Id. ¶¶ 25, 27; see also
id. ¶ 31 (noting that one of Saab's hard drives contained a folder entitled "05-01-14~16 Istanbul"
with approximately 208 photographs and nine videos of scenes from Istanbul))

Saab's devices also contained photographs of a rally in Lebanon attended by "the current
Secretary General of Hizballah, Hassan Nasrallah" (id. ¶ 33.a) and "videos depicting Hizballah
propaganda" (Id. ¶ 33.(b)).

United States v. Nejad, 436 F. Supp. 3d 707, 718-19 (S.D.N.Y. 2020) (quoting United States v. Rajaratnam, 719 F.3d 139, 146 (2d Cir. 2013), and citing Franks, 438 U.S. at 155-56) (emphasis in Nejad).

With regard to the first prong – intentionality – "the reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" Rajaratnam, 719 F.3d at 154 (quoting United States v. Awadallah, 349 F.3d 42, 68 (2d Cir. 2003)). "Where omissions are concerned, recklessness may be inferred where the omitted information was clearly critical to the probable cause determination." Nejad, 436 F. Supp. 3d at 719 (citation and quotation marks omitted). Further, "[r]eckless disregard for the truth may be established by demonstrating that an affiant made statements which failed to take account of the facts as he knew them, or which he seriously doubted were true." Id. (citation and quotation marks omitted); see also United States v. DeFilippo, No. 17cr585, 2018 WL 740727, at *2 (S.D.N.Y. Jan. 31, 2018) ("As courts in this Circuit have recognized, it is not shocking that every affidavit will omit facts which, in retrospect, seem significant." (citation, quotation marks, and alteration marks omitted)).

With regard to the second prong – materiality – a reviewing court will

> gauge materiality by a process of subtraction or addition depending on whether misstatements or omissions are at issue. In other words, to determine materiality, courts should disregard the allegedly false statements, insert the omitted truths, and determine whether there remains a residue of independent and lawful information sufficient to support probable cause. If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a Franks hearing.

Nejad, 436 F. Supp. 3d at 719 (citations and quotation marks omitted); see also Franks, 438 U.S. at 172 (where a defendant demonstrates that a search warrant affidavit contains falsehoods or

suffers from material omissions, if the remaining content is sufficient "to support a finding of probable cause, no hearing is required").

C.   __Analysis__

Saab contends that the Government was required to disclose in the Cipriano affidavit that Hizballah terminated its relationship with Saab in the spring of 2005, and did not provide Saab with any assignments, tasking, or training after the spring of 2005 (the "omitted information"). (__See__ Def. Br. (Dkt. No. 118) at 5, 8) According to Saab, the Government "intentionally omitted [this] material information [in order] to mislead" Judge Lehrburger, and these "material fact[s] [were] necessary to the finding of probable cause." (__Id.__ at 6-7) Saab further contends that the omitted information "is material because it speaks directly to whether it is reasonably likely that the search of . . . Saab's devices will reveal evidence of the Material Support Offenses and his current involvement with Hizballah." (__Id.__ at 8) Because the omitted information is material, Saab contends that Agent Cipriano's affidavit was misleading, and that a __Franks__ hearing is necessary. (__Id.__ at 9)

The Court concludes that (1) there is no evidence of an intentional effort to omit probative information from the search warrant application; and (2) the inclusion of the omitted information would not have materially affected the probable cause determination.

It is abundantly clear, from the Cipriano affidavit, that the Government had no evidence of Hizballah-related operational activity by Saab since 2005. The last operational event cited in Agent Cipriano's affidavit took place between January and April 2005. (__See__ Cipriano Aff. (Dkt. No. 118-1) ¶ 13(i)-(j) (explaining that Saab was instructed to surveil and take photographs of Istanbul "[i]n approximately January 2005," that Saab did so before traveling back to Lebanon, and that Saab was stopped in the Istanbul airport on his way to the United

50

States "[i]n approximately April 2005"))  Agent Cipriano further disclosed that Saab reported that he had told his Hizballah handler – after the positive April 2005 explosive residue test in Istanbul, and the subsequent questioning at JFK Airport – that he was "done with Hizballah" and was quitting the organization.  (Id. ¶ 13(k))  Agent Cipriano likewise disclosed that Saab had told his Hizballah handler at an April 2006 meeting that "he was not doing anything else for Hizballah."  (Id. ¶ 13(l))  While Agent Cipriano also disclosed that Saab had retracted and equivocated with regard to these assertions about severing his ties with Hizballah (id. and n.12), his affidavit asserts no facts suggesting that Saab engaged in operational activity on behalf of, or had substantive communication with, Hizballah after 2006.

       Given Agent Cipriano's disclosures that Saab had repeatedly stated that he had told his Hizballah handler that he was terminating his relationship with Hizballah, this Court cannot find any intentional effort to mislead the magistrate judge.  Moreover, given these disclosures, the omitted information – essentially, that Hizballah felt the same way about Saab, likewise wanted to terminate the relationship, and did in fact terminate the relationship – adds nothing material to the probable cause determination.  Saab has thus not satisfied either the first prong of the test for a Franks hearing – "intentional" omissions – or the second prong of that test – material omissions.  Accordingly, Saab's motion for a Franks hearing is denied.[11]

---

[11]  This determination is based solely on the publicly filed materials, without regard to the Government's August 24, 2021 ex parte supplemental submission pursuant to CIPA § 4. Accordingly, Saab's request that the Court order that the Government's classified ex parte supplement be disclosed to cleared defense counsel (see Oct. 12, 2021 Ltr. Mot. (Dkt. No. 126)) is denied.  The Court's appointment of cleared counsel does not entitle Saab to access the Government's ex parte supplemental opposition, which was properly submitted pursuant to CIPA § 4, and which has not affected this Court's determination regarding Saab's pre-trial motions.

## <u>CONCLUSION</u>

For the reasons stated above, Saab's pre-trial motions (Dkt. Nos. 26, 67, 87, and 117) are denied.

Dated: New York, New York
December 10, 2021

SO ORDERED.

Paul G. Gardephe
United States District Judge

52