UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------
UNITED STATES OF AMERICA


                -v.-                                              19 Cr. 676 (PGG)


ALEXEI SAAB,
     a/k/a "Ali Hassan Saab,"
     a/k/a "Alex Saab,"
     a/k/a "Rachid,"

                                    Defendant.
-------------------------------------------------------------
```

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

<div style="text-align:right">

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
*Attorney for the United States*
*of America*

</div>

Sam Adelsberg
Jason A. Richman
      Assistant United States Attorneys
      *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

DISCUSSION ...................................................................................................................... 12

  I. Certain Hizballah-Related Materials on the Defendant's Electronic Devices Should Be Admitted at Trial................................................................................................................. 12

    A. Applicable Law ........................................................................................................ 16

    B. Discussion................................................................................................................. 19

  II. The Government May Use the Defendant's Proffer Statements to Cross-Examine Him and to Rebut Certain Defense Arguments and Evidence ............................................................. 24

    A. Relevant Facts .......................................................................................................... 25

    B. Applicable Law......................................................................................................... 28

    C. Discussion................................................................................................................. 29

  III. The Court Should Preclude Part of the Defendant's Proposed Expert Testimony and Require the Defendant to Supplement His Expert Notice.................................................................. 30

    A. Relevant Background ............................................................................................... 31

    B. Applicable Law......................................................................................................... 35

    C. The Defendant's Proffered Expert Testimony Should Be Limited and Precluded in Part ......................................................................................................................................... 37

    D. The Court Should Require the Defendant to Supplement His Expert Notice ............... 41

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

  V. The Court Should Take Judicial Notice that Hizballah Is a Designated Foreign Terrorist Organization................................................................................................................... 44

CONCLUSION...................................................................................................................... 47

i

# **TABLE OF AUTHORITIES**

**Cases**

*Amorgianos v. Romano Enterprises*, 303 F.3d 256 (2d Cir. 2002) .............................................. 35

*Bourjaily v. United States*, 483 U.S. 171 (1987) ......................................................................... 35

*Costantino v. Herzog*, 203 F.3d 164 (2d Cir. 2000) .................................................................... 23

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) .................................................. 35, 37

*Donovan v. Centerpulse Spine Tech Inc.*, 416 F. App'x 104 (2d Cir. 2011) .............................. 41

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ........................................................................... 36

*Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005) ................. 36, 38

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) .............................................................................. 36

*Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999) ......................................................... 35

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785 (S.D.N.Y. 2012) .............................. 36

*Old Chief v. United States*, 519 U.S. 172 (1997) ........................................................................ 18

*United States v. Abdel Rahman*, 189 F.3d 88 (2d Cir. 1999) ...................................................... 38

*United States v. Abel*, 469 U.S. 45 (1984) .................................................................................. 17

*United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010) .............................................. 17, 20, 23

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ........................................................... 19

*United States v. Alimehmeti*, No. 16 Cr. 398 (S.D.N.Y. 2018) .................................. 20, 21, 24, 46

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) ................................................................ 39

*United States v. Barnes*, 604 F.2d 121 (2d Cir. 1979) ............................................................... 44

*United States v. Barrow*, 400 F.3d 109 (2d Cir. 2005) .......................................................... 28, 37

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .......................................................... 38

ii

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) .................................................... 17

*United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991) .................................................... 36

*United States v. Coonan*, 938 F. 2d 1553 (2d Cir. 1991) .................................................... 17

*United States v. Curley*, 639 F.3d 50 (2d Cir. 2011) .................................................... 18

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994) .................................................... 40

*United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013) .................................................... 19, 38

*United States v. El Gammal*, No. 15 Cr. 88 (S.D.N.Y. 2017).................................................... 46

*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) .................................................... 20, 23

United States v. *Gelzer*, 50 F.3d 1133 (2d Cir. 1995).................................................... 19

*United States v. Gohari*, 227 F. Supp. 3d 313 (S.D.N.Y. 2017).................................................... 17

*United States v. Gomez*, 210 F. Supp. 2d 465 (S.D.N.Y. 2002) .................................................... 29

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) .................................................... 17, 18

*United States v. Jacques Dessange, Inc.*, 2000 WL 294849 (S.D.N.Y. 2000) .................................................... 40

*United States v. Jasper*, 2003 WL 223212 (S.D.N.Y. 2003).................................................... 41

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) .................................................... 20

*United States v. Knox*, 687 F. App'x 51 (2d Cir. 2017).................................................... 40

*United States v. Kourani*, 17 Cr. 417 (S.D.N.Y. 2019) .................................................... 5, 43

*United States v. Lights*, 2016 WL 7098633 (S.D.N.Y. 2016) .................................................... 18

*United States v. Lyle*, 919 F.3d 716 (2d Cir. 2019) .................................................... 28

*United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013).................................................... 20

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008).................................................... 39

*United States v. Mezzanatto*, 513 U.S. 196 (1995) .................................................... 28

*United States v. Nersesian*, 824 F.2d 1294 (2d Cir. 1987) .............................................. 36

*United States v. Pugh*, 162 F. Supp. 3d 97 (E.D.N.Y. 2016).......................................... 20

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) ............................................... 17, 21

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012) .................................................. 17

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ....................................... 18

*United States v. Rosemond*, 841 F.3d 95 (2d Cir. 2016)........................................... 28, 30

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998)................................................... 23

*United States v. Scala*, 405 F. Supp. 2d 450 (S.D.N.Y. 2005) ...................................... 43

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988)...................................................... 36

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ................................................... 43

*United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985)................................................ 44

*United States v. Tomero*, 486 F. Supp. 2d 320 (S.D.N.Y. 2007).................................... 43

*United States v. Torres*, 2021 WL 1947503 (S.D.N.Y. 2021)......................................... 39

*United States* v. *Ulbricht*, 79 F. Supp. 3d 466 (S.D.N.Y. 2015)................................... 18

*United States v. Vario*, 943 F.2d 236 (2d Cir. 1991) ............................................... 43, 44

*United States v. Wilson*, 493 F. Supp. 2d 484 (E.D.N.Y. 2006) ..................................... 42

*United States v. Wood*, 335 F.3d 993 (9th Cir. 2003) ................................................... 45

*United States v. Zafar*, 291 F. App'x 425 (2d Cir. 2008) .............................................. 37

**Statutes**

18 U.S.C. § 1001......................................................................................................... 1

18 U.S.C. § 1015......................................................................................................... 1

18 U.S.C. § 1425......................................................................................................... 1

18 U.S.C. § 1546 ........................................................................................... 1

18 U.S.C. § 2339 ................................................................................. 1, 19, 44

18 U.S.C. § 3286 ......................................................................................... 39

18 U.S.C. § 371 ............................................................................................. 1

44 U.S.C. § 1507 .................................................................................... 45, 46

8 U.S.C. § 1325 ............................................................................................. 1

**Other Authorities**

62 Federal Regulation 52650 (October 8, 1997) ....................................... 45

64 Federal Regulation 55112 (October 8, 1999) ....................................... 45

66 Federal Regulation 51088 (October 5, 2001) ....................................... 45

78 Federal Regulation 17745 (March 22, 2013) ........................................ 45

81 Federal Regulation 61290 (September 6, 2016) .................................... 46

82 Federal Regulation 28730 (June 23, 2017) ........................................... 46

83 Federal Regulation 56894 (November 14, 2018) .................................. 46

Executive Order 13,224 ................................................................................ 3

Immigration and Nationality Act ................................................................. 3

**Rules**

Federal Rule of Criminal Procedure 16 ..................................................... 42

Federal Rule of Evidence 16 ................................................................. 31, 41

Federal Rule of Evidence 201 ............................................................... 45, 46

Federal Rule of Evidence 401 .......................................................... 16, 17, 37

Federal Rule of Evidence 402 ............................................................... 16, 17

Federal Rule of Evidence 403 ................................................................................................ passim

Federal Rule of Evidence 404 ................................................................................................ passim

Federal Rule of Evidence 702 ............................................................................................. 35, 40

Federal Rule of Evidence 704 ..................................................................................................... 38

Federal Rule of Evidence 801 ..................................................................................................... 19

<u>**PRELIMINARY STATEMENT**</u>

The defendant, Alexei Saab, is charged in Indictment 19 Cr. 676 (PGG) in nine counts with (1) conspiring to provide material support to Hizballah, in violation of 18 U.S.C. § 2339B; (2) providing material support to Hizballah, in violation of 18 U.S.C. § 2339B; (3) conspiring to receive military-type training from Hizballah, in violation of 18 U.S.C. §§ 371, 2339D; (4) receiving military-type training from Hizballah, in violation of 18 U.S.C. § 2339D; (5) unlawfully procuring citizenship or naturalization to facilitate an act of terrorism, in violation of 18 U.S.C. § 1425(a); (6) conspiring to commit marriage fraud, in violation of 8 U.S.C. § 1325(c) and 18 U.S.C. § 371; (7) citizenship application fraud, in violation of 18 U.S.C. § 1546(a); (8) naturalization fraud, in violation of 18 U.S.C. § 1015(a); and (9) making false statements, in violation of 18 U.S.C. § 1001.

The evidence at trial will show that the defendant is a highly trained terrorist who conducted missions for Hizballah in the United States and around the world.[1]  Among other things, the defendant gathered intelligence to identify the most vulnerable points of attack at various landmarks and critical infrastructure in New York City and elsewhere; provided surveillance photographs and detailed notes to Hizballah concerning these landmarks and infrastructure to maximize damage and destruction in any future attack; attempted to shoot and kill a suspected Israeli spy in Lebanon (the "Attempted Murder"); and alongside his brother, who was also a Hizballah operative, planted an improvised explosive device ("IED") designed to target and kill

_____

[1] The Government respectfully submits that all of the evidence described in this brief is admissible as direct evidence of the crimes charged.  The Government hereby provides notice that it also intends to offer this evidence, in the alternative, pursuant to Rule 404(b).  The Government plans to continue to meet with potential witnesses between now and the trial and will supplement this notice as necessary should the Government learn of additional Rule 404(b) evidence.

Israeli soldiers. In addition, the defendant illegally obtained his United States citizenship by falsely affirming that he had never been "a member of or in any way associated with . . . a terrorist organization," and in 2012, the defendant entered a fraudulent marriage so that his nominal wife could apply for naturalized citizenship based on their marriage. The defendant admitted all of this in stark detail to the Federal Bureau of Investigation ("FBI") during voluntary pre-arrest interviews. At trial, in addition to the defendant's admissions to the FBI, the Government anticipates offering documentary and electronic evidence, such as surveillance photographs taken by the defendant for Hizballah; Hizballah propaganda materials found on the defendant's electronic devices; travel records; and expert testimony about, among other things, the history of Hizballah, certain notable events in that history that intersect with the defendant's involvement with the organization, and the role and duties of undercover operatives in the organization, which will provide necessary context for the other evidence of the defendant's activities on behalf of Hizballah.

In advance of trial, the Government respectfully submits these motions *in limine* seeking the following pretrial rulings:

1. Hizballah related materials seized from the defendant's electronic devices are admissible as direct evidence and pursuant to Rule 404(b);

2. The defendant's statements made during post-arrest proffers, in the presence of counsel and conducted pursuant to this Office's standard proffer agreement, may be used by the Government at trial (a) to cross-examine the defendant if he testifies; and (b) to rebut any suggestions or arguments raised by the defense at trial that are contrary to the statements made by the defendant during these proffer sessions;

3. The Court should preclude part of the defendant's proposed expert testimony and otherwise require the defendant to supplement his expert notice;

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

5. The Court should take judicial notice of Hizballah's status as a designated foreign terrorist organization.

### BACKGROUND

Hizballah is a Lebanon-based Shia Islamic organization with political, social, and terrorist components. Hizballah was founded in the early 1980s with support from Iran after the 1982 Israeli invasion of Lebanon, and its mission includes establishing a fundamentalist Islamic state in Lebanon. In 1997, the U.S. Department of State designated Hizballah a Foreign Terrorist Organization ("FTO"), pursuant to Section 219 of the Immigration and Nationality Act ("INA"), and it remains so designated today. In 2001, pursuant to Executive Order 13,224, the U.S. Department of the Treasury designated Hizballah a Specially Designated Global Terrorist entity. In 2010, State Department officials described Hizballah as the most technically capable terrorist group in the world, and a continued security threat to the United States. *See* Assessing the Strength of Hezbollah: Hearing Before the Subcomm. on Near Eastern and South and Central Asian Affairs, 111 Cg. 700 (2010) (Joint Statement of Jeffrey D. Feltman and Daniel Benjamin, Dep't of State).

As the defendant admitted to the FBI, he was an active operative for this terrorist organization for years. Hizballah first recruited the defendant in 1996. For the next three to four years, the defendant observed and reported on the actions and movements of Israeli and Southern

Lebanese Army soldiers in Yaroun, Lebanon, the defendant's hometown.  The defendant provided these details to one of his handling Hizballah agents (known to the defendant as "Ibrahim") and provided Ibrahim with written reports about troop locations and patterns.  In addition to this regular surveillance activity, in 1997 or 1998, the defendant worked with his brother and fellow Hizballah operatives to plant an IED targeting Israeli soldiers in Lebanon.  As the defendant admitted to the FBI, higher-ranking members of Hizballah instructed the defendant and his brother to assemble and then place an IED in a particular location for later, remote detonation.  The defendant drove his brother to the pre-determined target location, where his brother planted the IED.  The IED later detonated, and when the attack was covered in the local media, the defendant was so proud of his efforts that he showed a newspaper article covering the attack to a then-romantic interest.

In approximately 1999, Ibrahim introduced the defendant to a second handling agent (known to the defendant as "Wissam") and the defendant began his training to become a member of Hizballah's Islamic Jihad Organization ("IJO")—also known as the External Security Organization ("ESO") or "Unit 910"—which is a highly compartmentalized component of Hizballah responsible for the planning, preparation, and execution of intelligence, counterintelligence, and terrorist activities outside of Lebanon.[2]  That year, the defendant attended

---

[2] Hizballah and the IJO are responsible for numerous terrorist attacks that have killed hundreds, including the 1983 bombing of the United States Marine barracks in Lebanon, which killed 241 Marines; the 1983 bombing of the United States Embassy in Beirut, which killed 24 people; the 1985 hijacking of TWA Flight 847, which killed one U.S. citizen; the 1992 bombing of the Israeli Embassy in Argentina, which killed 29 people; and the 1994 bombing of a Jewish cultural center in Buenos Aires, which killed 95 people.  In July 2012, an IJO operative conducted a bombing in Burgas, Bulgaria that killed six people and injured 32.  Additional IJO attacks in Thailand and Cyprus were thwarted in 2012, and an attack was thwarted in Cyprus in 2015, which involved the seizure of approximately 8.2 tons of the bomb-making component ammonium nitrate.  In 2019, a former IJO operative, Ali Kourani, was convicted in this District of terrorism-related offenses and

4

his first Hizballah training focused on the use of firearms. During this training, the defendant handled and fired an AK-47, an M16 rifle, and a pistol, and he learned how to use and throw grenades. Over the ensuing years, the defendant's training from Hizballah intensified. In particular, the defendant detailed during the FBI interviews his participation in counter-surveillance training; firearms and explosives training; and field exercises focused on explosives and intelligence gathering. The defendant explained the heavy security that attached to these trainings, and that Hizballah would transport him to training sessions in a van with blacked-out windows and with a mask over his face so he could not see his fellow trainees or where they were going. The defendant and his co-trainees used fictitious names, with the defendant choosing to use "Rachid." The defendant's explosives training, in particular, was extensive. He explained to the FBI that on multiple occasions he went to locations in Lebanon, where he learned to construct and detonate multiple types of explosives, including the following three viable devices that he later diagrammed for the FBI:



---

sentenced to a 40-year term of imprisonment by Judge Hellerstein. *See United States v. Kourani*, 17 Cr. 417 (AKH), Dkt. No. 141 (S.D.N.Y. Dec. 18, 2019).

In 2000, the defendant moved to the United States. In connection with this move, one of the defendant's handlers provided him with a two-part covert communication method. The first system was for if the defendant needed to contact his Hizballah handlers when he returned to Lebanon. The defendant was told by his handlers that when he traveled to Lebanon, he could call a particular number and input a code to let his handlers know he had returned so that they could then set up a meeting or training. The second system was for if Hizballah needed to recall the defendant from the United States. One of the defendant's handlers told him that if the IJO ever needed the defendant to return to Lebanon, he would send the defendant an email that appeared to be spam but that would contain a coded signal in either the subject line or body, indicating to the defendant that he needed to return. The defendant traveled frequently back and forth to Lebanon from the United States, participating in Hizballah trainings and de-briefings during his trips to his home country.

At the same time, the defendant put his training to use, conducting at least two missions overseas. In approximately January 2005, the defendant traveled to Istanbul, Turkey, with instructions from one of his handlers to learn enough detail about the city to report on it to someone who had never been there. Hizballah paid for the trip, during which the defendant surveilled and took photographs of tourist locations, including religious sites, palaces, and street markets. On his way back to Lebanon, the defendant met one of his handlers in Syria, a country with strong ties to Hizballah and its leadership. From there, the defendant and his handler drove across the border between Syria and Lebanon, where his handler showed Syrian intelligence officers his identification so that they could pass. During this intelligence operation, the defendant also

purchased a map of Istanbul, on which he circled particular landmarks of interest and which the FBI later recovered in a search of his New Jersey residence:

  

Around this time, the defendant also participated in the Attempted Murder. In connection with this mission, one of the Hizballah members who trained the defendant first instructed the defendant to locate a particular car, which they then drove together days later to the intended victim's location. Once there, the defendant was told to reach under his seat, where the defendant found a silver firearm with an attached silencer. The defendant was then told to go to a second car and shoot the person inside "twice in the belly" and "once in the head." The defendant walked to the vehicle and pointed his firearm at the individual inside. The intended victim cried out that it "wasn't him" as the defendant raised his gun. The defendant pulled the trigger twice, but the firearm jammed, preventing the murder. The defendant told the FBI that at first he thought the incident may have been a training exercise, but he later realized it was not. The defendant's supervisor on the mission was visibly upset that the gun had jammed, and told the defendant that someone would pay for the malfunction.

Throughout this time period, from roughly 2000 to 2005, the defendant continued training, conducting pre-attack operational surveillance, and gathering intelligence for the IJO in the United

States.  As he explained to the FBI, the defendant's goal in the United States was to create an "operational capability" so that Hizballah could strike back on U.S. soil in case of a war that threatened Iran; and he was taught by Hizballah to be a self-sufficient operative, able to act as an individual cell who could surveil, prepare, and, if necessary, carry out an attack.  In connection with this mission, the defendant's handlers instructed him to have an intelligence collection mindset, such that he was constantly surveilling potential attack locations while traveling in New York and elsewhere.  At one point, one of the defendant's handlers explicitly tasked him to map out certain "hot spots" in New York, and to provide intelligence on these locations back to the IJO. In carrying out this continuing mission, the defendant focused on the structural weaknesses of the targets he surveilled, so that any future attack would cause the maximum possible destruction and death.  To that end, the defendant gathered details such as the materials used to construct his targets, how close in proximity one could get to these potential targets, and site weaknesses or "soft spots" that the IJO could exploit.  The defendant understood that the IJO would use the information he provided to calculate the size of a bomb needed to target a particular structure and to determine the ideal location to place a bomb to maximize damage and casualties.  In other words, as the defendant admitted to the FBI, his job was to find "soft spots" or "weaknesses" in landmarks and infrastructure for Hizballah to attack, and that is precisely what he did.

In carrying out this pre-attack surveillance, the defendant often provided photographs to his handlers in Lebanon and, on at least one occasion, provided detailed findings to his handlers in a lengthy hand-written report (the "Report").  The Report contained a hand-drawn map with locations that the defendant had surveilled, and a summary of potential targets in New York City and elsewhere, including 26 Federal Plaza, the United Nations, the Statue of Liberty and Ellis

Island, the Empire State Building, and certain tunnels and bridges. The defendant also provided details on New York City airports, including particulars about security and accessibility. In addition to landmarks and critical infrastructure, the defendant also took photographs of, and conducted pre-attack surveillance for, locations associated with Israel or local Jewish communities, including synagogues and Jewish community centers. Certain of the photographs taken by the defendant were later located on the defendant's electronic devices, including the following:

 

 



The defendant's devices also contained similar photographs of other landmarks and government buildings in New York City, Washington, D.C., and Boston. As the defendant admitted to the FBI, he was trained by Hizballah to be in a constant state of intelligence gathering, such that he was always in a collection mindset and would take photographs, even if also for personal interest, that he knew would be of interest for Hizballah and his handlers. The FBI recovered from the defendant's electronic devices dozens of such pictures and videos, all depicting potential attack targets for Hizballah.

In addition, the defendant admitted to the FBI that he attended multiple Hizballah rallies, including a large Hizballah rally in Lebanon on March 8, 2005 (the "Rally"). As further discussed below, the FBI located Hizballah related photographs on the defendant's electronics, including photographs of a speech at the Rally from Hizballah's current Secretary General, Hassan Nasrallah, further evidencing that the defendant attended the Rally. The Government anticipates establishing through metadata from these photographs that they were taken while Nasrallah was speaking at the Rally, a speech in which Nasrallah demanded that the United States stop

"meddling" in Lebanon and to "leave us alone."[3]  Similarly, the defendant saved additional photographs on his hard drive, with metadata establishing that they were also taken in March 2005, depicting the scene of the murder of former Lebanese Prime Minister Rafic Hariri, who was killed approximately three weeks earlier at that location.  The defendant also had a series of Hizballah propaganda videos on his hard drive, which the Government anticipates introducing together with translations of relevant portions of these videos.  They include, among other things, videos with eulogies for Hizballah soldiers and videos of Nasrallah speaking to Hizballah members regarding ongoing war with Israel.

Beyond his Hizballah training and terrorist activity, the defendant committed another series of federal crimes in connection with his own citizenship and subsequent fraudulent marriage to a woman living in New York City ("CC-1").  More specifically, on or about July 13, 2005, the defendant applied for naturalized citizenship, and falsely affirmed that he had never been "a member of or in any way associated with . . . a terrorist organization."  In part based on this false affirmation, the defendant was granted his naturalized citizenship in or about 2008.  Then, in 2012, the defendant married CC-1, and CC-1 applied for conditional residency based on that marriage approximately three months later.  On or about March 13, 2015, the defendant and CC-1 filed a petition (the "Petition") seeking to obtain permanent residency for CC-1.  In the Petition, both the defendant and CC-1 falsely affirmed under penalty of perjury that their marriage "was not for the purpose of procuring an illegal immigration benefit."

---

[3] The Government anticipates that its expert witness on Hizballah, Dr. Matthew Levitt, will testify about the content of Nasrallah's speech at the Rally, which will provide necessary context for the jury in connection with this evidence.

However, as he later admitted to the FBI, Saab entered the marriage with CC-1 in exchange for $20,000 from CC-1 and for the exact reason he swore was not the case—so that she could obtain her citizenship. Indeed, the defendant had a series of communications with another individual in which Saab explained that the marriage to CC-1 was for money and that he had only met CC-1 two times prior to their decision to get married. In addition, Saab admitted to the FBI that he had proposed to CC-1 that they should stage a marriage so that CC-1 could obtain her citizenship, and that CC-1 had paid the defendant $20,000 in return.

## DISCUSSION

### I. Certain Hizballah-Related Materials on the Defendant's Electronic Devices Should Be Admitted at Trial

At trial, the Government plans to introduce portions of videos and certain photographs found on one of the defendant's external hard drives (collectively, the "Hizballah Materials") that are direct proof of his support of Hizballah and are additionally admissible pursuant to Rule 404(b). In particular, the Government seeks to offer the following five videos and one audio file (and translations of portions of the same) found on the defendant's devices[4]:

- GX 201. File name "janoobiyyoon." Approximately 1 minute, 5 second saved by the defendant on or about April 20, 2007, displaying a poem titled "Steadfast." Video contains Hizballah flags, an image of Hizballah Secretary General Hassan Nasrallah, and also displays the logo of Al-Manar, a Lebanese satellite television station owned and operated by Hizballah, indicating it was produced by Al-Manar.[5] The video glorifies the efforts of

---

[4] The Government has already provided the defense with copies of these videos, identified them as possible exhibits, and produced to the defense copies of draft transcripts of these recordings. Attached as Exhibit A are these draft transcripts (with corresponding exhibit numbers), and as Exhibit B, the Government will provide the Court with a copy of the recordings on a compact disc under separate cover.

[5] In 2006, the United States Department of the Treasury designated Al Manar as a Specially Designated Global Terrorist entity, and it remains so designated. *See* U.S. Dep't of the Treasury, "U.S. Designates Al-Manar as a Specially Designated Global Terrorist Entity, Television Station

Southern Lebanese inhabitants in "liberat[ing]" Lebanon, which appears to be a reference to fighting against Israel in Southern Lebanon.[6]

- GX 202. File name "jnobi al-hawa." Approximately 50 second video saved by the defendant on or about April 20, 2007, with Hizballah propaganda displaying a poem. At the end of the video, the text "the open war" is displayed on the screen.[7] Video also displays the logo of Al-Manar. Among other things, the poem references a "waterfall of martyrs" and the "day of Conquest in Lebanon."

- GX 203. File name "3ayta." Approximately 3-minute video saved by the defendant on or about September 19, 2007, depicting a poem dedicated to towns in southern Lebanon for standing up against violence and destruction. Towards the end of the video, images of Hizballah flags are shown. Video also contains the logo of Al-Manar.

- GX 204. File name "VID-20140504-WA0000." Approximately 3-minute video saved by the defendant on or about September 19, 2014, set to a song eulogizing Hizballah martyrs. Among other things, the song lyrics include "crying for the dead is not good so don't cry." A photograph of Bashar al-Assad, the president of Syria and a staunch ally of Hizballah, is depicted during the video.

- GX 205. File name "shohada2_alwa3d_al9adiq." Approximately 6 minute, 8 second video saved by the defendant on or about October 14, 2006, depicting an image of and a message from Hassan Nasrallah to apparent martyrs and Hizballah militants to support their ongoing conflict with Israel. Video also displays the logo of Al-Manar. Among other things, lyrics include "peace be upon you Jihad . . . and the muhjadin," a reference to Islamic fighters and the fight against the supposed enemies of Islam, and a reference to "thunder above the heads of Zionists." The lyrics also include references to the fighting against "enemy soldiers" in several Lebanese towns bordering Israel[8] and references to several infamous

---

is Arm of Hizballah Terrorist Network," *available at* https://www.treasury.gov/press-center/press-releases/pages/js4134.aspx.

[6] As described above, the defendant spied on Israeli and Southern Lebanese Army forces on behalf of Hizballah in Southern Lebanon and planted an IED targeting Israeli troops in the area as well.

[7] In or about July 2006, Nasrallah publicly declared that Hizballah would fight an "open war" against Israel. *See* Jerusalem Post, "Nasrallah says ready for 'open war' with Israel," July 14, 2006, *available at* https://www.jpost.com/Israel/Nasrallah-says-ready-for-open-war-with-Israel.

[8] These towns are in the direct vicinity of the defendant's hometown, Yaroun, which is where he conducted militant activities and surveillance on behalf of Hizballah against Israeli and Southern Lebanese Army forces.

Hizballah terrorists and spies, including Samir Kuntar[9] and Nissim Naser.[10]

- GX 206. File name "inoubeye." Approximately 1 minute, 53 second audio saved by the defendant on or about September 19, 2007, which includes the voice of a woman expressing her anger towards Israel for the devastation Israel allegedly caused in Lebanon during 2006 war, and voicing her support for the resistance (Hizballah) and for former Lebanese prime minister Rafic Hariri.

In addition, the Government seeks to introduce the following three photographs of the Rally, including a photograph of Hassan Nasrallah speaking at the event, which the Government has selected from approximately 31 photographs of the Rally found on the defendant's electronics:



---

[9] On September 8, 2015, the Department of State designated Samir Kuntar as a Specially Designated Global Terrorist under Executive Order 13,224. In April 1979, Kuntar participated in the attempted kidnapping of an Israeli family in Nahariya, Israel that resulted in the deaths of five Israelis, including two young children. *See* U.S. Dep't of State, "Terrorist Designation of Samir Kuntar," *available at* https://2009-2017.state.gov/r/pa/prs/ps/2015/09/246687.htm.

[10] Nissim Naser was a Hizballah spy tasked with, among other things, supplying the group with maps of Tel Aviv marking electricity and gas installations. *See* New York Times, "Israel releases spy; Hezbollah returns remains said to be of soldiers," June 1, 2008, *available at* https://www.nytimes.com/2008/06/01/world/africa/01iht-mideast.3.13371083.html.

GX 211.  Photograph of rally-goer holding picture of Syrian President Bashar al-Assad.



GX 212.  Photograph of rally-goers and soldiers.



Finally, the Government seeks to introduce the following two photographs of the St. George Hotel in Beirut, Lebanon—the site of the assassination of former Lebanese Prime Minister Rafic Hariri—which were taken less than one month after the assassination took place, and also found on the defendant's devices:





These materials are admissible as direct proof of the Hizballah-related terrorism offenses charged in Counts One through Four of the Indictment, and alternatively pursuant to Rule 404(b), for the reasons set forth below.

## A. Applicable Law

Federal Rules of Evidence 401 and 402 establish the broad principle that relevant evidence is admissible at trial except as otherwise provided by the Constitution, federal statute, or Rules of

Evidence.  *See* Fed. R. Evid. 401, 402; *United States v. Abel*, 469 U.S. 45, 51 (1984).  Rule 403 allows a trial judge to exclude relevant evidence if, among other things, "its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.

"To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt."  *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010).  Rather, evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Fed. R. Evid. 401; *see United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency.").  Thus, evidence is often admissible "to provide background for the events alleged in the indictment" or "to enable the jury to understand the complete story of the crimes charged." *United States v. Reifler*, 446 F.3d 65, 91-92 (2d Cir. 2006) (internal quotation marks omitted); *see also United States v. Gohari*, 227 F. Supp. 3d 313,  317 (S.D.N.Y. 2017) (evidence is admissible if it relates to conduct that:  (i) "'arose out of the same transaction or series of transactions as the charged offense'"; (ii) "'is inextricably intertwined with the evidence regarding the charged offense'"; or (iii) "'is necessary to complete the story of the crime on trial.'" (quoting *United States v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012)).  "Background evidence may be admitted to show, for example, the circumstances surrounding the events, or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Coonan*, 938 F. 2d 1553, 1561 (2d Cir. 1991) (internal quotation marks omitted); *see United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (articulating well-established principle that evidence is direct

evidence (and not other act evidence under Rule 404(b)) if it is inextricably intertwined with the evidence of the charged offense or necessary to complete the story of the charged offense (citing *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997))); *see also* Weinstein's Federal Evidence § 404.20[2][c] (observing that evidence the absence of which "would leave a chronological or conceptual void in the story of the crime" is "intrinsic evidence"). As the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 183 (1997).

Additionally, under Rule 404(b), courts "may allow evidence of other acts by the defendant if the evidence is relevant to an issue at trial other than the defendant's character and if the risk of unfair prejudice does not substantially outweigh the probative value of the evidence." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015). "This Circuit follows the inclusionary approach, which admits all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (internal quotation marks omitted). "Rule 403 does not bar evidence of other bad acts that 'did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged.'" *United States v. Lights*, No. 15 Cr. 721 (RWS), 2016 WL 7098633, at *2 (S.D.N.Y. Dec. 5, 2016) (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)).

Finally, Rule 403 requires the Court to evaluate whether the probative value of evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative

evidence." Fed. R. Evid. 403. Since any evidence that is probative of guilt is, by definition, prejudicial, Rule 403 is designed to reach only unfair or undue prejudice—that which "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (internal quotation marks omitted).

## B. Discussion

The Hizballah Material is admissible as direct proof of the charged terrorism-related offenses. As a preliminary matter, this evidence is not hearsay, as the Government does not seek to introduce the Hizballah Material for its truth.[11] *See* Fed. R. Evid. 801(c); *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013). Instead, the Hizballah Material is relevant to show the defendant's state of mind and participation in the charged terrorism offenses—in particular, his knowledge and intent relating to Hizballah's ideology and terrorist conduct—and the effect these materials had on him, as he provided support to Hizballah in pursuit of its aims. As detailed further below, the Hizballah Material is relevant for at least two reasons.

First, the Hizballah Material is direct evidence as to the knowledge component of Counts One through Four of the Indictment. For each count, the Government must prove that the defendant knew that Hizballah was a designated terrorist organization or involved in terrorism. *See* 18 U.S.C. §§ 2339B, 2339D; *United States v. Al Kassar*, 660 F.3d 108, 129 (2d Cir. 2011). The Hizballah Material, all of which was saved on the defendant's devices during the time period of the charged offenses, goes directly to this element. For example, the defendant's videos

---

[11] Accordingly, should the Court grant the Government's motion as to the Hizballah Material, the Government will work with defense counsel to propose for the Court's consideration a limiting instruction to be read at the time these materials are admitted.

portraying Hizballah's fighters, martyrs, and conflict with Israel reflect his knowledge of the

organization, its history, and its mission. The defendant's photographs of the Rally and the site of

the Hariri assassination—marking important events in Hizballah's recent history—also speak to

his knowledge of Hizballah, in addition to his involvement with the organization. *See Abu-Jihaad*,

630 F.3d at 133-34 (2d Cir. 2010) (affirming district court's finding that the "pro-jihadist contents

of the [terrorist propaganda] videos were relevant to understanding [the defendant's] motive and

intent"); *United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013) (holding that videos, images, and

literature that defendant had "absorbed and endorsed" were admissible to establish that defendant

was "inspired by terrorist rants" and "developed an anti-American animus" that culminated in his

decision to travel to Yemen to join al-Qaeda); *United States v. El-Mezain*, 664 F.3d 467, 509-10

(5th Cir. 2011) (holding that material seized from defendant, "including images of violence and

videos glorifying Hamas and depicting Hamas leaders, was probative of the motive or intent of the

[defendant] to support Hamas"); *United States v. Jayyousi*, 657 F.3d 1085, 1108 (11th Cir. 2011)

(holding that televised interview with Usama bin Laden was properly admitted as "state of mind

evidence"); *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE), Dkt. No. 96 at 13-17 (S.D.N.Y.

Jan. 5, 2018) (granting Government's *in limine* motion to admit terrorist propaganda materials

found on electronic devices seized from defendant charged with providing material support to

ISIS, explaining that the "materials bear on whether Alimehmeti had the required state of mind,"

as "Alimehmeti's possession of them suggests that he was supportive of terrorist ideology in

general and of ISIS in particular"); *United States v. Pugh*, 162 F. Supp. 3d 97, 114 (E.D.N.Y. 2016)

(noting that "[t]he Second Circuit has regularly allowed terrorist propaganda to be admitted,

particularly in the context of material support offenses, in order to prove the *mens rea* element of the offense") (citation omitted).

Second, the Hizballah Material is inextricably intertwined with the rest of the Government's evidence of the defendant's support for and activities on behalf of Hizballah, such that presentation of those materials will help the jury to understand the complete story of the defendant's conduct and intent to further Hizballah's aims. The videos and audio described above located on the defendant's devices tend to show, among other things, that he subscribed to, and was motivated by, Hizballah's ideology. *See Reifler*, 446 F.3d at 91-92; *see, e.g.*, *Alimehmeti*, Dkt. No. 96 at 15 ("[T]he materials are essential context for the Government's allegations that Alimehmeti became radicalized—and thereby developed a motive and intent to provide support for ISIS—at least in part through his exposure to and apparent enthusiasm for such materials."). For example, the defendant admitted to the FBI that he attended the Rally depicted in certain of the Hizballah Materials, and the photographs from the Rally provide direct proof of that conduct and corroborate his admissions to the FBI. Similarly, the defendant told the FBI that during his training, one assignment he was given involved a recreation of the Hariri assassination site and an evaluation of what type of explosive device was used. The fact that the defendant had photographs of the same exact site on his electronic devices, again, corroborates his statements to the FBI and establishes his familiarity with the site in question. For the jury to understand the defendant's embrace of Hizballah's terrorist ideology, and his desire to act on its behalf, it is important for the jury to consider the propaganda and other Hizballah materials that the defendant consumed and maintained during the very period in which he engaged in activity on behalf of Hizballah.

In addition, the Government anticipates that one of its expert witnesses, Dr. Matthew Levitt, who is an expert on Hizballah, will testify about the Rally, Hariri's assassination, and certain figures depicted or discussed in the Hizballah propaganda videos. In particular, Dr. Levitt will testify that both the Rally and the assassination were notable events in Hizballah's recent history and that the videos depict notorious Hizballah terrorists and spies. The Government anticipates arguing at trial that this testimony—combined with evidence of the defendant's participation in the Rally, his documentation of the site of Hariri's murder, and his possession of videos lionizing Hizballah terrorists and spies—further establishes the defendant's support for and involvement with Hizballah at a crucial juncture for the organization. The Hizballah Materials are thus relevant and admissible as direct evidence of the charged terrorism offenses.

In the alternative, these materials are also admissible pursuant to Rule 404(b) as other act evidence of the defendant's preparation, plan, knowledge, motive, intent, absence of mistake, and lack of accident. As discussed above, the evidence is highly probative of the defendant's knowledge of Hizballah's existence, goals, and terrorist activities, and of his motive and intent for knowingly and intentionally engaging in activities supportive of the organization and its terrorist ideology. Thus, even if not admissible as direct evidence—which they are—these materials would be admissible, in the alternative, pursuant to Rule 404(b).

Nor would the admission of the Hizballah Material run afoul of Rule 403. The probative value of this evidence is not outweighed, much less "substantially outweighed," by any risk of unfair prejudice. The defendant surveilled potential attack sites in Manhattan and elsewhere; attempted to kill a suspected Israeli spy; and planted an IED targeting Israeli soldiers, among other things. The evidence in question is highly probative of the defendant's knowledge and intent in

committing these acts. For that reason, this evidence is prejudicial—but only insofar as it tends to prove the defendant's guilt. *See, e.g.*, *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) (noting that "virtually all evidence is prejudicial to one party or another," and so "to justify exclusion under Rule 403 the prejudice must be *unfair*") (emphasis added). But the mere fact that the evidence tends to prove the defendant's guilt does not render this evidence *unfairly* prejudicial: indeed, if anything, the materials chosen by the Government to offer at trial (which are culled down from a much larger set) are, if anything, *less* inflammatory than the defendant's own conduct. The Government has culled back the material it plans to offer from closer to 20 videos either displaying Hizballah propaganda or Hizballah-related materials, and none of the materials that the Government anticipates offering at trial display graphic violence. The Second Circuit has long made clear that evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *See, e.g.*, *Herzog*, 203 F.3d at 174; *El-Mezain*, 664 F.3d at 508-11 ("Because this [is] a case about supporting terrorists, it is inescapable . . . that there [will] be some evidence about violence and terrorist activity. It cannot be denied that [such] evidence [will be] unfavorable to the defendant[], but [the court] cannot conclude that it [will be] unduly prejudicial."). Courts within this Circuit have consistently admitted similar evidence of substantially more graphic nature in terrorism prosecutions. *See, e.g.*, *Abu-Jihaad*, 630 F.3d at 132-34 (affirming district court's admission of excerpts of jihadist propaganda videos including graphic combat scenes); *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) (per curiam) (affirming district court's admission, over a Rule 403 objection, of video depicting embassy bombing and materials that "bristled with strong anti-American sentiment and advocated violence

against targets in the United States," in light of their probative value); *Alimehmeti*, Dkt. No. 96 at 16-17.

For the foregoing reasons, the Court should permit the Government to introduce the Hizballah Material.

## II. The Government May Use the Defendant's Proffer Statements to Cross-Examine Him and to Rebut Certain Defense Arguments and Evidence

After the FBI arrested the defendant on July 9, 2019 and he obtained counsel, he participated in three proffer sessions with the Government, conducted pursuant to the standard proffer agreement used by this Office (the "Proffer Agreement," attached as Exhibit C). Under the terms of the Proffer Agreement, if the defendant testifies at trial, the Government is permitted to question him regarding all of his statements during the proffer. *See* Proffer Agreement ¶ 3(b) ("[T]he Government may use statements made by [Saab] at the [proffer] . . . for the purpose of cross-examination should [Saab] testify"). Even if the defendant does not testify, the Government may offer the defendant's proffer statements to rebut contrary arguments and evidence offered at trial by the defense. *See id.* ("[T]he Government may also use statements made by [Saab] at the [proffer] to rebut any evidence or arguments offered by or on behalf of [Saab] . . . at any stage of the criminal prosecution"). For example, the Government should be permitted to use the defendant's proffer statements to rebut any evidence or defense argument that the defendant's admissions to the FBI were not truthful; that the defendant engaged in the admitted conduct for any reason other than in support of Hizballah; that the agents who interviewed the defendant are lying about the defendant's admissions to them; that the defendant only made those admissions to the FBI because he was coerced or otherwise pressured to do so; or that the defendant ever unequivocally told Hizballah that he was withdrawing from the organization. As further detailed

below, each of these potential defense arguments is expressly contradicted by the defendant's admissions during the proffer sessions with the Government.

## A. Relevant Facts

The defendant participated in three post-arrest proffers with the Government. At each proffer, he was represented by counsel and was read and confirmed his understanding of the Proffer Agreement.

The first proffer occurred on July 17, 2019. At the outset, the Government explained to the defendant the contours of the Proffer Agreement, including that his statements could be used against him in the future if he testified at trial or counsel made an argument contrary to his statements during the proffer, and he reviewed and signed the Proffer Agreement. During the proffer, the defendant detailed his involvement with Hizballah. First, he admitted he joined the organization in 1996, and, for the first few years of his involvement, he reported back to Hizballah about Israeli troop movement and would provide a written report to his handler on what he observed. The defendant also explained that, in 1998 or 1999, he participated in a Hizballah mission with his brother, also an IJO member and Hizballah operative. The defendant explained that he went to an apartment with his brother and two senior Hizballah members, where they used a map to choose a location to set up an ambush on Israeli troops. The mission, the defendant admitted, was to plant an IED in that location that would target passing Israeli soldiers. The defendant further admitted that the mission detailed during this meeting was carried out weeks or months later, during Ramadan, and explained that he picked up the IED with his brother from his uncle's house; drove his brother to drop off the IED; and then drove back home to meet his brother. The defendant then explained that weeks or months later the IED was remote detonated, and that

he read about the explosion in the newspaper. Indeed, the defendant recalled showing the article to a romantic interest of his to try to impress her.

The defendant then detailed during the proffer that his training intensified. He explained that he had firearms training with one of his handlers, during which he was taught to use a pistol, AK-47, M16, and grenades. He stated that he was instructed by one of his handlers to prepare an underground location for weapons and ammunition storage for Hizballah, and he did so under his parents' house, though he does not believe that the room was ever used. The defendant further explained that, sometime around 2000, he met a new handler who gave him a covert communication method for the defendant to speak to his handlers when he returned to Lebanon, and a similar method for Hizballah to recall him from the United States. The defendant detailed that, starting in around 2003, his training again intensified, and he began learning "soft skills" like intelligence gathering, surveillance, interrogation, and counter-interrogation. The defendant admitted that, in 2003 or 2004, he attempted to shoot a target who was sitting in a car, and confirmed the particulars he had told the FBI before his arrest—that he was told to shoot the target "twice in the belly and once in the head," that he exited a car, approached his target inside a van, tried to pull the trigger twice, and then was called back by his supervisor. The defendant further reiterated that the target covered his face as soon as he saw the gun, and that his supervisor was angry afterwards that the gun had jammed and the mission had not been completed.

The second proffer took place on August 1, 2019. Again, the Government reviewed the Proffer Agreement with the defendant before the meeting began and the defendant signed it again. The defendant then described details of his training and operational activity for Hizballah, including explosives training in 2004 or 2005, and detailed the three types of explosives he was

taught to create. In addition, the defendant admitted, as he had in pre-arrest interviews, that he had tested positive for explosives residue in Turkey when he was traveling from Istanbul to New York in April 2005, and that he lied during a subsequent interview upon landing at JFK Airport when he claimed the residue was from hunting and gunpowder residue. The defendant then explained how he provided the findings from his pre-operational surveillance to Hizballah, explaining that he wrote a written report that included, among other things, a map of New York City annotated with landmarks he had surveilled; details of what he saw, including security and building construction specifics; and other detail. The defendant also explained that he had surmised that he was being asked to write this report so that Hizballah could best understand where to bomb the locations he surveilled. The defendant also detailed some of his conduct after 2005. The defendant noted that he met with one of his handlers in 2006, and that during this meeting he expressed that he was not sure he could continue with Hizballah but his handler told him they could revisit his decision later. In addition, he explained that in 2010, he traveled back to Lebanon and met with another Hizballah member, Bilal Khanifer, and they talked about Wissam, one of the defendant's former handlers.

The defendant participated in his third and final proffer on August 14, 2019. Again, the Government reviewed with the defendant the Proffer Agreement before beginning and the defendant signed it for a third time. During this proffer, the defendant admitted that he had never formally left Hizballah, and that, instead, his handlers considered him "technically . . . still part" of the organization and something of a "runaway recruit." Indeed, the defendant expressed that if he had been more steadfast in his desire to no longer affiliate with Hizballah, the organization would not have let him simply leave. The defendant also admitted—for the first time—that his

handler had asked him to purchase fertilizer to store in the United States, and the defendant knew this was possibly for use in explosives. Lastly, the defendant stated that he researched forming a front company to procure this material.

## B. Applicable Law

"Like all contracts, proffer agreements must be interpreted to give effect to the intent of the parties." *United States v. Rosemond*, 841 F.3d 95, 107 (2d Cir. 2016) (internal quotation marks and citations omitted). The provisions of the Proffer Agreement at issue here—which permit the Government to cross-examine the defendant with his proffer statements and use those statements to rebut contrary arguments made by the defense—have been upheld repeatedly by courts. *See United States v. Mezzanatto*, 513 U.S. 196 (1995); *United States v. Lyle*, 919 F.3d 716, 732-33 (2d Cir. April 1, 2019). Moreover, it is well-settled in this Circuit that, once defense counsel makes a "factual assertion . . . that contradicts a statement made during the proffer session, the Government may then offer the earlier proffer statement to rebut the assertion being made at trial." *Rosemond*, 841 F.3d at 107.

The concept of rebuttal evidence is a flexible one and may encompass "any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary." *Id.* at 108 (internal quotation marks and citations omitted); *United States v. Barrow*, 400 F.3d 109, 121 (2d Cir. 2005) ("Rebuttal is hardly limited to evidence that directly contradicts what it opposes; rather, rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary."). Indeed, to permit the defendant to present evidence or make arguments that are contrary to the admissions in his proffer session—without also permitting the jury to assess that evidence in light of that proffer—

would thwart the truth-seeking purpose of a trial and mislead the jury. *See United States v. Gomez*, 210 F. Supp. 2d 465, 476 (S.D.N.Y. 2002) ("[E]nforcement of a proffer agreement does not preclude defense counsel from taking a position or presenting evidence inconsistent with a defendant's proffer statements . . . . [b]ut if she does, . . . it is only fair that the Government then be permitted to present the defendant's own words in rebuttal.").

### C. Discussion

Consistent with the plain language of the Proffer Agreement and established law in this Circuit, the defendant should be held to the terms of the Proffer Agreement and, if he testifies or makes factual assertions contrary to his admissions during proffers with the Government, the Government should be allowed to use his proffer statements to the contrary. While, of course, the Government does not now know what arguments the defendant will make at trial, he has made certain claims in pre-trial filings that are flatly contradicted by his proffer statements. For example, if the defendant argues or suggests at trial that his effort to murder the suspected Israeli spy was merely a training exercise, the Government should be allowed to introduce the statements he made during the proffer sessions that contradict this argument—namely, the reaction of the target and his supervisor during the event and the defendant's clear characterization of the episode as not being a simulation. Similarly, as he has also done in his pre-trial filings, if Saab argues that his mission with his brother to detonate an IED took place before Hizballah was a designated FTO, the Government should be allowed to introduce his statements from his proffers concerning when that event took place. In addition, if the defendant argues that he withdrew from Hizballah at any point (to support, for example, a statute of limitations defense) the Government should be permitted to introduce his proffer statements that he never actually communicated any withdrawal; that he never told Hizballah that he really left the organization; and that he believed that Hizballah

29

considered him "still part" of the terrorist group. Finally, more broadly, if the defendant argues or otherwise suggests, through counsel's jury addresses, cross-examination of Government witnesses, or otherwise, that his admissions to the FBI were coerced, fabricated by the agents, exaggerated, or otherwise unreliable, the Government should be permitted to introduce his proffer statements to establish that he consistently made these admissions, even after being arrested and appointed counsel (and, in fact, made the admissions in the presence of counsel). *See Rosemond*, 841 F.3d at 108-09 (collecting cases and noting that defense argument or cross-examination that accuses a witness of fabricating an event opens the door to admission of proffer statements to the contrary). Any argument or evidence from the defense suggesting that the defendant would not have said what he said to the FBI during his pre-arrest interview but for alleged coercion will open the door to the Government's rebuttal evidence of his admissions during the counseled post-arrest proffers.

To the extent the Government believes the defense has opened the door to admission of the defendant's proffer statements, the Government will notify the Court and counsel outside the presence of the jury before seeking to offer those statements.

## III. The Court Should Preclude Part of the Defendant's Proposed Expert Testimony and Require the Defendant to Supplement His Expert Notice

The Government moves to preclude certain expert testimony noticed by the defendant. Specifically, the Government moves to limit expert testimony from Thanassis Cambanis, the defendant's proposed expert witness on Hizballah, on the grounds that a portion of his apparent proposed testimony would invade the province of the jury and the Court, and otherwise would not help the jury to understand the evidence or to determine a fact at issue. The Government also moves to require further disclosures regarding Cambanis, including details regarding his proffered

opinions and the bases for those opinions, as the notice provided by the defense to date is not sufficient under Rule 16.

## A. Relevant Background

As described above, the Government anticipates proving at trial that, as part of his operational work for Hizballah, the defendant attempted to shoot and kill a suspected Israeli spy for Hizballah in 2005. In particular, the Government anticipates introducing the defendant's admissions during his pre-arrest FBI interview that his Hizballah supervisor for that particular mission provided him with a firearm and instructed him to shoot an individual that the defendant came to believe was an Israeli spy. The defendant also explained that the only reason he did not murder the spy was because the gun jammed.

On May 24, 2021, the defendant filed a bail motion along with a motion seeking an order compelling the Government to declassify certain information. (Dkt. No. 90). In his bail motion, defense counsel argued the following, as relevant here:

> [The defendant] admitted to participating in a training exercise in 2005 where his handler told him to shoot a person. This exercise likely involved another Hezbollah operative, and Mr. Saab did not endanger anyone's life during this exercise. No one from Hezbollah told Mr. Saab that this person was an Israeli spy. There are almost zero Israeli operatives in Lebanon. There is no chance that Hezbollah would risk the death or capture of a trainee like Mr. Saab in an attempt to assassinate an Israeli spy in Lebanon. The characterization of this person as an Israeli spy is absurd at best and inflammatory at worst. There is no proof that Mr. Saab tried to murder an Israeli spy other than his uncounseled, uncorroborated statement.

(Dkt. 90 at 15).

In support of his bail motion, the defendant attached a declaration from Cambanis (Dkt. No. 89 (the "Declaration")), along with Cambanis's *curriculum vitae*. The Declaration first outlined Cambanis's educational background and his experience researching Hizballah (*id.* ¶¶ 2-9), before detailing the materials Cambanis reviewed in preparing the Declaration (*id.* ¶ 10) ("I

have examined the complaint, the indictment, and the public filings in this case. I have met with the defendant. I have examined a copy of the data seized from the defendant's hard drive.").

Cambanis then turned to the substance of the Declaration, noting that it "addresses the issues of the training exercise that the government misleadingly describes as an 'attempted murder' of an unidentified male." (*Id.* ¶ 11). Cambanis wrote that the Government's description of the event "misstates and willfully distorts the defendant's own description of the training exercise, creating an alarmist fantasy that has no connection to the facts described by the defendant." (*Id.* ¶ 13). Cambanis continued by providing his spin on the defendant's statements about the Attempted Murder, characterizing the episode as a "simulation" and "a choreographed training exercise"—not an "attempted assassination"—at one point even casting doubt on whether "this story even took place as described at all." (*Id.* ¶¶ 18, 20, 22).

Cambanis then continued by asserting facts about the episode as if he were present himself:

> After the gun failed to fire, Saab did not engage in any violence. He did not attempt to harm or capture or otherwise engage with the man in the van. Saab returned to the car, and his trainer drove them away from the van. The man in the van did not pursue Saab, or lodge a complaint with Hezbollah, his extended family or tribe, law enforcement, or any other authority.
>
> ****
>
> Afterward, Saab was upset and angry at his trainer, and complained that the exercise violated Saab's trust. He told his trainer to never again involve him in an exercise without warning him ahead of time about the nature of the training exercise. After completing the training in March 2005, the defendant never participated in any training with Hezbollah, or received any instructions from the organization.

(*Id.* ¶¶ 22-23).

Cambanis then took aim at the defendant's own admission that he believed the target of the Attempted Murder was an Israeli spy:

The description of the man in the van as an Israeli spy is nonsensical at best or intentionally inflammatory at worst. Saab in any case neither knew nor claimed to know the identity of the man in the van. Few if any 'Israeli spies,' meaning agents or operatives originating in Israel or working as part of an Israeli agency, have ever been apprehended inside Lebanon. On the other hand, a great many Lebanese have admitted to, been convicted of, or suspected of, providing intelligence or information to Israeli authorities; such people are referred to as 'collaborators,' 'informants,' or in colloquial Lebanese Arabic as 'spies.' . . . . There are no documented cases of the group publicly assassinating suspected collaborators.

(*Id.* ¶ 24).

Cambanis further opined that if this "were not a training exercise . . . it would not be consistent with known Hezbollah practice." (*Id.* ¶ 25). According to Cambanis, "Hezbollah would not risk, in a simple operation on Hezbollah's home turf that could be conducted by any trained shooter, the capture of a trainer, nor the compromise of a trainee whose value was as a legal U.S. resident who could operate abroad and who was on a path to U.S. citizenship." (*Id.*)

The Declaration concluded with Cambanis—an adjunct professor without a law degree—drawing legal conclusions about events he did not experience first-hand:

There is no evidence that Saab attempted to murder an Israeli spy, or anybody at all. The complaint details nothing more than uncorroborated story from Saab himself about a training exercise, in which he pointed an object that he believed to be a gun at an unidentified man and pulled the trigger. The gun, if it was a real gun, did not fire. No one was harmed; there were no follow-on consequences, other than Saab's angry complaint to his trainers, and subsequent decision to part ways with Hezbollah before completing his training.

****

The complaint's inflammatory language describing the alleged incident portrays the defendant as a cold-blooded killer engaged in a murder attempt with loaded political overtones. The government, with vast resources at its disposal, has furnished no corroborating evidence for this allegation, relying entirely on the defendant's own storytelling. The defendant's account, however, tells the story of a nervous recruit who performed poorly in a Hezbollah training course. He did not trust his instructors and complained about the training exercises. He severed

contact with the group after the training exercise that included the simulated shooting, and never again received instruction from Hezbollah.

(*Id.* ¶¶ 27-28).

On June 26, 2021, the defendant filed his reply brief in support of the bail motion. (Dkt. No. 105). In the brief, the defendant noted that he intended to request that the Court "declare Prof. Cambanis a Hezbollah expert," and explained that Cambanis "is prepared to opine that such instructions were likely never given." (*Id.* at 4). The brief further referenced the Declaration, claiming that Cambanis "lays out the essential facts of the incident. This was a training exercise. This incident took place between 2004 and 2005. No one was hurt, injured, or could have injured in this incident." (*Id.*).

On July 15, 2021, the defendant sent a letter to the Government indicating that he intended to call Cambanis as an expert witness on Hizballah for the bail hearing. In the letter, the defendant provided the Government with the following description of Cambanis's expected testimony and background:

> The Defense expects to offer the testimony and reports of Professor Thanassis Cambanis. Professor Cambanis is an author, journalist, and senior fellow at The Century Foundation. He has studied Hezbollah and other groups in the Middle East. He has written on Hezbollah and will be the Defense Hezbollah expert. Professor is expected to testify about Hezbollah's training, operations, and recruitment of members. He is also expected to testify about the history, ideology, and organizational structure of Hezbollah. The basis of his testimony is his five-plus years living in Lebanon, interviews of Hezbollah operatives, his book, and his research of Hezbollah.

At the bail hearing, defense counsel instead indicated that it intended to call Cambanis as an expert witness at trial—not the hearing—and would provide 3500 material "as soon as possible." *See* July 15, 2021 Tr., at 57-58. On or about November 29, 2021, the Government inquired of defense counsel as to whether it was still intending to call Cambanis or any expert, and defense counsel

responded that they were not sure and would let the Government know soon. More recently, during the week of December 13, 2021, the Government asked again if the defendant was planning to call Cambanis, and again defense counsel expressed uncertainty and said he would notify the Government soon. During this communication, defense counsel indicated that he does intend to call an expert witness to testify about the Attempted Murder though it may not be Cambanis. The parties have since had no additional dialogue concerning Cambanis, the defendant's disclosures, or whether the defense still intends to call him at trial.

### B. Applicable Law

Under Rule 702, an expert may testify if his or her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The party that proffers expert testimony bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). The trial court must also find that the proposed testimony is both relevant and reliable prior to admitting it into evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *see Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137, 141 (1999). Specifically, the trial judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Applying Rule 702, a court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. *See Amorgianos v. Romano Enterprises*, 303 F.3d 256, 267 (2d Cir. 2002) (district court should undertake a rigorous examination of the facts on which the expert relies, the expert's methodology, and the application of that methodology to the facts). The fact that an expert may generally possess "specialized knowledge" does not automatically render his opinions in a given case reliable. *Id.*

The trial judge's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139, 142 (1997).

Rule 703 precludes an expert from disclosing to the jury "[f]acts or data that are otherwise inadmissible" unless the court determines that their probative value substantially outweighs their prejudicial effect, and the facts or data must be "of a type reasonably relied upon by experts in the particular field forming opinions or inferences upon the subject." Further, experts cannot speculate as to the credibility, state of mind, or the motivations of others. *See, e.g.*, *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("[E]xpert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony. The credibility of witnesses is exclusively for the determination by the jury."); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-470 (S.D.N.Y. 2005) (rejecting expert's attempt to speculate "regarding the state of mind and motivations of certain parties" and as to the "knowledge possessed by defendants and non-parties"); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 Civ. 8426 (WHP), 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) ("Additionally, an expert may not testify as to facts not within his personal knowledge, and may not opine as to a party's state of mind, whether a party acted in bad faith, or as to the credibility of witnesses.").

Relatedly, a district court must exclude expert testimony that "expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992). Similarly, the district court must be vigilant to prevent an expert from "usurping the jury's function." *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987); *see also United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (the district court should not admit testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help").

Rules 401, 402, and 403 likewise provide that relevant evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (internal quotation marks and citation omitted).

### C. The Defendant's Proffered Expert Testimony Should Be Limited and Precluded in Part

To the extent the defense seeks to offer at trial the testimony regarding the Attempted Murder described in the Declaration, the Court should preclude this testimony because he attests to purported facts outside the realm of his personal knowledge regarding an incident to which he was not a percipient witness. Cambanis was not present during the Attempted Murder (and he does not claim otherwise) and he should not be permitted to give testimony about the episode in the guise of "expert" testimony that is in reality mere speculation about facts unknown to him. *See United States v. Barrow*, 400 F.3d 109, 124 (2d Cir. 2005) ("[T]his court has frequently cautioned as to the risks presented by allowing a law enforcement officer to testify as both a fact and an expert witness."). Indeed, expert testimony is inadmissible when, as here, it is calculated primarily to insinuate what must have happened in a case on trial and therefore attempts to substitute for fact witness testimony concerning what actually did happen. *See, e.g.*, *United States v. Zafar*, 291 F. App'x 425, 427 (2d Cir. 2008) (limiting expert testimony in securities fraud case when its purpose was to "insinuate what had happened with respect to the relevant stock trades, a subject on which

[the expert witness] was not a competent witness"). The same would apply to any other purported Hizballah expert whom the defense may seek to call to opine on the Attempted Murder.

Nor should Cambanis—or any other expert—be permitted to testify about the defendant's state of mind during the Attempted Murder or afterward. On several occasions in the Declaration, Cambanis purports to step into the psyche of the defendant in an apparent attempt to explain away devastating evidence of an attempted murder. (*See, e.g.*, Declaration ¶ 28 ("The defendant's account, however, tells the story of a nervous recruit who performed poorly in a Hezbollah training course."); *id.* ("[Saab] did not trust his instructors and complained about the training exercises."); *id.* ¶ 24 ("Saab in any case neither knew nor claimed to know the identity of the man in the van.")). But Cambanis is not in a position to explain to the jury what the defendant knew, thought, or believed, and courts routinely preclude such testimony from expert witnesses. *See United States v. Abdel Rahman*, 189 F.3d 88, 136 (2d Cir. 1999) (affirming exclusion of expert testimony in material support case that "constituted an effort to tell the jury the defendant's intentions through the mouths of witnesses other than himself"); *see Highland Cap.*, 379 F. Supp. 2d at 469-70 (rejecting expert's attempt to speculate "regarding the state of mind and motivations of certain parties" and as to the "knowledge possessed by defendants and non-parties"). Indeed, the law is clear that the defendant's mental state is not a proper subject for expert testimony from a purported expert on Hizballah like Cambanis. *See* Fed. R. Evid. 704(b); *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991); *see also United States v. Dupree*, 462 F.3d 131, 138 (2d Cir. 2006) (affirming exclusion of expert testimony which would "mislead and confuse the jury, and to permit the defendant to put an impermissible theory of justification before the jury"). Cambanis can only speculate regarding those issues, and he should not be permitted to do so.

38

Insofar as Cambanis's opinions are based on evaluating the defendant's statements about the Attempted Murder, the jurors will be more than capable of that task, and this is not properly a subject of purported expert testimony from Cambanis. Furthermore, the defendant will have the opportunity to challenge those statements through the examination and cross-examination of witnesses at trial. Cambanis's ruminations on the defendant's statements would not assist the jury on this score and would only encroach on its role as the finder of fact. *See United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) (district court should not admit "expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror"); *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *6 (S.D.N.Y. May 13, 2021) ("[I]f the purported expert testimony 'concerns matters that the average juror is . . . capable of understanding on his or her own,' it is also inadmissible." (quoting *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008))).

The Court should also preclude any expert testimony from Cambanis or anyone else regarding improper legal conclusions. The defendant has already cited the Declaration—along with its unfounded factual and legal conclusions—to argue that his actions during the Attempted Murder did not "create[] a foreseeable risk of death or serious bodily injury" and that, accordingly, the statute of limitations for several of the charged offense would not be eliminated." (*See* Dkt. No. 90 at 16; *see also* Dkt. No. 105 at 4-5 ("Prof. Cambanis is prepared to opine that such instructions were likely never given. As such, there was no substantial risk of death or serious physical injury, and the statute of limitations is not extended under 18 USC 3286")). Expert testimony that purports to tell the jury how to resolve this factual dispute about what transpired during the Attempted Murder does not "help the trier of fact to understand the evidence or to

determine a fact in issue," Fed. R. Evid. 702, but instead seeks to usurp the jury's function by dictating a particular outcome. Relatedly, Cambanis peppers the Declaration with unsupported views on both legal concepts and the sufficiency of the Government's evidence, including his proclamation that "[t]here is no evidence that Saab attempted to murder an Israeli spy, or anybody at all." (Declaration ¶ 27; *see also id.* ¶ 28 (claiming that the Government has "furnished no corroborating evidence . . . relying entirely on the defendant's own storytelling")). This is precisely the kind of testimony regarding legal concepts and their applications that fails to satisfy Rule 702 because it would improperly usurp the role of the trial judge as to the applicable law, and by definition cannot aid the jury in making a decision. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (noting that the law "requires the exclusion of testimony which states a legal conclusion"); *see also United States v. Dessange*, 2000 WL 294849, at *2 (S.D.N.Y. Mar. 21, 2000) ("expert testimony that amounts to the statement of a legal conclusion must be excluded").

Finally, Cambanis's proffered testimony about the Attempted Murder—or similar expert testimony from another witness—should be precluded because it would lead to unfair prejudice and confusion of the issues. *See* Fed. R. Evid. 403. An opinion, for example, that the Government has "creat[ed] an alarmist fantasy that has no connection to the facts described by the defendant" or that the "government's claims are easily debunked, and appear intended to create an aura of intrigue and drama" (Declaration ¶¶ 13-14) would improperly place the Government's investigation on trial. *See United States v. Knox*, 687 F. App'x 51, 54 (2d Cir. 2017) (affirming instruction that "the government is not on trial"). Similarly, Cambanis's unsupported characterization of the Attempted Murder as a "simulation" and "a choreographed training exercise" would suggest to the jury—with the imprimatur of someone designated an expert—that

the defendant was not tasked with real-world missions on behalf of Hizballah, a central issue in the case properly within the purview of the jury. (Declaration ¶¶ 18, 22).

For all of these reasons, the Court should preclude Cambanis—or any other purported Hizballah expert—from testifying about the Attempted Murder as proffered in the Declaration.

**D. The Court Should Require the Defendant to Supplement His Expert Notice**

In addition to the substantive infirmities in the proffered expert testimony highlighted above, the defendant's notice lacks adequate specificity regarding Cambanis's opinions and the bases for those opinions. *See* Fed. R. Crim. P. 16(b)(1)(C); *see also Donovan v. Centerpulse Spine Tech Inc.*, 416 F. App'x 104, 106 (2d Cir. 2011) ("[A]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion . . . ."); *United States v. Jasper*, No. 00 CR. 825 (PKL), 2003 WL 223212, at *3 (S.D.N.Y. Jan. 31, 2003) ("[T]he Advisory Committee emphasized that the most important aspect of this mutual discovery obligation is the provision of a summary of the bases of the expert's opinion."). Accordingly, to the extent the defense still intends to rely on Cambanis's testimony (and the defense has not yet confirmed that for the Government), the defendant should be required to supplement his expert notice to inform the Government of the substance of—and bases for—Cambanis's opinions.

The defendant's notice merely states the defendant "expects to offer the testimony and reports" of Cambanis "about Hezbollah's training, operations, [] recruitment of members, . . . history, ideology, and organizational structure of Hezbollah" without providing any context or detail regarding how Cambanis arrived at these conclusions, such as prior testimony or a more fulsome expert disclosure. These general statements give no indication whatsoever of Cambanis's opinions, let alone the bases upon which those opinions are based. Relatedly, the defendant has

41

provided no detail regarding which "reports" Cambanis intends to testify about, nor does he proffer any basis for their admissibility. (*Id.*). Without any explanation beyond these generalities, the defendant has failed to provide the Government with sufficient notice of what the "witness's opinion" will be. *See* Fed. R. Crim. P. 16(b)(1)(C). Such vague notice defeats the purpose of disclosure under Rule 16, which is to "'minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" *United States v. Wilson*, 493 F. Supp. 2d 484, 487 (E.D.N.Y. 2006) (quoting Fed. R. Crim. P. 16, Advisory Committee's Note to 1993 Amendments). Because the defendant's disclosures provide the Government with inadequate knowledge of the content or basis of the testimony, the Government cannot meaningfully prepare to test the merits of such testimony through cross-examination. Accordingly, the Court should require the defense to supplement its expert notice and further disclose Cambanis's particular opinions and their bases so that the Government can meaningfully prepare cross-examination and consider whether to offer additional expert testimony to rebut his opinions.





## V. The Court Should Take Judicial Notice that Hizballah Is a Designated Foreign Terrorist Organization

The Government respectfully requests that the Court take judicial notice at trial of the designation of Hizballah as an FTO effective 1997. Hizballah's designation as an FTO is an element of Counts One through Four of the Indictment. *See* 18 U.S.C. §§ 2339B, 2339D. The

Government has addressed this issue with defense counsel and anticipates being able to reach a stipulation; if the parties are unable to do so, the Government will submit a proposed order to the Court in conformity with the below.

The Federal Rules of Evidence allow a court to take judicial notice of adjudicative facts—such as whether Hizballah is, in fact, a designated FTO—when those facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1). Further, federal courts are required to take judicial notice of items published in the Federal Register. *See* 44 U.S.C. § 1507 (providing that "[t]he contents of the Federal Register shall be judicially noticed"); *United States v. Wood*, 335 F.3d 993, 1001 (9th Cir. 2003) (holding that the district court complied with federal law by judicially noticing a rule published in the Federal Register).

As to Hizballah and the IJO, the relevant portions of the Federal Register include the following:

- On October 8, 1997, then-Secretary of State Madeline Albright designated Hizballah, also known as the "Islamic Jihad Organization" and other aliases, as an FTO pursuant to Section 219 of the INA. *See* 62 Fed. Reg. 52650 (October 8, 1997).

- On October 8, 1999, then-Secretary of State Madeline Albright designated Hizballah, also known as the "Islamic Jihad Organization" and other aliases, as an FTO. *See* 64 Fed. Reg. 55112 (October 8, 1999).

- On October 5, 2001, then-Secretary of State Colin Powell redesignated Hizballah, also known as the "Islamic Jihad Organization" and other aliases, as an FTO. *See* 66 Fed. Reg. 51088 (October 5, 2001).

- On March 14, 2013, then-Secretary of State John F. Kerry affirmed that the designation of Hizballah as an FTO remained warranted and ordered that it stay in place. *See* 78 Fed. Reg. 17745 (March 22, 2013).

- On August 23, 2016, then-Secretary of State John F. Kerry affirmed that the designation of Hizballah as an FTO remained warranted and ordered that it stay in place. *See* 81 Fed. Reg. 61290 (September 6, 2016).

- On May 16, 2017, then-Secretary of State Rex Tillerson concluded that there was sufficient factual basis to amend the designation of Hizballah as an FTO to include more aliases for Hizballah, including, among others, External Security Organization ("ESO"). *See* 82 Fed. Reg. 28730 (June 23, 2017).

- On July 23, 2018, then-Secretary of State Michael Pompeo affirmed that the designation of Hizballah as an FTO remained warranted and ordered that it stay in place. *See* 83 Fed. Reg. 56894 (November 14, 2018).

To date, Hizballah remains a designated FTO. *See* U.S. Dep't of State, Foreign Terrorist Organizations, https://www.state.gov/foreign-terrorist-organizations/ (last visited December 13, 2021). Based on the foregoing, and pursuant to 44 U.S.C. § 1507 and Rule 201, the Government respectfully requests that the Court take judicial notice of the fact that Hizballah is designated as an FTO, as determined by the U.S. Department of State and published in the Federal Register. *See United States v. El Gammal*, No. 15 Cr. 88 (ER), Dkt. No. 139 (S.D.N.Y. Jan. 3, 2017) (order granting motion *in limine* by the Government for judicial notice of ISIS's designation as an FTO); *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE), Dkt. No. 96 at 30-31 (granting Government's substantially identical motion relating to ISIS and stating that the Court would so-order the Government's proposed order absent a stipulation between the parties).

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should grant the relief requested herein.

Dated: New York, New York
       December 20, 2021

<div style="margin-left: 50%;">

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:     /s/
        Sam Adelsberg
        Jason A. Richman
        Assistant United States Attorneys

</div>

Cc:    Defense Counsel
       (Via ECF)