UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ALEXEI SAAB,
    a/k/a "Ali Hassan Saab,"
    a/k/a "Alex Saab,"
    a/k/a "Rachid,"

                    Defendant.

19 Cr. 676 (PGG)

**THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION *IN LIMINE*
AND REPLY IN FURTHER SUPPORT OF ITS MOTIONS *IN LIMINE***

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
*Attorney for the United States*
*of America*

Sam Adelsberg
Jason A. Richman
    Assistant United States Attorneys
    *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v.-

ALEXEI SAAB,
    a/k/a "Ali Hassan Saab,"
    a/k/a "Alex Saab,"
    a/k/a "Rachid,"

                Defendant.

19 Cr. 676 (PGG)

The Government respectfully submits this memorandum of law in further support of its December 20, 2021 motions *in limine* and in reply to the defendant's December 28, 2021 filing, which contained both an opposition to the Government's motions *in limine* and a new motion *in limine* brought by the defendant. In addition, the Government submits one supplemental motion *in limine* based on recent representations made by defense counsel to the Government.

On December 20, 2021, the Government filed its motions *in limine* seeking rulings from the Court that: (1) Hizballah-related materials seized from the defendant's electronic devices are admissible as direct evidence and pursuant to Rule 404(b); (2) the defendant's statements made during post-arrest proffers, in the presence of counsel and conducted pursuant to this Office's standard proffer agreement, may be used by the Government at trial (a) to cross-examine the defendant if he testifies; and/or (b) to rebut any suggestions or arguments raised by the defense at trial that are contrary to the statements made by the defendant during these proffer sessions; (3) the Court should preclude part of the defendant's proposed expert testimony and otherwise require the defendant to supplement his expert notice; ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ and (5) the Court should

take judicial notice of Hizballah's status as a designated foreign terrorist organization ("FTO").

(Dkt. 141 ("Gov't MILs")).

The defense did not file motions *in limine* on that day, and, instead, filed an opposition to

the Government's motions *in limine* on December 28, 2021, which included one affirmative *in*

*limine* motion. (Dkt. 155 ("Br.")). The defendant opposes, to varying degrees, each of the

Government's motions *in limine*, except for the Government's request that the Court take judicial

notice of Hizballah's status as an FTO, which the defendant has agreed to admit by stipulation.

(*See* Br. 15). The defendant also argues affirmatively that the Court should require the jury to

"make[] . . . a finding of fact" on the verdict sheet, asking the jury to decide whether, first, "[i]n or

about 2005, at Hizballah's direction, did Alexei Saab attempt to murder a person he came to believe

was an Israeli spy?" and, if the answer is yes, "[d]id the actions of Mr. Saab create a foreseeable

risk of death or serious physical bodily injury to another person?" (Br. 11). As further detailed

below, the defendant's objections to the Government's *in limine* motions are without merit, and

the defendant's argument concerning the verdict sheet miscomprehends the Government's theory

on the statute of limitations in this case and is undermined by the clear law in this Circuit. Thus,

the Court should grant the Government's motions *in limine* and deny the defendant's request for

special interrogatories on the verdict sheet.

Finally, in recent communications with defense counsel, the Government has inquired

whether the defense intends to cross-examine the law enforcement officers who questioned the

defendant in his first interview in March 2019 about *why* they asked him about Hizballah. The

defense indicated that it has not decided whether it intends to pursue this line of cross-examination,

which is plainly irrelevant to the issues at trial; would illicit an objection from the Government related to the potential revelation of classified information; and improperly places the origins of the Government's investigation in question. As such, and as further detailed below, the Court should preclude this line of cross-examination in advance of trial.

## DISCUSSION

### I.    The Defendant's Objections to the Hizballah Propaganda Material Are Meritless

The defendant argues that the Government should not be permitted to introduce, either as direct evidence or pursuant to Rule 404(b), portions of videos and audio files and certain photographs found on one of the defendant's external hard drives (collectively, the "Hizballah Materials"). The defendant argues that these materials are inadmissible because they are irrelevant and cumulative. Both of these arguments fail. As detailed below, the Hizballah Materials are admissible as direct evidence of the defendant's violation of the charged crimes, in addition to being admissible for several non-propensity purposes as well. Furthermore, the materials are neither cumulative nor unfairly prejudicial.

### A. The Hizballah Materials Are Direct Evidence of the Defendant's Provision of Material Support to Hizballah and Receipt of Military-Type Training

The defendant's principal argument in support of precluding admission of the Hizballah Materials is that the materials are irrelevant because (i) the defendant claims the Hizballah Materials are all dated after 2005 (Br. 3-4) and (ii) he argues that post-2005 materials do not bear on the defendant's earlier support of Hizballah (Br. 4). These arguments misstate the facts, misconstrue the Protective Order entered by this Court, and misapply the law.

The Hizballah Materials, as more fully described in the Government's motions *in limine* (Gov't MILs 12-24), include five videos and one audio file containing Hizballah propaganda; three

photographs of a Hizballah rally that the defendant admitted attending in March 2005 (the "Rally") that included a speech by Hizballah Secretary General Hassan Nasrallah; and two photographs of the St. George Hotel in Beirut, Lebanon—the site of the bombing that assassinated former Lebanese Prime Minister Rafic Hariri—a location that the defendant admitted photographing in the wake of the assassination.

As a preliminary matter, the Government anticipates eliciting testimony at trial that the photographs of the Rally and the Hariri assassination site were created in or about early March 2005—before the time period covered by the stipulation contained in the Court's Protective Order. (Dkt. 138, 154 (stipulation concerning the defendant's conduct after the spring of 2005)). The defendant's argument for precluding admission of the photographs because they were created after 2005 should thus be rejected.

Moreover, the photographs are important corroboration for the defendant's admissions to the FBI. There will be testimony about the defendant's admissions to the FBI concerning the Rally and Hariri assassination site—including that he attended the Rally and took photographs there, that he took photographs of the Hariri assassination site a few weeks after the explosion, and that he studied the blast site of Hariri's assassination as part of his Hizballah explosives training—all of which clearly ties the photographs to his conduct for Hizballah and corroborates witness testimony concerning his admissions. The defendant's possession of the photographs—which pertain to events important in Hizballah's history—is also evidence of the defendant's knowledge of Hizballah's terrorist ideology and mission. For all of these reasons, the photographs are important direct evidence of the defendant's commission of Counts One, Two, and Four, and should be admitted.

Similarly, the Hizballah propaganda videos and audio the Government proposes to introduce—which constitute a limited subset of the overall Hizballah-related material identified on the defendant's electronic devices—are also relevant and admissible as direct evidence. While the Hizballah videos and audio were downloaded after the spring of 2005—specifically in October 2006, April 2007, September 2007, and October 2014—they are important corroboration of the defendant's admissions to the FBI regarding his operational activity and support for Hizballah. Specifically, GX 201, 202, 203, 205, and 206 each glorify the efforts of Southern Lebanese inhabitants and militants who contributed to the fight against Israeli forces, a fight that the defendant participated in by conducting surveillance of—and planting an IED to attack—Israeli troops. And GX 204 eulogizes Hizballah martyrs and depicts Hizballah-stalwart Bashar al-Assad, the president of Syria, which is notable, among other reasons, because the defendant met one of his handlers in Syria, before driving together across the border between Syria and Lebanon, where his handler showed Syrian intelligence officers his identification so that they could pass. Thus, this propaganda evidence corroborates the defendant's knowledge of, and support for, Hizballah.

In addition, the Government anticipates eliciting at trial evidence that the defendant attempted to contact his Hizballah handling agent and/or other Hizballah members in, at least, 2006, 2008, and 2010, thus demonstrating that the defendant believed he could reengage with these Hizballah contacts. That the defendant continued downloading Hizballah propaganda during this period further corroborates these admissions and demonstrates that the defendant continued to consume propaganda from the terrorist organization that he actively supported for years while also seeking to connect with his Hizballah associates.

The Hizballah videos and audio file are also evidence of the defendant's knowledge of

Hizballah's status as a designated terrorist organization and its involvement in terrorism. For example, GX 202 is a video which plays a poem that includes the lyrics "waterfall of martyrs" and "day of Conquest in Lebanon," and concludes with an Arabic phrase meaning "the Open War," a reference to a public declaration in July 2006 from Nasrallah that Hizballah was ready for an "open war" on Israel and its allies. (*See also* Gov't MILs 13-14). Similarly, GX 205 directly references "the light of jihad and mujahideen," which, as the Government intends to elicit through its expert witness at trial, are references to Hizballah violent struggle against the enemies of Islam.

The Hizballah videos and audio file are also probative of the defendant's state of mind when he was an operationally active Hizballah agent. As the Court already acknowledged, evidence of the defendant's post-2005 conduct may be relevant to the defendant's pre-2005 state of mind. (*see* Dkt. 154) (holding that "[e]vidence of post-2005 conduct by Defendant Alexei Saab that does not constitute operational actively may shed light on the Defendant's state of mind prior to the Spring of 2005."). The videos and audio file reference Hizballah's open war on Israel and its allies and glorify the concepts of martyrdom and jihad. While the defendant downloaded these materials after the spring of 2005, his collection of these materials nonetheless demonstrates his embrace of Hizballah's violent ideology and explains the defendant's provision of material support to Hizballah through, for example, his pre-attack surveillance and efforts to kill Israeli soldiers and a suspected Israeli spy. Notably, the defendant even saved the Hizballah Materials on the same device where he saved his Hizballah surveillance photographs, which further reflects what is clear from their content: the Hizballah Materials manifest the defendant's commitment to, and understanding of, Hizballah's terrorist mission—the same mission that inspired the defendant to conduct operational activity on behalf of Hizballah for years.

Finally, the Court should reject the defendant's argument that his willingness to stipulate that he knew Hizballah was an FTO renders "cumulative" the Government's use of the Hizballah Materials. (Br. 4). First, the parties have entered into no such stipulation, nor has the defense proposed one to the Government (the defense has agreed to a much more limited stipulation regarding Hizballah's designation as an FTO).[1] In any event, such a stipulation would not render the Hizballah Materials cumulative. As detailed above, the Hizballah Materials each contain important corroboration of the defendant's admissions to the FBI. As also detailed above, more than just showing the defendant's knowledge of Hizballah as an FTO, the Hizballah Materials show the defendant's deep understanding of Hizballah's terrorist mission, its intended targets, and its acts of violence—all of which is relevant to the defendant's motive and intent to provide material support to and receive training from Hizballah.

### B. The Hizballah Materials Are Also Admissible Pursuant to Rule 404(b)

The defendant also argues that the Hizballah Materials are not admissible pursuant to Rule 404(b). (Br. 5-8). To the contrary, the Hizballah Materials are admissible for several non-propensity purposes, including to show (as described above) the defendant's knowledge of Hizballah's existence, history, and methods of operation; and to show the defendant's motive and intent for engaging in years of terrorist activity on Hizballah's behalf. That the defendant took

---

[1] Even if the defendant did propose such a stipulation, the Government "is entitled to prove its case free from any defendant's option to stipulate the evidence away." *United States v. Aref*, 285 F. App'x 784, 791 (2d Cir. 2008) (quoting *Old Chief v. United States*, 519 U.S. 172, 189-90 (1997)); *see also United States v. Velazquez*, 246 F.3d 204, 211 (2d Cir. 2001) (affirming district court's admission of autopsy photos showing the extent of the victim's bruising, even though the defendant offered to stipulate that the assault had occurred). Of note, even the theoretical stipulation the defendant describes in his brief stipulates only that he knew Hizballah was an FTO, and not that he knew it engaged in terrorist activity and terrorism. *See* 18 U.S.C. §§ 2339B, 2339D.

photographs of the Rally and the Hariri assassination site demonstrates, for example, his first-person knowledge of notable events in Hizballah's history.[2]  Thus, these materials are admissible for the non-propensity purpose of showing his knowledge regarding Hizballah's terrorist history and activity, directly relevant to his guilt on Counts One, Two, and Four.  Similarly, the defendant's possession of the Hizballah propaganda videos shows his knowledge of the same and further sheds light on the defendant's state of mind in the actions he undertook for Hizballah before the spring of 2005.  As such, the Hizballah Materials are alternatively admissible pursuant to Rule 404(b).

### C.  The Hizballah Materials Are Admissible Pursuant to Rule 403

Finally, the defendant argues in conclusory fashion, and absent any support, that the "probative value does not outweigh [its] prejudicial effect."  (Br. 5).  This is incorrect.  The Government's proof at trial will include testimony that the defendant admitted to surveilling landmarks and critical infrastructure in New York City and elsewhere in the United States to maximize death and destruction in a future Hizballah attack.  The defendant also admitted to participating in the attempted assassination of a suspected Israeli spy, and to placing an improvised explosive device ("IED") in a targeted location to attack and kill Israeli soldiers.  Given the nature of the defendant's admitted conduct on behalf of Hizballah, the photographs, audio, and video files that comprise the Hizballah Materials are not "unfair[ly]" prejudicial to justify exclusion under Rule 403.  *See, e.g.*, *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) (noting that "virtually all evidence is prejudicial to one party or another," and so "to justify exclusion under Rule 403 the

---

[2] The Government anticipates that its expert witness on Hizballah, Dr. Matthew Levitt, will testify that both the Rally and the assassination were momentous events in Hizballah's recent history.

prejudice must be *unfair*" (emphasis added)).  Indeed, courts within the Second Circuit routinely admit evidence like the Hizballah Materials when such evidence is less graphic and sensational than the charged crimes.  *See, e.g.*, *Herzog*, 203 F.3d at 174; *United States v. Abu-Jihaad*, 630 F.3d 102, 132-34 (2d Cir. 2010) (affirming district court's admission of excerpts of jihadist propaganda videos including graphic combat scenes); *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) (per curiam) (affirming district court's admission, over a Rule 403 objection, of video depicting embassy bombing and materials that "bristled with strong anti-American sentiment and advocated violence against targets in the United States," in light of their probative value); *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE), Dkt. 96 at 16-17 (S.D.N.Y. Jan. 5, 2018) (granting Government's *in limine* motion to admit terrorist propaganda materials found on devices seized from defendant charged with providing material support to ISIS, explaining that the "materials bear on whether [defendant] had the required state of mind," as "[defendant's] possession of them suggests that he was supportive of terrorist ideology in general and of ISIS in particular"); *see also United States v. El-Mezain*, 664 F.3d 467, 508-11 (5th Cir. 2011) ("Because this [is] a case about supporting terrorists, it is inescapable . . . that there [will] be some evidence about violence and terrorist activity. It cannot be denied that [such] evidence [will be] unfavorable to the defendant[], but [the court] cannot conclude that it [will be] unduly prejudicial.").

## II.     The Government May Use the Defendant's Proffer Statements to Cross-Examine Him and to Rebut Certain Defense Arguments and Evidence

The defendant contends that since he "will not be making a coercion argument," the Government should be precluded from introducing statements he made during his post-arrest proffers.  (Br. 8).  But the plain language of the agreement he signed before each of these proffer sessions (the "Proffer Agreement"), along with established law in this Circuit, permits the

Government to introduce his proffer statements to rebut *any* arguments and evidence offered at trial by the defense that run contrary to his proffer statements—not just to counter a "coercion argument." (*See* Gov't MILs 24-30). For example, the Government should be permitted to introduce contrary proffer statements if the defendant seeks to introduce any evidence or make any argument that (i) his admissions to the FBI were exaggerations or untruthful; (ii) he engaged in the conduct he admitted during the proffer sessions (*e.g.*, taking pictures of major landmarks and buildings in New York City) for any reason other than to support Hizballah and plan future attacks for the group; (iii) the agents who interviewed him are being untruthful, are exaggerating, or otherwise misremember portions of their conversations with the defendants; (iv) he only made admissions to the FBI because he was pressured (even if not coerced) to do so; (v) he ever unequivocally told Hizballah that he was withdrawing from the organization; and/or (vi) he did not attempt to murder an individual at point-blank range whom he later learned was an Israeli spy. Each of these potential defense arguments is expressly contradicted by the defendant's admissions during the proffer sessions and the Government should be permitted to use those proffer statements to rebut these potential defense arguments, as well as any other evidence or defense arguments that are contrary to the defendant's proffer statements, pursuant to the terms of the Proffer Agreement. Further, the Court has expressly advised the parties that its Protective Order "does not provide a vehicle to circumvent a proffer agreement," and that, for example, "were the Defendant to testify in a manner inconsistent with statements made pursuant to a proffer agreement, the Government would be permitted to cross-examine the Defendant about prior inconsistent statements made at a proffer session." (Dkt. 154 at 1-2).

In addition, to the extent the defendant seeks to minimize his conduct in the United States

or claim that he was "only" tasked with surveilling public landmarks for potential attack, the Government should be permitted to introduce his proffer statements to the contrary—namely, that he also was tasked with aggregating fertilizer in the United States, which he knew could be used in explosives, and that he researched how to do so. Similarly, if the defendant claims that he was merely a "failed recruit" (Br. 14), the Government should be permitted to introduce his proffer statements that he in fact *did* provide actionable information to his Hizballah handlers about New York City landmarks and critical infrastructure to help them carry out terrorist attacks here, and his proffer statements regarding other missions he actually carried out for Hizballah. In sum, the Court should reject the defendant's attempt to preclude the Government's introduction of his devastating proffer admissions, which the defendant made with full awareness of the potential implications at trial, and which the Government is permitted to use at trial pursuant to the terms of the Proffer Agreement and established Circuit law, if the defendant opens the door by testifying or seeking to present contrary evidence or argument.[3]

### III. The Court Should Preclude a Portion of the Defendant's Proposed Expert Testimony

In his brief, the defendant expounds on the expected testimony of Thanassis Cambanis, his proposed Hizballah expert, for the first time.[4] (Br. 9). In particular, the defendant notes that Cambanis intends to testify as follows:

---

[3] To the extent the Government believes the defense has opened the door to admission of the defendant's proffer statements, the Government will notify the Court and counsel outside the presence of the jury before seeking to offer those statements. In addition, the Government will instruct its witnesses to not testify about the proffer statements absent further instruction.

[4] The defendant previously submitted an affidavit from Cambanis in support of his motion for bail but did not provide any additional notice or details to the Government. (*See* Dkt. 89; *see also* Br. 13).

Hizballah is a Lebanese-based organization that has been designated as a foreign terrorist organization by the US State Department. He will discuss the history, structure, and methods of Hizballah in military, political and charitable matter. He will testify that between 2000 and 2008, Hizballah engaged in assassinations of political enemies and rivals. The sole method used by Hizballah to commit assassinations during this period was bombing. If asked about Mr. Saab's attempted shooting of a person described as an Israeli Spy, he will opine that the attempted shooting is not consistent with the means of assassination used by Hizballah."

(Br. 9-10).

To the extent Cambanis is properly qualified as an expert on Hizballah, the Government acknowledges that the proposed topics of Hizballah's designation by the United States Department of State, and Hizballah's history, structure, and methods, are generally appropriate areas of testimony. The Government further acknowledges that it may be appropriate for Cambanis to testify, in general terms and without specific reference to the defendant's alleged attempted shooting of an Israeli spy, regarding issues relevant to the assessment of whether the defendant attempted to murder an Israeli spy, including Hizballah's history of assassinations of political enemies and rivals between 2000 and 2008 and their supposed use of bombings—as opposed to shootings—to carry out such attacks. (Br. 9-10).[5]

The Government does, however, continue to object to Cambanis informing the jury of his opinion that "the attempted shooting is not consistent with the means of assassination used by Hizballah." (Br. 9-10). The defendant is certainly free to cite Cambanis's proposed potential testimony regarding Hizballah's purported assassination methods in making such an argument at

---

[5] Given the lack of specificity in the defense's purported notice of Cambanis's testimony, the Government is confined to addressing the propriety of potential topics of testimony in general terms; does not concede in the discussion above that any particular line of inquiry constitutes admissible testimony; and will make objections as appropriate at trial.

trial, but Cambanis—who was not present during the attempted murder—should not be permitted to opine directly on the nature of this factual episode under the guise of "expert" testimony. Expert testimony is inadmissible when, as proposed here, it is calculated primarily to insinuate what must have happened in a case on trial and therefore attempts to substitute for fact testimony concerning what actually did happen. *See, e.g.*, *United States v. Zafar*, 291 F. App'x 425, 427 (2d Cir. 2008) (limiting expert testimony in securities fraud case when its purpose was to "insinuate what had happened with respect to the relevant stock trades, a subject on which [the expert witness] was not a competent witness"); *United States v. Scop*, 846 F.2d 135, 139-40 (2d Cir. 1988) (holding that expert's testimony that the defendants had engaged in a manipulative and fraudulent scheme was not within the permissible scope of expert testimony and was prejudicial); *United States v. Maxwell*, No. 20 Cr. 330 (AJN), Dkt. No. 516 at 16 (S.D.N.Y. Nov. 21, 2021) (precluding part of defense expert witness's testimony applying psychological concepts to the facts of the case, "because an expert witness may not . . . serve as a vehicle for the factual history of the case"); *Island Intell. Prop. LLC v. Deutsche Bank AG*, No. 09 Civ. 2675 (KBF), 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012) ("It is also inappropriate for experts to act as . . . vehicles for factual narrative"); *LinkCo, Inc. v. Fujitsu, Ltd.*, No. 00 Civ. 7242 (SAS), 2002 WL 1585551, at *2-4 (S.D.N.Y. July 16, 2002) (excluding proposed expert opinion that defendant had misappropriated trade secrets that belonged to the plaintiff). Furthermore, Cambanis's proposed testimony about this event would suggest to the jury—with the imprimatur of an expert witness—that the defendant's mission on behalf of Hizballah was merely a training exercise, a determination that is properly within the purview and grasp of the jury. *See United States v. Escobar*, 462 F. App'x 58, 62 (2d Cir. 2012) ("A district court may commit manifest error by admitting expert testimony

where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."). Accordingly, the Court should preclude this part of the defendant's proposed expert testimony.

## IV. The Court Should Deny the Defendant's Request for a Jury "Finding of Fact" or a Set of Interrogatories

The Court should deny the defendant's request for a jury "finding of fact" or set of interrogatories with respect to Counts One, Two, and Four. (*See* Br. 11).

As an initial matter, there is no basis for a "finding of fact" or a set of interrogatories here. Neither of the defendant's proposed questions relates to an element of the charged crimes and, tellingly, the defendant cites no case law to support his request.[6] The Second Circuit has expressed its "traditional distaste for special interrogatories" in criminal cases. *United States v. Coonan*, 839 F.2d 886, 891 (2d Cir. 1988); *see United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (noting that "special verdicts in criminal cases are generally disapproved"); *see Skidmore v. Baltimore & Ohio Ry.*, 167 F.2d 54, 70 (2d Cir. 1948) (L. Hand, J., concurring) (noting that jury particularization is "undesirable" in criminal cases); *see also Black v. United States*, 561 U.S. 465, 472 (2010) ("Although not dispositive, the absence of a Criminal Rule authorizing special verdicts counsels caution."). *But see United States v. Pimentel*, 346 F.3d 285, 305 (2d Cir. 2003)

---

[6] To the extent the defendant relies on *Musacchio v. United States*, 577 U.S. 237 (2016), to support this request (Br. 10), such reliance is misplaced. The cited portion of *Musacchio* merely stands for the proposition that a defendant must raise a statute of limitations defense at trial, at which point the Government must either demonstrate that the charged conduct occurred within the allotted period or that an exception to the limitations period applies. *Id.* at 248. Because *Musacchio* does not concern—or even mention—findings of fact or interrogatories, it has no bearing on the defendant's request here.

(encouraging "the use of special verdict forms in cases alleging multiple racketeering acts to facilitate appellate review").

The requested interrogatories here are additionally problematic and improper because they imply that the resolution of a single factual issue—*i.e.*, whether Saab attempted to murder a suspected Israeli spy—is dispositive of his guilt on Counts One, Two, and Four. (*See* Br. 10 ("The Defense will challenge the statute of limitations for Counts 1, 2, and 4 by arguing that the 2005 event either did not happen, was a trust exercise, or a training exercise.")). But the Government intends to present several different bases for the jury to conclude that the defendant's activity for Hizballah "resulted in, or created a foreseeable risk of, death or serious bodily injury to another person," such that the statute of limitations for these counts would be eliminated pursuant to 18 U.S.C. § 3286(b). For example, the jury reasonably could conclude that any of the following conduct, among other conduct by the defendant for Hizballah, meets the § 3286(b) threshold: (1) the defendant admitted that he observed and reported on the actions and movements of Israeli and Southern Lebanese Army soldiers for Hizballah during a time when Hizballah was regularly conducting deadly ambushes against these troops in Southern Lebanon; (2) the defendant admitted that, on Hizballah's orders, he and his brother planted an IED designed to kill Israeli military personnel, and further admitted that the IED detonated and injured an Israeli army officer; and (3) the defendant admitted that he surveilled landmarks and infrastructure in New York and elsewhere to maximize potential damage for a future Hizballah terrorist attack; that he gathered details about these locations to calculate the size of a bomb needed to target a particular structure and to determine the ideal location to place a bomb to maximize damage and casualties; and that he provided this information to his Hizballah handlers on trips back to Lebanon, knowing that

15

Hizballah had engaged in violence and bombings (including one he participated in) in the past. All of this conduct created a foreseeable risk of death or serious bodily injury; indeed, it was the very point of the defendant's work for Hizballah, as he repeatedly admitted before and after his arrest. And, notably, the Second Circuit has explicitly warned against the use of interrogatories in situations like this one, where a factual issue raised in an interrogatory—that does not go to the elements of the offense—might mislead the jury as to the guilt or innocence of the defendant. *See United States v. Ruggiero*, 726 F.2d 913, 927 (2d Cir. 1984) ("Interrogatories are especially objectionable when they make resolution of a single fact issue determinative of guilt or innocence, without regard to the elements of an offense.").

Interrogatories are also unnecessary here because "the advantage of securing particularized fact-finding" on this issue is, at most, minimal. *Ruggiero*, 726 F.2d at 927. To that end, courts in this District routinely address statute of limitations issues in jury instructions without the need for interrogatories. *See, e.g.*, *United States v. Silver*, No. 15 Cr. 93 (VEC), Dkt. 135, 137 (addressing statute of limitations in jury instructions and not on verdict sheet). The Second Circuit has likewise concluded that special interrogatories are unnecessary where, as here, jury instructions can adequately address a possible defense. *See United States v. Bell*, 584 F.3d 478, 484-85 (2d Cir. 2009) (finding special interrogatories to be "unnecessary" since the district court "addressed the issue of self-defense" in the jury charge). Here too, the Court can adequately instruct the jury regarding the defendant's statute of limitations defense, if such an instruction is warranted based on the evidence at trial and if requested by the defense, thus obviating any possible argument for a "finding of fact" or a set of interrogatories on the matter.









## VI.    The Court Should Preclude Cross-Examination Concerning the Questioning Officer's Motivation for Asking the Defendant about Hizballah

Finally, the Government moves *in limine* for a ruling from the Court precluding the defense from questioning testifying agents about why they asked the defendant about Hizballah in their first interview of the defendant on March 14, 2019 (or asking any other law enforcement witness the same).  On December 30, 2021, given prior defense arguments in the case, the Government asked defense counsel if they planned to make this inquiry of the FBI agents testifying at trial. Defense counsel responded that they are unsure of whether this is a topic they plan to pursue on

cross-examination but that, at this juncture, they would not forego this line of questioning.  For at least three reasons, the Court should preclude this line of cross-examination.

First, this line of questioning is irrelevant to any issue at trial.  Inquiry regarding *why* the officers asked the question about Hizballah has no bearing on his subsequent admission concerning his years of terrorist activity and does nothing to undermine the corroborating evidence uncovered during this investigation.  This is particularly true because the defendant has already represented to the Court that he will not make an argument that his pre-arrest statements to the FBI were coerced.  (Br. 8).  Thus, there is no probative value in this line of inquiry at all, and it would instead cause unfair prejudice, confuse the issues, and unnecessarily delay the proceedings.  *See* Fed. R. Evid. 402, 403; *see also United States v.* Galanis, 844 F. App'x 400, 402-03 (2d Cir. 2021) (affirming district court's ruling precluding cross-examination and noting the "wide latitude" afforded a district court to impose such limits on questions that would prejudice the jury); *United States v. Ware*, 399 F. App'x 659, 662 (2d Cir. 2010) (quoting Fed. R. Evid. 403 and affirming limits on cross-examination).

Second, this line of questioning may elicit a Government objection pursuant to 18a U.S.C. § 8(c).  *See* 18a U.S.C. § 8(c) ("During the examination of a witness in any criminal proceeding, the United States may object to any question or line of inquiry that may require the witness to disclose classified information not previously found to be admissible.").  As such, this questioning would do nothing except delay the proceedings and confuse the jurors while not resulting in any admissible testimony in response. *See* Fed. R. Evid. 403.  For this reason, as well, the Court should preclude this line of potential cross-examination.

Finally, to the extent the defense wishes to use cross-examination to attack the

prosecution's motivation or methods in initiating prosecution, Courts consistently exclude such evidence or argument. *See, e.g.*, *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (affirming district court's ruling precluding defendant from arguing in summation that the Government had improperly targeted him for prosecution); *United States v. Loera*, No. 09 Cr. 466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) (precluding defense arguments to the jury that the Government's motives were improper); *United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (same); *United States v. Anaconda*, 342 F. Supp. 1116, 1123 (S.D.N.Y. 1972) ("The result is that the Government's motivation is generally legally irrelevant in all aspects of a criminal prosecution[.]").   To the extent the defendant is alleging a defect in the initiation of the prosecution, this is a pre-trial issue for the Court, not a basis of cross-examination before the jury. *See United States v. O'Brien*, 926 F.3d 57, 82 (2d Cir. 2019) (noting that arguments asserting a defect in initiating a prosecution "must be made before trial"); *see also Farhane*, 634 F.3d at 167 (noting that a defense argument claiming "a defect in the institution of the prosecution . . . is an issue for the court rather than the jury"); *see also* Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 193 (5th ed.) ("Other types of motions that allege a defect in the initiation of the prosecution are also covered by [Fed. R. Crim. P. 12], even if they are not enumerated in subsection (b)(3), and must be filed pretrial on pain of a sanction for untimeliness.").   This, too, provides a reason to grant this *in limine* motion.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should grant the relief requested in the Government's motions *in limine* and herein, and deny the defendant's motion *in limine*.

Dated:  New York, New York
       January 3, 2022

<div style="margin-left:50%">

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:       /s/
       Sam Adelsberg
       Jason A. Richman
       Assistant United States Attorneys

</div>

Cc:    Defense Counsel
      (Via ECF)