UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ALEXEI SAAB,
    a/k/a "Ali Hassan Saab,"
    a/k/a "Alex Saab,"
    a/k/a "Rachid,"

       Defendant.

19 Cr. 676 (PGG)

**THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S
POST-TRIAL MOTION FOR A JUDGMENT OF ACQUITTAL**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
*Attorney for the United States
of America*

Sam Adelsberg
Jason A. Richman
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

THE TRIAL EVIDENCE ............................................................................................... 4

   I. The Government's Case ...................................................................................... 4

   II. The Defense Case............................................................................................... 12

DELIBERATIONS AND THE JURY'S VERDICT.................................................... 14

ARGUMENT .................................................................................................................. 16

   I.      The Court Should Deny the Defendant's Motion for a Judgment of Acquittal ............ 16

      A.     Applicable Law ................................................................................................ 16

      B. The Defendant Misstates the Law Regarding Count Three and the Government Met Its Actual Burden Concerning the Defendant's Knowledge and Intent ................................... 20

      C. The Government Met Its Burden on the Statute of Limitations on Count Three ........... 22

CONCLUSION.............................................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**

*Cavazos v. Smith*, 565 U.S. 1 (2011) ............................................. 16

*Coleman v. Johnson*, 566 U.S. 650 (2012) ................................... 32

*Simmons v. Himmelreich*, 578 U.S. 621 (2016) ........................... 33

*United States v. Anderson*, 747 F.3d 51 (2d Cir. 2014) ............... 16

*United States v. Barris*, 377 F. App'x 93 (2d Cir. 2010) .............. 32

*United States* v. *Cruz*, 363 F.3d 187, 197 (2d Cir. 2004) ............. 16

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) .............. 17

*United States v. Heng Awkak Roman*, 356 F. Supp. 434 (S.D.N.Y.), *aff'd*, 484 F.2d 1271 (2d Cir. 1973) ............................................................................................. 31

*United States v. Ng*, 934 F.3d 110 (2d Cir. 2019) ......................... 17

*United States v. O'Brien*, 926 F.3d 57 (2d Cir. 2019) ................... 32

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011) ............. 17, 32

*United States v. Pham*, 2022 WL 993119 (S.D.N.Y. 2022) ................ passim

*United States v. Riley*, 2008 WL 2875432 (S.D.N.Y. 2008) ......... 32

*United States v. Sampson*, 898 F.3d 270, 276, 285 (2d Cir. 2018) ........... 19

*United States v. Tounisi*, 900 F.3d 982 (7th Cir. 2018) ............... 23

*United States v. Turk*, 626 F.3d 743 (2d Cir. 2010) ........... 19, 23, 28

United States v. Weisser, 417 F.3d 336 (2d Cir. 2005) ............... 31

**Statutes**

18 U.S.C. § 1114 ............................................................................. 38

18 U.S.C. § 1365 ............................................................................................ 18, 20

18 U.S.C. § 2332 ............................................................................................ passim

18 U.S.C. § 2339 ............................................................................................ passim

18 U.S.C. § 3286 ............................................................................................ passim

18 U.S.C. § 844 ............................................................................................... 38

18 U.S.C. § 930 ............................................................................................... 38

22 U.S.C. § 2656 ............................................................................................. 19

8 U.S.C. § 1182 ............................................................................................... 19

**Other Authorities**

*A Review of the Material Support to Terrorism Prohibition Improvements Act: Hearing Before the*
*Subcomm. on Terrorism, Technology and Homeland Security of the Comm. on the Judiciary:*
U.S. Senate, 109th Cong. 28 (2005) ...................................................... 36

*Administration's Draft Anti-Terrorism Act of 2001: Hearing Before the Comm. on the Judiciary:*
*House of Representatives*, 107th Cong. 11 (2001) ................................... 33

*Aiding Terrorists: An Examination of the Material Support Statute: Hearing Before the Comm. on*
*the Judiciary: U.S. Senate*, 108th Cong. 12 (2004) ................................ 35

*Congressional Record* 150, Cong. Rec. 25 (2004), S11996/ 2004 ............................... 39

*Congressional Record*, 147 Cong. Rec. 19 (2001), S10589/ 2001 ............................... 34

Foreign Relations Authorization Act ......................................................... 17

*Homeland Defense: Hearing Before the S. Comm. on the Judiciary*, 107th Cong. 28 (2001) ..... 34

Immigration and Nationality Act ............................................................... 17

Intelligence Reform and Terrorism Prevention Act (IRTPA) ...................................... 34

iv

Uniting and Strengthening America (USA) Act of 2001 ................................................ 34

USA PATRIOT Act ......................................................................................................... 34

USA PATRIOT Improvement and Reauthorization Act of 2005 .................................. 36

**Rules**

Federal Rule of Criminal Procedure 29 ..................................................... 1, 16, 17, 22

Federal Rule of Criminal Procedure 33 ............................................................. 17, 32

The Government respectfully submits this memorandum of law in opposition to defendant Alexei Saab's motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 (the "Motion").

After six days of deliberations, the jury returned a split verdict, convicting the defendant on three counts; acquitting him on three counts; and failing to reach a verdict on one count. In the Motion, the defendant challenges his conviction on Count Three, for receiving military-type training from Hizballah, in violation of 18 U.S.C. § 2339D. The defendant's sole argument in the Motion is that the Government failed to prove that the defendant knew that Hizballah was a designated foreign terrorist organization at the time he received this training. The defendant is plainly incorrect regarding the Government's burden as a matter of law, and the evidence at trial was more than sufficient to support the jury's determination that the Government met its *actual* burden on the relevant element of Count Three—that the defendant knew that Hizballah had engaged in terrorism or terrorist acts when he received military-type training from the organization.

Beyond that, the Government addresses in this opposition the application of 18 U.S.C. § 3286(b) to the statute of limitations on Count Three. While the defendant abandons this point in the Motion, and instead contends that the Court need not reach the issue, the Government addresses this argument given the Court's comments after the jury returned its verdict and because the defendant raised the statute of limitations in making his oral Rule 29 motion at the conclusion of trial. Pursuant to Section 3286(b), there is no statute of limitations for Count Three if the "commission of such offense … created a for[e]seeable risk of death or serious bodily injury to another person." From the time of opening statements, and throughout the trial, the Government embraced this question and placed it squarely before the jury. Defense counsel did the same,

calling this inquiry "[t]he issue" for the jury to decide, cross-examining Government witnesses on specific acts of violence relevant to the foreseeability question, and presenting a defense case focused on this issue.  Both the Government and defense counsel spent significant portions of their closing arguments addressing the statute of limitations question.  Ultimately, the jury rejected the defendant's arguments as to Count Three and unanimously found that the Government had met its burden.

The evidence presented at trial provided the jury with an ample basis to find that the defendant's commission of Count Three created a foreseeable risk of death or serious bodily injury. The defendant received military-type training from Hizballah in the creation and use of explosive devices; the use of firearms, including pistols, AK-47s, M-16s, and grenades; and pre-operational surveillance, including instruction in features of landmarks and buildings to effectively maximize death and destruction in a future terrorist attack.  Beyond those training sessions, the defendant admitted—and the evidence at trial corroborated—specific Hizballah training exercises that he participated in.  For example, the defendant recalled with vivid detail what he called a "training" exercise in Istanbul, when he was tasked with creating a "city guide" of Istanbul and returned to his handling agent with a map and surveillance photographs.  The FBI recovered evidence of this trip, including an Istanbul city map, in the defendant's apartment during a 2019 search.  The defendant's provision of pre-attack surveillance information to Hizballah as part of his training further demonstrates the risk that training created.  Further corroborating the risk of death and serious bodily injury created by Hizballah's training of the defendant was evidence of the actual risks of violence and terrorist attacks resulting from the defendant's implementation of his training. The Government presented evidence, for example, that the defendant put his small arms training to use when he attempted to assassinate a suspected Israeli spy, and put his surveillance and

explosives trainings to use when he conducted preoperational surveillance on buildings in New York City in an effort to prepare Hizballah to bomb those locations.  And while the defense argued that the Government had not met its burden on the statute of limitations, it also argued to the jury that the defendant was a "mere" Hizballah trainee—an argument which, even if credited by the jury, would still support its finding on the statute of limitations.  By way of just one example, even if the jury determined that any surveillance photographs taken by the defendant in the United States were taken as part of his training—it could still find that these photographs, when passed to Hizballah (which the evidence at trial showed had conducted bombings and other attacks), created a foreseeable risk of death or serious bodily injury sufficient to satisfy Section 3286(b).

Such findings by the jury as to Count Three are in line with the purpose and reach of Section 3286(b).  As further discussed below, Congress's inclusion of Section 2339D in the statutes covered by Section 3286(b) evinces a clear intent by the legislature for there to be no statute of limitations for at least some conduct criminalized by Section 2339D.  Moreover, the statutory history of Section 3286(b) speaks to Congress's intent that it would broadly apply in appropriate cases.  Further, the legislative history of Section 2339D makes clear that this is exactly the type of case Congress had in mind when it enacted the law—a defendant with a long history with a foreign terrorist organization who received training in how to further hone his skills for future use; training that created a foreseeable risk of harm by him or other members of the terrorist organization.

Particularly given the jury's carefully considered, split verdict, and how squarely the foreseeability question was presented to the jury throughout trial, the Court should not disturb the jury's verdict and should, instead, deny the defendant's motion for an acquittal on Count Three.

**THE TRIAL EVIDENCE**

The evidence at trial overwhelmingly established that the defendant received military-type training from Hizballah.[1]  Hizballah trained the defendant in the construction and use of explosive devices, including improvised explosive devices ("IEDs"); the use of firearms, including pistols, AK-47s, M-16s, and grenades; and pre-operational surveillance, intended for use in planning future attacks.  The defendant detailed these Hizballah training sessions, which spanned years, in consensual interviews with the Federal Bureau of Investigation ("FBI") before his arrest, and the Government introduced significant evidence to corroborate them during trial, including schematics of IEDs drawn by the defendant that an opinion witness identified as potentially viable devices, surveillance photographs and videos seized from the defendant's hard drive, and testimony from a retired FBI Special Agent that the defendant admitted testing positive for explosives residue on his bag in 2005, just after he attended a multi-week Hizballah training session on how to build, plant, and detonate explosives.  Both parties also introduced relevant opinion testimony, as detailed below, regarding how Hizballah trained its operatives and, in part, focused on operatives who, like the defendant, joined Hizballah's elite External Security Organization ("ESO").

**I.  The Government's Case**

At trial, the defendant's admissions to the FBI were detailed through the testimony of FBI Special Agent Anthony Cipriano.  Special Agent Cipriano testified that the FBI first approached the defendant on March 14, 2019, outside his apartment building in Morristown, New Jersey.  (Tr.

---

[1] The Indictment as filed contained nine counts, but the Government only proceeded to trial on seven of the nine.  In this opposition, the Government uses the numbering of counts as they went to the jury at trial.  Further, the Government confines its discussion of the trial evidence to that relevant to Count Three of the Indictment as the defendant does not challenge his convictions on Counts Four and Seven.

191-94).[2]  The defendant described being recruited into Hizballah in 1996 and his relationship with his first handling agent, Ibrahim.  (Tr. 194-95).  The defendant further explained that his first set of assignments was to surveil locations in Southern Lebanon that were associated with Israeli and Southern Lebanese Army troop positions.  (Tr. 199).  The defendant admitted that he surveilled soldier check points and security procedures, and then provided this information to Ibrahim in a written report to help facilitate Hizballah's IED operations against Israeli convoys in the area.  (Tr. 199).  The defendant also discussed his first weapons training session with Ibrahim, which took place in 1999.  (Tr. 199-200).  The defendant explained that he received training in the use of pistols, AK-47s, M-16s, and grenades.  (Tr. 200).

In a later interview, the defendant went into greater detail regarding his firearms training. He explained that he learned particulars about the best uses for AK-47s and M-16s.  (Tr. 280-81). In particular, he detailed that he had been taught that M-16s were better for long-range and sniper shooting, while AK-47s were preferred for "spraying bullets" at targets.  (Tr. 280-81).  Further, the defendant explained that he learned about the differences between automatic and semi-automatic rifles during his training.  (Tr. 280-81).  Finally, the defendant told the FBI that he learned how to throw grenades during these training sessions.  (Tr. 200, 281).

The defendant also admitted that he began to transition to a new role within Hizballah and a new handling agent in approximately 2000.  (Tr. 200).  Around this time, as he was beginning to transition to ESO, he was introduced to a second handling agent, Wissam, who he then met with 20 to 30 times over the ensuing four-year period.  (Tr. 200-01).  The defendant also described

---

[2] All references to "Tr." are to the transcript from trial in this matter; all references to "GX" are to Government Exhibits admitted at trial; all references to "CX" are to Court Exhibits from trial; and all references to "Dkt." are to the criminal docket, 19 Cr. 676 (PGG).

trainings that he received under Wissam's watch. (Tr. 201). He explained that he received training in countersurveillance and surveillance, counterintelligence, counterinterrogation, and explosives training. (Tr. 201). The defendant explained that these trainings, led by Wissam, started in approximately 2003 and that they took place in person. (Tr. 202). The defendant provided significant detail about these trainings and how he would travel to them. (Tr. 202-03). He explained that he and other trainees would take significant steps to stay covert during training, including wearing masks and using aliases, so that they would not learn each other's identities. (Tr. 202-03, 308).

A significant focus of the defendant's training with Hizballah was the use of explosives. The defendant explained that he had three weeks of explosives training that "incorporated training [in] triggering mechanisms, explosive substances, detonators, and the assembly of circuits." (Tr. 204). He further described a field-training exercise where he built and tested IEDs. (Tr. 204-05). He explained that he was trained in how to create a homemade IED that could be manufactured using parts that he could purchase anywhere, and incorporating "homemade" explosive substances, as opposed to military explosives. (Tr. 205). He also described constructing a sticky bomb, meaning an explosive device that incorporated a magnetic attachment and mercury switch that would detonate upon movement. (Tr. 205). In addition to learning how to build one, the defendant also admitted to detonating a sticky bomb during the training in a mountainous area outside of Beirut. (Tr. 205-06).

The defendant also explained to the FBI that, after this explosives training, he was traveling back to the United States from Lebanon and got caught with explosives residue on his luggage. (Tr. 206). The defendant later admitted that this positive residue hit was from the explosives field training exercise. (Tr. 206). This admission was corroborated by the testimony of former FBI

Special Agent Greg McHugh, who was working at JFK Airport on April 14, 2005, when the defendant flew into the United States from Istanbul. (Tr. 910-14). Mr. McHugh testified that he interviewed the defendant that day at JFK Airport, and the defendant admitted that he had been "detained by the Turkish authorities based on the [detection] of explosive residue." (Tr. 913).

The defendant also discussed the particulars of his training—that he went into a safe house where he had to change into a military uniform, before going to an underground classroom used for the training. (Tr. 252). He admitted that the training was focused on "the specific shapes of explosive charges" that would be used to target different potential targets. (Tr. 252). Further, he described training in triggering mechanisms, circuits, and detonators, and in the construction of IEDs. (Tr. 252-53). The defendant also admitted that he had learned to create a "telescopic" device, meaning one used to target personnel. (Tr. 253). The defendant emphasized that he was trained in different types of explosive materials. More specifically, he discussed with the FBI that "C4 was the explosive that was utilized in training" and that he had discussed procuring ammonium nitrate—an explosive precursor that the defendant was once tasked with procuring for Hizballah in the United States—and RDX. (Tr. 253-54, 434 (discussing his tasking to obtain fertilizer)).

The defendant also demonstrated just how thoroughly he had been trained in how to build and detonate explosives when he sketched the following three IEDs:

  

(GX 301, 302, 303; Tr. 270-76, 772-73).  After Special Agent Cipriano testified to the defendant's drawing of the IEDs, and what the defendant recounted about the training sessions (Tr. 270-76), FBI Special Agent Bomb Technician Murtagh provided opinion testimony that these could be potentially viable devices if they were constructed as diagrammed (Tr. 771).  Specifically, SABT Murtagh reviewed these images and explained that, based on his considerable training and field experience with explosives, each of the diagrammed IEDs contained the minimum requirements required for a viable and operable IED, namely, a power source, an initiator, explosives, and a switch.  (Tr. 745).  SABT Murtagh further described how IEDs can "kill or maim people."  (Tr. 754).  The sketches—combined with SABT Murtagh's testimony contextualizing and explaining their contents—made clear to the jury that the defendant remembered how to construct IEDs in vivid detail more than a decade after his rigorous explosives training.

In addition to his firearms and explosives training, the defendant also detailed to the FBI how he was trained in conducting surveillance and pre-operational surveillance, how he conducted such surveillance, and how this surveillance was designed to maximize future destruction.  (*See, e.g.*, Tr. 190, 254-56).  The defendant explained that he was taught in explicit terms how to most effectively take photographs for Hizballah and hide his activity; described how he provided this information back to his handling agents on his trips back to Lebanon; and explained how he understood the potential that Hizballah would use this information to plan future attacks.  For example, as part of this "surveillance training," the defendant described going to Istanbul, Turkey, in 2005, where he was instructed to create a "city guide" for the city.  (Tr. 254).  He focused on several particular locations, including a religious facility in Istanbul, a palace, and street markets.  (Tr. 255).  Special Agent Cipriano testified about certain photographs found on the defendant's

electronic devices, with metadata indicating they were likely taken during this trip, which evidence this surveillance activity:

 



(Tr. 254-60; GX 114, 115, 121).  And Dr. Matthew Levitt, the Government's opinion witness on Hizballah, testified that ESO thereafter carried out "several" attacks in Istanbul, including most prominently the attempted assassination of the Israeli Consul General in 2010 or 2011.  (Tr. 638).

The defendant also detailed to the FBI significant surveillance activity that he conducted in the United States.  He described how he was trained to focus on "soft spots" or structural weaknesses of the locations he surveilled.  (Tr. 262-63).  For example, when focusing on bridges, he would assess the composition of the bridge; what types of materials it was made out of; what type of bridge it was; and access roads to the bridge.  (Tr. 263).  This conduct, the defendant admitted, was all to position Hizballah to "cause the most destruction" in any future attack.  (Tr. 190).  And the defendant explained that he understood that the purpose of ESO was to work as a "countermeasure to retaliate in case there was a war between the United States and Iran."  (Tr. 282).  The defendant detailed his surveillance of over 40 locations in New York alone, along with

locations in Boston, Washington D.C., and elsewhere.  (*See, e.g.*, Tr. 334).  In early interviews with the FBI, the defendant labeled this surveillance activity as an exercise, and later as a "directive" from his handling agent.  (Tr. 288-89).  Indeed, the defendant "couched himself as a trainee" and "informant" on other occasions when discussing his general Hizballah activity.  (Tr. 270).    In addition to the defendant's admissions about this surveillance activity, the Government also introduced a subset of surveillance photographs and videos that were recovered from his electronic devices and which matched in method his training from Hizballah.  For example:



(GX 33, 57, 58).  The defendant explained in vivid detail how Hizballah trained him to conduct this surveillance and how to best mask his activity from potential detection from law enforcement. (Tr. 266-67, 311-312).  For example, the defendant would start filming an unrelated object before panning to the true object of his surveillance and would take video from a high altitude then zoom in on the target.  (Tr. 312).  The defendant also explained how he would film and photograph "multiple vantage points of bridges in order to show different angles," which was corroborated by videos and pictures found on his devices. (Tr. 285; *see, e.g.*, GX 24-26 (photographs of different vantage points of the Brooklyn Bridge), GX 88-90 (videos of different vantage points of the Brooklyn Bridge)). For photographs, the defendant would position someone in front of the true

object of his surveillance and would sometimes take skyline photographs with the object in the skyline. (Tr. 266-67; *see, e.g.*, GX 45). Dr. Levitt testified about how Hizballah's attack planning program relies on preoperational surveillance just like that conducted by the defendant. More specifically, Dr. Levitt testified about how Hizballah had operatives "collect preoperational surveillance" that could be used for future operations. (Tr. 643). Dr. Levitt explained that this surveillance was akin to "off-the-shelf, available planning" that they had available to act on quickly if needed. (Tr. 644). This, Dr. Levitt explained, "sets [Hizballah] apart from other organizations[.]" (Tr. 643).

During the course of his meetings with the FBI, the defendant also admitted his direct participation in two violent acts in Lebanon. First, the defendant described how, in or about 1997 or 1998, he planted an IED with his brother, Bassem Saab, targeting an Israeli troop convoy. (Tr. 354, 382-84). In the last interview before his arrest, the defendant, for the first time, told the FBI that he and his brother were tasked with placing an IED at a particular location in Yaroun, Lebanon, where they knew Israeli troop convoys, and a particular high-ranking Israeli soldier, would often pass. (Tr. 354). He described how he and his brother obtained the IED from a "dead drop" location and how it was an armed bomb that they left at the target site, for another team from Hizballah to later detonate. (Tr. 382-84). And he admitted that the IED mission was a success, and that it exploded and another, lower-ranking Israeli official had been injured in the attack. (Tr. 385). The defendant confirmed many of these admissions in his post-arrest statement, portions of which were shown to the jury during trial, and which the jury requested to re-watch multiple times during deliberations. (*See* GX 700, 700-T). The defendant described, in explicit terms, the entire mission, and about how someone from Hizballah left the IED for them to pick up. (GX 700-B). He then explained how the mission was a success. (GX 700-D). And just as Dr. Levitt testified, the

defendant explained that at that point he was not yet trained in IEDs himself, so he played a more limited role in the operation.  (Tr. 696; GX 700-G).

The defendant also admitted his role in what he described as the attempted assassination of an individual he later learned was a suspected Israeli spy in or about 2003.  The defendant detailed exactly how the operation took place, and that he was first tasked with stealing a vehicle that was later used for the mission.  (Tr. 289).  The defendant identified to the FBI the precise location where the attempted shooting took place (GX 307), and how his firearm jammed when he tried to shoot his intended victim at close range (Tr. 290-92).  This left his field mentor "distraught that the operation had not gone as planned," and angry with the person responsible for preparing the firearm.  (*Id.*).

Finally, during his meetings with the FBI, the defendant made clear his understanding that Hizballah had engaged in acts of terrorism.  For example, the defendant told the FBI that he knew that Hizballah had conducted "particularly devastating" IED attacks when he conducted surveillance for Hizballah in Lebanon.  (Tr. 251-52).  Indeed, the defendant himself admitted conducting just such an attack.  (Tr. 189).  And the defendant evidenced a deep understanding of Hizballah's history, including in particular certain historically important figures in Hizballah's terrorist operations.  (*See, e.g.*, Tr. 302-04).

## II.  The Defense Case

After the Government rested, the defense called two witnesses.  The first was Thanassis Cambanis.  In relevant part, Mr. Cambanis began by describing Hizballah's background and founding.  (Tr. 925-26).  He explained that Hizballah engaged in "horrific and well-known terrorist attacks" as far back as 1982 to 1985, including attacks on American interests abroad.  (*Id.*).  Mr. Cambanis then detailed that Hizballah published an "open letter" in 1985 in which the organization declared its existence, and engaged in significant ongoing violence after publishing the letter.  (*Id.*).

This included the kidnapping of "many Americans, journalists, professors, government officials, [and] lots of other westerners" who were "kidnapped, tortured, and murdered" by Hizballah.  (Tr. 926-27).  Mr. Cambanis then discussed some of the historical hostilities in Lebanon, including its conflicts with Israel.  (Tr. 927-32).  Mr. Cambanis's testimony then turned to Hizballah's "means and methods" of assassination, continued violence, and his opinion that Israeli spies were not targeted for assassination in Lebanon.  (Tr. 932-37).  This last point, of course, was an effort by the defense to rebut evidence of the defendant's attempted assassination of a suspected Israeli spy—one of the Government's theories for the elimination of the statute of limitations.

Mr. Cambanis then turned to Hizballah's use of IEDs.  In particular, he testified that Hizballah engaged in bombing attacks between 1996 and 2005, and it was one of the "central tactics" of their "guerilla war."  (Tr. 937-38).  He then reviewed various databases that he claimed kept records of these attacks, and his conclusion that no such attack occurred in Yaroun, Lebanon, in around 1996 to 1998.  (Tr. 938-44).  Though forced to admit on cross-examination that there was such an attack in Bint Jbeil, the district in which Yaroun is located during the relevant time frame, (Tr. 979-81), Mr. Cambanis's testimony about these databases was clearly intended by the defense to take aim at the Government's statute of limitations arguments.  After some testimony about the Hizballah propaganda materials introduced at trial and Mr. Cambanis's view of their import, his testimony turned to a March 8, 2005 Hizballah rally in Beirut, Lebanon, which the defendant attended and photographed.  (Tr. 949-58).  Finally, his testimony ended with some focus on Hizballah's public pronouncements regarding the United States.  (Tr. 964-67).  The defendant's second witness, Michelle Bush, testified about her forensic analysis of the defendant's electronic devices.

The parties delivered closing arguments on May 3, 2022. The Government devoted a significant portion of its argument to the statute of limitations issue. (Tr. 1151-56). The Government argued that the jury had a number of ways in which it could determine that the defendant had created the requisite foreseeable risk of death or serious bodily injury, and that any one of them would suffice standing alone on this issue. (*Id.*). In defense counsel's closing arguments, he emphasized the statute of limitations defense again. (Tr. 1172-78). Defense counsel attacked each aspect of the Government's theory, and argued, again, that the defendant was merely a "trainee" and not a full-fledged Hizballah member. (*See, e.g.*, Tr. 1160 ("There are no ESO trainees that are in sleeper cells."), 1166 ("No witness presented by the government or the defense verified anything about a trainee assassinating anybody that was [known] to him to be an Israeli spy or someone working for Israeli."), 1176 ("But if you look at what Dr. Levitt said and what's consistent with the means and methods of Hizballah, they wouldn't send a trainee to do anything. They wouldn't send a trainee to be in a sleeper cell."), 1178 ("He is coming here to take photos in 2000, and he's not finished his training. Does that mean – what does that mean? Does that mean he's an ESO person? He still has to do training. No. It means that he is an ESO training – if it means anything, he's an ESO trainee.")). Thus, because he was just a trainee, counsel argued that he would not have been tasked with certain of the things he admitted doing, and that other aspects of his Hizballah activity were mere training exercises.

## DELIBERATIONS AND THE JURY'S VERDICT

The jury began deliberations on the morning of May 4, 2022. (Tr. 1274). Over the next six days, the jury requested extensive portions of the record, including:

- On the first day, a note asking for a particular subset of Special Agent Cipriano's testimony; a second note asking for all of Special Agent Cipriano's testimony; and a third note asking for a clarification regarding the elements of Count Five. (*See* Tr. 1275-85; CX 2-4).

14

- On the second day, a note asking for copies of the testimony from Dr. Levitt and Mr. Cambanis; a projector to help display the testimony; and a question as to whether the jurors "all need to be in agreement regarding the theory of liability on any of the listed counts." (Tr. 1288; CX 5).

- That same day, another note asking for a copy of testimony from Artek Raevsky; for clarification regarding the phrase "in furtherance" as it related to venue; and whether an act had "to occur as part of the offense or after" to establish venue.  (Tr. 1300; CX 6).

- On the third day, a note requesting to view certain exhibits and asking for one copy of the testimony of FBI CART Examiner Craig Roth and defense witness Michelle Bush.  (Tr. 1317; CX 7).  Later that day, the jury also sent back a partially completed verdict form and a note regarding the timing of deliberations for the following week.  (Tr. 1320-21; CX 8).

- After the weekend, on the fourth day of deliberations (Monday, May 9), the jury sent a note requesting copies of certain exhibits and requesting to see two snippets of the defendant's post-arrest statement, played twice each.  (Tr. 1332; CX 10).  Later that day, the jury sent another note to the Court, asking what the jury should do "[i]f we are unable to return a unanimous verdict based on individual consciences, beliefs, and honest conviction concerning the evidence on one or more counts[.]"  (Tr. 1340; CX 12).

Owing to these questions and the time the jury took during deliberations, the Court noted how methodical and thorough the jury appeared to be.  (*See, e.g.*, Tr. 1333).  On May 11—the sixth day of deliberations—the jury returned a partial verdict.  (Tr. 1356-60; CX 13, 14).  The jury returned a guilty verdict on counts Three, Four, and Seven; a not guilty verdict on counts One, Five, and Six; and did not reach a unanimous verdict on Count Two.  (*Id.*).

<u>**ARGUMENT**</u>

**I. The Court Should Deny the Defendant's Motion for a Judgment of Acquittal**

The defendant makes one argument in the Motion: that the Government failed to prove that the defendant knew Hizballah was a designated foreign terrorist organization when he received military-type training from the organization. This argument rests on a misstatement of the law, and the defendant ignores that the Government met its *actual* burden on this element of Count Three. Beyond that, while the defendant does not press the argument in the Motion, the Government addresses the jury's determination that the Government met its burden on the statute of limitations as to Count Three. For the reasons to follow, the trial record amply supported the jury's finding that the defendant's military-type training from a murderous terrorist organization "created" a "foreseeable risk of death or serious bodily injury." Thus, the Court should deny the defendant's motion for a judgment of acquittal on Count Three.

    **A. Applicable Law**

    **1. Rule 29**

Federal Rule of Criminal Procedure 29(a) provides that a "court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." However, "[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004). "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). A Rule 29 motion "does not provide the trial court"—or, on review, the court of appeals—"with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Anderson*, 747 F.3d 51, 59-60 (2d Cir. 2014) (quotation marks omitted). The evidence must be viewed "in a light that is most favorable to the

government, and with all reasonable inferences resolved in favor of the government." *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (quotation marks omitted). A court "may reverse a guilty verdict only if evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Ng*, 934 F.3d 110, 130 (2d Cir. 2019) (quotation marks omitted). And the Second Circuit has instructed that a trial court should only use its authority under Rule 29 in the rarest situations; indeed, despite the Second Circuit mandating that the trial court has "broader discretion" under Rule 33 than Rule 29, even the Rule 33 authority must itself be used "sparingly" and only in "the most extraordinary circumstances." *See United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citations and quotations omitted).

### 2. Title 18, United States Code, Section 2339D

18 U.S.C. § 2339D criminalizes the receipt of military-type training from a foreign terrorist organization:

> Whoever knowingly receives military-type training from or on behalf of any organization designated at the time of the training by the Secretary of State under section 219(a)(1) of the Immigration and Nationality Act as a foreign terrorist organization shall be fined under this title or imprisoned for ten years, or both. To violate this subsection, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (c)(4)), that the organization has engaged or engages in terrorist activity (as defined in section 212 of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

(18 U.S.C. § 2339D(a)). To convict the defendant on Count Three, the Government was required to meet its burden of proof on four elements in addition to the statute of limitations:

- First, that the defendant received military-type training from a foreign terrorist organization, namely, Hizballah;

17

- Second, that the defendant did so knowingly and intentionally;

- Third, that the defendant did so with knowledge that Hizballah (a) engaged in or engages in terrorist activity or (b) engaged in or engages in terrorism; and

- Fourth, that a jurisdictional element was satisfied.

18 U.S.C. § 2339D; *see also* Tr. 1242-46 (jury charge on Count Three). The jurisdictional element can be satisfied, as relevant here, when (a) after the conduct required for the offense occurs, an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States; (b) the offense occurs in whole or in part within the United States; or (c) the offense occurs in or affects interstate commerce. *Id.*

The term "military-type training" is defined as including "training in means or methods that can cause death or serious bodily injury, destroy or damage property, or disrupt services to critical infrastructure, or training on the use, storage, production, or assembly of any explosive, firearm or other weapon, including any weapon of mass destruction." *See* 18 U.S.C. § 2339D(c)(1). The term "serious bodily injury" is defined by cross-reference to 18 U.S.C. § 1365(h)(3) to include bodily injury involving "a substantial risk of death; extreme physical pain; protracted and obvious disfigurement; or protracted loss or impairment of the function of a bodily member, organ, or mental faculty[.]" 18 U.S.C. § 1365(h)(3). The term "critical infrastructure" is defined as "systems and assets vital to national defense, national security, economic security, public health or safety including both regional and national infrastructure." 18 U.S.C. § 2339D(c)(3). The statute further makes explicit that critical infrastructure may be publicly or privately owned, and includes, for example, telecommunications networks, financing and banking systems, and transportation systems and services, to themselves include highways, mass transit, airlines and airports. *See id.*

Finally, "terrorist activity" is defined as, among other things, assassination; use of any explosive, firearm, or other weapon or dangerous devices, other than for monetary gain and with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property; or a threat, attempt, or conspiracy to do either of the above (or other examples in the statute); and "terrorism" is defined as "premeditated, politically motivated violence perpetrated against non-combatant targets by sub-national groups or clandestine agents." *See* 18 U.S.C. § 2339B(a)(1) (defining "terrorism" and "terrorist activity" by reference to 8 U.S.C. § 1182(a)(3)(iii) and 22 U.S.C. § 2656f(d)(2)); *see also* Tr. 1227-29 (jury charge on definitions of "terrorism" and "terrorist activity").

### 3.  Title 18, United States Code, Section 3286(b)

18 U.S.C. § 3286(b) eliminates the statute of limitations for certain terrorism offenses:

> Notwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense listed in section 2332b(g)(5)(B), if the commission of such offense resulted in, or created a for[e]seeable risk of, death or serious bodily injury to another person.

18 U.S.C. § 3286(b).  Section 2332b(g)(5)(B) in turn enumerates the specific statutory violations qualifying as terrorism offenses subject to that extended statute of limitations, including violations of 18 U.S.C. § 2339D. 18 U.S.C. § 2332b(g)(5)(B). The determination of whether a terrorism offense is time-barred by the statute of limitations "is a question for the jury."  *United States v. Pham*, No. 12 Cr. 423 (AJN), 2022 WL 993119, at *10 (S.D.N.Y. Apr. 1, 2022); *see also United States v. Sampson*, 898 F.3d 270, 276, 285 (2d Cir. 2018) ("If a defendant raises a statute-of-limitations defense . . . , the government bears the burden of proving compliance with the statute to a jury beyond a reasonable doubt.").  "Foreseeable" harm means harm that a defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense conduct.  (Tr. 1247 (jury charge); *see also United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010)

(defining "foreseeable harm")).  And "serious bodily injury" is defined as bodily injury involving "a substantial risk of death; extreme physical pain; protracted and obvious disfigurement; or protracted loss or impairment of the function of a bodily member, organ, or mental faculty."  18 U.S.C. § 1365(h)(3) (defining "serious bodily injury" and cross-referenced in 18 U.S.C. § 2332b(g)(3)); Tr. 1243, 1246-47 (jury charge on the same)).

## B.  The Defendant Misstates the Law Regarding Count Three and the Government Met Its Actual Burden Concerning the Defendant's Knowledge and Intent

The defendant's only argument in the Motion incorrectly asserts that the Government was required to prove that the defendant knew Hizballah was a designated foreign terrorist organization ("FTO") at the time he received military-type training from Hizballah to sustain a conviction on Count Three.  (Mot. at 7).  The defendant argues that because "the Government failed to present any evidence that Mr. Saab knew, at the time he received training from Hizballah" that Hizballah was "a designated foreign terrorist organization," the Court should overturn the jury's verdict and enter a judgment of acquittal.  (*Id.*).  This is simply incorrect.

For each of Counts One through Three of the Indictment, under the charged statutes, the Government was required to prove that the defendant acted knowingly and intentionally, with knowledge that Hizballah (A) was a designated FTO; (B) has engaged in or engages in terrorist activity; *or* (C) has engaged in or engages in terrorism.  *See* 18 U.S.C. §§ 2339B, 2339D.  While the parties did not dispute that Hizballah was a designated FTO (*see* GX 1001), at the conclusion of trial, the Court found there was no factual basis to instruct the jury that the Government could meet its burden on this element (on Counts One through Three) through the defendant's knowledge of Hizballah's FTO designation.  (Tr. 1083-84).  Instead, the Court instructed the jury on the other two prongs of the element, without objection from the defendant—the defendant's knowledge of Hizballah's history of engaging in "terrorism" or "terrorist activity."  (Tr. 1223-24, 1227-29,

1242).  Thus, the defendant's argument misses the mark entirely, and the jury was not even asked to consider whether the defendant knew that Hizballah was a designated FTO, nor was the Government required to prove as much.

And while the defendant does not even endeavor to argue that the Government failed to meet its actual burden, the jury had an array of evidence to choose from in reaching the determination that the defendant knew Hizballah engaged in terrorism or terrorist activity.  Again, this required the Government to prove that the defendant had knowledge of Hizballah's terrorist activity (including assassination, the use of explosives or firearms to endanger the safety of others, or conspiracy to do the same) or Hizballah's history of terrorism ("premeditated, politically motivated violence perpetrated against non-combatant targets by sub-national groups or clandestine agents.").  *See* 18 U.S.C. § 2339B(a)(1); (*see also* Tr. 1227-29).  The jury had more than enough evidence before it to reach such a conclusion.  For example, the defendant himself participated in an IED attack against Israeli soldiers and helped Hizballah plan other IED attacks before he began his formal training in firearms, explosives, and pre-operational surveillance.  (*See* Tr. 574, 938; GX 700-G).  In addition, the defendant evidenced a deep knowledge of Hizballah's history.  (*See, e.g.*, Tr. 301-05).  Particularly given the defendant's own history of involvement with Hizballah and knowledge of its past, the jury also could have inferred his knowledge of Hizballah's other terrorist attacks that predated his training, including attacks detailed at trial through the testimony of both Dr. Levitt and Mr. Cambanis.  For example, Dr. Levitt testified about the hijacking of TWA Flight 847, the attack on the U.S. Embassy in Kuwait in 1983 and the bombing of the U.S. marine barracks the same year, attacks or attempted attacks in Saudi Arabia and Europe, and attacks against Jewish centers in Argentina in the 1990s.  (*See, e.g.*, Tr. 637-38).  Similarly, both witnesses also testified about Hizballah's founding and the publication of the

"Open Letter" in 1985, in which Hizballah declared its desire to target Americans and others.  (Tr. 572-73, 964-65).  And Mr. Cambanis detailed a "spate of assassinations and explosions in various parts of Lebanon" in, for example, 2004, and admitted that Hizballah "absolutely" engaged in bombings and bomb attacks between 1996 and 2005.  (Tr. 935-38).

In sum, the defendant misstates the Government's burden on Count Three and ignores facts that clearly support the jury's determination on the actual issue at trial.  This argument is without merit and should be swiftly rejected.

### C.  The Government Met Its Burden on the Statute of Limitations on Count Three

While the defendant argues that the Court "need not reach" the statute of limitations question regarding Count Three, the Government addresses it here given the Court's prior commentary on this issue and the defendant's oral Rule 29 motion at the conclusion of trial.  (Tr. 1073-74, 1361-64).  Hizballah provided the defendant with military-type training in multiple areas and any of these could have also supported the jury's determination that the Government met its burden to satisfy Section 3286(b).  Notably, the jury's verdict was considered and not at all a rubber-stamp on the Government's case.  Instead, the jury took six days to deliberate; sent back over 10 notes seeking clarification on legal issues and the evidence; and returned a split verdict acquitting the defendant on one of the most serious charges in the Indictment.  The statute of limitations issue was squarely before the jury during opening statements; the taking of evidence; and closing arguments and was, indeed, one of the defendant's central arguments throughout the trial.  To now disregard the jury's verdict would run counter to the deference the verdict must be given and would be contrary to the factual record developed during trial and the law as correctly applied by the jury.  This is especially true since the Government's reliance on this statute of limitations theory is well within the confines of the relevant statutes and the intent of Congress in

passing the legislation in question.  As such, the Court should not overturn the jury's unanimous

verdict on Count Three of the Indictment on statute of limitations grounds.

### 1.   The Defendant Received Military-Type Training from Hizballah that the Jury Could Have Reasonably Concluded Created a Foreseeable Risk of Death or Serious Bodily Injury

At trial, the Government established that the defendant received "military-type training"

from Hizballah in the form of, among other things, firearms training, explosives training, and

intelligence gathering to scout out targets for future terrorist attacks, including training where the

defendant actually provided details back to Hizballah.  Any of these aspects of the defendant's

training could have appropriately been the basis for the jury's decision to convict on Count Three,

and any argument to the contrary was squarely made to, and rejected by, the jury.  In other cases

requiring a finding of foreseeability, "the Supreme Court has concluded that Congress intended

courts to conduct a case-specific analysis."  *Pham*, 2022 WL 993119, at *7 (citations omitted).

And "reasonably foreseeable" harm is harm that was a "potential result" of the offense conduct—

here, the potential result of the defendant's receipt of military type training.  *See id.* at *7-*8

(collecting cases which analyzed "foreseeable" and "risk of death or serious bodily injury"); *see

also Turk*, 626 F.3d at 750 (defining "reasonably foreseeable pecuniary harm"); *United States v.

Tounisi*, 900 F.3d 982, 985 (7th Cir. 2018) (noting that district court had applied enhancement for

conduct posing a "foreseeable risk to another person" based on defendant's attempt to travel to

Syria to join an FTO).  Here, this case-specific analysis makes clear that the jury drew a more than

reasonable conclusion in determining that the Government met its burden on the statute of

limitations, and the Court should not disturb this determination.

#### a. Firearms and Explosives Training

As detailed above, in 1999, the defendant attended his first Hizballah training focused on

the use of firearms, which included training on handling and firing an AK-47, an M-16, a pistol,

and grenades. (Tr. 280-81).   Over the ensuing years, the defendant's training from Hizballah intensified as he received trainings regarding explosives and intelligence gathering. In his interviews with the FBI, the defendant explained the heavy security that attached to these trainings, including the use of fictitious names and that Hizballah would transport him to training in a van with blacked-out windows and with a mask over his face so he could not see his fellow trainees or where they were going, further underscoring the intensity of the training.  (Tr. 202-03, 308).

The defendant's explosives training was particularly extensive.  (Tr. 204-06, 250-54).  He explained to the FBI that on multiple occasions he conducted field exercises in locations across Lebanon, where he learned to construct and detonate multiple types of explosives.  (Tr. 204-05). The defendant's knowledge of the purpose of this training was also clear: as he admitted in his interviews with the FBI and in his video-taped post-arrest statement, the defendant previously helped plant an IED to attack an Israeli convoy in an attempt to assassinate a senior Israeli military official.  (Tr. 354).   The defendant's explosives training was so extensive that the defendant recalled—15 years after he received the training—how to draw three specific IED devices, which an FBI bomb technician at trial confirmed would be viable bombs if constructed as designed.  (Tr. 270-76, 771).

The jury could have easily determined that this explosives training "created" a "foreseeable risk" of death or serious bodily injury.  After learning how to construct, detonate, and place IEDs, the defendant was poised and ready to maim and kill.  That satisfies Section 3286(b).  His training, itself, created the requisite risk—and, as detailed below, Congress criminalized such training for precisely this purpose.  Put simply, the jury was well within "reasonable" if it found that the defendant's receipt of this explosives training from a designated terrorist organization created a foreseeable risk of death or serious bodily injury.  But here, even beyond the foreseeable risk of

death or serious bodily injury created by virtue of the training itself, the jury had additional case-specific bases to support this conclusion.  The Hizballah opinion witnesses, for example, made clear at trial that this was not just any designated terrorist organization but a group with a long and violent history of specifically employing IEDs, other explosives, and firearms in conducting murderous attacks against military and civilian targets.  (*See, e.g.*, Tr. 636-37, 925-26 (Hizballah attacks), 647-48, 934-35 (use of explosives), 596 (reference to "shooting attacks or explosive attacks")).  Moreover, the defendant admitted to the FBI to being part of an IED attack.  (Tr. 538-39).  While this attack happened prior to his training (and his role in the attack was thus limited to delivering the IED, and not constructing or detonating it), his participation in the training *after* the attack underscores the dangerous and foreseeable consequences of the training he would later receive—all in support of the jury's verdict.

There was also ample basis in the record to support a finding by the jury that the defendant's firearms training created a foreseeable risk of death or serious bodily injury.  Indeed, Dr. Levitt testified that Hizballah would train members in small arms tactics, including the use of handguns, semiautomatic, and automatic weapons, because, in part, they would use them for assassinations and similar activity.  (Tr. 689-91).  Moreover—removing any doubt of the risk the training created—the defendant admitted to the FBI that, subsequent to his small arms training, he attempted to shoot a suspected Israeli spy.  While the Court appropriately noted following the verdict that Section 3286(b) requires that the actual "commission of" the crime create the risk of death or serious bodily injury, nothing in the statute or caselaw suggests that the jury cannot consider how the defendant actually used that training, or the defendant's history of involvement with the organization providing the training, in assessing the foreseeability of the risk inherent in the military-type training.  *See, e.g.*, *Pham*, 2022 WL 993119, at *9 (outlining a number of relevant

factors in considering whether foreseeable result of defendant's conspiracy to provide material support created a risk of serious bodily injury or death).  Thus, it would have been perfectly appropriate for the jury to consider post-training facts, such as the attempted assassination of the suspected Israeli spy, in determining the foreseeable risks posed by the defendant's extensive training.

### b. Pre-Attack Surveillance Training

Hizballah also trained the defendant in how to gather information about bombing targets, how to secretly take photographs of these targets, and how to best prepare Hizballah for future attacks.  (Tr. 190, 260-67).  The defendant said that he was tasked with conducting "mapping" or "site surveillance" that Hizballah was going to use to plan bombing operations to "cause the most destruction."  (Tr. 190, 332-33).  And more than just receiving instruction on how to conduct surveillance in furtherance of future bombings, the defendant also described a training in which he collected information and passed it back to Hizballah with knowledge that it would possibly be used to support attack planning.  (*See id.*).  Specifically, for example, in detailing his "surveillance training," the defendant described going to Istanbul, conducting surveillance at a number of sites in the city, taking photographs, preparing a "city guide" to pass back to Hizballah, and buying a map of the city.  (Tr. 254-55, 260-62).  This map was then recovered from his apartment in March 2019, and several photographs taken during this surveillance were recovered from his electronic devices, including multiple photographs of the Bosphorous Bridge.  (Tr. 260, GX 115).

Following and during receipt of his surveillance training, between approximately 2003 and 2005, the defendant went on to conduct surveillance at dozens of locations in New York, among other major cities in the United States, scouting them out for potential attack vulnerabilities and photographing and videoing the locations from different vantage points, as well as certain targets

overseas.  (Tr. 262-63, 334, 456).  Given that the defendant's scouting of these locations was focused in particular on structural vulnerabilities that could be exploited through bombings, this preoperational surveillance drew not just on his surveillance training but also on his explosives training and resulting expertise.  The defendant provided these photographs and videos, as well as additional written reports, to his handlers at Hizballah safe houses upon his trips back to Lebanon. (*See, e.g.*, Tr. 308, 332-33).

Thus, the evidence at trial clearly demonstrated that the defendant was trained by Hizballah in conducting preoperational surveillance for the purpose of supporting bombing attacks.  The testimony regarding the defendant's training, particularly when considered in the context of his admissions that the purpose of surveillance was to prepare Hizballah to conduct attacks, the opinion testimony regarding Hizballah's use of preoperational surveillance in attack planning and preparation, and the defendant's corroborated confession to in fact providing such surveillance information to Hizballah about locations in Istanbul (a location targeted by Hizballah) as part of his training, was more than sufficient to support a finding by the jury that the training created a foreseeable risk of death or serious bodily injury.  Moreover, in assessing that risk, the jury could reasonably consider the defendant's later implementation of that training when he surveilled landmarks in Washington, D.C., Boston, and New York City, including some of the highest security federal facilities in the country.  (*See, e.g.*, Tr. 876 (testimony of Stephen Anest); *see also Pham*, 2022 WL 993119, at *9-10).

Indeed, Section 2339D specifically criminalizes, among other things, training in "means or methods that can . . . destroy or damage property, or disrupt services to critical infrastructure[.]" 18 U.S.C. § 2339D(c)(1).  And this aspect of the defendant's training, in which he passed photographs and other information back to Hizballah regarding a city, Istanbul, subsequently

27

attacked by Hizballah on several occasions (*see* Tr. 638), certainly "created" the "potential result" that Hizballah would use the information to plan attacks in Istanbul, which could and almost certainly would, of course, cause "death or serious bodily injury." (*See* Tr. 1247; *Turk*, 626 F.3d at 750 (defining "foreseeable harm")). Again, this is yet another basis on which a reasonable jury easily could have concluded that the Government met its burden.

### c. Hizballah's History of Violence and Murder

In addition, it is important to consider the context within which the jury as fact-finder was evaluating this evidence: against the backdrop of what it learned about Hizballah's long and documented history of causing "death or serious bodily injury" to its targets. So, too, the jury was presented with significant evidence that the defendant was well-aware of this history of violence when he received his military-type training, having already participated in furthering attacks by conducting surveillance in Southern Lebanon and planting an IED targeting Israeli troops. (Tr. 199, 354, 382-84). And the Hizballah opinion witnesses for both the Government and defense described general Hizballah training and attack methods, which further buttress a conclusion that this type of training could result in a risk of death or serious bodily injury.

Both Dr. Levitt and Mr. Cambanis detailed Hizballah's history of carrying out scores of deadly attacks in Lebanon and abroad in which the organization murdered hundreds of Americans, including soldiers, diplomats, priests, journalists, and civilians. (Tr. 631-32). These attacks have involved bombings, as well as the use of firearms, and followed significant preoperational surveillance by Hizballah operatives. (Tr. 638, 668, 688). Dr. Levitt also described how ESO conducts small-arms training for its operatives (Tr. 649), and how ESO trains its operatives in how to build and use explosives "using materials that are commonly available," including ammonium nitrate (Tr. 648, 652). Notably, Dr. Levitt highlighted Hizballah's use of two specific explosive

precursors—fertilizer and ammonium nitrate—in prior attacks, components which the defendant learned about in his Hizballah training.  (Tr. 253, 434, 663).  Dr. Levitt further described how ESO instructs its operatives regarding how to conduct surveillance, including "targeting"—*i.e.* picking targets—noting that Hizballah focuses on "places where people might congregate or where there might be a bottleneck, where more people could be attacked, particular places that might be -- weak spots in infrastructure. Not just the building, but where in the building. Transportation. Bridges, tunnels."  (Tr. 665-66).  Beyond just target selection, Dr. Levitt discussed Hizballah's training regarding how to gather information "in a way that doesn't draw attention to one's self." (Tr. 651).  Dr. Levitt then provided an example of how Hizballah instructs its operatives to "tak[e] pictures of things that you're interested in, but they're in the background as you're taking a picture of somebody else, or a selfie of yourself [so] it doesn't look like you're taking a picture of that building or of that critical infrastructure or of that particular pillar that might be a vulnerability in the building if it was -- if a bomb was placed there."  (Tr. 651).  Dr. Levitt detailed Hizballah's demonstrated purpose of the surveillance: to provide Hizballah with "off-the-shelf" plans to conduct a deadly attack in the future.  (Tr. 643-44, 648).

Thus, Hizballah's own history and tactics provides important context further supporting the jury's conclusion that the defendant's training from Hizballah created a foreseeable risk of death or serious bodily harm.

### d. Even if the Jury Accepted the Defendant's Arguments, It Still Could Find a Foreseeable Risk of Death or Serious Bodily Injury on Count Three

Faced with powerful evidence of his repeated (and corroborated) admissions to the FBI, the defendant attempted at trial to minimize his association with Hizballah and his provision of support by arguing that he was a Hizballah trainee and not a full-fledged ESO operative.  *(See, e.g.*, Tr. 30 (opening statement), Tr. 1178 (closing argument)).  Counsel further argued that the

defendant had not "finished his training" in 2000 when he came to the United Sates because he then continued his training in 2003 and 2004, including in his effort to shoot and kill an Israeli spy. (*See* Tr. 1177-78). In making these arguments, the defense highlighted, for example, certain statements made to Special Agent Cipriano in which the defendant "couched himself as a trainee" in describing his ESO operations. (Tr. 270). At one point, the defendant also told Special Agent Cipriano that his surveillance activity in the United States was an exercise (though he later admitted it was a directive from his handling agents). (Tr. 288-89).

While extensive evidence at trial established that the defendant was an ESO operative conducting operations in the United States, even if the jury accepted the defendant's argument that he was only a trainee, the jury could still have concluded that the defendant's training created a foreseeable risk of death or serious bodily injury. For example, if the jury believed that the defendant's pre-operational surveillance activity in the United States was part of his training, as he told Special Agent Cipriano during certain of his pre-arrest admissions (Tr. 270, 288-89), and as counsel argued in closing statements (Tr. 1178 ("He is coming here to take photos in 2000, and he's not finished his training . . . . if it means anything, he's an ESO trainee.")), this nonetheless clearly qualified as "training in means or methods that can . . . disrupt services to critical infrastructure[.]" *See* 18 U.S.C. § 2339D(c)(1). Indeed, for all of the reasons detailed above, the defendant's preoperational surveillance training created a sufficient risk under Section 3286(b), and so, regardless of whether the defendant's surveillance in the United States was a continuation of the training or an outgrowth from it, the training itself nonetheless created a sufficient risk to support the jury's finding.

Similarly, even if the jury credited the defendant's repeated argument that the Israeli spy incident was merely a training exercise this could have, nonetheless, sufficed to establish for the

jury that the defendant created a foreseeable risk of death when he pointed a gun at close range and attempted to shoot his victim.  Even if this was, under the defense version of the facts, a mere training exercise, a loaded gun shot at a close range could have easily gone off and killed or injured the victim, particularly since the defendant himself told the FBI he thought it was an actual shooting attempt such that he was trying to assassinate his target.  *Cf. United States v. Weisser*, 417 F.3d 336 (2d Cir. 2005) (finding that "factual impossibility is not a defense to a charge of attempt in substantive criminal law"); *United States v. Heng Awkak Roman*, 356 F. Supp. 434, 437 (S.D.N.Y.), *aff'd*, 484 F.2d 1271 (2d Cir. 1973) (noting that an attempt crime is committed when "the defendants' actions would have constituted the completed crime if the surrounding circumstances were as they believed them to be" and citing a state law case where the defendant was found "guilty of attempted murder where he pointed [a] gun at another, believing it to be loaded when in fact it was not loaded, and pulled [the] trigger").

In short, the defendant cannot have it both ways.  Defense counsel argued to the jury that the defendant was a trainee for Hizballah in an effort to minimize his culpability and explain away certain admissions his client made to the FBI and other evidence in this case.  The jury may have adopted his argument, particularly given the split verdict on Counts One through Three.  But even adopting this argument, the jury could have easily concluded that certain of the activity the defendant painted as "training" would suffice to satisfy the Government's burden under Section 3286(b).  This is another reason why the Court should reject any challenge to the jury's verdict on this score.

### e. The Jury's Deliberations and Split Verdict

Further supporting the reasonableness of the verdict on Count Three, the jury was careful, deliberated for six days, requested the trial testimony of nearly every substantive witness, and

ultimately returned a split verdict.  This is particularly salient where, as here, the statute of limitations defense was one that was central to this trial.  As the Supreme Court has instructed, and the Second Circuit has re-affirmed, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *United States v. O'Brien*, 926 F.3d 57, 80 (2d Cir. 2019) (quoting *Coleman v. Johnson*, 566 U.S. 650, 651 (2012)).  And, as this Court observed, this was a "methodical[]" and "dedicat[ed]" jury.  (*See* Tr. 1333 (the Court noting that it is "clear" that "the jury is working methodically through the seven counts and through the accompanying jury instructions"), 1360 (the Court noting that the jury's "dedication to [its] duty was obvious to everyone in the courtroom")).  Far from rubber stamping the Government's arguments, the jury deliberated for nearly a week, requested to review nearly the entire trial transcript in the jury room, acquitted the defendant on another terrorism count, and was unable to reach a unanimous decision on the third terrorism count.  *See United States v. Riley*, No. 06 Cr. 80 (NRB), 2008 WL 2875432, at *3 (S.D.N.Y. July 16, 2008), *aff'd sub nom. United States v. Barris*, 377 F. App'x 93 (2d Cir. 2010) (rejecting Rule 33 motion and noting that "it is telling that the jury deliberated for two days, and over the course of that period, requested the trial transcripts of all four of the government's cooperating witnesses and asked several thoughtful questions regarding the applicable legal standards. The verdict against Patterson and his co-defendants appeared to have been the product of careful consideration of the evidence presented at trial."); *see also United States v. Persico*, 646 F. Supp. 752, 761 (S.D.N.Y. 1986) ("A review of the record of the twelve straight days of jury deliberation, during which the jury was sequestered, irrefutably demonstrates that the jury carefully examined the evidence before returning its discriminating and thoughtful verdict.").

Particularly given the emphasis on the statute of limitations issue before the jury at trial—and the jury's clearly thoughtful deliberation—the Court should not disturb the jury's verdict on Count Three of the Indictment.

### 2. The Government's Reliance on Section 3286(b) on the Facts of this Case Fully Aligns with Congress's Intent in Enacting the Statute

The Government next turns to congressional intent on the statute of limitations, in light of the Court's comments following the return of the jury's verdict. As explained below, the statutory text and legislative history only further support the reasonableness of the jury's conclusion that Count Three is subject to Section 3286(b). As an initial matter, the plain text of Section 3286(b) makes clear that Congress sought to eliminate the statute of limitations for violations of Section 2339D "if the commission of such offense resulted in, or created a for[e]seeable risk of, death or serious bodily injury to another person." 18 U.S.C. § 3286(b); *see Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016) ("Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says."). The language of these statutes is clear—and as the legislative history discussed below further confirms, there is no doubt that Congress intended for violations of Section 2339D to have no limitations period provided those violations satisfy Section 3286(b).

The Government's reliance on Section 3286(b) in this case comports with Congress's intent in enacting both Sections 2339D and 3286(b). In the wake of the attacks of September 11, 2001, Congress, in consultation with the Department of Justice, sought to expand and, in certain cases, eliminate entirely, the statute of limitations for certain terrorism crimes. *Administration's Draft Anti-Terrorism Act of 2001: Hearing Before the Comm. on the Judiciary: House of Representatives*, 107th Cong. 11 (2001) (prepared remarks of John Ashcroft, Att'y Gen. of the United States calling on Congress to "eliminate the statute of limitations on terrorist acts"). The

legislative history of the eventual statute—Section 3286(b)—makes clear that Congress was concerned about the applicable statute of limitations standing in the way of prosecuting those convicted of certain terrorism offenses and, in particular, international terrorism crimes.  *See, e.g.*, *Homeland Defense: Hearing Before the S. Comm. on the Judiciary*, 107th Cong. 28 (2001) (statement submitted for the record of Sen. Russell D. Feingold, Member, S. Comm. on the Judiciary that "I believe we should move expeditiously to remove the statute of limitations for certain international terrorism crimes").  On October 4, 2001, Senator Tom Daschle introduced Senate Bill 1510, the Uniting and Strengthening America (USA) Act of 2001, which included proposed language modifying the statute of limitations of terrorism offenses delineated in Section 2332b(g)(5)(B) which "resulted in, or created a forseeable [sic] risk of, death or serious bodily injury to another person." *See* S.1510, 107th Cong. (2001), at 218, *available at* https://www.congress.gov/107/bills/s1510/BILLS-107s1510is.pdf.   Senators debating this bill noted its purpose—to strengthen our nation's terrorism laws by extending the period of time within which the Government had to prosecute certain terrorism offenses.  For example, Senator Maria Cantwell noted that the purpose of the bill was to ensure that "when you commit a crime of terrorism, you can be prosecuted for that crime for the rest of your life, with no limitations period. Statutes of limitations guarantee what lawyers call 'repose.'  Terrorists deserve no repose." *Congressional Record* (daily ed.), 147 Cong. Rec. 19,536 (2001), S10589/October 11, 2001.  The final bill—which included several other revisions to national security laws and ultimately became known as the USA PATRIOT Act—included the "foreseeable risk" language of Section 3286(b) and became law on October 26, 2001.  *See* P.L. 107-56, 115 Stat. 272.

Three years later, in December 2004, Congress, as part of the Intelligence Reform and Terrorism Prevention Act (IRTPA) of 2004, made it a crime to receive military-type training from

designated terrorist organizations through the passage of 18 U.S.C. § 2339D.  *See* P.L. 108-458,

118 Stat. 3761.   The legislative history of the law reveals that its enactment was driven by

congressional concern that the prevailing terrorism laws were insufficient to prosecute those who

received training from terrorist organizations, given the danger such individuals posed to the

United States and, in particular, individuals, like the defendant, who receive such training abroad

and then came to live as sleeper agents in the United States.  *See, e.g.*, *Aiding Terrorists: An*

*Examination of the Material Support Statute: Hearing Before the Comm. on the Judiciary: U.S.*

*Senate*, 108th Cong. 12 (2004) (the "May 5 Hearing") (statement of Sen. Orrin Hatch, Chairman,

S. Comm. on the Judiciary that "[i]n light of the fact that there may have been tens of thousands

around the world who received such training in the camps, I am deeply concerned that there may

be a number of sleepers in the United States right now").   At the May 5 Hearing, several witnesses

emphasized the need to enact Section 2339D, highlighting the dangers posed by those receiving

military-type training from designated terrorist groups and the shortcomings of the then-existing

material support laws that did not explicitly prohibit receiving military-type training from

designated terrorist organizations.   For example, Gary Bald, the then-Assistant Director of the

FBI's Counterterrorism Division, said that among those who posed the most danger to the United

States were people who "have actually traveled overseas to attend Al Qaeda and other terrorist

training camps and provide instruction on how to make bombs, surveil a target, and other terrorist

trade craft, and have returned now to the United States to await further operational direction."  *See*

*id.* at 12 (statement of Gary Bald, Assistant Dir., Counterterrorism Div., FBI).  Another witness at

the May 5 Hearing, then-Assistant Attorney General for the Department of Justice's Criminal

Division Christopher A. Wray, discussed those who "have attended training camps where they

have been schooled in terrorist tradecraft, learning skills like bomb-making and covert

communications." *See id.* at 3 (statement of Christopher A. Wray, Assistant Att'y Gen., U.S. Dep't of Just.).  Assistant Attorney General Wray further noted that "[b]y dismantling the entire terrorist network, from the front-line killers, *to those training to kill*, to the fundraisers and facilitators, we maximize our chances of neutralizing terrorist activity. The more difficult it is for a terrorist to reach our shores, or communicate with co-conspirators, or buy a bomb, *or learn how to build one*, the less likely it is that a bomb will explode in one of our cities and kill innocent Americans." *Id.* (emphasis added).

Two years later, in March 2006, Congress passed the USA PATRIOT Improvement and Reauthorization Act of 2005 (the "Patriot Reauthorization Act"), P.L. 109-177/120 Stat. 209, which added Section 2339D to Section 2332b(g)(5)(B), thus explicitly bringing Section 2339D into the ambit of statutes for which the statute of limitations could be eliminated pursuant to Section 3286(b).  In the debate leading to the passage of the Patriot Reauthorization Act generally, there was, again, commentary on the need to continue to prosecute individuals who trained with terrorist groups as part of the U.S. Government's defense against terrorist organizations.  For example, Senator Cornyn remarked that:

> To achieve this, the government must stop all persons acting within a terrorist organizational structure, including those individuals and organizations that engage in fundraising, procurement, *training*, logistics and recruiting on behalf of terrorist organizations. Terrorists are taking note of our country's resolve to fight them and anyone who may support them. Whether it be terrorist fundraising, *training at a terrorist training camp*, or terrorist recruiting Congress has taken an unqualified stand that anyone guilty of these types of crime be punished severely and, if appropriate, removed from this country.

*See A Review of the Material Support to Terrorism Prohibition Improvements Act: Hearing Before the Subcomm. on Terrorism, Technology and Homeland Security of the Comm. on the Judiciary: U.S. Senate, 109th Cong. 28-29 (2005) (statement of Sen. John Cornyn, member, Subcomm. on*

Terrorism, Technology and Homeland Sec., S. Comm. on the Judiciary) (emphasis added).  The amendment through which Section 2339D was added to Section 2332b(g)(5)(B), and thus to Section 3286(b), itself passed through both houses of Congress without debate before it was signed into law on March 9, 2006.  P.L. 109-177, 120 Stat. 209.  Ultimately, this resulted in the statutory regime relied upon by the Government in this case—whereby the receipt of military-type training in violation of Section 2339D, which "resulted in or created a for[e]seeable risk of, death or serious bodily injury to another person" is properly charged and prosecuted "at any time without limitation[.]"  18 U.S.C. § 3286(b).

Thus, in addition to the plain language of the statutes, the legislative history of Section 3286(b), Section 2339D, and the deliberate addition of Section 2339D to Section 2332b(g)(5)(B) further reinforces congressional intent to eliminate the statute of limitations for at least certain violations of Section 2339D.  And while there was no debate when Section 2339D was added to the list of statutes in Section 2332b(g)(5)(B), there are important aspects of the statute itself and circumstances of its passage that yet further reinforce that this case is an example of precisely the sort of Section 2339D prosecution subject to Section 3286(b) contemplated by Congress.  First, underscoring Congress's deliberateness in passing and amending the legislation, Section 3286(b) does not extend to every statute listed in Section 3286(a) (which itself creates an eight-year statute of limitations for a larger body of terrorism offenses), but only a subset of those crimes; namely, those enumerated in Section 2332b(g)(5)(B), to which Section 2339D was deliberately added in 2006. *See Pham*, 2022 WL 993119, at *8 ("Section 3286(a) lists the offenses with an 8-year statute of limitations.  Section 3286(b) then identifies a subset of those offenses—the ones listed in 18 U.S.C. § 2332b(g)(5)(B)—and provides that if a further condition is satisfied (the creation of a foreseeable risk of death or serious bodily injury) then no statute of limitations applies.").  Again,

it is clear that Congress intended to allow for the prosecution of Section 2339D offenses without limitation in at least certain circumstances.

Second, the Court expressed a concern that applying Section 3286(b) to a case like this one involving in-depth training in explosives and firearms "would effectively eliminate the statute of limitations for any military-type training charge." (Tr. 1364). For all of the reasons just discussed, this concern is not applicable on the facts of this case and the jury's unanimous decision, given the extensive evidence regarding foreseeable risk of death or serious bodily injury created by the defendant's military-type training. Beyond that, Congress's intent in enacting the statutes in question was to effectively eliminate the statute of limitations for certain offenses, so long as the threshold showing was met. Indeed, it bears noting that the commission of certain of the terrorism offenses listed in Section 2332b(g)(5)(B) would—almost by definition—involve the creation of a foreseeable risk of death or serious bodily injury, including Sections 844(f)(2) or (3) (relating to arson and bombing of Government property risking or causing death), Section 930(c) (relating to killing or attempted killing during an attack on a Federal facility with a dangerous weapon), and Section 1114 (relating to the killing and attempted killing of officers and employees of the United States) and, thus, have no statute of limitations. Nonetheless, Congress did not outright strip the statute of limitations from these statutes, either, but instead included them, alongside Section 2339D, in Section 3286(b) (via cross-reference to 2332b(g)(5)(B)), evidencing a recognition that Section 3286(b) would apply to those statutes, and effectively eliminate the statute of limitations, in almost all circumstances. In other words, Congress was apparently not concerned (and, indeed, appears to have desired the result) that enacting Section 3286(b) would "effectively eliminate the statute of limitations" for these other offenses. (Tr. 1364). Accordingly, there is no cause for concern that the application here runs afoul of Congress's intent.

In passing, the defendant addresses the legislative history of Section 2339D with a purported quote from former Arizona Senator John Kyl.  (Mot. at 8).  The defendant claims that this quote "does not support the Government's position" and that "[t]here is no talk of such a person [a 'mere trainee'] posing a risk to United States nationals."  (*Id.*).  While the import of this argument is unclear, what is clear is that it is a misstatement of the record.  The full language from the hearing in question, in which Senator Kyl quotes the testimony from Justice Department officials, follows:

> It is critical that the United States stem the flow of recruits to terrorist training camps. A danger is posed to the vital foreign policy interests and national security of the United States whenever a person knowingly receives military-type training from a designated terrorist organization or persons acting on its behalf. Such an individual stands ready to further the malicious intent of the terrorist organization through terrorist activity that threatens the security of United States nationals or the national security of the United States. Moreover, a trainee's mere participation in a terrorist organization's training camp benefits the organization as a whole. For example, a trainee's participation in group drills at a training camp helps to improve both the skills of his fellow trainees and the efficacy of his instructors' training methods. Additionally, by attending a terrorist training camp, an individual lends critical moral support to other trainees and the organization as a whole, support that is essential to the health and vitality of the organization.

*Congressional Record* (daily ed.) 150, Cong. Rec. 25,834 (2004), S11996/December 8, 2004, *available at* https://www.govinfo.gov/content/pkg/CREC-2004-12-08/pdf/CREC-2004-12-08.pdf.  The thrust of the quote is captured in the first two sentences—that the United States had a "critical" interest in "stem[ming] the flow of recruits to terrorist training camps" and the "foreign policy interests and national security of the United States" was in danger every time a person received military-type training from a designated terrorist organization, irrespective of that individual's conduct thereafter.  *Id.*  Thus, contrary to the defendant's argument, this quote only underscores that the statute was designed to address the significant risk to national security when

individuals, like the defendant, receive training from a terrorist organization in how to murder and maim.  The defendant's argument to the contrary is misguided.

* * * * *

In sum, the jury's verdict in this case should not be disturbed.  Regarding the argument the defendant now presses in the Motion, the defendant misstates the law and ignores the actual burden which the Government clearly carried.  Beyond that, regarding the application of Section 3286(b) to this case, the jury's verdict was supported by significant evidence adduced during trial about the defendant's training from Hizballah.  And that application is in line with Congress's intent in passing Section 2339D and later adding it to the statutes to which Section 3286(b) applies in the appropriate circumstances.  There is no basis to overturn the jury's verdict, and the Court should therefore deny the defendant's motion for an acquittal.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendant's post-trial motion.

Dated:  New York, New York
        June 1, 2022

                                            Respectfully submitted,

                                            DAMIAN WILLIAMS
                                            United States Attorney
                                            Southern District of New York

                                    By:     ___/s/_____
                                            Sam Adelsberg
                                            Jason A. Richman
                                            Assistant United States Attorneys

Cc:     Defense Counsel
        (Via ECF)