UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-against-<br><br>ALEXEI SAAB,<br><br>Defendant. | **MEMORANDUM**<br>**OPINION & ORDER**<br><br>19 Cr. 676 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Alexei Saab was convicted at trial of receiving military-type training from Hizballah, in violation of 18 U.S.C. §§ 2339D and 3238; conspiracy to commit marriage fraud, in violation of 8 U.S.C. § 1325(c) and 18 U.S.C. § 371; and making false statements to federal officials, in violation of 18 U.S.C. § 1001. On May 23, 2023, this Court sentenced Saab to an aggregate sentence of twelve years' imprisonment and three years' supervised release. (Judgment (Dkt. No. 284)) Saab appealed his conviction, and in a January 14, 2026 decision, the Second Circuit affirmed his conviction but remanded for resentencing. United States v. Saab, 164 F.4th 198, 204 (2d Cir. 2026).

Before this Court proceeds with resentencing, however, it must determine whether Saab's conviction under 18 U.S.C. § 2339D triggers the following enhancements under the U.S. Sentencing Guidelines: (1) a twelve-level enhancement (and a Criminal History Category of VI determination) pursuant to U.S.S.G. § 3A1.4 (the "Terrorism Enhancement"); and (2) a two-level enhancement, pursuant to U.S.S.G. § 2M5.3 (the "Material Support Enhancement").

For the reasons stated below, this Court concludes that the Terrorism Enhancement and the Material Support Enhancement apply to Saab's Section 2339D offense.

# BACKGROUND

## I. PROCEDURAL HISTORY

On September 19, 2019, the Government obtained an indictment charging Saab with (1) conspiracy to provide material support to Hizballah, a designated terrorist organization, in violation of 18 U.S.C. § 2339B (Count One); (2) providing material support to Hizballah, in violation of 18 U.S.C. § 2339B (Count Two); (3) conspiracy to receive military-type training from Hizballah, in violation of 18 U.S.C. §§ 371, 2339(D), and 3238 (Count Three); (4) receiving military-type training from Hizballah, in violation of 18 U.S.C. §§ 2339D and 3238 (Count Four); (5) unlawfully procuring the naturalization of a person to facilitate an act of terrorism, in violation of 18 U.S.C. § 1425(a) (Count 5); (6) conspiracy to commit marriage fraud, in violation of 8 U.S.C. § 1325(c) and 18 U.S.C. § 371 (Count 6); (7) committing citizenship application fraud, in violation of 18 U.S.C. § 1546(a) (Count 7); (8) committing naturalization fraud, in violation of 18 U.S.C. § 1015(a) (Count 8); and (9) making false statements to federal officials, in violation of 18 U.S.C. § 1001 (Count 9). (Indictment (Dkt. No. 6) at 1-12)

The Government elected not to proceed on Counts Three and Five, and those counts were dismissed. (Dec. 24, 2021 Govt. Ltr. (Dkt. No. 148); see also Judgment (Dkt. No. 284) at 1) Trial on the remaining counts began on April 20, 2022. (See Apr. 20, 2022 Min. Entry) On May 11, 2022, the jury returned a verdict finding Saab guilty on Counts Four, Six, and Nine (Judgment (Dkt. No. 284) at 1) and acquitting him on Counts One, Seven, and Eight.

(Id.) The jury was unable to reach a verdict on Count Two. (May 11, 2022 Trial Tr. (Dkt. No. 235) at 2; Verdict (Dkt. No. 207))[1]

On May 31, 2022, Saab moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, arguing, inter alia, that the evidence was insufficient as to Count Four, which alleged that Saab had received military-type training from Hizballah, in violation of 18 U.S.C. § 2339D. (Def. Br. re Mot. for Jdgmt. of Acquittal (Dkt. No. 239)) On September 28, 2022, this Court denied Defendant's motion, finding that (1) "a reasonable jury could have concluded from the evidence that Saab had knowledge of Hizballah's terrorist activities sufficient to find him guilty of receiving military-type training"; and (2) "a reasonable jury could have concluded" – based on "Saab's knowledge that his training would likely result in the construction of explosive devices that would be used to kill or seriously injure others" – "that his receipt of explosive training created a foreseeable risk of death or serious physical injury." (Sept. 28, 2022 Tr. (Dkt. No. 259) at 19-20, 23-24)

On May 23, 2023, this Court sentenced Saab to ten years' imprisonment on Count Four and two years' imprisonment on Counts Six and Nine. (Judgment (Dkt. No. 284) at 3) The two-year terms on Counts Six and Nine were to run concurrently to each other and consecutively to the ten-year term on Count Four. (Id.)

Saab filed a notice of appeal on June 5, 2023, seeking vacatur of his conviction and sentence on Count Four, the Section 2339D offense. (Notice of Appeal (Dkt. No. 285)); United States v. Saab, 164 F.4th 198, 204 (2d Cir. 2026). On appeal, Saab argued, inter alia, that this Court improperly applied the Terrorism Enhancement to his conviction on Count Four,

[1] The Government declined to re-try Saab on Count Two, which was dismissed at sentencing. (See Oct. 4, 2022 Govt. Ltr. (Dkt. No. 258); Judgment (Dkt. No. 284) at 1)

having incorrectly found that Saab's Section 2339D offense "involved . . . a federal crime of terrorism." See id. at 203 (quoting U.S.S.G. § 3A1.4).

In a January 14, 2026 decision, the Second Circuit ruled that this Court had erred in applying the Terrorism Enhancement on the basis that Saab's "Section 2339D offense 'involved . . . a federal crime of terrorism.'" Id. (quoting U.S.S.G. § 3A4.1) (alterations in original). The Second Circuit explained that the Terrorism Enhancement set forth in Section 3A4.1 applies "'[i]f the offense involved, or was intended to promote, a federal crime of terrorism,'" and that the term '"federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." Id. at 214 (first quoting U.S.S.G § 3A4.1; and then quoting U.S.S.G. § 3A1.4 cmt. n.1) (alterations and quotations in original).

This Court had found that the Terrorism Enhancement applied because Section 2339D is included in a list of offenses – set forth in 18 U.S.C. § 2332b(g)(5) – that "constitute a [f]ederal crime of terrorism." See id. at 209 (internal quotations and citations omitted). The Second Circuit noted, however, that Section 2339D was not added to this list of offenses – and therefore did not become "a 'federal crime of terrorism'" – until March 2006. Id. Given that "Saab ceased all activities for Hizballah in or around the spring of 2005" – before Section 2339D was statutorily enumerated as a "federal crime of terrorism" – this Court "could not have applied the Terrorism Enhancement on the basis that the offense 'involved' that federal crime of terrorism without violating the Ex Post Facto Clause." Id. at 205, 216. The Second Circuit went on to affirm Saab's Section 2339D conviction, but vacated his sentence and remanded for resentencing "so as to allow the district court in the first instance to consider, after full briefing from the parties, whether the Terrorism Enhancement should apply in this case." Id. at 203, 219. The Second Circuit mandate issued on March 9, 2026. (March 9, 2026 Min. Entry)

In a March 10, 2026 order, this Court directed the parties to make "submission[s] addressing the factual and legal basis for application of the Terrorism Enhancement under U.S.S.G. § 3A4.1." (Mar. 10, 2026 Order (Dkt. No. 290) **at 3**)

In an April 10, 2026 submission, the Government contends that "the Terrorism Enhancement clearly applies to the [D]efendant's conviction for receipt of military-type training from Hizballah, in violation of 18 U.S.C. § 2339D, on either of two theories." (Apr. 10, 2026 Govt. Resentencing Br. (Dkt. No. 296) at 1) Under the Government's first theory, the Terrorism Enhancement applies to Saab's 2339D offense because his "conduct . . . was 'intended to promote' federal crimes of terrorism," thereby satisfying the first prong of U.S.S.G. § 3A4.1. (Id. at 3) Under the Government's second theory, "Saab's offense 'involved' several then-enumerated 'federal crime[s] of terrorism,' which would satisfy the second prong of Section 3A1.4." (Id. at 5)

In a May 14, 2026 submission, Saab argues that the Terrorism Enhancement does not apply to his Section 2339D offense under either of the Government's theories. (See May 14, 2026 Def. Resentencing Br. (Dkt. No. 303)) According to Saab, the Government has "ignore[d] U.S.S.G. § 1B1.3(c)" (id. at 2), the recently added Guidelines provision that prohibits a court from relying on acquitted conduct in determining the applicable Guidelines sentencing range, unless "such conduct also establishes, in whole or in part, the instant offense of conviction." See U.S.S.G. § 1B1.3(c). According to Saab – pursuant to U.S.S.G. § 1B1.3(c) – "the jury's verdict of acquittal with respect to Count One precludes a finding that the Defendant's conduct involved or was intended to promote a federal crime of terrorism." (Id. at 2 (cleaned up)) Saab also opposes application of the two-level Material Support Enhancement to his Section 2339D offense on substantially the same grounds. (Id. at 7-9)

## DISCUSSION

## I. RELEVANT STATUTORY AND SENTENCING GUIDELINES PROVISIONS

Sabb was convicted on Count Four of the Indictment, which charges him with receiving military-type training from Hizballah, a foreign terrorist organization, in violation of 18 U.S.C. § 2339D. (Indictment (Dkt. No. 6) at 6-7) Section 2339D provides that

> [w]hoever knowingly receives military-type training from or on behalf of any organization designated at the time of the training by the Secretary of State under section 219(a)(1) of the Immigration and Nationality Act as a foreign terrorist organization shall be fined under this title or imprisoned for ten years, or both.

18 U.S.C. § 2339D(a). The Second Circuit has determined that Section 2339D "prescribe[s] [] a statutory ceiling of 10 years' imprisonment." United States v. Saab, 164 F.4th 198, 216 n.7 (2d Cir. 2026).

U.S.S.G. § 3A4.1 – the Terrorism Enhancement – provides for a 12-level increase to a defendant's Guidelines offense level where the defendant's "offense . . . involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A4.1; see also United States v. Awan, 607 F.3d 306, 313 (2d Cir. 2010) (noting that U.S.S.G. § 3A1.4 requires "that the predicate offense must either (1) 'involve' a federal crime of terrorism or (2) be 'intended to promote' a federal crime of terrorism" and "that each clause has a separate meaning"). "[F]or any such crime," the offense level is "increase[d] by 12 levels; but if the resulting offense level is less than level 32, [the offense level is] increase[d] to level 32." U.S.S.G. § 3A4.1. Moreover, "[i]n each such case, the defendant's criminal history category . . . shall be Category VI." Id. (emphasis removed).

According to the Application Notes to Section 3A4.1, "[f]or purposes of this guideline[,] 'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." U.S. Sent'g Guidelines Manual § 3A4.1 cmt. n.1 (U.S. Sent'g Comm'n 2023).

Under 18 U.S.C. § 2332b(g)(5), "the term 'federal crime of terrorism' means an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of [a statute enumerated herein]." 18 U.S.C. § 2332b(g)(5).

U.S.S.G. § 2M5.3 – the Material Support Enhancement – provides for a two-level increase to a defendant's offense level where the defendant "provid[ed] material support or resources to designated foreign terrorist organizations or specifically designated global terrorists, or for a terrorist purpose." U.S.S.G. § 2M5.3 (cleaned up). Pursuant to Section 2M5.3(b)(1),

> [i]f the [defendant's] offense involved the provision of (A) dangerous weapons; (B) firearms; (C) explosives; (D) funds with the intent, knowledge, or reason to believe such funds would be used to purchase any of the items described in subdivisions (A) through (C); or (E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act,

then the base offense level is "increase[d] by 2 levels." Id.

The Material Support Enhancement became effective on November 1, 2002, see U.S.S.G. § 2M5.3, historical note (Effective Nov. 1, 2002, Amendment 637), and was amended effective November 1, 2003. Id. (Amended effective Nov. 1, 2003, Amendment 655).

## II. APPLICABILITY OF THE TERRORISM ENHANCEMENT AND THE MATERIAL SUPPORT ENHANCEMENT

The Government contends that the Terrorism Enhancement "applies to [Saab's] conviction for receipt of military-type training from Hizballah, in violation of 18 U.S.C. § 2339D," because his "conduct [] (1) was 'intended to promote' federal crimes of terrorism, and (2) 'involved' several then-enumerated 'federal crimes of terrorism.'" (Apr. 10, 2026 Govt. Resentencing Br. (Dkt. No. 296) at 3 (quoting U.S.S.G. § 3A4.1)).

Saab argues, however, that "the jury's verdict of acquittal with respect to Count One" – conspiring to provide material support to Hizballah – "precludes a finding that the

Defendant's conduct involved or was intended to promote a federal crime of terrorism," and that, accordingly, neither the Terrorism Enhancement nor the Material Support Enhancement apply here. (May 14, 2026 Def. Resentencing Br. (Dkt. No. 303) at 2, 7 (cleaned up)) In making this argument, Saab cites U.S.S.G. § 1B1.3(c), which provides that "acquitted conduct" is excluded from the Guidelines analysis, unless the acquitted conduct "also establishes, in whole or in part, the instant offense of conviction." (Id.); see also U.S.S.G. § 1B1.3.

Given Saab's argument that Section 1B1.3(c) "precludes" the Court from applying the Terrorism and Material Support Enhancements when calculating his Guidelines range, the Court first addresses the effect of Amendment 826 – which adds subparagraph (c) to Section 1B1.3 – on the Guidelines analysis.

### A. The Effect of Amendment 826 at Saab's Resentencing

U.S.S.G. § 1B1.3 defines "relevant conduct" for purposes of determining the applicable Guidelines range. See U.S.S.G. § 1B1.3. U.S.S.G. § 1B1.3(c) was added to the Sentencing Guidelines by virtue of Amendment 826, which became effective on November 1, 2024. (U.S. Sent'g Guidelines Manual app. C at 265 (U.S. Sent'g Comm'n 2025)) Amendment 826 provides as follows:

> ACQUITTED CONDUCT.—Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction.

U.S.S.G. § 1B1.3(c).

Pursuant to 18 U.S.C. § 3742(g),

> [a] district court to which a case is remanded pursuant to subsection (f)(1) or (f)(2) shall resentence a defendant in accordance with section 3553 and with such instructions as may have been given by the court of appeals, except that –
>
> (1) In determining the range referred to in subsection 3553(a)(4), the court shall apply the guidelines issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, and that were in effect on the date of the

> previous sentencing of the defendant prior to the appeal, together with any amendments thereto by any act of Congress that was in effect on such date[.]

18 U.S.C. § 3742(g).

18 U.S.C. §3742(f)(1) provides that "[i]f the court of appeals determines that [] the sentence was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings with such instructions as the court considers appropriate[.]" 18 U.S.C. § 3742(f). Citing 18 U.S.C. § 3742(g), the Second Circuit has observed that "the district court on remand [is] required to calculate the defendant's Guidelines range as it existed at the time he was originally sentenced." United States v. Waite, 12 F.4th 204, 217 (2d Cir. 2021) (citing 18 U.S.C. § 3742(g)(1), cert. granted, judgment vacated on other grounds, 142 S. Ct. 2864 (2022); United States v. Norris, 277 F. Supp. 2d 189, 192 (E.D.N.Y. 2003) ("The Feeney Amendment added subsection (g) to section 3742 of Title 18 of the United States Code. Subsection (g)(1) requires a resentencing court to apply the Sentencing Guidelines in effect on the date of the original sentencing."); Esteban-Gomez v. United States, No. 08-CV-4319, 2011 WL 3298219, at *5 (E.D.N.Y. July 27, 2011) ("This Court originally sentenced Petitioner on September 15, 2005. Amendment 709 took effect on November 1, 2007, more than two (2) years after Petitioner's original sentencing. . . . Thus, pursuant to § 3742(g)(1), it would have been error for this Court to have applied Amendment 709 when calculating the applicable Guidelines range upon resentencing. Accordingly, Petitioner's claim that Amendment 709 to the Guidelines should have been applied upon resentencing is denied." (internal citations omitted)); see also United States v. Binkholder, 909 F.3d 215, 218 (8th Cir. 2018) ("§ 3742(g)(1) and [U.S.S.G.] § 1B1.11(a) may be read in concert to accomplish a single, rational goal: to make sure that defendants are sentenced under the version of the Guidelines in effect on the date of their original sentencing." (emphasis in

original)); United States v. Taylor, 648 F.3d 417, 424 (6th Cir. 2011) (same; "we continue to adhere to the rule in this circuit . . . that upon remand for resentencing, the court should apply the version of the guidelines that properly governed the original sentencing" (internal quotations omitted)); United States v. Tanner, 544 F.3d 793, 797 (7th Cir. 2008) ("And while a sentencing judge is to use the guidelines in force at sentencing, when a case is remanded for resentencing he is to use the guidelines that were in force at the time of the original sentencing, even if they have changed in the meantime." (citing 18 U.S.C. § 3742(g)(1)).

Saab argues that "[t]he Sentencing Guidelines have changed in a significant way since [his] May 2023 sentencing," because "in May 2024, the Sentencing Commission adopted Amendment 826, which added a subsection (c) to § 1B1.3." (Apr. 14, 2026 Def. Resentencing Br. (Dkt. No. 303) at 2) Saab goes on to argue that (1) the newly added subsection (c) precludes the Court from considering acquitted conduct in determining his Guidelines range; and (2) in finding Saab not guilty on Count One – "Conspiracy to Provide Material Support or Resources to a Foreign Terrorist Organization. . . . the jury expressly found that Mr. Saab did not agree to support the mission of Hizballah materially." (Id. at 2 (emphasis in original))

Amendment 826 will not be applied at Saab's re-sentencing, however, "because it was not yet in effect at the time of [his] [original sentencing]." See United States v. Gunn, 162 F.4th 319, 335 (2d Cir. 2025). Saab was sentenced on May 23, 2023 (see May 23, 2023 Min. Entry), and Amendment 826 did not become effective until November 1, 2024. Gunn, 162 F.4th at 335 (citing U.S. Sent'g Guidelines Manual app. C at 265 (U.S. Sent'g Comm'n 2025) ("providing that '[t]he effective date of this amendment is November 1, 2024.[']")). Given that on remand for resentencing a court is required "to apply the Sentencing Guidelines in effect on the date of the original sentencing," Norris, 277 F. Supp. 2d at 192, the 2021 Sentencing

Guidelines – which were in effect at the time of Saab's May 23, 2023 sentencing – will govern Saab's resentencing. 18 U.S.C. § 3742(g)(1).

Under the 2021 Sentencing Guidelines, this Court has discretion to "consider[] conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." United States v. Watts, 519 U.S. 148, 157 (1997); see also United States v. Fabian, 171 F.4th 174, 192 (2d Cir. 2026) ("Under the then-operative Guidelines, the court could consider 'all information adduced during trial, including acquitted conduct,' so long as the court found that [the defendant] committed the conduct by a preponderance of the evidence.") Accordingly, the applicability of the Terrorism Enhancement and the Material Support Enhancement will be determined in accordance with this standard.

### B. Whether Saab "Intended to Promote" a Federal Crime of Terrorism

#### 1. Applicable Law

The Terrorism Enhancement applies to "offense[s] . . . that involved, or [were] intended to promote, a federal crime of terrorism." U.S.S.G. § 3A4.1. "[A]n offense is 'intended to promote' a federal crime of terrorism when the offense is intended to help bring about, encourage, or contribute to a federal crime of terrorism as that term is defined in 18 U.S.C. § 2332b(g)(5)." Awan, 607 F.3d at 314. 18 U.S.C. § 2332b(g)(5) defines "federal crime of terrorism" as "an offense that '(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of [one of a number of enumerated statutes]." 18 U.S.C. § 2332b(g)(5).

"The 'intended to promote' prong applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the

defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." Awan, 607 F.3d at 314. "'[A] defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime; instead the phrase implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism.'" Id. at 315 (quoting United States v. Graham, 275 F.3d 490, 516 (6th Cir. 2001)).

**2. Relevant Evidence**

The bulk of the evidence concerning Saab's activities on behalf of Hizballah consisted of admissions Saab made to FBI Special Agent Anthony Cipriano during a dozen interviews between March 14, 2019 and June 20, 2019. (Apr. 26, 2022 Tr. (Dkt. No. 213) at 184) During these interviews, Saab told Agent Cipriano about "his recruitment [by Hizballah] and operational activity [he had engaged in] on behalf of [Hizballah]." (Id. at 185)

Saab had grown up in southern Lebanon and was recruited by Hizballah while attending the University of Lebanon in Beirut. (Id. at 189) Saab described "his training in operations on behalf of . . . the military component of [Hizballah]," as well as his work for Hizballah's "external security organization" or "ESO," which Agent Cipriano testified is "a small compartment and unit that is responsible for . . . terrorist attacks and intelligence collection outside Lebanon." (Id. at 187)

Saab told Agent Cipriano that in late 2000 he was introduced to a handler named Wissam, who trained Saab "for external operations" on behalf of Hizballah. (Id. at 200) Saab met with Wissam "[a]pproximately 20 to 30 times over the course of a four-year period from 2000 to 2004." (Id. at 201) Between "approximately 2003" and April 2005, Saab – who was then living in the United States – periodically traveled from the United States back to Lebanon for "in-person" training concerning the "operative part" of his work for the ESO. (Id. at 189,

201-02, 206) "In [] 2004 and 2005," Saab received "approximately three weeks of [explosives] training" from the ESO, which included instruction in "triggering mechanisms, explosive substances, detonators, and the assembly of circuits." (Id. at 204) He also participated in "a field training exercise in which he built and tested improvised explosive devices," or "IEDs." (Id.) As part of his explosives training, Saab "described constructing what he called a sticky bomb" – which Agent Cipriano testified is "an explosive device that incorporated a magnetic attachment and a mercury switch that would allow it to detonate upon movement." (Id. at 205) Saab "describ[ed] detonating that [sticky bomb] during his field training." (Id.)

Saab also told Agent Cipriano that "in approximately April of 2005" – during a return trip from a training in "Lebanon to the United States[,] . . . he traversed the Istanbul Airport in Turkey, and he had an explosive detection hit on his person." Saab "attribut[ed] [the presence of explosive residue on his person] to his participation in th[e] field training exercise where explosives were detonated." (Id. at 206)

"[I]n between 2003 and 2005," Saab also conducted "site surveillance . . . to facilitate [Hizballah's] bombing operations against [] targets" in multiple United States cities, including "New York City, Boston, Massachusetts, and Washington, D.C." (Id. at 190, 210) Saab "described conducting [this] site surveillance to assess the security and structural weaknesses of [various] sites" and "to allow [Hizballah] to determine the size and placement of the explosives that would be needed to destroy them." (Id. at 259-60)

Saab told Agent Cipriano that he surveilled "over 40 different locations" in New York City alone, including "official buildings like federal, state, and local facilities, specifically 26 Federal Plaza"; "telecommunications infrastructure," such as "the Verizon wireless building in Manhattan, the AT&T building in Manhattan, and the AT&T cellular tower, and [another]

cellular tower"; "transportation infrastructure," including "Grand Central Station, [the] New York Port Authority bus terminal; airports, [such as] JFK, La Guardia, [and] Newark Airport"; "tourist sites, for instance, Herald Square, the Empire State Building, Rockefeller Plaza, Times Square, the Macy's in midtown, . . . the World Trade Center, the United Nations headquarters, the Statue of Liberty, and Ellis Island"; and "every bridge and tunnel in the area . . . includ[ing] the Goethals Bridge and Queensboro Bridge." (Id. at 334) Saab "described taking panoramic photos" of the locations that he surveilled with a "tripod," and then "us[ing] a software application in order to put the photographs together." (Id. at 260) Saab told Agent Cipriano that he "focus[ed] his photography on the main structural components of bridges; for instance, joints, towers, and [] cables." (Id.)

At trial, the Government introduced surveillance photos taken by Saab. These photographs depict: (1) "an on ramp to the Brooklyn Bridge"; (2) "the Brooklyn Bridge and an adjacent road"; (3) "structural components of the bridge, specifically the towers and cables"; (4) government buildings, including "a city municipal building," "the U.S. Attorney's Office," and "the federal courthouse"; (5) Times Square; (6) the United Nations; (7) "the on-ramp of the Lincoln Tunnel"; and (8) "the Christmas tree setting" at "Rockefeller Plaza," among other landmarks and locations. (Id. at 264-65, 337)

Saab told Agent Cipriano that his Hizballah handlers had instructed him "to take photographs and take videos" surreptitiously. (See id. at 266, 268) Saab employed "multiple techniques" to do so, including: (1) "position[ing] someone in front of the object of [his] surveillance"; (2) "focus[ing] on the city skyline and hav[ing] the object of his surveillance included in that skyline photograph"; and (3) "tak[ing] a photograph in which the focal point of

the picture was unrelated, but the target of the surveillance was also in the background." (Id. at 267-68)

Saab told Agent Cipriano that he had "provided his [ESO] handler a written report" that summarized the surveillance he had conducted in New York City, Boston, and Washington, D.C. (Id. at 190-91) Saab's report also contained a hand-drawn map that "included numbers that corresponded to each site"; "a legend of how those numbers matched to those sites"; and "narrative description[s] of those locations, which included details like the security protocols" at each location. (Id. at 190-91, 332-33) Saab also "provid[ed] a CD containing [his surveillance photographs] to Jalal," one of his Hizballah handlers. (Id. at 338)

At trial, the Government offered expert testimony concerning Hizballah and its terrorist activities and objectives. The Government's counterterrorism expert – Dr. Matthew Levitt – testified that Hizballah is "a Lebanon-based militant organization dedicated to the destruction of Israel and dedicated to opposing the United States and Western powers," and operates "in service to and with Iran against foreign powers that are set against Iran." (Apr. 27, 2022 Tr. (Dkt. No. 215) at 560, 572) Levitt further testified that Hizballah "has been quite clear consistently throughout [its existence] that it considers the United States a mortal enemy," and that the group's "political leader," Hassan Nasrallah, "has repeatedly, over the years, and certainly within that time period [of 1988 to 2022], made clear [Hizballah's] militant opposition to the United States." (Apr. 28, 2022 Tr. (Dkt. No. 217) at 733, 710) Levitt described ESO – the Hizballah unit that trained Saab – as "[Hizballah's] terrorist wing" – which "engages in acts of terrorism and violence domestically in Lebanon, and . . . also engages in international acts of terrorism beyond Lebanon's borders." (Id. at 628) The jury also heard testimony that bombings are Hizballah's preferred method "to intimidate and silence and kill their critics," and "[s]ome of

these bombings were clearly targeting individuals who were killed or maimed, [including] well-known prominent politicians, journalists, and other thought leaders." (Apr. 29, 2022 Tr. (Dkt. No. 219) at 934-35)

**3. Analysis**

The Government argues that "the Court should apply the [Terrorism Enhancement] under the 'intended to promote' prong of [U.S.S.G.] Section 3A1.4." (Apr. 10, 2026 Govt. Resentencing Br. (Dkt. No. 296) at 4) According to the Government, this "Court already determined at sentencing that Saab's offense was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' [and this finding] satisf[ies] the first prong of 18 U.S.C. § 2332b(g)(5)'s definition of a '[f]ederal crime of terrorism.'" (Id. at 3) The Government further argues that the trial "record also firmly establishes that Saab's offense conduct, along with his relevant conduct, was 'intended to encourage, further, or bring about' Hizballah's federal crimes of terrorism." (Id. at 3-4)

Saab responds that "[t]he application of § 3A1.4 under the "intended to promote" prong depends on [his] intent, not the institutional aims of Hizballah generally," and that "because Saab was acquitted of conspiracy [to provide material support to Hizballah,] . . . the jury's acquittal signifies a finding as to Saab's lack of mens rea." (May 14, 2026 Def. Resentencing Br. (Dkt. No. 303) at 5 (emphasis in original))

The fact that the jury concluded that the Government had not proven beyond a reasonable doubt that Saab conspired to provide material support to Hizballah is not dispositive at sentencing on the issue of whether he intended to promote a federal crime of terrorism under U.S.S.G. § 3A1.4, however. As discussed above, this Court may consider acquitted conduct at Saab's re-sentencing if the evidence proves – by a preponderance of the evidence – that Saab intended to promote a federal crime of terrorism. U.S.S.G. § 6A1.3, comment. (U.S. Sent'g

Comm'n 2021); see also Watts, 519 U.S. at 157; Fabian, 171 F.4th at 192. Given the evidence summarized above, this Court has no difficulty in determining that the preponderance of the evidence standard is met here.

Moreover, and contrary to Saab's argument (see May 14, 2026 Def. Resentencing Br. (Dkt. No. 303) at 5-6), the intent element of Section 3A1.4 can be met here even in the absence of a conspiratorial agreement to provide material support to Hizbollah. In United States v. Awan, the Second Circuit determined that "the application of § 3A1.4" under the "intended to promote" prong "does not require a finding that [the defendant] was personally motivated by a desire to influence or affect the conduct of government." Awan, 607 F.3d at 315-16. "Rather, the government need only demonstrate that [the defendant] intended to promote a crime calculated to have such an effect, i.e., that his offenses were intended to promote a federal crime of terrorism as defined in § 2332b(g)(5), whatever [the defendant's] reason for committing them." Id. at 316.

Accordingly, for the Terrorism Enhancement to apply to Saab under the "intended to promote" prong, "it is sufficient that [Hizballah] committed one of the § 2332b(g)(5) offenses calculated to influence government and that [Saab] intended to promote [Hizballah's] activities." See United States v. Cordoba-Bermudez, 4 F. Supp. 3d 635, 647 (S.D.N.Y. 2014). "[Saab's] offense 'need not itself be "calculated" [to influence government action] as described in § 2332b(g)(5)(A),' as long as it was 'intended to encourage, further, or bring about' the crime of terrorism." Id. at 646-47 (quoting Awan, 607 F.3d at 314).

As to the first requirement – that Hizballah "committed one of the § 2332b(g)(5) offenses calculated to influence government action – there is no dispute. "Since 1997, [Hizballah has] been a designated terrorist organization." (Apr. 29, 2022 Tr. (Dkt. No. 219) at

974) And at trial, the jury heard extensive testimony about Hizballah's long history of political violence and acts of terror, including "the blowing up of the U.S. marine barracks [in Beirut], the French marine barracks, the U.S. Embassy in Beirut twice and twice [the] Israeli military headquarters in the south [of Lebanon] in the city of Tyre." (Id. at 926). Hizballah was described at trial as "one of the most violent and most capable groups that's connected to not just terrorist attacks, but [also] to various other acts of violence in Lebanon's civil war and later in international terrorist attacks." (Id. at 925) The jury also heard evidence about a manifesto that Hizballah issued in 1985 setting forth its "extremist ideology and justification for violence . . . against American targets, international targets, and Israeli targets." (Id. at 964) In furtherance of its aims, "from 1985 to 1992" Hizballah carried out the "kidnapping of many Americans, diplomats, journalists, professors, [and] government officials," and "kidnapped, tortured, and murdered" "westerners and Lebanese." (Id. at 926)

"[S]tarting in 2004" – while Saab was working on Hizballah's behalf – Hizballah engaged in "a spate of assassinations and explosions in various parts of Lebanon," "[a]ll of them targeting people or communities who were critical of Hizballah." (Id. at 934) Hizballah used bombings as its primary method "to intimidate and silence and kill [its] critics." (Id.) Indeed, Hizballah orchestrated "15 major [bombing] incidents" during the 2004-2005 period, including the February 14, 2005 murder of the former Lebanese prime minister, Rafic Hariri. (Id. at 934, 949)

Based on the Secretary of State's designation of Hizballah as a foreign terrorist organization and the events described above, the Court concludes that Hizballah has engaged in at least two federal crimes of terrorism enumerated in 18 U.S.C. § 2332b(g), including violations of 18 U.S.C. § 2332f (relating to bombings of places of public use, government facilities, public

transportation systems, and infrastructure facilities), see 18 U.S.C. § 2332b(g) (1996) (amended 2002), and 18 U.S.C. § 2332b(a) (relating to acts of terrorism transcending national boundaries). See 18 U.S.C. § 2332b (1996). Moreover, given Hizballah's publicly expressed commitment "to the destruction of Israel and dedication to opposing the United States and Western powers" (see Apr. 27, 2022 Tr. (Dkt. No. 215) at 560) and its history of politically-motivated attacks, including but not limited to the 2005 assassination of the former Lebanese prime minister, the Court further concludes that Hizballah's Section 2332b(g) offenses were "calculated to influence or affect the conduct of government" within the meaning of U.S.S.G. 3A4.1. See Awan, 607 F.3d at 315.

As to the second requirement of the "intended to promote" prong – whether Saab intended to promote Hizballah's activities and "'to encourage, further, or bring about' the crime of terrorism" (Cordoba-Bermudez, 4 F. Supp. 3d at 647 (quoting Awan, 607 F.3d at 314)) – there is likewise overwhelming evidence.

The evidence introduced at trial demonstrates that Saab received military-type training from Hizballah with the intent "to encourage, further, or bring about the crime of terrorism." Saab's admissions to Agent Cipriano make clear both that Hizballah – through the military training it provided to Saab – sought to use Saab to further potential acts of terrorism in the United States – bombings of important infrastructure and landmarks – and that Saab, in receiving that military training, had agreed to assist Hizballah in committing acts of terrorism in the United States.

Saab's "intent to further the activities of a group that committed federal crimes of terrorism," Cordoba-Bermudez, 4 F. Supp. at 647, is in part demonstrated by his repeated travel back to Lebanon during the 2003 to 2005 time period for explosives training. When Saab

returned to Lebanon "in 2003, 2004, and 2005," he "complete[d] operational missions for Hizballah's [terrorist wing,] ESO." (Apr. 27, 2022 Tr. (Dkt. No. 215) at 544) He received "explosives training during that period of time by Hizballah" (id. at 455), and he learned "how to construct IEDs" – improvised explosive devices – "[i]n approximately 2004 and 2005." (Id. at 539) Saab's Hizballah-led IED "training [covered] triggering mechanisms, explosive substances, detonators, and the assembly of circuits" and "various different types of explosive materials." (Apr. 26, 2022 Tr. (Dkt. No. 213) at 204; Dec. 19, 2022 Amended PSR (Dkt. No. 265) ¶ 36 (internal quotations omitted))

During the 2003-2005 time period, Saab also conducted surveillance of more than 40 locations in New York City and elsewhere with a focus on determining "structural weaknesses" and "security weaknesses in the buildings that he was surveilling." (Apr. 26, 2022 Tr. (Dkt. No. 213) at 332, 262-63) For example, Saab systematically "assess[ed] the composition of [] bridge[s]," including "what type of materials [they were] made out of," whether they were "cable versus suspension" bridges," and whether there "were roads that could hinder access to the bridge." (Id. at 263-64) He photographed "soft spots" – security and structural weaknesses in the buildings and landmarks he surveilled – and he shared these photographs with Hizballah on a CD. (Id. at 262-63, 338) He also provided his Hizballah handler with a written report containing a map of and a key to the U.S. landmarks that he surveilled, a "narrative description of those locations," and details of the "security protocols" utilized at these locations. (Id. at 332-33) Saab provided his surveillance photographs and videos, and his written report, to Hizballah in order "to facilitate [Hizballah's] bombing operations against those targets" and to assist Hizballah in "caus[ing] the most destruction [to

these potential targets]." (Id. at 190)[2]

In addition to the surveillance photos and videos that Saab took for Hizballah of potential bombing targets in New York City, Boston, and Washington, D.C., he also discussed with his Hizballah handler acquiring the material necessary to create the explosives that would be used in such bombings. Saab told Agent Cipriano that "during his [Hizballah] explosives training . . . the procurement of ammonium nitrates" – a substance commonly found in fertilizer that can be used to create an explosive – "was a topic that would be discussed." (Apr. 27, 2022 Tr. (Dkt. No. 215) at 436) Saab said that he "was directed by his handler to open an agricultural business in the United States that would provide cover for him to procure fertilizer legally," and "discussed [this directive] in the context of his training." (Apr. 27, 2022 Tr. (Dkt. No. 215) at 434) In short, there was overwhelming evidence at trial that Hizballah had provided military

[2] Moreover, as this Court ruled in denying Saab's post-trial motion for a judgment of acquittal, "in the context of this case, . . . Saab's surveillance training qualifies as military-type-training within the meaning of § 2339D":

> The statute defines "military-type" training to include "training in means or methods that can cause death or serious bodily injury, destroy or damage property, or disrupt services to critical infrastructure." A reasonable jury could have found that Saab's surveillance in New York City, Washington, D.C., and Boston was a field exercise in which he was being trained on how to look for vulnerabilities in landmarks and infrastructure in the United States, so as to cause the maximum amount of damage and the maximum number of casualties. Accordingly, he was being trained in a "means or method []" – that is, preoperational surveillance for a bombing – that could "cause death or serious bodily injury, destroy or damage property, or disrupt services to critical infrastructure."

(Sept. 28, 2022 Tr. (Dkt. No. 259) at 25-26 (quoting 18 U.S.C. § 2339D) (internal citation omitted)) Because Saab's surveillance activities qualify as "military-type training," they are directly relevant to and probative of his intent for sentencing purposes. As discussed above, Saab "memorialized his United States surveillance activities in the form of a written report – a written report that he submitted to [Hizballah] and a written report that could be used to facilitate future terrorist attacks." (Id. (Apr. 26, 2022 Tr. (Dkt. No. 213) at 190) Saab's pre-operational surveillance demonstrates an unambiguous intent to promote future crimes of terrorism by Hizballah in the United States.

training to Saab with the intent to use Saab to assist in potential bombing operations in the United States, and that Saab – in receiving military training from Hizballah – had agreed to assist Hizballah in preparing for potential acts of terrorism in the United States, including the bombing of important infrastructure and landmarks in this country.

Because Saab – through his explosives training and surveillance activities – acted with the "intent to further the activities of a group that committed federal crimes of terrorism," thereby "satisf[ying] the 'intent to promote' prong of the § 3A1.4 sentencing enhancement." Cordoba-Bermudez, 4 F. Supp. 3d at 647, this Court will apply the 12-level Terrorism Enhancement at his re-sentencing.

### C. Applicability of the Material Support Enhancement

In his May 14, 2026 re-sentencing submission, Saab argues that the two-level Material Support Enhancement set forth at U.S.S.G. § 2M5.3(b) is inapplicable "for the same reasons" that the Terrorism Enhancement is inapplicable. (May 14, 2026 Def. Resentencing Br. (Dkt. No. 303) at 7) The Government does not address the applicability of the Material Support Enhancement in either of its resentencing submissions.

#### 1. Applicable Law

U.S.S.G. § 2M5.3(b) provides that

> [i]f the offense involved the provision of (A) dangerous weapons; (B) firearms; (C) explosives; (D) funds with the intent, knowledge, or reason to believe such funds would be used to purchase any of the items described in subdivisions (A) through (C); or (E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act, increase by 2 levels.

Id.

The Application Notes to Section 2M5.3 state that, "[f]or the purposes of this guideline[,] . . . '[m]aterial support or resources' has the meaning given that term in 18 U.S.C.

§ 2339B(g)(4)." U.S. Sent'g Guidelines Manual § 2M5.3 cmt. n.1 (U.S. Sent'g Comm'n 2021). "As used in [Section 2339B(g)] . . . the term 'material support or resources' has the same meaning given that term in Section 2339A (including the definitions of 'training' and 'expert advice or assistance' in that section)." 18 U.S.C. § 2339B(g)(4). As used in Section 2339A,

> [t]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

**2. <u>Analysis</u>**

Saab submits that, "[a]t the original [sentencing], this enhancement was held applicable based on a finding that [] Saab provided material support to Hizballah with the intent and knowledge that such support would be used to assist in the commission of a violent act." (May 14, 2026 Def. Resentencing Br. (Dkt. No. 303) at 7-8 (citing May 23, 2023 Sentencing Tr. (Dkt. No. 286) at 17)) Saab now argues, however, that the Material Support Enhancement does not apply because (1) "Saab is not alleged to have provided Hizballah with weapons, firearms, explosives, or funds"; and (2) "in the wake of Amendment 826 . . . such a finding would be inconsistent with the jury's verdict of acquittal on Count One." (<u>Id.</u>)

At sentencing, this Court determined that "the guideline for [a] violation of 18 United States Code section 2339D is found in U.S.S.G. section 2X5.1, which instructs courts to 'apply the most analogous offense guideline' if 'the offense is a felony for which no guideline expressly has been promulgated.'" (May 23, 2023 Sentencing Tr. (Dkt. No. 286) at 17) This Court went on to say that "the [P]robation [O]ffice states, and the parties do not dispute, that the most analogous offense guideline is section 2M5.3 of the [S]entencing [G]uidelines, which is the

guideline applicable to providing material support or resources to designated foreign terrorist organizations." (Id. (citing Dec. 19, 2022 Amended PSR (Dkt. No. 265) ¶ 75)) This Court concluded that, because "the offense charged in [C]ount [Four] involved dangerous weapons, firearms, and explosives, and it involved the provision of material support or resources with the intent, knowledge, or reason to believe that they were to be used to commit or assist in the commission of a violent act, a two-level [] upward adjustment applies." (Id.)

The two-level Material Support Enhancement applies here because Saab's Section 2339D offense ""involve[d] the provision of . . . material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." U.S.S.G. § 2M5.3 (2021). In receiving military-type training from Hizballah, Saab provided "material support or resources" in the form of "personnel" to Hizballah. See 18 U.S.C. § 2339A(b)(1) ("[T]he term 'material support or resources' means any . . . service, including . . . personnel (1 or more individuals who may be or include oneself)."). Saab also conducted "preoperational surveillance" of "official buildings, landmarks, and bridges and tunnels" in New York City, Boston, and Washington, D.C., and then summarized his findings in a written report that he provided to Hizballah "to facilitate [the organization's] bombing operations against those targets." (Apr. 26, 2022 Tr. (Dkt. No. 213) at 333, 190)

As this Court stated at Saab's May 23, 2023 sentencing, "[Saab] provided this pre-operational surveillance information to one of the world's most dangerous terrorist organizations. He knew that the information he provided to Hizballah might be used in a subsequent terrorist attack aimed at innocent civilians on United States soil. The fact that no Hizballah attack took place on American soil does not excuse Saab's conduct." (May 23, 2023 Sentencing Tr. (Dkt. No. 286) at 51-52)

In sum, the evidence at trial demonstrates that Saab (1) provided material support to Hizballah by, inter alia, conducting pre-operational surveillance on the organization's behalf; and (2) performed this "service . . . with the intent, knowledge, or reason to believe [that the results of his pre-operational surveillance were] to be used to commit or assist in the commission of a violent act." See U.S.S.G. § 2M5.3(b). For these reasons, the Material Support Enhancement will be applied at Saab's re-sentencing.[3]

## CONCLUSION

For the reasons stated above, the Terrorism Enhancement, U.S.S.G. § 3A1.4, and the Material Support Enhancement, U.S.S.G. § 2M5.3(b), will be applied at Saab's re-sentencing.

Dated: New York, New York
August 12, 2026

SO ORDERED.

Paul G. Gardephe
United States District Judge

[3] Although Saab argues that – in light of Amendment 826 – application of the Material Support Enhancement "would be inconsistent with the jury's verdict of acquittal on Count One," as explained above, Amendment 826 has no bearing here, because it was enacted after Saab's May 23, 2023 sentencing, and this Court is obligated to apply the Guidelines in effect as of the time of that sentencing.